ACCEPTED
03-16-00761-CV
13800262
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/15/2016 1:42:07 PM
JEFFREY D. KYLE
CLERK

**Texas A&M University School of Law**
## Texas A&M Law Scholarship

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

11/15/2016 1:42:07 PM

JEFFREY D. KYLE
Clerk

Faculty Scholarship

1999

# Parallel Litigation

James P. George

*Texas A&M University School of Law*, pgeorge@law.tamu.edu

Follow this and additional works at: http://scholarship.law.tamu.edu/facscholar

 Part of the Law Commons

Recommended Citation

James P. George, *Parallel Litigation*, 51 Baylor L. Rev. 769 (1999).
Available at: http://scholarship.law.tamu.edu/facscholar/427

This Article is brought to you for free and open access by Texas A&M Law Scholarship. It has been accepted for inclusion in Faculty Scholarship by an authorized administrator of Texas A&M Law Scholarship. For more information, please contact sphillips64@law.tamu.edu.

# PARALLEL LITIGATION*

## James P. George**

## TABLE OF CONTENTS

I.   PARALLEL LAWSUITS--AN OVERVIEW ............................................. 773
     A.  *Parallel Litigation Defined and Distinguished* ........................... 773
     B.  *The Milieu--Four Distinct Settings for Parallel Litigation* .......... 776
     C.  *The Remedies: Five Responses to Parallel Litigation* ................. 777
         1.  Do Nothing ................................................................ 777
         2.  Transfer and Consolidation ....................................... 777
         3.  Dismissals and Stays (and Abatements) ..................... 778
         4.  Antisuit Injunctions ................................................. 780
     D.  *The Common Doctrines: Six Themes in Parallel Litigation* ....... 782
         1.  The First-Filed Case ................................................ 782
         2.  In Rem Cases .......................................................... 782
         3.  Declaratory Actions ................................................ 782
         4.  Degree of Similarity ................................................ 783
         5.  Discretionary Standard ............................................ 783
         6.  Comity ................................................................... 783
     E.  *The Slow Development of Precedent and Federal Court*
         *Prominence* ............................................................... 784
     F.  *Unitary Discussions* ..................................................... 785
     G.  *Terminology* .............................................................. 785
II.  INTRAJURISDICTIONAL LITIGATION ........................................... 785
     A.  *Intra-Federal Parallel Litigation* ....................................... 785
         1.  Who filed first? ...................................................... 788
         2.  In rem cases ........................................................... 788
         3.  Statutory Preemption ............................................... 788
         4.  Which court decides? ............................................... 789
     B.  *Transfer and Consolidation* ............................................ 789
         1.  Consolidation Within the Same Division ..................... 789
         2.  Move to Another Division Within the District ............... 789
         3.  Move to Another Division or District to Correct Venue ....... 790
         4.  Transfers Based on Forum Selection Agreement ............ 791

---

*The author is grateful to Professors Anna Teller and Susan Phillips, and law librarian Wendy Law, for significant help in researching and rewriting this article, and to attorneys Brian Stagner, Lu Pham, Albon Head, and Jeff Bragalone for valuable editorial suggestions.
**Professor of Law, Texas Wesleyan University School of Law.

      5.  Inconvenient Forum Transfers ............................................. 792

      6.  Multidistrict Transfer of Multiple Cases for Consolidated
         Pretrial Proceedings ............................................... 795

  C.  *Dismissal* ........................................................................ 796

      1.  Voluntary Dismissals and The "Two Dismissal Rule" .......... 796

      2.  Involuntary Dismissals ............................................. 797

  D.  *Stays in Favor of Other Federal Court Litigation* ....................... 799

      1.  The Landis Case ..................................................... 799

      2.  Various Tests in the Circuits ...................................... 801

      3.  Stay of Derivative Suits ............................................ 807

      4.  Enjoining Other Federal Litigation ............................... 808

III.  INTRASTATE PARALLEL LITIGATION ............................................ 813

  A.  *Consolidation and Transfers In Texas* ................................... 813

      1.  Consolidation Within One Court .................................. 813

      2.  Transfers within a Judicial District ............................... 813

      3.  Transfers Between Different Judicial Districts in the Same
         State ................................................................... 814

         *a.*  *Improper Venue* ............................................... 814

         *b.*  *Impartiality* ................................................... 814

         *c.*  *Consent* ........................................................ 814

         *d.*  *Inconvenient Forum* .......................................... 815

         *e.*  *Multidistrict Transfer* ....................................... 815

  B.  *Stays, Dismissals and Injunctions: Texas and Other States* ........ 816

      1.  General Principles .................................................. 816

      2.  Statutory Dismissal ................................................ 819

IV.  INTERSTATE PARALLEL LITIGATION ......................................... 820

  A.  *"Transfers" to a Sister State* ............................................ 820

  B.  *Dismissing or Staying the Local Action* ............................... 821

      1.  Dismissal Under the First-Filed Rule ........................... 822

      2.  Dismissal of the Second-Filed Declaratory Action .............. 825

      3.  Dismissals Based on Forum Selection Agreements .............. 826

      4.  Interstate Forum Non Conveniens ............................... 832

      5.  Staying the Local Action ........................................... 837

  C.  *Antisuit Injunctions Against Sister State Litigation* ................. 840

      1.  General Principles in Texas ....................................... 841

      2.  Other States ........................................................ 848

      3.  Refusal to Recognize Another State's Injunction .................. 849

V.  FEDERAL COURTS AND PENDING STATE LITIGATION ...................... 849

  A.  *Transferring the Federal Case to State Court* ............................. 850

  B.  *Dismissing the Federal Action Based on a Forum Selection
      Agreement* ..................................................................... 851

C.  *Stays and Dismissals Based on the Abstention Doctrines* ............ 854
    1.  Colorado River Abstention:  Economy, Convenience and
        "Wise Judicial Administration" ............................................. 855
        a.  *Moses Cone and Wilton Refine the Test* ........................ 860
        b.  *Other Federal Tests for State-Federal Parallels* ........... 863
    2.  Dismissals or Stays Based on Federalism-The Other
        Abstention Doctrines ........................................................ 864
        a.  *Pullman Abstention--Unclear State Law with*
            *Constitutional Implications* ........................................... 864
        b.  *Burford Abstention--Avoiding Conflict With Complex*
            *State Regulatory Systems* ............................................... 870
        c.  *Thibodaux Abstention: Difficult Questions of State*
            *Law* ........................................................................... 872
    3.  Abstention Procedure:  Reserving Rights to a Federal
        Forum ............................................................................. 874
D.  *Enjoining the State Action* ..................................................... 875
    1.  The Younger/Pennzoil Doctrine and Equitable Abstention... 876
        a.  *The Younger and Pennzoil Cases* ................................... 876
        b.  *Younger's Application in Civil Cases* ............................. 879
        c.  *Perfecting a Younger Objection* ..................................... 881
    2.  Statutory Abstention: The Anti-Injunction Act ...................... 881
        a.  *"Expressly Authorized" Injunctions* ............................... 882
        b.  *Injunctions "In Aid of Its Jurisdiction"* .......................... 885
        c.  *Injunctions to Prevent Relitigation* ................................ 888
E.  *Summary of Limits on Federal Courts Enjoining State Court*
    *Litigation* ............................................................................. 896
VI.  STATE COURTS AND PENDING FEDERAL LITIGATION ......................... 897
A.  *"Transfers" from State to Federal Court: Federal Removal* ....... 897
B.  *Dismissing or Staying the State Case* ..................................... 898
    1.  Forum Selection Clauses ..................................................... 898
    2.  Other Grounds ................................................................... 898
    3.  Enjoining the Federal Litigation ........................................... 901
VII.  FEDERAL COURTS AND FOREIGN LITIGATION ................................... 904
A.  *Dismissing or Staying the Federal Action* ................................ 904
    1.  The General In Personam Tests:  Landis and
        Colorado River ................................................................. 905
        a.  *The First-to-Judgment Rule, the Laissez-Faire*
            *Approach* ..................................................................... 909
        b.  *Comity as a stand-alone test* .......................................... 910
    2.  Dismissals Based on Forum Selection Agreements ............... 912

        a.   *Five Foundational Cases*..............................................913
            i.   *The Bremen v. Zapata Off-Shore Company*..............913
            ii.  *Scherk v. Alberto-Culver Co.*.....................................916
          iii.  *Mitsubishi Motors Corp. v. Soler Chrysler-*
               *Plymouth, Inc.* .........................................................918
           iv.  *Stewart Organization, Inc. v. Ricoh Corp.*.................920
            v.   *Carnival Cruise Lines, Inc. v. Shute* .........................921
        b.   *Divergence as to Governing Law*....................................923
        c.   *Intrajurisdictional Cases*...............................................925
        d.   *Interstate Cases* ...........................................................926
        e.   *State-Federal Cases*......................................................926
        f.   *International Cases* .......................................................928
            i.   Federal Question Cases......................................929
            ii.  Diversity Cases Applying Federal Law to the
               Forum Clause ..................................................931
          iii.  Diversity Cases Applying State Law to the Forum
               Clause.............................................................935
           iv.  Undecided as to Which Law Governs in Diversity
               Cases .............................................................936
        g.   *What Law Governs Interpretation?*..............................937
        h.   *The Prorogation Distinction*..........................................938
        i.   *Form of Motion and Standard of Review* .......................941
        j.   *Ensuring the Case's Survival* .......................................941
    3.  Forum non conveniens dismissals ............................942
        a.   *Generally*.......................................................942
        b.   *Removal to Federal Court to Obtain Different Forum*
            *Non Conveniens Law*......................................................946
        c.   *Enjoining Repetitive Litigation of Foreign Claims*
            *Previously Dismissed on Forum Non Conveniens*
            *Grounds* ...................................................................949
    4.  Dismissal or Stay of In Rem Cases............................950
  B.  *Federal Injunctions Against Foreign Litigation* .......................953
    1.  Historical Development .......................................953
    2.  Current Law .................................................955
    3.  Miscellaneous Points.........................................966
VIII.  STATE COURTS AND FOREIGN LITIGATION ............................969
  A.  *Transferring the Case*.........................................970
  B.  *Dismissing or Staying the Local Case*..........................970
    1.  Comity.........................................................971
    2.  Forum Selection Agreements.................................974
    3.  Forum Non Conveniens .......................................975

    4. Another Dismissal Ground: Due Process and the Fair
       Play and Substantial Justice Test ............................................ 979
  C. *Enjoining the Foreign Litigation* .................................................. 981
    1. The Basic Standard ................................................................ 981
    2. Anti-Antisuit Injunctions ...................................................... 986

## I. PARALLEL LAWSUITS--AN OVERVIEW

The keynote speaker at Fort Worth's 1999 bar awards banquet, Dee Kelly, has stories about people and places in a career that began on Speaker Sam Rayburn's congressional staff. Some of the audience no doubt would have preferred his recollections to the intense address he delivered. His choice—"What To Do When Your State Court Action is Collaterally Attacked in Federal Court"—arose from the four lawsuits generated by the airport dispute in Dallas and Fort Worth. This dispute is not the first to generate duplicative litigation,[1] and the airport fight is not Texas's most sensational example. That distinction may belong, at least for the moment, to the Dallas Cowboys' decision to promote Pepsi and Nike alongside the NFL's promotion of Coca Cola and Adidas, leading to mirror-image lawsuits in New York. Outside of Texas, the Beatles did their version in a management dispute that led to twin billings in New York and England.[2] So have Elvis,[3] Disney[4] and Caruso,[5] to name only a few. Although the tactics involved may be as old as litigation itself, their increasing high-stakes use have made parallel litigation a timely topic.

### A. Parallel Litigation Defined and Distinguished

Parallel litigation—a dispute generating multiple lawsuits—is not a new phenomenon and is not limited to celebrities or sensational controversies. Besides the publicity-generating lawsuits noted above, divorce actions have a long history of parallel lawsuits and conflicting judgments. Recent years have seen an expansion both in the incidence and the subject matter of parallel lawsuits, perhaps fueled by the traditional motivations of home-

---

[1]*See* Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 87-89 (5th Cir. 1977) (involving suits between Southwest Airlines and Dallas, filed in both federal and state courts).

[2]*See* Abkco Indus., Inc. v. Lennon, 377 N.Y.S.2d 362 (N.Y. App. Div. 1975)

[3]*See* Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 217 (2d Cir. 1978).

[4]*See* Muller v. Walt Disney Prod., 822 F. Supp. 1033, 1034 (S.D.N.Y. 1993).

[5]*See* Caruso v. Caruso, 143 A. 771, 772 (N.J. Ch. 1928), *rev'd* 148 A. 882 (N.J. 1930).

court advantage and differing laws, along with the expansion of personal jurisdiction rules in the past fifty years.[6]

In spite of this increase, the vocabulary remains imprecise and ambiguous. Parallel litigation would seem to mean identical or mirror image lawsuits between identical parties, but is often used when the lawsuits are not identical. Duplicative litigation has been defined as the "simultaneous prosecution of two or more suits in which some of the parties or issues are so closely related that the judgment in one will necessarily have a res judicata effect on the other."[7] Earlier discussion have noted three categories of parallel litigation: (1) repetitive actions: multiple suits on the same claim by the same plaintiff against the same defendant; (2) reactive suits: a separate suit filed by a defendant in the first action against the plaintiff in the first action, seeking a declaratory judgment that he is not liable under the conditions of the first action or asserting an affirmative claim that arises out of the same transaction or occurrence as the first suit; and (3) separate actions by class members on the same cause of action raised in the class action, seeking to represent the same or a similar class. These categories are perfectly parallel and clearly subject to claim and issue preclusion, along with arguments that simultaneous prosecution is inefficient and wasteful.[8] A distinct fourth category is "related litigation": separate suits involving similar parties or issues to which claim preclusion may not apply, but eligible for issue preclusion and to a lesser extent, subject to the same arguments as to wasteful litigation. Treatment here includes all four categories, with distinctions drawn as to their differing treatment in varying jurisdictions.

In discussing these cases and their remedies, this Article will use the terms "parallel" and "duplicative" interchangeably, in reference both to identical and mirror image lawsuits, as well as substantially similar lawsuits with common questions of law or fact between substantially—but not always perfectly—identical parties. This Article discusses (1) repetitive suits by the same plaintiff against the same or similar defendants,[9] (2) reactive suits filed by the defendant in the first action

---

[6]*See* G. BORN, INTERNATIONAL CIVIL LITIGATION IN UNITED STATES COURTS 459 (3d ed. 1996) (hereinafter BORN, INTERNATIONAL CIVIL LITIGATION).

[7]R. MARCUS & E. SHERMAN, COMPLEX LITIGATION 104 (3d ed. 1998).

[8]*See id.* at 147-48 (citing Vestal, *Repetitive Litigation*, 45 IOWA L. REV. 525 (1960), and Vestal, *Reactive Litigation*, 47 IOWA L. REV. 11 (1961)).

[9]*See* Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1200-01 (2d Cir. 1970); Foyt v. Championship Auto Racing Teams, Inc., 947 F. Supp. 290, 291-92 (S.D. Tex. 1996).

against the plaintiff in the first action,[10] (3) declaratory judgment suits filed by a current or potential defendant lacking any real affirmative claim,[11] and (4) separate actions by class members on the same cause of action raised in the class action.[12]

Most of the cases discussed are reactive and anticipatory suits where the defendant in the first case becomes the plaintiff in the second suit in a different court, perhaps in a different state or country. In the two lawsuits, both plaintiffs may believe their respective choice of forum to be more appropriate, or even essential to success. Both plaintiffs may be reluctant to forego their choice of forum, even though the entire lawsuit may be litigable in one court.

Some of the cases are repetitive suits, and there are many reasons for a party to file two lawsuits in the same matter. Three reasons are that (1) the plaintiff anticipates a real or imagined jurisdictional flaw in the first lawsuit, and files the second to beat the limitations period, (2) the first forum makes a preliminary ruling that displeases the plaintiff, or (3) without any ruling or action by the first forum, the plaintiff experiences "post-filing dissonance" from discomfort with the judge, the type of court, the locale, or some other aspect of the first lawsuit. Plaintiffs who file a second lawsuit in the same matter often file a voluntary dismissal or nonsuit in the first case. Some do not nonsuit, and that leads to repetitive parallel litigation, and possibly reactive litigation. For example, assume that P sues D in Forum A, and D then counterclaims against P. P now decides that Forum A is undesirable because of the judge, locale, type of court, a bad preliminary ruling, or P's intuition and files a second lawsuit in Forum B that provides what P perceives as a better setting. Now the lawsuit has two affirmative claimants, each desiring a distinct forum, in what are now reactive suits that may both be aggressively pursued.[13]

Yet another example is duplicative (but not quite parallel) litigation in which a dispute is being litigated in two or more forums with somewhat different parties and/or slightly different claims, but with significantly overlapping parties, issues and claims. This example is not to suggest that every time different lawsuits have overlapping issues or parties that they

[10]*See* Manufacturers Hanover Trust Co. v. Kingston Investors Corp., 819 S.W.2d 607, 609 (Tex. App.--Houston [1st Dist.] 1991, no writ).

[11]*See* William Gluckin & Co., v. International Playtex Corp., 407 F.2d 177, 177-78 (2d Cir. 1969); Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970).

[12]Katz v. Realty Equities Corp. of New York, 521 F.2d 1354, 1357 (2d Cir. 1975).

[13]*See Semmes Motors, Inc.*, 429 F.2d at 1202-03.

are necessarily duplicative. To the contrary, many lawsuits in modern litigation are repetitive and overlapping, but not duplicative. When the lawsuits have a sufficient degree of overlap, or are identical, concerns may arise as to the efficient use of the parties' and taxpayers' resources. This Article explores the remedies for duplicative lawsuits and highlight a few special problems in using those remedies.

One category of overlapping lawsuit that is not primarily featured in this Article is the derivative suit. Some disputes involving multiple litigation are not truly parallel or duplicative, but instead involve an underlying suit with a later derivative. Two examples are (1) an underlying action for liability where the defendant's insurer files a derivative declaratory action to assert nonliability,[14] and (2) an underlying action in which a plaintiff's attorney has allegedly committed malpractice, and the plaintiff's immediate derivative action for malpractice is filed before the underlying action is final.[15] These multiple disputes are neither reactive nor repetitive. They often do not lend themselves to resolution under the standard remedies for parallel litigation and instead may have distinct tests. This category of multiple lawsuits is generally not addressed here and when discussed is noted separately.

## B.  *The Milieu--Four Distinct Settings for Parallel Litigation*

The problems and tactical opportunities of parallel or related litigation occur in four settings: (1) within the same jurisdiction, (2) between states in the United States, (3) between the state and federal systems, and (4) internationally. This discussion is organized under those headings. The state and federal court approaches to these conflicts are similar in many instances and identical in some. In spite of this similarity, this study avoids consolidating different jurisdictions' approaches because of a danger of quickly concluding that the law is homologous when it is not. In many jurisdictions, there have been too few cases to permit development of a well-considered policy for dealing with jurisdictional conflicts. Moreover, the emergence of a more cohesive international community may cause changes in the law.

The court's authority and willingness to remedy duplicative litigation draws on a number of conflicting doctrines and policies. These include honoring the plaintiff's choice of forum, favoring the first-filed lawsuit, reluctance to dismiss an action that has proper jurisdiction and venue,

---

[14]*See* Montrose Chem. Corp. v. Superior Court, 861 P.2d 1153, 1555-56 (Cal. 1993).
[15]*See* Adams v. Paul, 904 P.2d 1205, 1207 (Cal. 1995).

avoidance of waste, convenience to parties, respect paid to coordinate courts and governments, and federalism concerns in state-federal conflicts.

## C. The Remedies: Five Responses to Parallel Litigation

Litigants who find themselves in parallel litigation may choose from five responses: (1) do nothing and continue to litigate both cases, (2) transfer and consolidation, (3) dismissal, (4) stay, and (5) antisuit injunctions. The Article discusses the latter four generally in that sequence within each category, varying where the law combines two remedies, such as dismissals and stays. The definitions immediately below provide a common entry point for their application in the various jurisdictional conflicts.

### 1. Do Nothing

Except for actions concerning real property, an outright bar to parallel or related lawsuits does not exist in state and federal courts in the United States.[16] There are, however, discretionary legal doctrines which may cause the excessive suits to be dismissed, abated, enjoined, or transferred. Parties to duplicative litigation may find relief in one or more of the four remedies discussed below. On the other hand, if an attorney wishes to use duplicate litigation, and the strategy is under attack by one of the motions discussed below, these cases also provide the best defenses.

### 2. Transfer and Consolidation

Transfers and consolidations are distinct procedural functions, available only within the same jurisdiction. This may be changing. Currently, there are inter-jurisdictional means of moving disputes. Forum non conveniens and enforcement of a forum selection agreement are examples, but these methods are accomplished by dismissing in one forum and refiling in the other. There are also proposals for inter-jurisdictional transfers in the form of uniform acts and treaties, but few jurisdictions have adopted this option.[17] Within the jurisdiction, transferring a case for consolidation with a parallel case is often unnecessary. Instead, parties merely amend one of the lawsuits to add the necessary claims and parties from the other lawsuit. Transfer and consolidation may be necessary, however, to preserve claims that for any reason may not be added by amendment. An example involves

---

[16]*See* Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466 (1939); Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926-27 (D.C. Cir. 1984).

[17]*See infra* Part IV.A.

a claim where a limitations period has run. Other reasons include using discovery gathered in the transferred case and taking advantage of the transferor court's preliminary rulings, which would be lost if the court dismissed the case.

### 3. Dismissals and Stays (and Abatements)

The third and fourth responses to parallel litigation are dismissal and stay, discussed together because of the confusion arising from the ambiguous use of the term "abatement," which can mean both dismissal and stay. A dismissal ends the case, usually without prejudice.[18] Dismissal may not be the preferred option because it (1) terminates a lawsuit with proper jurisdiction and venue, (2) upends the timetable in that case, and (3) assumes a perfect identity with the parallel case, or at least sufficient similarity that no claims are lost or other prejudice results. Nonetheless, dismissal is available in several forms as discussed below. In both state and federal courts, these forms include voluntary dismissals (either unilaterally by the plaintiff or by stipulation), involuntary dismissal pursuant to comity, and forum non conveniens dismissals.

A stay is a court's temporary suspension of the prosecution of its own case. "Stay" sometimes describes a temporary suspension imposed by another court, either on a party or the court.[19] One example is a bankruptcy court's automatic "stay" of related civil proceedings, and another is the editor's title choice for the federal Anti-Injunction Act, which is termed a "Stay of State court proceedings."[20] This use may be a legitimate meaning for stay, but it is less confusing to limit the term to a court's self-imposed suspension of proceedings. Upon request, a court may suspend prosecution of its own action, pending resolution of the other case. If the other case becomes final (that is, it is decided on the merits by a competent court, and becomes final under the law of the rendering state or country), it should have a preclusive effect as to the stayed action which can then be dismissed. On the other hand, if the parallel case does not result in a valid and final judgment on the merits, then the stayed case may be revived and litigated. If circumstances change during the stay, it may be lifted for good cause. Case law, however, does not offer examples of this procedure in stays imposed based on parallel litigation.

---

[18]*But see* the "two dismissal" rule, *infra* at Part II.C.1.

[19]*See* 28 U.S.C. § 2283 (1994).

[20]*See id.*

Abatement is a more difficult term to understand because it can mean both stay and dismissal. The Seventh Circuit has defined "abatement" as "the overthrow or destruction of a pending action . . . which defeats the action for the present, but does not debar the plaintiff from commencing it in a better way."[21] Black's Law Dictionary echoes that definition, defining "Abatement of Action" as "an entire overthrow or destruction of the suit so that it is quashed and ended."[22] On the other hand, "Plea in Abatement" is defined as something that "merely suspends or postpones" the action's prosecution.[23] Texas case law usage reflects this meaning, without referring to Black's Law Dictionary.[24] One Texas statute uses the term "abatement" to describe a sixty-day suspension of prosecution arising from the plaintiff's failure to provide written notice of the complaint prior to filing suit.[25] The first two meanings are consistent with dismissal, the last three with a stay. An 1870 South Carolina case may explain this inconsistency:

> The effect of an abatement at law and in equity is materially different. "In the sense of Courts of Equity, an abatement signifies only a present suspension of all proceedings in the suit from the want of proper parties capable of proceeding therein. At the common law, a suit, when abated, is absolutely dead."[26]

This distinction may have been lost with the merger of law and equity in federal and most state courts. Whatever the reason for the conflicting usage, this Article will avoid the term "abatement" where possible, using dismissal or stay as indicated in the specific case. Where the case refers to "abatement," this Article will note such usage and attempt to describe whether the effect was a stay or dismissal.

One other distinction must be made between stays and dismissals. Logically, dismissals are preferred over stays for duplicative litigation within the same jurisdiction, while stays are preferred over dismissals (if a remedy is available at all) for parallel cases in multiple jurisdictions. The

---

[21]Bowles v. Wilke, 175 F.2d 35, 37-38 (7th Cir. 1949).

[22]BLACK'S LAW DICTIONARY 4 (6th ed. 1990) (quoting Carver v. State, 398 S.W.2d 719 (1966)).

[23]*Id.* at 1151 (citing United States v. Brodson, 234 F.2d 97, 99 (7th Cir. 1956)).

[24]*See* Miles v. Ford Motor Co., 914 S.W.2d 135, 139 (Tex. 1995).

[25]*See* TEX. BUS. & COM. CODE ANN., § 17.505(d)(Vernon Supp. 1999).

[26]Pringle v. Sizer, 2 S.C. 59, 68 (1870) (quoting JOSEPH STORY, COMMENTARIES ON EQUITY PLEADING § 354 (C.C. Little & J. Brown 1848)).

use of dismissals for local duplication is more economical, while the use of stays for interjurisdictional conflicts reflects courts' greater reluctance to extinguish a case and expose the local plaintiff to the mercy of a distant forum. Stays provide the protection of reviving the case in the event of problems in the other forum. Where dismissals are available in interjurisdictional conflicts the test is a heightened one, often linked to forum non conveniens analysis.[27] The test for stays, on the other hand, may be as simple as the "first-filed rule."[28] One exception to the no-dismissal rule involves in rem cases, where courts will generally dismiss in deference to the court first assuming control over the property.[29]

## 4. Antisuit Injunctions

A fourth option is to ask the court to enjoin the opposing party from pursuing the other case.[30] This option is especially appropriate when the other court may not grant a motion to stay its own action.[31] The injunction applies only to the party being enjoined; it does not apply to the court or judge presiding over the parallel case.[32] In other words, courts of original jurisdiction may not enjoin each other.[33] However, an appellate court with jurisdiction over a trial court may freeze the litigation in the lower court where a court improperly denied a motion for stay.[34]

One treatise describes four applications for antisuit injunctions: (1) stopping litigation of the same dispute in another forum; (2) consolidating related-but-not-identical claims in the moving party's preferred forum, (3) stopping the relitigation of a completed case in another forum, and (4) a counter-injunction, or anti-antisuit injunction to prevent the opponent from seeking an antisuit injunction in another forum.[35] Stays and dismissals may achieve the same objectives, however, antisuit injunctions may be most effective when the "other" forum is unlikely to grant the stay or dismissal.

The antisuit injunction remedy began as an intrajurisdictional device in fifteenth century England, where common law courts issued writs of

---

[27]*See, e.g.,* White Light Prods., Inc. v. On The Scene Prods., Inc., 660 N.Y.S.2d 568 (1997); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 84 cmt. e (1971).

[28]*See infra* text accompanying notes 63-85.

[29]*See id.*

[30]*See* 16 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3923 (2d. ed. 1996).

[31]*See id.*

[32]*See id.*

[33]*See id.*

[34]*See id.*

[35]BORN, INTERNATIONAL CIVIL LITIGATION, *supra* note 6, at 475.

prohibition to undermine the expansion of ecclesiastical courts' jurisdiction.[36] The chancery courts adopted the remedy, using their equitable power to restrain parties from bringing related suits in common law courts.[37] Antisuit injunctions were eventually used to enjoin foreign proceedings, which Professor Bermann cites as its most common use in English courts today.[38]

Today, state courts have the power to enjoin litigation (1) within the same state, pursuant to that state's law, with no constitutional or international law hurdles to clear;[39] (2) in sister state courts under the common law doctrine of comity;[40] and (3) in foreign countries.[41] State courts may not enjoin federal litigation absent extraordinary circumstances such as maintaining the court's in rem jurisdiction.[42] A federal court's power is similar. A federal court may restrain federal litigation,[43] state litigation where the effect would be to defeat or impair the jurisdiction of the federal court,[44] and foreign litigation under the doctrine of comity and the limits discussed in *Gau Shan Co., Ltd. v. Bankers Trust Co.*[45]

Injunction is the most controversial of the remedies for parallel litigation because it interferes with another court's power, often in another state or country. As noted above, the injunction is against the party, not against the other court.[46] Some courts and commentators, however, suggest that this is a meaningless distinction and that the other forum may perceive that its powers are being challenged or compromised.[47]

---

[36]*See* George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 COLUM. J. TRANSNAT'L L. 589, 593 (1990) (hereinafter Bermann, *Anti-Suit Injunctions*).

[37]*See id.* at 593-94.

[38]*See id.*; *see also* Hartley, *Comity and the Use of Antisuit Injunctions in International Litigation*, 35 AM. J. COMP. L. 487, 489 (1987).

[39]*See* Gannon v. Payne, 706 S.W.2d 304, 305-06 (Tex. 1986).

[40]*See* Christensen v. Integrity Ins. Co., 719 S.W.2d 161, 163 (Tex. 1986).

[41]*See Gannon,* 706 S.W.2d at 305-06 (noting that this power is accompanied by a "caveat of limited use").

[42]*See* Donovan v. City of Dallas, 377 U.S. 408, 412 (1964); *cf.* University of Tex. v. Morris, 344 S.W.2d 426, 428 (Tex. 1961).

[43]*See* Municipal Energy Agency of Miss. v. Big Rivers Elec. Corp., 804 F.2d 338, 343 (5th Cir. 1986).

[44]*See* Kline v. Burke Constr. Co., 260 U.S. 226, 229 (1922).

[45]*See* Gau Shan Co. v. Bankers Trust Co., 956 F.2d 1349, 1354-55 (6th Cir. 1992).

[46]*See Gannon,* 706 S.W.2d at 306.

[47]*Id.* at 306-07(citing Laker Airways v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984)); *see also* Total Minatome Corp. v. Santa Fe Minerals, Inc., 851 S.W.2d 336, 339 n.5 (Tex. App.--Dallas 1993, no writ); BORN, INTERNATIONAL CIVIL LITIGATION, supra note 6 at 476 nn. 39-40; Trevor C. Hartley, *Comity and the Use of Antisuit Injunctions in*

## D. *The Common Doctrines: Six Themes in Parallel Litigation*

Six points transcend these remedies, some with consistent applications and some varied according to the setting and the law of a specific jurisdiction.

### 1. The First-Filed Case

In intrajurisdictional conflicts, there is a heavy presumption favoring the first-filed case, but it may be overcome by a party's misconduct (such as forum shopping) or important state interests. The first-filed rule appears irregularly in other settings, varying from a mere element of a larger test to the same presumptive strength it has in intrajurisdictional settings.

### 2. In Rem Cases

The first-filed presumption is stronger for in rem cases, which almost invariably defer to the first-filed action as noted in *Princess Lida of Thurn and Taxis v. Thompson*.[48] In many jurisdictions, the presumption is weaker to non-existent for parallel case conflicts involving another jurisdiction, including state-federal conflicts within the same territory. Because of the dominance of the first-filed rule for in rem cases, readers should assume that cases discussed herein are in personam unless stated otherwise.

### 3. Declaratory Actions

Declaratory actions are suspect when they are mirror images of the other suit, but that alone will not cause one to be dismissed. In many jurisdictions, a second-filed declaratory action is dismissed as a matter of law if it seeks no greater relief than the first-filed action. In some jurisdictions, this applies to first-filed declaratory actions under certain circumstances, such as a perception that the first plaintiff was merely forum shopping.

---

*International Litigation*, 35 AM. J. COMP. L. 487, 506 (1987); William L. Reynolds, *The Proper Forum for a Suit: Transnational Forum Non Conveniens and Counter-suit Injunctions in the Federal Courts*, 70 TEX. L. REV. 1663, 1713 (1992) (citing George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 COLUM. J. TRANSNAT'L L., 589, 629 (1990)).

[48]305 U.S. 456, 466 (1939). *See infra* Part VII.A.4.

## 4. Degree of Similarity

To the extent that identity of parties and claims is an issue, the meaning of identity varies broadly among jurisdictions, and sometimes among courts within a jurisdiction

## 5. Discretionary Standard

The legal issues that resolve conflicts in parallel litigation are generally discretionary.

## 6. Comity

Some remedies rely on comity in various forms and to various degrees, with some states' remedies based entirely on comity. As a legal doctrine, comity is weak, imprecise and unreliable. Nonetheless, it has given many courts a nail on which to hang a ruling. Comity's weakness derives from its nonbinding nature-it is designed to promote friendly relations between sovereigns and not to protect private rights. Its disfavor is reflected in its omission from the Restatement (Second) of Conflict of Laws, although that may be the result of the drafters' wish to compensate for the over-emphasis on comity in earlier choice of law theories.[49] Comity does receive somewhat greater mention in the Restatement (Third) of Foreign Relations Law of the United States,[50] discussing (1) its role in international law;[51] (2) extraterritorial application of antitrust law;[52] (3) enforcement of foreign judgments;[53] (4) "reasonableness";[54] and (5) in the introductory note to Part IV discussing prescriptive jurisdiction. Even so, these five references are seemingly minimal treatment for a concept that is pervasive in American courts, reflecting the dim view that scholarly texts have of the doctrine.[55] On the other hand, sufficient prolonged use of a nonbinding, nonlegal doctrine can result in its ripening into a legal doctrine capable of predictable application. It is difficult to determine whether this is the case with regard to comity, in spite of the increased application of comity in interstate and international procedural matters. In light of this uncertainty,

---

[49]RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971).

[50]RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES (1987).

[51]*See id.* § 101, cmt. e.

[52]*See id.* § 415, note 4.

[53]*See id.* § 481, note 1.

[54]*See id.* § 402, cmt. a.

[55]*See* EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS 11-15 (2d ed. 1992) (discussing comity and its critics); *see also* James Paul George & Fred C. Pedersen, *Conflict of Law,* 41 SW. L.J. 383, 409-10 nn.217-21 (1987)

a lawyer should be aware of comity's arguably suspect status as a legal norm and be prepared either to challenge or defend its application.

## E. The Slow Development of Precedent and Federal Court Prominence

Precedent developed slowly for the doctrines and remedies discussed here. The reasons are speculative, but most prominent may be the distance that inhibited all but local parallel litigation until the most recent decades. To the extent that remedies were available, parties in parallel lawsuits may not have raised them as often, instead preferring races to judgment to gain a preclusion and execution advantage. Another reason may be the interlocutory nature of these remedies and a possible non-appealability that inhibited the development of stare decisis.

In examining this doctrinal development, this Article's earlier drafts placed state courts first in each setting because of their status as courts of general jurisdiction. It was the author's initial belief that these remedies were largely based on common law that originated some time ago in state courts. However, to the contrary, some of these doctrines developed almost exclusively in federal courts.

The reasons for federal prominence are also speculative. First, orders that were appealed may have been less likely to be reported in state courts. Second, until the last fifty years American jurisprudence subscribed to a strong concept of state sovereignty, which may have discouraged remedies against parallel litigation except in intrajurisdictional conflicts. Federal courts, as components of a single judiciary, had a greater opportunity to develop rules and precedents for parallel litigation that spanned any significant distance. Third, international disputes may have been more likely to be filed in federal court or removed there for a dismissal motion. Whatever the reason, federal law provides a somewhat better history of these issues and is discussed first in each of the parallel settings.

State law discussions are nonetheless important for an accurate survey of current law. This Article focuses on Texas because of the author's familiarity with that law, but has examples from other states. Primary attention is given to states whose decisions appeared in digests more often and whose law was therefore presumably better developed, as well as to states whose law provides a contrast. A brief foreign law section provides general cites on these topics without attempting the same analysis.

## F.  Unitary Discussions

In spite of the individual treatment given each remedy in each jurisdictional setting, some topics required a unitary discussion to fully illustrate the doctrine and its development.  These unitary discussions which cover forum selection clauses, forum non conveniens, and antisuit injunctions, appear in Section VII (addressing international parallel litigation in federal courts), and are cross referenced to other specific sections.

## G.  Terminology

The paucity of writing in this area has left the terminology imprecise. As noted above, the term "parallel litigation" is itself ambiguous and is used here as a generic reference to pending related lawsuits.[56]   The term "abatement" also has conflicting definitions.  This article opts for the more precise terms "stay" and "dismissal," and attempts to identify the correct meaning for each use of "abatement" from case law or statutes.[57]   For inconvenient forum remedies, this article uses two terms.   The first, "inconvenient forum" means statutory transfers within the same jurisdiction, while the second, "forum non conveniens" refers to the common law doctrine that provides for dismissal and re-filing in a geographically distinct jurisdiction.   References to the federal practice treatise by Professors Wright, Miller, and others are made simply to "Professor Wright" or "Wright."

## II. INTRAJURISDICTIONAL LITIGATION

## A.  Intra-Federal Parallel Litigation

Federal law disfavors simultaneous federal litigation and distinguishes it from state-federal duplication.

> Generally, as between state and federal courts, the rule is
> that "the pendency of an action in the state court is no bar
> to proceedings concerning the same matter in the Federal
> court having jurisdiction . . . ." *As between federal district*

---

[56]*See* discussion *supra* at Part I.A.
[57]*See* discussion *supra* at Part I.C.3.

> *courts, however, though no precise rule has evolved, the*
> *general principle is to avoid duplicative litigation.*[58]

In the earlier *Kerotest* case, the Court had observed that solving the problem of duplicative federal litigation must involve "giving regard to conservation of judicial resources and comprehensive disposition of litigation, [and did] not counsel [a] rigid mechanical solution."[59] Instead, an evaluation of matters of equity should be made and "an ample degree of discretion" should be afforded the lower court.[60]

When faced with duplicate federal litigation, most courts use all four remedies: transfer and consolidation, dismissal, stay, and injunction,[61] although some have observed only three, omitting dismissal.[62] The common thread in exercising these remedies is the "first-to-file" rule, and its application is fairly uniform throughout the remedies. *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24* offers perhaps the best Fifth Circuit statement, holding that the Texas federal court should have heeded the first-filed rule and "stayed, dismissed, or transferred" its second-filed action in deference to the New York federal court that had jurisdiction over a broader range of issues in the dispute.[63] *West Gulf* further noted the policies underlying the first-filed rule were "comity and orderly administration of justice," both of which stress the importance of deference to prior exercised power and the efficiency and convenience of letting one court adjudicate substantially-related issues.[64]

The following brief synthesis of the first-filed rule is generally applicable to the discussion of remedies that follows. Application of the rule dictates that the first action filed takes priority unless (1) the balance of convenience strongly favors the other forum, or (2) there are special (sometimes "compelling") circumstances that justify an alternative such as

---

[58]Colorado River Water Conservation Dist. No. 7 v. United States, 424 U.S. 800, 817 (1976) (emphasis added)(citations omitted).

[59]Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952).

[60]*Id.* at 183-84. *See also* Sutter Corp. v. P & P Indus., Inc., 125 F.3d 914, 917 (5th Cir. 1997) (discussing the "first-to-file rule" of parallel federal litigation).

[61] *See* West Gulf Maritime Ass'n. v. ILA Deep Sea Local 24, 751 F.2d 721, 728-32 (5th Cir. 1985) (vacating a preliminary injunction and remanding for an order of stay, transfer, or dismissal).

[62]*See* Smith v. SEC, 129 F.3d 356, 361 (6th Cir. 1997).

[63]751 F.2d 721, 730 (5th Cir. 1985).

[64]*Id.* at 729 (quoting Washington Metro. Area Transit Auth. V. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980)).

dismissing, enjoining or transferring the first action, or allowing both to be litigated.

The balance of convenience test resembles an inconvenient forum contest under 28 U.S.C. § 1404(a).[65] The special factors are more vague, but may include the following:

(1) the similarity of the claims, though perfect identity is not required;[66]

(2) the relative progress of the two cases;[67]

(3) the existence of a forum selection clause;[68]

(4) a plaintiff's need to litigate that claim individually rather than join a class;[69]

(5) the need to consolidate related actions;[70]

(6) multidistrict litigation transfer for pretrial purposes;[71]

(7) lack of notice of the first-filed claim;[72]

(8) having jurisdiction over necessary or desirable parties;[73]

---

[65]*See* 800-Flowers, Inc. v. Intercontinental Florists, Inc., 860 F. Supp. 128, 133 (S.D.N.Y. 1994); Igloo Prods. Corp. v. Mounties, Inc., 735 F. Supp. 214, 218 (S.D. Tex. 1990).

[66]*See* Save Power Ltd. v. Syntek Fin. Corp., 121 F.3d 947, 950-51 (5th Cir. 1997) (transferring first suit to second forum). *But see* Congress Credit Corp. v. AJC Int'l, Inc., 42 F.3d 686, 689-90 (1st Cir. 1994) (quoting Thermal Dynamics Corp v. Union Carbide Corp., 214 F. Supp. 773, 776 (S.D.N.Y. 1963) for the proposition that suits "must be materially on all fours with the other," and "must have such an identity that a determination in one action leaves little or nothing to be determined in the other"); Computer Assocs. Int'l v. Altai, Inc., 893 F.2d 26, 29 (2d Cir. 1990) (stating that it is improper to enjoin related proceedings where the claim therein would not have been a compulsory counterclaim).

[67]*See* Cooperative Centrale Raiffeisen-Boerenleen Bank B.A. v. Northwestern Nat'l Ins. Co., 778 F. Supp. 1274, 1279 (S.D.N.Y. 1991) (denying stay of second suit).

[68]*See* International Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112 (5th Cir. 1996); *In re* Fireman's Fund Ins. Co., 588 F.2d 93 (5th Cir. 1979); Texas Source Group, Inc. v. CCH, Inc., 967 F. Supp. 234 (S.D. Tex. 1997) (holding that the forum selection clause was valid in spite of allegations of breach of underlying contract); American Airlines, Inc. v. Rogerson ATS, 952 F. Supp. 377 (N.D. Tex. 1996); Wellons v. Numerica Sav. Bank, FSB, 749 F. Supp. 336 (D. Mass. 1990).

[69]*See* Savidge v. Fincannon, 784 F.2d 186 (5th Cir. 1986) (denying transfer of individual suit for consolidation with class).

[70]*See* Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 219 (2d Cir. 1978) (denying transfer to first forum because of later filing in second forum of related actions against other defendants for the same tort of misappropriation of Elvis Presley's likeness); Davidson v. Exxon Corp., 778 F. Supp. 909, 912 (E.D. La. 1991) (transferring later-filed class action to district with more than 100 actions already on file).

[71]*See In re* Antibiotic Drugs Antitrust Litig., 355 F. Supp. 1400, 1402 (J.P.M.L. 1973).

[72]*See* Employers Ins. of Wausau v. Prudential Ins. Co. of America, 763 F. Supp. 46, 49-50 (S.D.N.Y. 1991) (denying dismissal and transfer of second suit).

(9) discouragement of forum shopping;[74]

(10) the bad faith filing of a declaratory judgment action;[75] and

(11) "state interest" of the second forum.[76]

The burden of proving special circumstances is, of course, on the party challenging the first-to-file rule.[77]

### 1. Who filed first?

Closely filed actions may be deemed filed simultaneously. The most extreme example of this was simultaneous electronic filing that was alleged to be four-tenths of a second apart; the two courts selected the forum by a coin toss.[78] In removed cases, the state court filing date controls.[79]

### 2. *In rem* cases

While the "special factors" exceptions make the first-to-file rule flexible, the rule is rigid for *in rem* cases. That is, the first court to acquire jurisdiction of the *res* has priority to the exclusion of other courts.[80]

### 3. Statutory Preemption

The "first-filed" presumption yields to statutory overrides such as mandatory venue,[81] exclusive jurisdiction statutes such as 28 U.S.C. § 1346(b) giving federal district courts exclusive jurisdiction over claims

---

[73]*See* Span-Eng. Assoc. v. Weidner, 771 F.2d 464, 470 (10th Cir. 1985) (addressing the opportunity to add defendants); *see also* Chiron Corp. v. Advanced Chemtech, Inc., 869 F. Supp. 800, 802 (N.D. Cal. 1994).

[74]*See* Amerada Petroleum Corp. v. Marshall, 381 F.2d 661, 663 (5th Cir. 1967) (staying first-filed action); S-Fer Int'l, Inc. v. Paladion Partners, Ltd., 906 F. Supp. 211, 217 (S.D.N.Y. 1995) (denying transfer of first suit, and granting injunction against second suit); Johnson Bros. Corp. v. Int'l Bhd. of Painters, 861 F. Supp. 28, 30 (M.D. La. 1994) (dismissing first suit).

[75]*See* Commercial Union Ins. Cos. v. Torbaty, 955 F. Supp. 1162, 1163-64 (E.D. Mo. 1997) (dismissing first suit).

[76]*See* Muller v. Walt Disney Prods., 822 F. Supp. 1033, 1034-40 (S.D.N.Y. 1993) (denying defendant's motions to stay or transfer based on balance of convenience and the second forum's greater interest in the litigation).

[77]*See* Hanson PLC v. Metro-Goldwyn-Mayer, Inc. 932 F. Supp. 104, 106-08 (S.D.N.Y. 1996) (holding that burden was met and first suit was dismissed).

[78]*See* Mobil Oil Exploration Co. v. Federal Energy Regulatory Comm'n, 814 F.2d 998, 1001(5th Cir. 1987).

[79]*See* Igloo Prods. Corp. v. Mounties, Inc., 735 F. Supp. 214, 217 (S.D. Tex. 1990).

[80]*See* Dailey v. National Hockey League, 987 F.2d 172, 175 (3d Cir. 1993).

[81]*See* Sutter Corp. v. P & P Indus., Inc., 125 F.3d 914, 917 (5th Cir. 1997).

under the Federal Torts Claims Act,[82] or statutes divesting a court's jurisdiction, such as 28 U.S.C. § 1500, which divests jurisdiction in the Court of Federal Claims for a litigant involved in a parallel action.[83]

### 4. Which court decides?

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, was a patent dispute with the first suit filed in the Eastern District of New York and the second in the Western District of Texas, with the New York court enjoining that defendant from pursuing the Texas case, and the Texas federal court enjoining the New York plaintiff from adding a related patent claim in that action.[84] The Fifth Circuit reversed the Texas injunction and held that the court first having jurisdiction in a patent case should be the one to determine where the case should be tried, thus deferring the decision to the New York federal court.[85]

## B.  Transfer and Consolidation

### 1.  Consolidation Within the Same Division

Federal Rule of Civil Procedure 42(a) permits the consolidation of actions having a common question of law or fact, and provides for "joint trial of any or all the matters at issue."[86] It does not, however, address case transfer.  Case transfer is achieved within the division in which a court sits by 28 U.S.C. § 1404(c), which permits a district court to order that a case be tried at any court within the division.  However, Rule 42(a) is directed to convenience and economy, and (unlike Texas Rule 41) does not merge the suits into a single cause of action.[87]

### 2.  Move to Another Division Within the District

28 U.S.C. § 1404(b) provides the court with discretion to transfer the case from one division to another in the same district.[88]  Professor Wright

---

[82]*See* Calhoun v. United States, 32 Fed. Cl. 400, 407 (Fed. Cl. 1994), *aff'd* 61 F.3d 918 (Fed. Cir. 1995).

[83]*See* Keene Corp. v. United States, 508 U.S. 200 (1993).

[84]961 F.2d 1148, 1161 (5th Cir. 1992).

[85]*See id.* at 1161; *see also*, Smith v. SEC, 129 F.3d 356, 361 (6th Cir. 1997); Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 552 F.2d 601, 603 (5th Cir. 1977); Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 407 (5th Cir. 1971).

[86]FED. R. CIV. P. 42(a).

[87]*See* Johnson v. Manhattan Ry. Co., 289 U.S. 479, 497 (1933).

[88]*See e.g.,* Country Maid, Inc. v. Haseotes, 312 F. Supp. 1116, 1117 (E.D. Pa. 1970).

argues that section 1404(b) is limited to transfers in which all parties consent, pointing out that the second sentence of section 1404(b), which permits transfer of *in rem* actions brought by the United States without its consent, is meaningless unless consent of all parties is required for other transfers. Wright concludes that section 1404(a), which addresses transfers "to any other district *or division,*" governs motions for transfer within the district lacking consent of all parties.[89]

### 3. Move to Another Division or District to Correct Venue

Two federal statutes provide for venue transfers to correct improper filing, both of which may be used in limited cases to transfer and combine parallel actions. The first is a venue statute, 28 U.S.C. § 1406(a), which provides for the dismissal of cases filed in the wrong venue, but permits the court "in the interests of justice" to transfer the case to any district or division with proper venue.[90] The court may transfer even if it lacks subject matter jurisdiction,[91] or personal jurisdiction.[92] Section 1406(a) has been used to transfer improperly filed cases to districts where a properly filed parallel case was pending.[93] Venue must be improper to trigger the statute.[94]

The second statute is 28 U.S.C. § 1631, which provides for transfer of an action filed in a federal court lacking subject matter jurisdiction to

> any other such [federal] court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.[95]

---

[89]15 WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, §§ 3809 n.29, 3842 n.3; *see also* Williams v. Hoyt, 556 F.2d 1336 (5th Cir. 1977).

[90]28 U.S.C. § 1406(a) (West 1993).

[91]*See* United States *ex rel.* Ayala v. Tubman, 366 F. Supp. 1268, 1270 (E.D.N.Y. 1973).

[92]*See* Goldlawr, Inc., v. Heiman, 369 U.S. 463, 465-66 (1962); Dubin v. United States, 380 F.2d 813, 815 (5th Cir. 1967).

[93]*See* Papercraft Corp. v. Procter & Gamble Co., 439 F. Supp. 1060, 1063 (W.D. Pa. 1977); Scaramucci v. FMC Corp., 258 F. Supp. 598, 602 (W.D. Okla. 1966).

[94]*But see* Manley v. Engram, 755 F.2d 1463, 1467 (11th Cir. 1985) (holding that where venue is proper and personal jurisdiction is lacking, § 1406 authorizes transfer); *Dubin*, 380 F.2d at 815.

[95]28 U.S.C. § 1631 (1994).

This statute is aimed at several matters, but is principally a safety net for parties who mistakenly file in a federal court lacking some aspect of subject matter jurisdiction. This can be especially useful in cases where the limitations period may expire before correct filing occurs. By the statute's express terms, it applies where the transferor court lacks subject matter jurisdiction.[96] If the transferor court lacks subject matter jurisdiction, it is no impediment to transfer that it also lacks personal jurisdiction.[97] Although there are no cases using section 1631 in parallel cases, two decisions implicate its use to transfer from a court lacking jurisdiction to one having jurisdiction.[98]

### 4. Transfers Based on Forum Selection Agreement

The law of forum selection agreements is problematic, requiring a unitary discussion which appears in the International Section.[99] This section will briefly discuss the issue in intra-federal conflicts. Forum selection agreements have been enforceable in federal courts since *Bremen v. Zapata Off-Shore Corporation.*[100] *Bremen*, an admiralty case with an English forum-selection clause, was not controlling for a federal court faced with a forum-selection clause naming another federal court.[101]

Clauses that created an intra-federal conflict were first considered in *Stewart Organization, Inc. v. Ricoh Corporation.*[102] At the court of appeals level, the Eleventh Circuit had conducted an *Erie* analysis and determined that federal common law *(Bremen)* governed because the issue was not contract, but venue, an issue controlled by federal law.[103] The Supreme Court affirmed on different grounds—that the role of section 1404(a) as a federal statute precluded *Erie* analysis.[104] The Supreme Court further held that under section 1404(a), the forum clause was not per se enforceable,

---

[96]*See In re* Exclusive Indus., 751 F.2d 806, 808-09 (5th Cir. 1985).

[97]*See* O'Neal v. Hatfield, 921 F. Supp. 574, 575-76 (S.D. Ind. 1996). Lack of venue is also no impediment to a transfer under 28 U.S.C. § 1631. *See* Dornbusch v. Commissioner, 860 F.2d 611, 612 (5th Cir. 1988).

[98]*See* Hill v. U.S. Air Force, 795 F.2d 1067, 1070 (D.C. Cir. 1986) (holding court did not abuse its discretion in failing to transfer a case sua sponte where neither party raised the issue); York Assocs., Inc. v. Secretary of H.U.D., 815 F. Supp. 16, 22 (D.D.C. 1993) (holding no transfer where claims were "completely duplicative").

[99]*See infra* Part VII.A.2.

[100]407 U.S. 1, 15 (1972).

[101]*Id.* at 8-9.

[102]487 U.S. 22, 28-29 (1988).

[103]*See* Stewart Org., Inc. v. Ricoh Corp., 810 F.2d 1066, 1068-69 (11th Cir. 1987) (en banc).

[104]*See* Stewart, 487 U.S. at 28-29.

but would instead trigger an inconvenient forum analysis in which the forum agreement would be a factor to be balanced against other factors such as convenience and economy.[105]

There are at least three instances where forum selection clauses are not governed by section 1404(a). The first is where a plaintiff files suit in a federal court in the designated location, but the defendant challenges personal jurisdiction, and federal law differs from that state's law on whether a forum selection clause waives personal jurisdiction objections.[106] In this situation, the Eleventh Circuit has held that state law governs.[107] The second instance is where the forum selection clause specifies a state court, which of course makes a section 1404(a) venue transfer irrelevant.[108] The third instance is where the designated forum is a foreign country.[109]

### 5. Inconvenient Forum Transfers

In 28 U.S.C. § 1404(a),[110] Congress provided an inconvenient forum statute resembling the common law forum non conveniens standards of *Gulf Oil*[111] and *Piper Aircraft*[112]. The statute's test is simpler, providing for transfer "to any other district or division where [the action] might have been brought" when it is justified "[f]or the convenience of parties and witnesses" and "in the interest of justice."[113]

Section 1404(a) transfers have choice of law implications missing in other venue transfer statutes. Following a section 1404(a) transfer, the

---

[105]*See id.* at 29. For examples of 28 U.S.C. § 1404(a) transfers to enforce a forum selection agreement, see *In re* Fireman's Fund Ins. Cos., 588 F.2d 93, 94-95 (5th Cir. 1979) (upholding a transfer to federal court in New Jersey, honoring a forum selection clause, in spite of venue rule appearing to fix venue at the place of the contract's performance in Louisiana); Texas Source Group, Inc. v. CCH Inc., 967 F. Supp. 234, 238 (S.D. Tex. 1997) (holding forum selection clause was valid in spite of allegations of breach of underlying contract, resulting in transfer to Illinois); Wellons v. Numerica Savings Bank, FSB, 749 F. Supp. 336, 337-38 (D. Mass. 1990) (transferring first-filed action from Massachusetts to New Hampshire for consolidation with second-filed action, consistent with forum selection clause).

[106]*See* Alexander Proudfoot Co. World Headquarters v. Thayer, 877 F.2d 912, 916 (11th Cir. 1989) (distinguishing the jurisdictional challenge from the venue issue in *Stewart*). *But see* Northwestern Nat. Ins. Co. v. Donovan, 916 F.2d 372, 376 (7th Cir. 1990) (holding that federal law (*Bremen*) governs defendant's challenge to jurisdiction in the contractually-chosen forum).

[107]*See id.* at 919.

[108]*See infra* Part V.B. for a discussion of what law governs these transfers.

[109]*See infra* Part VII.A.3.

[110]28 U.S.C. § 1404(a) (1993).

[111]Gulf Oil v. Gilbert, 330 U.S. 501 (1947).

[112]Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981).

[113]28 U.S.C. § 1404(a).

transferee court must apply the transferor court's choice of law rule.[114] The transferor court's choice of law rule is that of the state in which the court is located.[115]

*Ginsey Industries, Inc. v. I.T.K. Plastics, Inc.* illustrates several aspects of a section 1404(a) transfer involving a parallel action.[116] Plaintiff Ginsey, a Pennsylvania corporation with its principal place of business in New Jersey, purchased vinyl plastic sheeting from defendant manufacturer, I.T.K., based in Massachusetts.[117] Then, alleging the plastic was not fit for its intended purpose, Ginsey sued in federal court to recover his payment and consequential damages.[118] Ginsey brought the action in a Pennsylvania federal court, even though the pertinent facts occurred in Massachusetts and New Jersey.[119] ITK objected on personal jurisdiction grounds, but alternatively sought transfer to the District of Massachusetts.[120]

Ginsey failed to come forward with evidence on the personal jurisdiction challenge, but instead asked for transfer to its home base in New Jersey.[121] The court noted both New Jersey and Massachusetts satisfied section 1404(a)'s requirement that a case be transferred only to a district where the action might have been brought (under requirements of jurisdiction and venue).[122] The more difficult question was "whether the balance of convenience weighs decisively in favor of one of the proposed districts."[123]

Although the law strongly favors a plaintiff's choice of forum,[124] that presumption was overcome here by the presence of a pending related case in a Massachusetts federal court.[125] The actions were not identical—they involved distinct but related purchases of plastic that were both rejected.[126]

---

[114]*See* Piper Aircraft Co., 454 U.S. at 243 n.8 (1981) (citing Van Dusen v. Barrack, 376 U.S. 612, 613 (1946)).

[115]*See* Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).

[116]545 F. Supp. 78, 79-80 (E.D. Pa. 1982).

[117]*See id.* at 79.

[118]*See id.*

[119]*See id.* at 79-80

[120]*See id.* at 79.

[121]*See id.*

[122]*See id.* at 80.

[123]*Id.*

[124]*See id.* "It is well-settled that 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Id.* (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

[125]*See id.* at 80-81.

[126]*See id.*

Relying on judicial efficiency and economy, the court chose Massachusetts:

> [I]t would appear that significant economies of time and effort can be achieved if these actions were consolidated in a single district. The essential questions of liability in both actions concern the fitness of I.T.K.'s vinyl products for the commercial purposes Ginsey sought to pursue. The witnesses who will testify about I.T.K.'s product and about Ginsey's reasons for purchasing that product are likely to be the same in both cases. To be sure, consolidation of these actions in the District of Massachusetts imposes a burden on Ginsey. But transfer to that district would, in my judgment, promote efficient judicial administration to such an extent that plaintiff's preference for New Jersey is outweighed. And consolidation ultimately benefits both parties since it is clearly more convenient to conduct related litigation in a single district rather than in two separate forums.[127]

As *Ginsey* noted, section 1404(a) limits transfer to "a district where the action might have been brought," requiring that the transferee court must have personal jurisdiction over all parties.[128] In *Continental Airlines, Inc. v. American Airlines, Inc.*, a Galveston federal court denied defendant's motion to transfer venue to Dallas, where much of the witnesses and documents were, or failing that, to Houston on the grounds that Galveston lacked direct air service and Houston was more accessible.[129] The court soundly rejected the notion that its location fifty miles from Houston amounted to the level of inconvenience contemplated by section 1404(a).[130]

The court denied a section 1404(a) transfer in *Muller v. Walt Disney Productions*, where the executor of Leopold Stokowski's estate sued Walt Disney Productions regarding royalties on the video cassette of Fantasia.[131] Disney had already sued in Pennsylvania, and moved to stay or transfer

---

[127]*Id.* at 80-81.

[128]*Id.* at 80 (citing Hoffman v. Blaski, 363 U.S. 335, 342-43 (1960)); *see also* Liaw Su Teng v. Skaarup Shipping Corp., 743 F.2d 1140, 1148 (5th Cir. 1984) (applying the *Hoffman* standard, *overruled on other grounds, In re* Air Crash Disaster Near New Orleans, LA, 821 F.2d 1147 (5th Cir. 1987)).

[129]805 F. Supp. 1392, 1394 (S.D. Tex. 1992).

[130]*See id.* at 1400-01.

[131]822 F. Supp. 1033, 1040 (S.D.N.Y. 1993).

this action there.[132] The court denied the motions, finding that the balance of convenience and New York interest favored the New York forum.[133]

First-filed actions do not always prevail on choice of forum. *Factors Etc., Inc. v. Pro Arts, Inc.,* was part of a two-case dispute in federal courts in Ohio and New York regarding exclusive ownership of Elvis Presley's likeness.[134] The Second Circuit upheld the trial court's refusal to transfer the second-filed case to the Ohio federal court, where convenience favored the second district.[135]

When both venue and personal jurisdiction are improper, section 1406[136] is the authority for transfer.[137] But where venue is proper and personal jurisdiction is lacking, some courts still use section 1406, in spite of its application only in cases where venue is improper.[138] Other courts—and sometimes other appellate panels—have held that section 1404(a) is appropriate here.[139]

### 6. Multidistrict Transfer of Multiple Cases for Consolidated Pretrial Proceedings

The multidistrict litigation statute, 28 U.S.C. § 1407, provides for the transfer of multiple civil actions from different districts with "one or more common questions of fact" to be transferred to a common forum for pretrial proceedings *only*.[140] Unlike transfers under sections 1404(a), 1404(b) or 1406, which may be consolidated with a parallel action under Federal Rule of Civil Procedure 42(a) ("Rule 42"), this may not be done

---

[132]*See id.* at 1034-35.

[133]*See id.* at 1039.

[134]579 F.2d 215, 217 (2d Cir. 1978), *overruled on other grounds,* Pirone v. McMillan, Inc. 894 F.2d 579 (2d Cir. 1990).

[135]*See id.* at 218-19. Other cases using 28 U.S.C. § 1404(a) (1994) to transfer and consolidate a second-filed parallel federal case include Jarvis Christian College v. Exxon Corp., 845 F.2d 523, 528 (5th Cir. 1988); Sundance Leasing Co. v. Bingham, 503 F. Supp. 139, 141 (N.D. Tex. 1980) (holding that pending related action is a factor under 28 U.S.C. § 1404(a)); Santa Fe Int'l Corp. v. Transcontinental Gas Pipe Line Corp., 728 F. Supp. 435, 437 (E.D. Tex. 1989).

[136]*See* 28 U.S.C. § 1406 (1993).

[137]*See* Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962); Aguacate Consolidated Mines, Inc. v. Deeprock, Inc., 566 F.2d 523, 524 (5th Cir. 1978).

[138]*See* Dubin v. U.S., 380 F.2d 813, 815-16 (5th Cir. 1967).

[139]*See* Sargent v. Genesco, Inc., 492 F.2d 750, 758-59 (5th Cir. 1974); 15 Wright Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE § 3827 (2d ed. 1986).

[140]28 U.S.C. § 1407 (1993).

with a multidistrict transfer under section 1407.[141]  But Rule 42 does have limited use in a section 1407 transfer, as illustrated in *Katz v. Realty Equities Corporation*.[142]  The court made a creative use of Rule 42 to order a consolidated complaint in a section 1407 transfer of cases (including class actions) from four districts in three states.[143]  The consolidated complaint allowed the judge to assess how best to conduct the pretrial discovery before returning the cases to their original forums for trial.[144]  However, while cases transferred under section 1407 may not be consolidated for trial, if the multidistrict pretrial proceeding resolves the case, by summary judgment for example, the case will not be remanded to the transferor district court.[145]

*In re Aviation Products Liability Litigation* is an early case distinguishing between cases that should be transferred for pretrial proceedings and those that should not.[146]  The panel considered twenty related lawsuits in various federal districts, for defective design, manufacture and installation of helicopter engines.[147]  Another instructive example is *In re the Upjohn Co. Antibiotic "Cleocin" Products Liability Litigation,* holding that discovery orders made prior to the multidistrict transfer may be modified by the transferee judge.[148]

## C.  Dismissal

### 1.  Voluntary Dismissals and The "Two Dismissal Rule"

Federal Rule of Civil Procedure 41(a) ("Rule 41(a)") provides for plaintiff's unilateral dismissal, or nonsuit, by notice if filed before defendant answers or files a motion for summary judgment.[149]  If defendant has answered or filed a dispositive motion, voluntary dismissal is still

---

[141]*See* Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 38 (1998) (holding that a court may not use section 1404 to retain a case for trial after obtaining the case under section 1407).

[142]521 F.2d 1354, 1355 (2d Cir. 1975).

[143]*See id.* at 1356.

[144]*See id.* at 1359.

[145]28 U.S.C. § 1407 (1993).

[146]347 F. Supp. 1401, 1404-06 (J.P.M.L. 1972).

[147]*See id.* at 1402.

[148]450 F. Supp. 1168, 1170 (J.M.P.L. 1978), *aff'd* 664 F.2d 114 (6th Cir. 1981).  For other examples, see *In re* Asbestos Litigation, 963 F. Supp. 247, 251 (S.D.N.Y. 1997); In re Air Crash Disaster at Lockerbie, Scotland, 709 F. Supp. 231, 232 (J.P.M.L. 1989), *aff'd, In re* Pan Am Corp., 16 F.3d 513, 517 (2d Cir. 1994).

[149]Fed. R. Civ. P. 41(a).

available by stipulation signed by all parties.[150]  A crucial feature of Rule 41(a) is the "two dismissal rule:"  the first voluntary dismissal is without prejudice, that is, it is not an adjudication on the merits unless otherwise stated in the dismissal order.[151]  The second dismissal is with prejudice, that is, when a voluntary dismissal is filed "by a plaintiff who has once dismissed in any court of the United States *or of any state* an action based on or including the same claim."[152]  The rule's rigidity is illustrated in *Lake at Las Vegas Investors Group, Inc., v. Pacific Malibu Development Corp.*, where the first dismissal, in state court, was not a dismissal as to all defendants, and was required because the plaintiff was an unregistered foreign corporation.[153]

## 2. Involuntary dismissals

If the plaintiff will not file a notice of dismissal or agree to a stipulated dismissal, the court may involuntarily dismiss the case.  This is not authorized by Rule 41, in spite of Rule 41(b)'s provisions for involuntary dismissals, they are expressly directed to the plaintiff's failure to prosecute or comply with a court order or the Federal Rules of Civil Procedure.[154]  No cases were found dismissing a duplicate lawsuit under Rule 41.

Federal Rule of Civil Procedure 12 ("Rule 12"), which authorizes dismissals on seven grounds, also does not apply to parallel litigation although it has been applied to motions to enforce a forum selection clause.[155]  No other statute or rule authorizes dismissal for grounds other than those in Rules 12 and 41.  Federal law no longer provides for pleas in abatement,[156] and as just stated, nothing in the federal rules or statutes authorizes its equivalent.  However, federal common law and the doctrine of comity do provide for dismissal on other grounds.[157]

---

[150]*See id.*

[151]*Id.*

[152]*Id.* (emphasis added);  *see also* Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 394-95 (1990).

[153]933 F.2d 724, 726-28 (9th Cir. 1991).

[154]Fed. R. Civ. P. 41(b).

[155]*See infra* Part VII.A.2.i.

[156]*See* Fed. R. Civ. P. 7(a),(c).

[157]*See* Ulmet v. United States, 888 F.2d 1028, 1031 (4th Cir. 1989);  800-Flowers, Inc. v. Intercontinental Florists, Inc., 860 F. Supp. 128, 135-36 (S.D.N.Y. 1994);  Johnson Bros. Corp. v. Int'l Bhd. of Painters, 861 F. Supp. 28, 29 (M.D. La. 1994);  Commercial Union Ins. Cos. v. Torbaty, 955 F. Supp. 1162, 1163 (E.D. Mo. 1997);  Brower v. Flint Ink Corp., 865 F. Supp. 564, 567 (N.D. Iowa 1994);  *see also* Michael Wells, *The Role of Comity in the Law of Federal Courts*, 60 N.C. L. REV. 59, 61 n.5 (1981).

One federal rule that may impact parallel cases is the compulsory counterclaim rule stated in Federal Rule of Civil Procedure 13(a). In *Adam v. Jacobs*, the court reversed the lower court's denial of Jacobs' motion to dismiss the second-filed New York federal case in deference to his first-filed Michigan federal case.[158] The Second Circuit held that although Adam had not technically violated Rule 13(a) by filing the second federal action instead of a counterclaim in the first action in Michigan, the district court abused its discretion in not dismissing or transferring Adam's second-filed claim for consolidation with Jacobs' first action.[159] Although the court recognized that filing a second lawsuit instead of a compulsory counterclaim in the first did not violate Rule 13(a), Adam was taking a chance.[160] If Jacobs' first-filed action came to final judgment first, Adam's compulsory counterclaim would then be precluded.[161]

Courts are often reluctant to dismiss lawsuits for which there is valid personal and subject matter jurisdiction.[162] In addressing duplicate litigation, trial courts are more inclined to use the other remedies: stay of the immediate case in that court; enjoining a party from pursuing the parallel case; or, where appropriate, moving the immediate action to be consolidated with the parallel case.[163] Forum selection clauses are one area providing for dismissals. The motion is raised under Federal Rule of Civil Procedure 12(b)(6), failure to state a claim, rather than Rule 12(b)(3), improper venue.[164]

The problem of parallel federal adjudication also arises between federal courts and federal administrative agencies.[165] Congress may assign certain matters, for example, the granting of a federal permit to operate a hazardous waste processor, to a federal agency along with adjudicatory authority as to parties who challenge the agency's decision.[166] In these cases, the agency may continue the litigation even when a party files suit in an Article III court; that is, the lawsuit does not divest the agency of

---

[158]950 F.2d 89, 90 (2d Cir. 1991).

[159]*See id.* at 94.

[160]*See id.* at 93.

[161]*See id.*

[162]*See* EEOC v. Univ. of Pa., 850 F.2d 969, 972 (3d Cir. 1988) (affirming the trial court's refusal to dismiss the EEOC's second-filed lawsuit seeking enforcement of a subpoena against the University of Pennsylvania for peer review records).

[163]*See id.* at 976 n.4.

[164]*See, e.g.,* Lambert v. Kysar, 983 F.2d 1110, 1112 n.1 (1st Cir. 1993).

[165]*See, e.g.,* Marine Shale Processors, Inc. v. EPA, 81 F.3d 1371, 1376 (5th Cir. 1996).

[166]*See id.*

jurisdiction.[167]   This was the result when Marine Shale Processors, Inc., applied to the Environmental Protection Agency ("EPA") for a permit to dispose of hazardous waste.[168]   The EPA denied the permit, and Marine Shale appealed within the agency's administrative review structure.[169]   In the meantime, the United States sued Marine Shale in federal district court for burning waste without a permit.[170]   In the federal lawsuit, Marine Shale immediately challenged the EPA's continuing jurisdiction over the permit application, arguing that by invoking the power of an Article III court, the United States ended the EPA's adjudicatory authority.[171]   The Fifth Circuit disagreed, observing by comparison that,

> State courts are not Article III courts, yet nothing in
> Article III prevents a state court from litigating the same
> controversy pending before a district court. In such cases,
> if the state court reaches final judgment first, its
> disposition may preclude further litigation in the [federal]
> district court without violating Article III."[172]

### D. *Stays in Favor of Other Federal Court Litigation*

#### 1. The *Landis* Case

In *Landis v. North American Co.*, Justice Cardozo described a court's inherent power to stay its own case.[173]   *Landis* is not often cited by courts addressing intrafederal parallels, apparently because its formulation of a first-impression test has been superseded by later, more definitive cases.[174] It nonetheless established an important point.

The *Landis* opinion arises from two cases.[175]   In understanding Cardozo's ruling, it is important to note that the plaintiffs in the two cases are distinct, although the issues were apparently identical.[176]   The plaintiff in each of the two actions was a holding company described in the opinion

---

[167]*See id.* at 1377.

[168]*See id.* at 1374.

[169]*See id.* at 1374-75.

[170]*See* id.

[171]*See id.* at 1376-77.

[172]*Id.* at 1377 (citation omitted).

[173]299 U.S. 248, 254 (1936).

[174]*See* SEC v. Downe, 1993 WL 22126, at *12 (S.D.N.Y. Jan. 26, 1993).

[175]*See* Landis, 299 U.S. at 249 (consolidating Landis v. North Amercan Co. and Landis v. American Water Works & Elec. Co.)

[176]*See id.* at 249.

as "the apex of a pyramid which includes subsidiary holding companies as well as subsidiary operating companies, these last being engaged as public utilities in supplying gas and electricity to consumers in different states."[177] In addition to these two primary actions, other plaintiffs had filed forty-seven similar suits in thirteen federal districts.[178] Defendants filed motions to stay in each of the two cases, hoping to use only one forum to resolve the central issue of the constitutionality of the registration requirement.[179] The district court granted the stay, but the D.C. Circuit reversed.[180] On review, the Supreme Court limited the question to a court's right to stay cases pending the resolution of a related case.[181] This focus led to Cardozo's often quoted statement:

> Viewing the problem as one of power, and of power only, we find ourselves unable to assent to the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical. . . . Apart, however, from any concession, the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both. Considerations such as these, however, are counsels of moderation rather than limitations upon power.[182]

---

[177]*Id.* at 249-50.
[178]*See id.* at 252.
[179]*See id.* at 250-51.
[180]*See id.* at 253-54.
[181]*See id.* at 254.
[182]*Id.* at 254 (citation omitted).

Thus, the Court ruled that a federal court may stay, at least temporarily, an action that is less than a perfect parallel to a similar action that may resolve common issues.[183] The test is a balancing test which requires the movant to "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else."[184] Cardozo also clarified that (1) the burden is on the party seeking the stay; and (2) the decision was discretionary but must be kept "within the bounds of moderation."[185]

## 2. Various Tests in the Circuits

While *Landis* establishes the source of the power to stay a parallel case, it did little to clarify when a stay should be granted, contrary to Cardozo's opening paragraph: "The controversy hinges upon the power of a court to stay proceedings in one suit until the decision of another, and *upon the propriety of using such a power in a given situation*."[186] To the extent that the emphasized phrase promises a legal test, *Landis* offers only oblique phrases such as: (1) "the exercise of judgment, which must weigh competing interests and maintain an even balance;"[187] (2) "clear case of hardship or inequity;"[188] (3) "fair possibility that the stay . . . will work damage to someone else;"[189] (4) "scandal to the administration of justice;"[190] and (5) "discretion was abused if the stay was not kept within the bounds of moderation."[191] The absence of a usable legal standard may explain why *Landis* is often ignored in legal opinions and scholarship tracing the heritage of stays to remedy parallel cases in federal courts.[192]

---

[183]*See id.* at 254-55. *Landis* noted several lower court opinions that limited stays to cases with identical parties. The Court observed that these cases could have been resolved on the grounds that the stays, all of indefinite duration, were an abuse of discretion. The other view,that courts simply lacked the power to stay a case whose parallel had different parties, was unacceptable.

[184]*Id.* at 255.

[185]*Id.* at 256.

[186]*Id.* at 249 (emphasis added).

[187]*Id.* at 254-55.

[188]*Id.* at 255.

[189]*Id.*

[190]*Id.* (quoting Amos v. Chadwick, L.R. 9 Ch. Div. 459, 462).

[191]*Id.* at 256.

[192]In spite of these shortcomings, the Fifth Circuit has applied *Landis*, explaining that: "A stay can be justified only if, based on a balancing of the parties' interests, there is a clear inequity to the suppliant who is required to defend while another action remains unresolved and if the order granting a stay can be framed to contain reasonable limits on its duration." GATX Aircraft Corp. v. M/V Courtney Leigh, 768 F.2d 711, 716 (5th Cir. 1985) (citing *Landis*, 299 U.S. at 254-

With no solid guidance from *Landis*, federal courts have found other authorities for staying local cases in deference to other federal litigation. One often cited case is *Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co.*, a parallel patent dispute in which the Supreme Court affirmed a stay of the second-filed declaratory judgment action.[193] *Kerotest* fails to add anything substantive to *Landis*:

> Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems. The factors relevant to wise administration here are equitable in nature. Necessarily, an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts. . . . Even if we had more doubts than we do about the analysis made by the Court of Appeals, we would not feel justified in displacing its judgment with ours.[194]

In other words, standards with identifiable elements are inappropriate here because the management of parallel litigation within the federal system requires a case-by-case analysis in which pertinent factors will vary from case to case. Of course, this approach may have contemplated that guidelines would develop over time, and they did.

In spite of being somewhat ignored in domestic parallel settings, *Landis* is cited with some regularity by federal courts considering stays of the immediate action in deference to foreign actions.[195] These cases, fortunately, have developed the legal test missing in *Landis*. One case considering a stay in deference to a first-filed Canadian case identified the following factors:

> [1] principles of comity, [2] the adequacy of relief available in the alternative forum, [3] promotion of judicial efficiency, [4] the identity of the parties and issues in the two actions, [5] the likelihood of prompt disposition in the alternative forum, [6] the convenience of the parties,

---

55). *GATX* upheld the federal trial court's denial of a stay pending the resolution of a non-parties' bankruptcy. *See* GATX, 768 F.2d at 717.

[193]342 U.S. 180, 186 (1952).

[194]*Id.* at 183-84.

[195]*See infra* Part VII.A.1.

> counsel and witnesses, and [7] the possibility of prejudice
> if the stay is granted.[196]

When these factors are considered in a purely federal context, presumably comity would decline or disappear, but the others are no doubt appropriate.[197]

The Seventh Circuit has stated a clear test based on *Kerotest*.[198] In *Serlin v. Arthur Andersen & Co.*, the court upheld the trial court's dismissal of a duplicate federal action.[199] For authority, it drew from a local federal district court opinion which paraphrased *Kerotest's* language authorizing dismissal of a parallel action "for reasons of wise judicial administration . . . whenever it is duplicative of a parallel action already pending in another federal court."[200] Interestingly, *Kerotest's* "wise judicial administration" concept was also the basis for the *Colorado River* doctrine, which determines the appropriateness of stays and dismissals in state-federal parallel litigation.[201] This has led to confusion for courts that might be tempted to apply the multi-factored *Colorado River* test in an intrafederal setting. *Serlin's* citation to *Colorado River* for the "wise judicial administration" test, quoted above, is an example. The Seventh Circuit corrected this in *Chrysler Credit Corp. v. Marino*, by rejecting movant's reliance on *Colorado River* as a basis for a stay of a parallel action:

> *Colorado River* and its progeny, however, address the stay
> of federal proceedings pending the conclusion of parallel
> state actions and that is how we have applied it. Here,
> both the guaranty and replevin actions were filed in federal
> court in the Northern District of Illinois. Consequently,
> abstention from the guaranty action under *Colorado River*
> is inapplicable.[202]

Of course there is no legal error in this if the court merely applies *Colorado River's* elements without the federalism twist, and perhaps without the heavy presumption of allowing the actions to continue. The

---

[196]I.J.A., Inc. v. Marine Holdings, Ltd., Inc., 524 F. Supp. 197, 198 (E.D. Pa. 1981).

[197]*See id.*

[198]*See* Serlin v. Arthur Anderson & Co., 3 F.3d 221, 223 (7th Cir. 1993).

[199]*Id.* at 222.

[200]*Id.* at 223 (quoting Ridge Gold Standard Liquors v. Joseph E. Seagram, 572 F. Supp. 1210, 1213 (N.D. Ill. 1983) (citation omitted).

[201]*See infra* Part V.C.

[202]63 F.3d 574, 578 (7th Cir. 1995) (citations omitted).

Seventh Circuit also has a narrower definition of "parallel:" "A suit is only duplicative if it involves the 'same claims, parties, and available relief.'"[203] This is contrary to the Supreme Court's approach in *Landis*, which held that "we find ourselves unable to assent to the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical."[204]

In other cases, the Fifth Circuit appears also to base its test on *Kerotest*, in spite of its earlier reliance on *Landis* in *GATX*, discussed above.[205] The best example of this *Kerotest* reliance is *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*.[206] Like the Seventh Circuit, the Fifth Circuit cites the inappropriate *Colorado River* precedent along with *Kerotest*.[207] However, the Court also identifies several useful considerations, including the degree of identity of the actions, the courts' respective ability to resolve all the issues in the dispute, and the likelihood of piecemeal litigation.[208]

*West Gulf* also draws from *Mann Manufacturing Inc. v. Hortex, Inc.*,[209] which provides the Fifth Circuit's position on stays in duplicate patent litigation. For its own authority, *Mann* ignored *Landis* and *Kerotest* and instead relied on two questionable cases and one appropriate precedent.[210] The two questionable cases are *Rickey Land & Cattle Co. v. Miller & Lux*,[211] a state-federal conflict, enforcing the first-filed rule in an in rem case, and *In re Georgia Power Co.*,[212] holding the first-filed rule to be axiomatic in both intrafederal conflicts and state-federal conflicts. The appropriate authority is *Tivoli Realty, Inc. v. Interstate Circuit, Inc.*, enforcing the first-filed rule by reversing an antisuit injunction from the second court.[213] In *Mann*, the court split its remedy, staying the first-filed action in regard to claims related to the second action, and staying specific claims pending plaintiff's motion for leave to add those claims in the second action.[214] Readers should not assume that legal tests and remedies

---

[203]*Id.* (quoting *Serlin*, 3 F.3d at 223).

[204]*See* Landis v. North America Co., 299 U.S. 248, 254 (1936).

[205]*See supra* note 105.

[206]751 F.2d 721, 728-29 (5th Cir. 1985).

[207]*See id.* at 728-29.

[208]*See id.* at 730-31.

[209]439 F.2d 403, 405 (5th Cir. 1971).

[210]*See id.* at 407 n.2.

[211]218 U.S. 258, 262-63 (1910).

[212]89 F.2d 218, 221 (5th Cir. 1937).

[213]167 F.2d 155, 158 (5th Cir. 1948).

[214]*See Mann*, 439 F.2d at 408.

applied in parallel patent cases are readily applicable to non-patent cases. Caution is appropriate here. Although there is no authority on point-- neither judicial or academic--patent cases appear to make up a greatly disproportionate number of federal parallel cases and have developed somewhat distinct rules.[215]

The Second Circuit uses a heavy presumption favoring the first-filed case, with *Semmes Motors, Inc. v. Ford Motor Co.*, as a leading example.[216] That presumption is qualified by the fact that *Semmes* was a repetitive parallel case, that is, both cases were filed by the same party.[217] It might not be as strong in reactive cases in which each party has made a bona fide choice of forum. The two cases arose from Ford's audit of Semmes's Ford dealership in New York, which included the investigation of warranty repairs and led to claims that the auditors randomly contacted customers.[218] In the audit, Ford found several instances of warranty refunds charged to Ford where no work was done, and recommended remedial measures to Semmes.[219] In response, Semmes sued Ford in New Jersey state court; Ford removed that claim to federal court, where the judge denied Semmes's request for a temporary injunction against Ford's actions and possible franchise termination.[220] Semmes then sued Ford in a New York federal court, still seeking the temporary injunction to stop Ford from terminating the franchise.[221] The New York federal court denied Ford's motion to stay the New York action and granted Semmes's injunction against Ford.[222] On appeal, the Second Circuit held the New Jersey action had priority as the first filed, that the New Jersey federal court would have been justified in enjoining Semmes from prosecuting the New York federal action, and that the result should not differ where Ford chose instead to seek a stay from the New York federal court.[223] The Second Circuit thus stayed the New York action, but did leave in effect the New York Court's injunction against Ford (that is, enjoining Ford from terminating Semmes's

---

[215]*See, e.g.,* William Gluckin & Co. v. International Playtex Corp., 407 F.2d 177, 178 (2d Cir. 1969) (discussing the "customer action" factor).

[216]429 F.2d 1197, 1202 (2d Cir. 1970).

[217]*See id.* at 1198-99, 1202.

[218]*See id.* at 1200.

[219]*See id.*

[220]*See id.* at 1200 n.5.

[221]*See id.*

[222]*See id.* at 1201.

[223]*See id.* at 1202.

dealership), even though the injunction had been denied by the New Jersey federal court which would subsequently try the case.[224]

The D.C. Circuit has significantly altered its rule for parallel federal actions. As recently as 1980, it had applied a "discretionary" rule that was phrased in dispositive terms in *Washington Metropolitan Transit Authority v. Ragonese*: "Where two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first."[225]     Further underscoring the rule, the court stated that "[c]onsiderations of comity and orderly administration of justice *dictate* that two courts of equal authority *should not hear the same case simultaneously*."[226] In applying the seemingly rigid first-filed rule, the D.C. Circuit's approach was, by 1997, that "in strictly limited circumstances, we have sometimes held that comity may warrant dismissal of [a pending] action."[227]

The Ninth Circuit has a more discretionary approach, observing "a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district."[228]  The court added that "this 'first to file' rule is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration."[229]

The Tenth Circuit offers a case that illustrates the need for a stay pending appeal of a possibly dispositive second case.[230]  In *O'Hare International Bank v. Lambert*, the bank originally sued Lambert in the Northern District of Illinois on a guarantee agreement.[231]  When the federal trial court initially ruled that it lacked personal jurisdiction, the bank sued again in the Western District of Oklahoma (and in federal courts in Texas and Arkansas) to protect its claim before the limitations period ran.[232]  The

---

[224]*See id.* at 1204.

[225]617 F.2d 828, 830 (D.C. Cir. 1980) (quoting Speed Products Co. v. Tinnerman, 171 F.2d 727, 729 (D.C. Cir. 1948) (upholding a dismissal in deference to a Virginia federal case)).

[226]*Id.* [emphasis added](citing Hilton Hotels Corp. v. Weaver, 325 F.2d 1010, 1010 (D.C. Cir. 1963) (per curiam)).

[227]Northwest Forest Resource Council v. Dombeck, 107 F.3d 897, 901 (D.C. Cir. 1997).

[228]Pacesetter Sys., Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982) (citing Church of Scientology of Cal. v. United States Dep't of the Army, 611 F.2d 738, 749 (9th Cir. 1979)).

[229]*Pacesetter*, 678 F.2d at 95.

[230]*See* O'Hare Int'l Bank v. Lambert, 459 F.2d 328, 329 (10th Cir. 1972).

[231]*Id.* at 329.

[232]*See id.* at 329-30.

bank then moved to stay the second action while appealing its first action; however, the Oklahoma federal court rejected the stay and granted summary judgment for the defendant on grounds unstated in the opinion.[233] Meanwhile, the Seventh Circuit reversed the Illinois federal court decision on personal jurisdiction, and remanded the case for litigation on the merits.[234] The bank now faced its loss in the Oklahoma federal court.[235] On appeal, the Tenth Circuit held that the Oklahoma federal court abused its discretion when it failed to stay the second-filed action while awaiting the appeal in the Seventh Circuit.[236] The Tenth Circuit's test included both a strong first-filed presumption, countered by "the general rule . . . that where the judgment sought is strictly in personam, courts having concurrent jurisdiction may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other."[237]

### 3. Stay of Derivative Suits

As noted in the introduction, this discussion focuses on "true" parallel cases to the possible exclusion of derivative cases that arise out of the original dispute but involve subsequent issues that may be determined in the underlying lawsuit. A California federal case provides an example of how the test for staying derivative suits can differ from that for ordinary parallel actions.[238] *M.D. Sass Investors Services, Inc. v. Reliance Insurance Co.* was a diversity case regarding an insurance bad faith claim, filed by Sass, an investment advisor who was being sued in five other federal actions by pension fund clients for losses on bond investments recommended by Sass.[239] These actions were consolidated by the Multidistrict Panel on Litigation for pretrial proceedings in the Eastern District of Louisiana.[240] Sass then sued Reliance in this case for a declaration of coverage and bad faith for Reliance's denial of coverage.[241] Subsequently, Sass moved for a stay pending the resolution of the five

---

[233] *See id.* at 330

[234] *See id.*

[235] *See id.*

[236] *See id.* at 331.

[237] *Id.* (citing Princess Lida v. Thompson, 305 U.S. 456 (1939)).

[238] *See* M.D. Sass Investors Servs., Inc. v. Reliance Ins. Co., 810 F. Supp. 1082, 1086 (N.D. Cal. 1992)

[239] *Id.* at 1083-84.

[240] *See id.* at 1084.

[241] *See id.*

underlying lawsuits.[242] The court noted the Ninth Circuit had no law on point displaying the criteria for staying a derivative case regarding insurance coverage pending a decision in the primary case.[243] The court then borrowed the following list of five factors from the Third Circuit:

> (1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the covenience of the parties; (3) the public interest in the settlement of the uncertainty of obligation; (4) the availabililty and convenience of other remedies; and (5) whether the same factual question lies at the heart of both the insurance coverage dispute and the underlying action.[244]

The court granted the stay after precisely evaluating these factors, which differ somewhat from the Ninth Circuit's test for routine intra-federal parallel cases.[245]

### 4. Enjoining Other Federal Litigation

The standard for intra-federal antisuit injunctions is almost identical to that of dismissals of duplicative litigation, with a strong first-filed presumption. That is, federal law favors dismissal of all but first-filed suits, unless there are special circumstances or the balance of convenience favors the latter suit.[246] The enjoining court need not be of coordinate jurisdiction with the court where the action is enjoined. For example, bankruptcy courts may enjoin actions in federal district courts.[247]

*William Gluckin & Co. v. International Playtex Corp.*, is a good example of rejecting the presumption favoring the first-filed case, based on the balance of convenience of the second forum.[248] Playtex is a Delaware corporation with its principal place of business in New York and three of its five manufacturing plants in Georgia.[249] F. W. Woolworth & Company

---

[242]*See id.* at 1085.

[243]*See id.* at 1089.

[244]*Id.* (citing Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1224-25 (3d Cir. 1989)).

[245]*See* Pacesetter Sys., Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982); *see also supra* text accompanying notes 228-29.

[246]*See* Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1202 (2d Cir. 1970); *see also* Municipal Energy Agency v. Big Rivers Elec. Corp., 804 F.2d 338, 343 (5th Cir. 1986).

[247]*See* Steelman v. All Continent Corp., 301 U.S. 278, 288-91 (1937); *In re* North Am. Oil & Gas Co. v. Fidelity & Deposit Co., 130 B.R. 482, 489 (W.D. Tex. 1991).

[248]407 F.2d 177, 180 (2d Cir. 1969).

[249]*See id.* at 178.

("Woolworth") is a New York corporation with its principal place of business in New York, though it operates retail stores throughout the nation.[250] Gluckin is a New York corporation with its principal place of business in New York City.[251] Even though these were federal question cases, these facts are pertinent to the "balance of convenience" calculation.

On April 25, 1968, Playtex sued Woolworth in federal court in the Northern District of Georgia for selling a brassiere manufactured by the Gluckin Company, which Playtex alleged infringed on a Playtex patent.[252] Gluckin was not registered to do business in Georgia, and according to the court in this case, not amenable there.[253] On May 28, 1968, Gluckin sued Playtex in the Southern District of New York for a declaratory judgment of non-infringement or patent invalidity.[254] On Gluckin's motion, the New York federal court enjoined Playtex from proceeding in the Georgia suit.[255] Playtex then appealed the injunction.[256]

The Second Circuit began its analysis by noting its parallel case rule that "as a principle of sound judicial administration, the first suit should have priority, 'absent the showing of balance of convenience in favor of the second action,' . . . or unless there are special circumstances which justify giving priority to the second."[257] The court then noted two special circumstances: (1) the "customer action" exception, "where the first-filed suit is against a customer of the alleged [patent] infringer while the second involves the infringer himself," and (2) "where forum shopping alone motivated the choice of the situs for the first suit."[258] The second did not apply; the district court had made no finding of forum shopping, and the appellate court was unable to infer it.[259] The district court, however, did utilize the first special circumstance, the "customer action" exception, to enjoin the first-filed action.[260]

---

[250]*See id.*

[251]*See id.*

[252]*See id.* at 177.

[253]*See id.* at 178.

[254]*See id.*

[255]*See id.*

[256]*See id.* at 177

[257]*Id.* at 178 (quoting Remington Prods. Corp. v. American Aerovap, Inc., 192 F.2d 872, 873 (2d Cir. 1951) (citation omitted).

[258]*Id.* at 178.

[259]*See id.*

[260]*See id.*

Playtex urged reversal, arguing the unfairness of the rigid application of the customer exception.[261] Playtex argued that in order to justify unseating the first-filed case, more than mere customer action was needed, such as harassment or probable harassment in litigating in the first forum.[262] The court rejected this argument, and instead described the need for a "flexible approach":

> Wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems. The factors relevant to wise administration here are equitable in nature. Necessarily, an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts.[263]

Under this approach, the customer exception would apply only when the balance of convenience favored the second forum. It did in this case, with the location of evidence and witnesses and other important factors overwhelmingly pointing to New York and the second-filed action.[264] Readers should note that the "customer exception rule" is limited to patent cases like *Gluckin*. On the other hand, the special circumstances test applies generally to parallel cases in federal courts.

The Fifth Circuit has a two-part test for enjoining federal duplicative litigation: "(1) are the two pending actions so duplicative that one court should decide the subject matter of both actions; and if so, (2) which of the two courts should take the case?"[265] In *Superior Savings Association v. Bank of Dallas*, the plaintiff was a judgment creditor which had filed related garnishment actions against various law firms in Dallas, Texas and Cleveland, Ohio, seeking unused fees held by the garnishee firms.[266] Applying the two-part test, the court first observed that in considering antisuit injunctions, "the customary rules governing the grant of injunctive

---

[261]*See id.* at 178-79.

[262]*See id.* at 179.

[263]*Id.* at 179 (quoting Kerotest Mfg. Co. v. C-O Two Fire Equip. Co, 342 U.S. 180, 183-84 (1951)).

[264]*See id.* at 179-80.

[265]Superior Sav. Ass'n v. Bank of Dallas, 705 F. Supp 326, 328-29 (N.D. Tex. 1989) (citing Coumbia Plaza Corp. v. Security Nat'l Bank, 525 F.2d 620, 628-29 (D.C. Cir. 1975); Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 407-08 (5th Cir. 1971)).

[266]*See id.* at 327-28.

relief are of 'secondary significance.'"[267] The court denied the defendants' motion to enjoin the Ohio litigation, finding that the two post-judgment actions were not sufficiently duplicative to require that one be stopped.[268]

Additionally, special concerns arise when enjoining repetitive litigation in the United States for claims arising outside the United States that have been dismissed on forum non conveniens grounds. Injuries and deaths in foreign countries often end up as claims in state or federal courts in the United States, if there is a basis for personal jurisdiction. Whether our courts should provide a forum for such claims is controversial.[269] These claims are sometimes dismissed on forum non conveniens grounds,[270] but claimants are not always deterred by the first or second dismissal. Plaintiffs in these repetitive suits may be enjoined from refiling the claims in any state or federal court in the United States, assuming that the United States as a whole was found inconvenient.[271] Compulsory counterclaims can be another problem. Where a party elects to file a second federal action rather than bring a compulsory counterclaim, and where the parties in the two actions are the same, the second action should be enjoined.[272]

The scope of the antisuit injunction may present special issues as well. In *Wood v. Santa Barbara Chamber of Commerce, Inc.*, photographer Wood sued several defendants for copyright infringement under federal law.[273] The district court dismissed Wood's claims for lack of personal jurisdiction over many of the defendants, and the running of the limitations periods as to some claims.[274] Because Wood had already been litigious on these issues, the court permanently enjoined Wood from relitigating these claims, or any claims remotely connected, and the Ninth Circuit

---

[267]*Id.* at 328 (citing Columbia Plaza Corp.,525 F.2d at 622 n.3 (D.C. Cir. 1975)); *see also* S-Fer Int'l, Inc. v. Paladion Partners, Ltd., 906 F. Supp. 211, 213-14 (S.D.N.Y. 1995).

[268]*See id.* at 331.

[269]*See* David W. Robertson & Paula K. Speck, *Access to State Courts in Transnational Personal Injury Cases: Forum Non Conveniens and Antisuit Injunctions*, 68 TEX. L. REV. 937, 938-975 (1990) [hereinafter Robertson & Speck, *Access to State Courts*]; *infra* Part IV.B.4.; *see also* Carl Scherz Comment, *Section 71.051 of the Texas Civil Practice and Remedies Code—The Texas Legislature's Answer to Alfaro: Forum Non Conveniens in Personal Injury and Wrongful Death Litigation*, 46 BAYLOR L. REV. 99 (1994) [hereinafter *Legislature's Answer to Alfaro*]; *see infra* Part IV.B.4.

[270]*See* De Melo v. Lederle Lab., 801 F.2d 1058, 1064 (8th Cir. 1986).

[271]*See* Villar v. Crowley Maritime Corp., 990 F.2d 1489, 1498-99 (5th Cir. 1993).

[272]*See* Columbia Plaza Corp. v. Security Nat'l Bank, 525 F.2d 620, 626 (D.C. Cir. 1975).

[273]705 F.2d 1515, 1518 (9th Cir. 1983).

[274]*See id.*

affirmed.[275] As might be expected, this ruling does not reflect the norm as to injunctions against future litigation. Albeit in a somewhat different setting, federal antisuit injunctions against state litigation, the Supreme Court has held that injunctions against future litigation must be narrowly drawn and limited to matters actually decided in the federal action.[276]

Honoring the injunction may also be problematic since the court in which the action has been enjoined is not always inclined to agree. In at least one noteworthy case, *Schauss v. Metals Depository Corp.,* the Fifth Circuit did honor a New York federal injunction despite sufficient justification to ignore it.[277] In *Schauss,* defendant Metals Depository Corporation ("MDC") was sued in two Texas federal courts and several Texas state courts.[278] MDC was also a defendant in a New York federal action brought by the Commodity Futures Trading Commission, in which a receiver was appointed and all creditors were joined.[279] The New York federal court then enjoined the creditors from prosecuting any further actions against MDC.[280] One of the two Texas federal courts stayed its action temporarily, in accordance with the New York injunction, to learn what effect the New York injunction had on the Texas proceeding.[281] The New York receiver, however, failed to correspond with the Texas action, even though he was a party and aware of the proceedings.[282] The two Texas actions were consolidated, and the Texas parties agreed on a settlement and final judgment was entered.[283] The New York receiver, a non-participating party, appealed.[284] The Fifth Circuit set aside the Texas federal court's judgment, which was in violation of the New York injunction, even though the New York receiver's inaction was a significant cause.[285]

---

[275]*See id.* at 1526.

[276]*See* Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 151 (1988); *see also* Deus v. Allstate Ins. Co., 15 F.3d 506, 524 (5th Cir. 1994).

[277]757 F.2d 649, 653 (5th Cir. 1985).

[278]*Id.* at 651-52.

[279]*See id.* at 651.

[280]*See id.*

[281]*See id.* at 652.

[282]*See id.*

[283]*See id.*

[284]*See id.* at 653.

[285]*See id.* at 655.

## III. Intrastate Parallel Litigation

Texas courts will defer to the plaintiff's choice of forum,[286] but this factor is nullified in reactive suits with two plaintiffs in different courts, especially in declaratory judgment actions where the court determines that the declaratory judgment plaintiff was forum shopping.[287]   Even with deference to the plaintiff's choice, courts are inclined to economize excessive litigation with a presumption favoring the first-filed case, unless special factors compel a different decision.

### A. Consolidation and Transfers In Texas

#### 1. Consolidation Within One Court

Based on concerns of economy, convenience, and the avoidance of inconsistent judgments and jurisdictional conflicts, Texas law presumptively disfavors duplicative litigation among its state courts.[288]  A primary remedy for multiple cases having a common question of law or fact is transfer to the same court, and either (1) ordering of a joint trial, or (2) consolidating them for all purposes, both pursuant to rule 174(a) of the Texas Rules of Civil Procedure (based substantially on Rule 42 of the Federal Rules of Civil Procedure).[289]   In addition, Rule 41 of the Texas Rules of Civil Procedure (based on Rule 21 of the Federal Rules of Civil Procedure), provides in part that actions may be jointly tried or consolidated at any time before submission to the jury, on motion by any party or by the court.[290]   Neither the parties nor the claims need to be identical, and the decision is discretionary.[291]

#### 2. Transfers within a Judicial District

Duplicative cases pending in the same court require only consolidation, not transfer.  Transfer is required to consolidate duplicative cases pending in different courts in the same judicial district.  Transfers between district courts in the same judicial district are governed by section 24.303 of the Texas Government Code[292] and Rule 330(e) of the Texas Rules of Civil

---

[286]*See* McIntosh v. Copeland, 894 S.W.2d 60, 65 (Tex. App.—Austin 1995, writ denied).

[287]*See infra* Part III.B.1.

[288]*See* Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063, 1071 (1926).

[289]Tex. R. Civ. P. 174(2).

[290]Tex. R. Civ. P. 41.

[291]*See* Owens-Corning Fiberglas Corp. v. Martin, 942 S.W.2d 712, 716 (Tex. App.—Dallas 1997, no writ).

[292]TEX. GOV'T CODE ANN. § 24.303 (Vernon 1988).

Procedure.[293] Transfers between other courts in the same district use section 74.121 of the Texas Government Code.[294]

### 3. Transfers Between Different Judicial Districts in the Same State

Texas venue laws offer five grounds for moving cases to another district or county that might be used to transfer and consolidate related actions; none of the following cases are examples of parallel litigation.

#### a. Improper Venue

Section 15.063(1) of the Texas Civil Practice and Remedies Code provides for transfer from an incorrect venue to a correct one.[295] Upon defendant's motion and plaintiff's failure to establish venue, the presumption favoring plaintiff's choice is defeated and defendant may choose, limited of course to appropriate venues.[296] Plaintiffs may not use this section to correct mistaken filings, thus permitting defendants a presumptive choice after one filing mistake by plaintiffs.[297]

#### b. Impartiality

Section 15.063(2) of the Texas Civil Practice and Remedies Code permits a change of venue if the moving party shows an inability to obtain an impartial civil trial in the transferee district.[298]

#### c. Consent

Section 15.063(3) of the Texas Civil Practice and Remedies Code permits a transfer if the parties previously agreed to venue in another county,[299] for example by designating a contract's place of performance;[300] by attorney stipulation during the lawsuit;[301] or presumably by a choice of forum agreement.

---

[293]TEX. R. CIV. P. 330(e)

[294]TEX. GOV'T CODE ANN. § 74.121 (Vernon 1998).

[295]TEX. CIV. PRAC. & REM. CODE ANN. § 15.063(1) (Vernon 1986).

[296]*See* WTFO, Inc. v. Braithwaite, 899 S.W.2d 709, 714 (Tex. App.—Dallas 1995, no writ).

[297]*See* Tenneco, Inc. v. Salyer, 739 S.W.2d 448, 449 (Tex. App.—Corpus Christi 1987, no writ).

[298]TEX. CIV. PRAC. & REM. CODE ANN. § 15.063(2) (Vernon 1986); *see also* Wilson v. Texas Parks & Wildlife Dep't, 853 S.W.2d 825, 829 (Tex. App.—Austin 1993), *rev'd,* 886 S.W.2d 259 (Tex. 1994).

[299]Tex. Civ. Prac. & Rem. Code Ann. § 15.063(3) (Vernon 1986).

[300]*See WTFO,* 899 S.W.2d at 716.

[301]*See* Farris v. Ray, 895 S.W.2d 351, 352 (Tex. 1995).

### d. Inconvenient Forum

Prior to September 1, 1995, the three grounds listed above were the only means in Texas of transferring a case between districts for consolidation purposes. In 1995, the Texas legislature substantially rewrote Texas venue law and added an "inconvenient forum" transfer provision—section 15.002(b) of the Texas Civil Practice and Remedies Code[302] that resembles the federal venue transfer provision, 28 U.S.C. § 1404(a).[303] The motion must be filed prior to or with the answer. Thus, duplicative litigation in different districts within Texas may be resolved by a successful motion to transfer under section 15.002(b), followed by a motion to consolidate under Rule 174(a) of the Texas Rules of Civil Procedure. There are no transfer cases on point nor will there be, because decisions to or not to transfer are not appealable and are not grounds for reversible error.[304]

### e. Multidistrict Transfer

Rule 11 of the Texas Rules of Judicial Administration provides a multidistrict litigation procedure similar to the federal one, authorizing the transfer of cases with "material questions of fact and law in common with another case pending in another court in another county . . . ."[305] Like the federal version, the transfer is limited to pretrial proceedings including summary judgment. The Rule has no provisions for consolidation, and provides to the contrary that the assignment "under this rule terminates

---

[302]TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(b) (Vernon Supp. 2000) .

> For the convenience of the parties and witnesses and in the interest of justice, a court may transfer an action from a county of proper venue under this subchapter or Subchapter C to any other county of proper venue on motion of a defendant filed and served concurrently with or before the filing of the answer, where the court finds:
>
> (1) maintenance of the action in the county of suit would work an injustice to the movant considering the movant's economic and personal hardship;
>
> (2) the balance of interests of all the parties predominates in favor of the action being brought in the other county; and
>
> (3) the transfer of the action would not work an injustice to any other party.

*Id.*

[303]28 U.S.C. § 1404(a) (1993).

[304]*SEE* TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(c) (Vernon Supp. 2000).

[305]TEX. R. JUD. ADMIN. 11.1, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. F app. (Vernon 1998).

when . . . all pretrial proceedings are completed . . . ."[306]  Whether a party could then use Texas Civil Practice and Remedies Code section 15.002(b) as the basis for an inconvenient forum transfer to the common forum for consolidation for trial is unclear.  That result is not permitted in the equivalent federal practice under 28 U.S.C. § 1407.[307]

## B.  *Stays, Dismissals and Injunctions:  Texas and Other States*

### 1.  General Principles

Where transfer is unavailable, Texas follows the common law presumption against duplicative litigation in the same jurisdiction, that is, in other Texas state courts, and in favor of the first-filed suit.[308]  The second-filed case is either dismissed[309] or stayed, which is an "abatement" in Texas.[310]  In *Miles*, the Texas Supreme Court discussed the options of dismissal or abatement without providing guidelines as to which action is preferable, other than to state that abatement offers certain benefits, such as protecting a party's right to proceed in the second-filed forum if the first-filing party has filed as a sham with no intent to proceed.[311]

Consistent with federal practice, and no doubt with common law, Texas recognizes an exception to the favoring of the first-filed suit when a party is guilty of such inequitable conduct that he is estopped from using the first-filed suit to abate the second.[312]  Inappropriate conduct includes misrepresentations regarding the status of negotiations and intentions to file suit.[313]  Failing to file a timely objection or motion waives the presumption of the first-filed forum's dominant jurisdiction, allowing both actions to proceed until one reaches final judgment and possibly precludes the other.[314]

---

[306]*Id.* at 11.3(f).

[307]*See infra* Part II.B.6.

[308]*See* Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063, 1071 (1926).

[309]*See, e.g., id.*;  Mower v. Boyer, 811 S.W.2d 560, 563 n.2 (Tex. 1991);  Curtis v. Gibbs, 511 S.W.2d 263, 267 (Tex. 1974).

[310]*See* Miles v. Ford Motor Co., 914 S.W.2d 135, 139 (Tex. 1995);  Wyatt v. Shaw Plumbing Co., 760 S.W.2d 245, 248 (Tex. 1988).

[311]914 S.W.2d at 139.

[312]*See* Johnson v. Avery, 414 S.W.2d 441, 443 (Tex. 1966).

[313]*See id.*;  *see also Curtis*, 511 S.W.2d at 267;  V.D. Anderson Co. v. Young, 128 Tex. 631, 101 S.W.2d 798, 800-01 (1937);  Russell v. Taylor, 121 Tex. 450, S.W.2d 733, 736 (1932).

[314]*See Mower*, 811 S.W.2d at 563 n.2 (citing Estate of Maxey, 559 S.W.2d 458, 460-61 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.)).

The degree of similarity in the two lawsuits is a matter of interpretation. Cases approaching exact duplication require, as a matter of law, dismissal of the second action.[315] Similar, but not identical, cases may be discretionarily stayed with the inquiry being "the practical results to be obtained, dictated by a consideration of the inherent interrelation of the subject matter of the two suits," that is, whether a determination of the issues in one case will resolve all the issues in the other.[316]

Texas has a distinct rule for a declaratory judgment action that mirrors a first-filed lawsuit.[317] "As a general rule, an action for declaratory judgment will not be entertained if there is pending, at the time it is filed, another action or proceeding between the same parties and in which may be adjudicated the issues involved in the declaratory action."[318]

Texas law also allows for injunctions against parallel litigation.[319] Because the typical procedure is for the objecting party to file a plea in abatement, or stay, in the second suit, unless there is a reason to stay the first-filed suit,[320] few reported instances of in-state injunctive relief being granted exist.

Texas practice is indicative of that in other states. California has a "rule of exclusive concurrent jurisdiction" giving presumptive priority to the first-filed case, provided that the first court has jurisdiction over the subject matter and the parties.[321] The rule resembles the statutory plea in abatement but is more expansive in application, not requiring absolute identity of the parties or remedies.[322] Like the plea in abatement, the rule of exclusive concurrent jurisdiction is mandatory.[323] California has a similar

---

[315]*See Wyatt*, 760 S.W.2d at 248; *see also* TEX. R. CIV. P. 39, 97(a).

[316]Dolenz v. Continental Nat'l Bank, 620 S.W.2d 572, 575 (Tex. 1981) (quoting North Texas Coach Co. v. Morten, 92 S.W.2d 263, 266 (Tex. Civ. App.—Austin 1935, no writ).

[317]*See* Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970).

[318]*Id.*

[319]*See* Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063, 1073 (1926); Galveston, Harrisburg & San Antonio Ry. Co. v. Dowe, 70 Tex. 5, 7 S.W. 368, 371 (1888); Gulf, Colorado & Santa Fe Ry. Co. v. Pearlstone Mill & Elevator Co., 53 S.W.2d 1001, 1003 (Tex. Comm'n App. 1932, holding approved) (enjoining Pearlstone's attempt to file ninety-seven separate small claims suits, "from which no appeal will lie and in which the court costs and attorney's fees will be out of proportion to the amounts involved").

[320]*See, e.g.,* McCurdy v. Gage, 123 Tex. 558, 69 S.W.2d 56, 59 (Tex. Comm'n App. 1934, judgm't adopted).

[321]People *ex rel.* Garamendi v. American Autoplan, Inc., 25 Cal. Rptr. 2d 192, 197 (Ct. App. 1993).

[322]*See id.* at 198.

[323]*See id.*

rule for derivative actions that grow out of other lawsuits. In *Adams v. Paul*, the California Supreme Court stayed an attorney malpractice claim pending the outcome of the underlying action which was being dismissed on limitations grounds.[324] Although the court would seemingly stay the derivative lawsuit, the legal grounds may differ from routine stays of parallel actions. Thus, while California has developed a "rule of conclusive concurrent jurisdiction" related to the plea in abatement for true parallel actions, it stays derivative suits under the court's inherent authority.

New York statutorily authorizes discretionary stays "in a proper case, upon such terms as may be just."[325] Stays apply to local parallel actions and to other settings as well.[326] In spite of the statute's vague language, case law has imposed a requirement of "complete identity of parties, cause of action and judgment sought."[327] Further, case law disregards judicial economy by noting that the "possibility or actuality of two trials is not of importance."[328] Two New York cases refer to a "special circumstances" exception that would permit litigation of the second-filed action, but the cases involved probate matters first raised in the surrogate court's that were also raised in the Supreme Court, which has concurrent jurisdiction over such matters.[329]

Similar to New York, Ohio case law provides for dismissal of a second-filed in personam action, but requires that the claims be identical.[330] Pennsylvania appears to be in this camp, authorizing a stay in one action that may be resolved or made moot by the resolution of another case.[331] In contrast, California's identity rule is much looser, requiring only that the

---

[324]904 P.2d 1205, 1211 (Cal. 1995); *see also* Montrose Chem. Corp. v. Superior Court, 861 P.2d 1153, 1162 (Cal. 1993) (staying a declaratory action on insurance coverage, noting that "a stay of the declaratory relief action pending resolution of the third party suit is appropriate when the coverage question turns on facts to be litigated in the underlying action").

[325]N.Y. C.P.L.R. 2201 (McKinney 1991).

[326]*See, e.g.*, 660 Riverside Drive Aldo Assoc. L.L.C. v. Marte, 681 N.Y.S.2d 436, 438 (Civ. Ct. 1998) (granting stay of state case that was related to pending federal administrative action).

[327]Pierre Assocs., Inc. v. Citizens Casualty Co., 304 N.Y.S.2d 158, 160 (App. Div. 1969) (quoting Corporate Investing Co. v. Mt. Vernon Metal Prods. Co., 200 N.Y.S. 372, 374 (App. Div. 1923)).

[328]*Id.*

[329]*See* Lupoli v. Lupoli, 613 N.Y.S.2d 423, 424 (App. Div. 1994); *In re* Moody's Will, 176 N.Y.S.2d 1, 2 (App. Div. 1958).

[330]*See* State *ex rel.* Judson v. Spahr, 515 N.E.2d 911, 913 (Ohio 1987).

[331]*See* Gwynedd Properties, Inc. v. Board of Supervisors, 635 A.2d 714, 718 (Pa. Commw. Ct. 1993).

two actions grow out of the same transaction.[332] Illinois cases provide for a discretionary stay and have drawn authority from the *Landis* test.[333] Louisiana ordinarily dismisses a second-filed case, but will stay it when class action status is pending in the other suit, thus affecting the plaintiff's presence in that action.[334] Georgia law authorizes discretionary stays but not mandatory dismissals.[335]

## 2. Statutory Dismissal

At least two states, Illinois and New Jersey, have statutes providing for involuntary dismissal of the local action in deference to a parallel action. For both states, these dismissal remedies are in addition to stay remedies for parallel actions. The Illinois statute applies when "there is another action pending between the same parties for the same cause."[336] Dismissal is available upon defendant's motion and may be supported by affidavit to establish the existence of the parallel action. Also, dismissal applies to all parallel actions in or out of Illinois, in state, federal, and foreign courts, and gives preference, though not absolute, to the first-filed case. The court has the discretion to stay the action to allow for the possibility of claim and party joinder in the other action that would then justify dismissal.[337] New York has a more restrictive statute, which provides for discretionary dismissal of a parallel action in a New York court and "a court of any state or the United States."[338] The statute also applies to conflicts between a New York court and a court in another state or a federal court, but it does not apply to actions in foreign courts.[339]

---

[332]*See* Lord v. Garland, 168 P.2d 5, 10 (Cal. 1946); Lawyers Title Ins. Corp. v. Superior Court, 199 Cal. Rptr. 1, 2 (Ct. App. 1984).

[333]*See* Kaden v. Pucinski, 635 N.E.2d 468, 471 (Ill. App. Ct. 1994) (denying plaintiff's motion to stay one of many taxpayer claims she had filed against county clerks of courts); First Nat'l Bank v. Fabbrini, 627 N.E.2d 356, 358 (Ill. App. Ct. 1993) (granting stay despite lack of perfect identity between the two actions involving lender fraud and foreclosure).

[334]*See* Perkins v. Mobil Oil Corp., 621 So. 2d 899, 901 (La. Ct. App. 1993).

[335]*See* International Telecomm. Exch. Corp. v. MCI Telecomm. Corp., 448 S.E.2d 71, 73 (Ga. Ct. App. 1994); *accord* Graham v. Graham, 648 So. 2d 814, 816 (Fla. Dist. Ct. App. 1995) (discretionary stay of second-filed divorce action).

[336]735 ILL. COMP. STAT. 5/2-619(a)(3) (West 1992).

[337]*See* Quantum Chem. Corp. v. Hartford Steam Boiler Inspection and Ins. Co., 616 N.E.2d 686, 690 (Ill. App. Ct. 1993).

[338]N.Y. C.P.L.R. 3211(a)(4) (Consol. 1994); *see also supra* notes 325-29 and accompanying text (discussing New York's statute governing stays of parallel cases).

[339]*See* Abkco Indus., Inc. v. Lennon, 377 N.Y.S.2d 362, 368 (N.Y. App. Div. 1975) (holding that parallel actions in New York and England regarding contract dispute between the Beatles and their management company does not support dismissal).

## IV. INTERSTATE PARALLEL LITIGATION

Parallel litigation in an interstate setting involves slightly more rigid rules and less willingness on the part of courts to subordinate a local action to a foreign one, whether "foreign" means a sister state or another country. The United States Constitution's strong full faith and credit mandate, which compels states to recognize the "public Acts, Records, and judicial Proceedings" of sister states,[340] does not apply to pending litigation.[341] Rather, the "authority" in this setting is the non-binding comity doctrine, which leaves state courts free to maintain local preferences and prejudices. Nonetheless, rules have developed that favor judicial economy and fairness to the parties.

### A. "Transfers" to a Sister State

Transfers to a sister state are not yet recognized. The Uniform Law Commission has proposed a Uniform Transfer of Litigation Act ("Act") that provides for an interstate transfer "to serve the fair, effective, and efficient administration of justice and the convenience of the parties and witnesses" based on "all relevant factors, including the interest of each plaintiff in selecting a forum and the public interest in securing a single litigation and disposition of related matters."[342] The transferor court does not have to have personal or subject matter jurisdiction.[343] A transferee court with subject matter jurisdiction, but lacking personal jurisdiction under its own long arm statutes, may accept the case if the transferor court had both subject matter and personal jurisdiction, although the transferee court may not exercise personal jurisdiction inconsistent with due process.[344] The proposed Act has choice of law provisions for specific areas such as limitations,[345] pending proceedings,[346] and attorney-client agreements.[347] The Act does not include provisions for selecting the governing substantive law, but contemplates that this could be resolved in

---

[340]U.S. CONST. art. IV, § 1.

[341]*See* Texas Employers' Ins. Ass'n v. Jackson, 820 F.2d 1406, 1421-22 (5th Cir. 1987).

[342]UNIF. TRANSFER OF LITIG. ACT § 104, 14 U.L.A. 194 (Supp. 1999).

[343]*See id.*

[344]*See id.* § 102.

[345]*See id.* § 209.

[346]*See id.* § 211. Proceedings must be completed after transfer under the procedural rules of the transferring court. *See id.*

[347]*See id.* § 213.

the transfer order.[348] The transfer motion may be made by a party, or on the court's motion.[349] The proposed Transfer of Litigation Act was approved in 1991 but has not yet been adopted by any state.

Even without the proposed Act, most states have a rough approximation of an interstate transfer, common law forum non conveniens. Generally patterned after the Supreme Court's decision in *Gulf Oil Corp. v. Gilbert*,[350] forum non conveniens allows a forum to dismiss an action that is significantly inconvenient for a defendant, balanced against the plaintiff's and the affected state's interests, conditioned on the defendant's agreement to waive any objections to the refiling of the case in the convenient jurisdiction. The dismissing forum typically conditions the dismissal on successful refiling and an opportunity to litigate on the merits in the second forum.

The significant difference between this practice and a venue transfer within a single jurisdiction is that venue transfers are statutory and not dependent on a vague doctrine like comity, on which forum non conveniens is based. In spite of comity's vagueness, the movement of cases from one forum to another by forum non conveniens is now common and governed by reasonably uniform standards, such as those found in *Gilbert*.[351]

## B. Dismissing or Staying the Local Action

Historically, states ignored actions in other states. For example, in 1812, when plaintiffs Bowne and Seymour filed an action in assumpsit in New York, defendant Joy pleaded the pendency of the same action in Massachusetts.[352] The New York court responded with a borrowed English rule.[353] The rules states, "The pendency of a suit in a foreign court, by the same plaintiff against the same defendant, for the same cause of action, is no stay or bar to a new suit instituted here."[354] The *Bowne* case did not necessarily hold that the court lacked the discretion to stay the duplicate action.[355] Rather, the case stated that the defendant's responsive pleading

---

[348]*See id.* § 208.

[349]*See id.* § 105. *See generally* Thomas D. Rowe, Jr., *Jurisdictional and Transfer Proposals for Complex Litigation*, 10 REV. LITIG. 325, 354-58 (1991) (covering interstate transfers).

[350]330 U.S. 501, 508 (1947).

[351]*See infra* Part VII.A.2.

[352]*See* Bowne & Seymour v. Joy, 9 Johns. 221, 221 (N.Y. 1812).

[353]*See id.*

[354]*Id.* (citing Maule v. Murray 101 Eng. Rep. 1081 (K.B. 1798).

[355]*Id.*

did not set up a defense as a matter of law.[356] In any event, neither this opinion nor any of its contemporaries offer so much as a discretionary stay.[357]

*Lynch v. Hartford Fire Insurance Co.*, provides a review of the early precedents, from early holdings supporting dismissal to a clearly-established contrary rule that "a plea of *lis alibi pendens* is not good when the litigation is in a court of foreign jurisdiction."[358] In prescient dictum, the court added that courts in the future would "hold that they may attain the same end through their power of postponing actions and suspending judgments."[359] That prediction proved true over time as stays tended to become available. However, the rule of no dismissal for foreign actions, at one time "almost an unbroken rule in the courts of the American states," remains valid in many states.[360]

To the extent that a general rule may be derived from relatively few cases, stays are discretionarily available today in many jurisdictions under varying tests and presumptions, with a general preference for first-filed actions and an almost routine dismissal of a local case in deference to a first-filed in rem action. A few states, as discussed below, grant dismissals in deference to in personam actions. Texas courts will dismiss a local action in deference to an action in another state in three instances: (1) when a second-filed declaratory action could be resolved in the first-filed suit; (2) when the parties have a valid forum selection agreement designating another state; and (3) on forum non conveniens grounds.

### 1. Dismissal Under the First-Filed Rule

One often cited rule is that, in an interstate setting, mere duplication of actions is not grounds for dismissal.[361] Thus, a court usually will not dismiss its own action in deference to a parallel action in another state, based on nothing more than the sequence of filing. A New York case offers an explanation for the disfavor of dismissals on this ground in an

---

[356]*See id.*

[357]*See* Lindsay v. Larned, 17 Mass. 190, 190 (1821) (denying "abatement," apparently meaning dismissal); *accord* Drake v. Brander, 8 Tex. 351, 357 (1852).

[358]17 F. 627, 628 (D.N.H. 1883) (denying "abatement" or dismissal)

[359]*Id.*

[360]Mexican Cent. Ry. Co. v. Charman, 24 S.W. 958, 958 (Tex. Civ. App. 1894, no writ) (dismissing an action under the term "abatement").

[361]*See* McClellan v. Carland, 217 U.S. 268, 282 (1910). This case was cited in Colorado River Conservation District v. United States, 424 U.S. 800, 817 (1976).

interstate setting.[362]   In *White Light Productions, Inc. v. On The Scene Productions, Inc.*, the lower court had dismissed the second-filed New York action, deferring to a parallel case in California merely because of the timing in filing.[363]  The appellate court reversed the dismissal, holding that the dismissal was inappropriate without an evaluation of all forum non conveniens factors.[364]   Thus, courts confronted with a motion to dismiss because of a parallel action in another state or foreign country may routinely reject the first-filed rule and instead apply forum non conveniens analysis.

New York does, however, authorize a discretionary stay or dismissal of a New York action that parallels one in a sister state.[365]  New York is one of the states that uses a statute for domestic parallel cases, providing:

> A party may move for judgment dismissing one or more causes of action asserted against him on the ground that: ... there is another action pending between the same parties for the same cause of action in a court of any state or the United States; the court need not dismiss upon this ground, but may make such order as justice requires.[366]

New York courts have defined the statute's party identity requirement as being one plaintiff and one defendant common in each action, thus avoiding a more rigid complete identity requirement.[367]   In spite of *White Light*'s heightened requirement of a forum non conveniens analysis for dismissals, New York courts issue both stays[368] and dismissals.[369]  Only one case granting a dismissal for a sister state court can be found.[370]  In that case, the trial court had dismissed the suit, but it was reversed with a stay substituted.[371]

---

[362]*See* White Light Prods., Inc. v. On The Scene Prods., Inc., 660 N.Y.S.2d 568, 570 (App. Div. 1997).

[363]*Id.*

[364]*See id.* at 574.

[365]*See* N.Y. C.P.L.R. 3211(a)(4) (Consol. 1994).

[366]*Id.*

[367]*See* Morgulas v. J. Yudell Realty, Inc., 554 N.Y.S.2d 597, 599-600 (App. Div. 1990).

[368]*See* SafeCard Servs. v. American Express Travel Related Servs. Co., 610 N.Y.S.2d 23, 23 (App. Div. 1994) (ordering stay of local action in deference to Florida case).

[369]*See* Reliance Ins. Co. v. American Elec. Power Co., 637 N.Y.S.2d 710, 711 (App. Div. 1996) (affirming denial of dismissal in deference to Ohio federal action).

[370]*See SafeCard*, 610 N.Y.S.2d at 24.

[371]*See id.*

Illinois is another state providing a statutory remedy when "there is another action pending between the same parties for the same cause."[372] The statute applies to all actions, including those in other states in the United States, and gives priority to the first-filed case.[373]

Although Alabama apparently diminishes its deference to sister state parallel actions, it dismisses claims that should have been filed as compulsory counterclaims in a first-filed action in another state.[374] In *Martin v. Robbins*, Stephanie Robbins sued her former husband, Howard Robbins, in regard to a closely held company they owned.[375] Apparently in league with Mrs. Robbins, Jeanette Martin sued Howard Robbins in Tennessee on a related claim, based on Martin's status as a shareholder in the Robbins company.[376] Howard Robbins filed a third party claim against Martin in the Alabama action and obtained a default judgment.[377] On appeal, Martin asked the Alabama Supreme Court to dismiss Howard Robbins's claim against her on the ground that it was a compulsory counterclaim in the Tennessee action.[378] The court disagreed and held that the comity owed to Tennessee did not require dismissal in Alabama merely because the claim could be raised in the Tennessee action.[379]

Although Texas law does provide for the dismissal of a local action that duplicates another Texas lawsuit,[380] it distinguishes between intrastate conflicts and those with sister states or foreign countries. For example, *Williamson v. Tucker* noted that abatement, apparently meaning "dismissal," of a duplicative case applies only where "[b]oth courts had been created by the same sovereign," and in some cases was a matter of right, while staying an action in deference to a foreign action is discretionary.[381] Thus, "[t]he fact that a plaintiff in a Texas case had prior to filing such case in Texas, filed a suit, that still pends, against the same

---

[372]735 ILL. COMP. STAT. 5/2-619(a)(3) (West 1992).

[373]*See* Doutt v. Ford Motor Co., 659 N.E.2d 89, 92 (Ill. App. Ct. 1995) (affirming dismissal of class action in deference to similar cases in several other state and federal courts).

[374]See Martin v. Robbins, 628 So. 2d 614, 617-18 (Ala. 1993).

[375]*Id.* at 616.

[376]*See id.*

[377]*See id.*

[378]*See id.* at 618.

[379]*See id.*

[380]*See supra* Part III.B.

[381]615 S.W.2d 881, 885-86 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.).

defendant on the same cause of action in a court of a sister state is not ground for abating the Texas suit."[382]

Although dismissals tend to be unavailable for routine interstate parallel actions, they are available almost invariably for second-filed in rem actions in which a first court has already acquired jurisdiction over the property.[383] Dismissals may be available to enforce forum selection clauses,[384] for forum non conveniens matters,[385] and in some states, for second-filed declaratory actions.[386]

The law is so little developed in most states that the few cases available tend to rely on law from other states or federal courts. Because of the differences among the states' laws, each state's law must be scrutinized for these nuances. For example, Texas uses dismissals only for in-state conflicts.[387] Alabama, by contrast, dismisses not only in-state conflicts, but also local suits in favor of a first-filed federal action.[388] This distinction from Texas practice is more than semantic. Alabama does not apply this rule to parallel actions in sister states[389] and, thus, distinguishes between state and federal courts in dismissing a local action. Texas, on the other hand, generally treats federal courts the same as sister state courts by making dismissal unavailable but providing for a discretionary stay of the local action.[390]

## 2. Dismissal of the Second-Filed Declaratory Action

Texas law requires the dismissal of a local declaratory judgment action that is filed after a primary action in another state. In *Space Master International, Inc. v. Porta-Kamp Manufacturing Co.*, the court of appeals affirmed the dismissal of the Texas second-filed suit in favor of the first-filed New Jersey action, and a prior-filed Massachusetts federal action,

---

[382]Badgett v. Erspan, 476 S.W.2d 381, 382 (Tex. Civ. App.—Fort Worth 1972, no writ) (citing Drake v. Brander, 8 Tex. 351 (1852)).

[383]*See e.g.*, Interfirst Bank—Houston v. Quintana Petroleum Corp., 699 S.W.2d 864, 877-78 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (citing the *Princess Lida* rule).

[384]*See infra* Part IV.B.3.

[385]*See infra* Part IV.B.4.

[386]*See* Foreman v. Smith, 133 So. 2d 497, 501 (Ala. 1961).

[387]*See* Williamson v. Tucker, 615 S.W.2d 881, 885-86 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e).

[388]*See* Fegaro v. South Cent. Bell, 252 So. 2d 66, 68 (Ala. 1971).

[389]*See* Galbreath v. Scott, 433 So. 2d 454, 456 (Ala. 1983).

[390]*See* Project Eng'g USA Corp. v. Gator Hawk, Inc., 833 S.W.2d 716, 724 (Tex. App.—Houston [1st Dist.] 1992, no writ) (ordering stay in deference to parallel California action); *Williamson*, 615 S.W.2d at 885-86 (ordering stay in deference to parallel federal action).

which involved only intrastate parallel actions.[391]    The decision also invoked comity with other jurisdictions, observing that the "custom has practically grown into a general rule which strongly urges the duty upon the court in which the subsequent action is instituted to [dismiss the mirror image declaratory action]."[392]

### 3. Dismissals Based on Forum Selection Agreements

The Dallas Court of Appeals provided a thorough statement of Texas law on forum selection agreements in *Accelerated Christian Education, Inc. v. Oracle Corp.*.[393]    In this repetitive suit, the local plaintiff was dissatisfied with the California defendant's removal of the case to federal court.[394] The plaintiff filed a new case in state court, apparently hoping to avoid the forum selection clause, which designated California as the proper forum, in the parties' contract at issue.[395]

The plaintiff in both cases was Accelerated Christian Education ("Accelerated"), a Texas corporation which "designs and markets educational materials for home study and Christian educational institutions."[396]    Oracle is "a California corporation that designs and markets computer software and related services."[397]  An additional party, Brady, was Oracle's regional sales manager in Dallas.[398]  Deciding to upgrade its computer system, Accelerated entered into two contracts with Oracle, giving Accelerated a license to Oracle's software and providing Accelerated with technical support and consulting services.[399]    "Both contracts specified that California law would govern the contracts."[400] Each contract contained the following forum selection clause:

> In any legal action relating to this Agreement, [Accelerated] agrees (a) to the exercise of jurisdiction over it by a state or federal court in San Francisco or San Mateo

---

[391]794 S.W.2d 944, 947 (Tex. App.—Houston [1st Dist.] 1990, no writ) (relying on Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970)).

[392]*Id.* at 946 (citing Mills v. Howard, 228 S.W.2d 906, 908 (Tex. Civ. App.—Amarillo 1950, no writ); Evans v. Evans, 186 S.W.2d 277, 279 (Tex. Civ. App.—San Antonio 1945, no writ)).

[393]925 S.W.2d 66 (Tex. App.—Dallas 1996, no writ).

[394]*See id.* at 68.

[395]*See id.* at 69.

[396]*Id.*

[397]*Id.*

[398]*See id.*

[399]*See id.*

[400]*Id.*

County, California; and (b) that if [Accelerated] brings the
action, it shall be instituted in one of the courts specified in
subparagraph (a) above. Oracle may institute legal action
in any appropriate jurisdiction.[401]

In a few months, Accelerated became dissatisfied with Oracle's
software and services.[402] Accelerated then sued Oracle and Brady in Dallas
County for breach of contract, violations of the Texas Deceptive Trade
Practices Act, negligent misrepresentation, breach of warranty, fraud,
promissory estoppel, and gross negligence.[403] This was Accelerated's
second lawsuit because Oracle had removed the first suit to federal court
and then moved to dismiss for improper forum.[404] Before the federal court
ruled on Oracle's motion, Accelerated dismissed its lawsuit.[405] Accelerated
then filed this lawsuit in Texas state court.[406] Other than joining Brady as a
party, the second lawsuit was identical to the first.[407] The trial court
dismissed Accelerated's second lawsuit based on the contracts' forum
selection clause.[408]

In affirming the dismissal, the court of appeals made several key rulings
that provide a primer in this area of Texas law. First, contrary to
Accelerated's argument, Oracle was not required to perfect its choice of
forum defense by either entering a special appearance, which pertains only
to amenability issues, or filing a motion to transfer venue to California,
which the Texas court had no power to do.[409] Second, Texas's status as a
more favorable forum, based on the interests of witnesses and Texas public
policy, was irrelevant and incorrect in light of the parties' forum
agreement.[410] The court stated:

> Forum selection clauses are valid in Texas. When a
> party contractually consents to the jurisdiction of a
> particular state, that state has jurisdiction over that party as
> long as the agreed-to state will enforce the type of forum
> selection clause signed by the parties. California enforces

---

[401] *Id.*
[402] *See id.*
[403] *See id.* at 68-69.
[404] *See id.* at 69.
[405] *See id.*
[406] *See id.*
[407] *See id.*
[408] *See id.*
[409] *See id.* at 70.
[410] *See id.* at 71.

> forum selection clauses as long as it would not be
> unreasonable to do so. Nevertheless, a forum selection
> clause does not bind a Texas court if the witnesses' and the
> public's interest strongly favors jurisdiction in a forum
> other than the one the parties agreed to in the contract.
>
>      . . . .
>
>      Here, the parties agreed to litigate any disputes
> "relating to" the agreements in California. Two
> sophisticated parties in an arm's length commercial
> transaction negotiated the agreements, and neither side
> objected to the forum selection clause. Although Texas
> has a significant interest in remedying civil injury to Texas
> citizens, Texas also recognizes the validity of forum
> selection clauses and the right of parties to contractually
> select their forum for future litigation.
>
>      Accelerated argues enforcing the forum selection clause
> will frustrate the "public's interest" because Accelerated
> will then be deprived of its rights under the Texas DTPA.
> We disagree. Enforcing the forum selection clause does
> not automatically determine the law applicable to the case.
> A California court may well determine, under its choice-
> of-law principles, that Texas law, including the DTPA,
> applies. We conclude the public's interest does not
> *strongly* favor keeping this litigation in Texas.[411]

Third, the forum clause also applied to the non-contract claims. The
court observed that "[p]leading alternate noncontractual theories of
recovery will not alone avoid a forum selection clause if those alternate
claims arise out of the contractual relations and implicate the contract's
terms."[412] The court also held that the forum selection clause's term
"relating to" indicated the parties' intent that related noncontractual claims
be covered.[413] Fourth, the forum selection clause did not contravene a
specific Texas venue rule.[414] The court noted a shift in the law since the
1919 case cited by *Accelerated* and that American courts now routinely

---

[411]*Id.* at 70-71 (emphasis added) (citations omitted).

[412]*Id.* at 72 (citing Barnette v. United Research Co., 823 S.W.2d 368, 370 (Tex. App.—
Dallas 1991, writ denied) (enforcing a New Jersey forum clause)).

[413]*See id.*

[414]*See id.* at 73.

hold that forum selection clauses do not interfere with venue rules.[415] Fifth, the forum clause was not an impermissible waiver of Accelerated's right to select venue under the Texas Deceptive Trade Practices Act.[416] The court acknowledged the venue waiver provision at Texas Business and Commerce Code section 17.42, but held it inapplicable by extension of the party autonomy rule, which allows parties to choose which law governs a contract.[417] Finally, the court held that the contractual forum selection clause controlled the dispute even though the contract was not signed by one of the California defendants.[418]

The public policy exception that is noted in *Accelerated* is that a Texas court may disregard a forum selection clause if the witnesses' and the public's interest strongly favors jurisdiction in a forum other than the one the parties agreed to in the contract.[419] In *Turford v. Underwood*, the plaintiff, Turford, filed a declaratory judgment action in Texas seeking to invalidate a non-compete agreement in regard to Anatec, a former employer based in Michigan.[420] After the Texas action was filed, Anatec filed a parallel action in Michigan and then filed a dismissal motion in the Texas action based on an employment contract addendum designating Michigan as the parties' forum.[421] Turford objected, stating that the contract addendum was signed under duress and lacked consideration.[422] The trial court denied Anatec's dismissal motion, but then granted its motion to compel arbitration.[423] Turford then filed a mandamus action against District Judge Underwood.[424] The court of appeals held that Texas law controlled the non-compete agreement, despite the contract's choice of Michigan law, because of Texas public policy regarding strict and narrow

---

[415]*See id.*; M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 6 (1972); Greenwood v. Tillamook Country Smoker, Inc., 857 S.W.2d 654, 656 (Tex. App.—Houston [1st Dist.] 1993, no writ); *Barnette*, 823 S.W.2d at 369-70.

[416]*See Accelerated*, 925 S.W.2d at 74.

[417]*See id.* (relying on Wydel Assocs. v. Thermasol, Ltd., 452 F. Supp. 739, 742 (W.D. Tex. 1978); DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990)).

[418]*See Accelerated*, 925 S.W.2d at 75 (citing Brock v. Entre Computer Ctrs., Inc., 740 F. Supp. 428, 431 (E.D. Tex. 1990); Clinton v. Janger, 583 F. Supp. 284, 290 (N.D. Ill. 1984)).

[419]925 S.W.2d at 71; *see also Greenwood*, 857 S.W.2d at 656; Sarieddine v. Moussa, 820 S.W.2d 837, 839 (Tex. App.—Dallas 1991, writ denied).

[420]952 S.W.2d 641 (Tex. App.—Beaumont 1997, no writ).

[421]*See id.* at 642.

[422]*See id.*

[423]*See id.* This issue is reported in the appellate opinion, but was not raised on appeal. *See id.*

[424]*See id.*

readings of non-compete agreements.[425]   The argument that Texas law should govern a contract dispute that might otherwise be governed by Michigan law because of a choice of law clause is another reason for the Texas court to deny the parties' forum selection agreement. That is, the Texas forum has a public policy interest in litigating a case in which Texas law should govern in place of the forum law that would be applied under a contrary choice of law agreement.

Many other states enforce forum clauses, but the interstate examples are few. For example, as recently as 1995, the Oklahoma Supreme Court had not ruled on forum clause enforceabilty in an interstate setting.[426]   Digest and computer research indicates widespread acceptance of choice of forum clauses, but with significant variations in application. Some states that do enforce forum clauses use what appears to be a standard *Bremen* formula[427] although many limit enforcement to contracts or disputes with a relationship to the forum state.[428]

New York statutorily endorses certain forum agreements in section 5-1402(1) of the General Obligation Laws, requiring that state courts honor forum clauses in transactions of one million dollars or more that are subject to New York law.[429]   New York's civil procedure rules supplement this protection for forum clauses by providing that courts may not stay or dismiss an action on inconvenient forum grounds if: (1) the suit arises

---

[425]*See id.* at 643 (citing DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 681 (Tex. 1990)).

[426]*See* Bakhsh v. JACRRC Enters., Inc., 895 P.2d 746, 747 (Okla. Ct. App. 1995) (enforcing a Texas forum clause, citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1969)).

[427]*See* Professional Ins. Corp. v. Sutherland, 700 So. 2d 347, 350 (Ala. 1997) (overruling a longstanding Alabama ban on forum clauses); Societe Jean Nicolas et Fils v. Mousseux, 597 P.2d 541, 542 (Ariz. 1979); Bancomer, S.A. v. Superior Court, 52 Cal. Rptr. 2d 435, 439 (Ct. App. 1996) (noting presumptive validity and the challenger's heavy burden of proving unreasonableness); Tuttle's Design-Build, Inc. v. Florida Fancy, Inc., 604 So. 2d 873, 873-74 (Fla. Dist. Ct. App. 1992); Brinson v. Martin, 469 S.E.2d 537, 538 (Ga. Ct. App. 1996); Dace Int'l, Inc. v. Apple Computer, Inc., 655 N.E.2d 974, 977 (Ill. App. Ct. 1995); Brooke Group Ltd. v. JCH Syndicate 488, 663 N.E.2d 635, 637-38 (N.Y. 1996); Kennecorp Mortgage Brokers, Inc. v. Country Club Convalescent Hosp., Inc., 610 N.E.2d 987, 990 (Ohio 1993); Bakhsh v. JACRRC Enterps., Inc., 895 P.2d 746, 747 (Okla. Ct. App. 1995); Leasefirst v. Hartford Rexall Drugs, Inc., 483 N.W.2d 585, 587 (Wis. Ct. App. 1992); *see also* Central Ohio Graphics, Inc. v. Alco Capital Resource, Inc., 472 S.E.2d 2, 3 (Ga. Ct. App. 1996); Woodmen of the World Life Ins. Soc. v. Yelich, 549 N.W.2d 172, 175 (Neb. 1996); Reeves v. Chem Indus. Co., 495 P.2d 729, 732 (Or. 1972). *But see* Dailey v. Dallas Carriers Corp., 51 Cal. Rptr. 2d 48, 51 (Ct. App. 1996) (holding that a forum clause is enforceable only if it has reasonable basis and the forum state's law does not conflict with fundamental California policy).

[428]*See, e.g.*, Vanier v. Ponsoldt, 833 P.2d 949 (Kan. 1992).

[429]N.Y. GEN. OBLIG. LAW § 5-1402(1) (Consol. 1998).

from a contract governed by section 5-1402; and (2) the contract has a New York choice of law clause.[430]

States also vary in the exceptions to forum clause enforcement. Some, for example, readily enforce the public policy exception.[431] In Iowa, forum clauses are not enforceable per se, but are considered as one factor when determining whether to exercise jurisdiction.[432] New Jersey will generally enforce forum clauses,[433] but forum clauses in franchise agreements are presumptively invalid.[434] Utah requires that it have some state interest in the dispute.[435] At least one Ohio case has held it reversible error to dismiss following the enforcement of a forum clause and required that the case be stayed pending recommencement in the proper court.[436]

Some states still reject forum selection clauses, or severely limit them. Until 1994, North Carolina enforced forum clauses under common law standards similar to most other states.[437] In 1993, the North Carolina legislature statutorily overruled this precedent with the following language:

> Except as otherwise provided in this section, any provision in a contract entered into in North Carolina that requires the prosecution of any action or the arbitration of any dispute that arises from the contract to be instituted or heard in another state is against public policy and is void and unenforceable. This prohibition shall not apply to non-consumer loan transactions or to any action or arbitration of a dispute that is commenced in another state pursuant to a forum selection provision with the consent of

---

[430]*See* N.Y. C.P.L.R. 327(b) (Consol. 1998).

[431]*See, e.g.*, Morris v. Towers Fin. Corp., 916 P.2d 678, 679 (Colo. Ct. App. 1996).

[432]*See* Holiday Inns Franchising, Inc. v. Branstad, 537 N.W.2d 724, 730 (Iowa 1995).

[433]*See* Shelter Sys. Group Corp. v. Lanni Builders, Inc. 622 A.2d 1345, 1346 (N.J. Super. Ct. App. Div. 1993).

[434]*See* Kubis & Perszyk Assos. v. Sun Microsystems, Inc., 680 A.2d 618, 628 (N.J. 1996); *see also* Benjamin A. Levin & Richard S. Morrison, *Kubis and the Changing Landscape of Forum Selection Clauses*, 16 FRANCHISE L.J. 97 (1997).

[435]*See* Prows v. Pinpoint Retail Sys., Inc., 868 P.2d 809, 811 (Utah 1993).

[436]*See* Barrett v. Picker Int'l, Inc., 589 N.E.2d 1372, 1376 (Ohio Ct. App. 1990).

[437]*See* Perkins v. CCH Computax, Inc., 423 S.E.2d 780, 784 (N.C. 1992) (finding forum clauses valid in North Carolina unless the product of fraud or unequal bargaining power or enforcement would be unfair or unreasonable).

all parties to the contract at the time that the dispute arises.[438]

Delaware courts have held that forum clauses must be raised as affirmative defenses in the derogating forum, thereby denying plaintiff's request in the second forum for an antisuit injunction.[439] While this rule is logically sound, its result is that a party filing an action contrary to a forum clause will have the benefit of having its chosen forum decide the validity of the forum clause.

### 4. Interstate Forum Non Conveniens

Texas has three sources of forum non conveniens law: two statutes and a common law model based on *Gulf Oil Corp. v. Gilbert*.[440] The first statute, Texas Civil Practice and Remedies Code section 71.051, applies only to wrongful death and personal injury claims.[441] The statute was enacted in 1993 to legislatively overrule *Dow Chemical Co. v. Alfaro*,[442] which had read the wrongful death statute as pre-empting traditional forum non conveniens objections.[443]

Section 71.051 distinguishes between plaintiffs who are not legal United States residents and those who are. As to non-United States residents, section 71.051(a) authorizes a discretionary application of traditional forum non conveniens, without specifying criteria other than "in the interests of justice."[444] Under section 71.051(b), plaintiffs who are United States residents may obtain a stay or dismissal, in whole or in part, by proving by a preponderance of the evidence that: (1) an alternative forum exists; (2) it provides an adequate remedy; (3) litigation in Texas "would work a substantial injustice to the moving party"; (4) the other forum has jurisdiction over all proper defendants; (5) the balance of the private and public interests favor litigation in the other forum; and (6) the "stay or dismissal would not result in unreasonable duplication or

---

[438]N.C. GEN. STAT. § 22B-3 (1996). *See generally* Joseph E. Smith, Note, *Civil Procedure— Forum Selection—N.C. GEN. STAT. § 22B-3 (1994)*, 72 N.C. L. REV. 1608 (1994).

[439]*See* El Paso Natural Gas Co. v. Transamerican Natural Gas Corp., 669 A.2d 36, 40 (Del. 1995) (denying plaintiff's request for an antisuit injunction against a related Texas action in violation of the parties' Delaware forum clause).

[440]330 U.S. 501 (1947).

[441]TEX. CIV. PRAC. & REM. CODE ANN. § 71.051 (Vernon 1997).

[442]786 S.W.2d 674 (Tex. 1990).

[443]*See Legislature's Answer to Alfaro, supra* note 269, at 101-02.

[444]TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(a).

proliferation of litigation."[445]    Section 71.051(e) provides that if Texas plaintiffs are joined with foreign plaintiffs, whether United States residents or not, the action may not be stayed or dismissed under the test in section 71.051(b) if the action arose from a single occurrence, although dismissal is mandatory under section 71.051(e) if a party was joined solely to create Texas jurisdiction, that is, to avoid forum non conveniens.[446]    The remainder of section 71.051 sets out other procedural requirements and deadlines.[447]

The second statute, Texas Civil Practice and Remedies Code section 71.052, addresses asbestosis claims filed by persons who were not residents at the time their claims arose and requires dismissal of claims that did not arise in Texas and are filed after January 1, 1997.[448]  For claims filed after January 1, 1995, a plaintiff must elect whether to: (1) abate the claim for 180 days while attempting to obtain another forum; or (2) retain the claim in Texas, but agree to limitations on punitive damages.[449]  If the plaintiff opts for another forum, the defendant in the Texas court must waive the right to object to limitations on cases that were timely filed in Texas and must agree that discovery responses in Texas may be used in the other forum.[450]  To date, no case on this 1997 statute exists.

All other causes of action are governed by common law forum non conveniens, which has an erratic history in Texas.  The Texas Supreme Court has recently cited *Flaiz v. Moore* as the "embracing" of *Gulf Oil*'s analysis.[451]  *Flaiz*, however, does not compel the conclusion that the Texas Supreme Court embraced any notion of forum non conveniens.  Instead, the opinion reveals the court was reluctant to endorse forum non conveniens in any particular form and unwilling, in the circumstances of that case, to affirm the lower court's forum non conveniens dismissal.[452]  As noted above, in *Dow Chemical Co. v. Alfaro*, the Texas Supreme Court also construed the Texas wrongful death statute as precluding forum non conveniens dismissals.[453]  The case was then legislatively overruled by the

---

[445]*Id.* § 71.051(b).

[446]*See id.* § 71.051(e).

[447]*See id.* § 71.051(f)-(i).

[448]*Id.* § 71.052 (Vernon Supp. 1999).

[449]*See id.* § 71.052(c).

[450]*See id.* § 71.052(e), (f).

[451]*See In re* Smith Barney, Inc., 975 S.W.2d 593, 596 (Tex. 1998) (citing *Flaiz v. Moore*, 359 S.W.2d 872, 874 (Tex. 1962)).

[452]*See Flaiz*, 359 S.W.2d 872.

[453]786 S.W.2d 674, 677-79 (Tex. 1990).

amendment to the wrongful death statute.[454] However, Texas continues to follow common law forum non conveniens except where statutorily modified.[455]

In a further development, the Texas Supreme Court recently changed the law as to foreign corporations authorized to do business in Texas.[456] A 1941 Texas appellate case, *H. Rouw Co. v. Railway Express Agency*, had held that properly registered foreign corporations were entitled to maintain actions in Texas courts, without regard to forum non conveniens, based on two statutes that gave Texas corporations the power to maintain and defend lawsuits.[457] From this, the appellate court concluded that because Texas corporations had an absolute right to sue in Texas, properly registered foreign corporations did as well.[458] The Texas Supreme Court adopted the opinion merely by refusing appellate review,[459] creating a precedent that was reluctantly followed for years.[460] In 1998, the Texas Supreme Court rejected *Rouw*'s reasoning, finding that the power to maintain a suit was not the same as the right to do so, that *Gulf Oil v. Gilbert* had rejected this very concept, and that, in fact, "[i]t simply makes no sense to allow foreign corporations an absolute right to sue non-residents in Texas courts when individuals have never been accorded the same right."[461]

In 1993, the Texas Supreme Court considered whether the act of refiling in another state rendered the plaintiff's local appeal of a forum non conveniens dismissal moot.[462] Forum non conveniens dismissals are always determined by comparing the immediate forum to another and are based on a finding that the immediate forum is significantly less

---

[454]*See Smith Barney*, 975 S.W.2d at 597.

[455]*See id.* at 596; *see also* Sarieddine v. Moussa, 820 S.W.2d 837, 840 (Tex. App.—Dallas 1991, writ denied) (recognizing that forum non conveniens is not precluded by a forum selection clause); Seguros Commercial America S.A. De C.V., v. American President Lines, Ltd., 966 S.W.2d 652, 656 (Tex. App.—San Antonio 1998, no writ) (apllying forum non conveniens in insurance cases).

[456]*See Smith Barney*, 975 S.W.2d at 598.

[457]154 S.W.2d 143, 145 (Tex. Civ. App.—El Paso 1941, writ ref'd) (interpreting and applying the statutes formerly codified as TEX. REV. CIV. STAT. ANN. art. 1320 (Vernon 1925) and TEX. REV. CIV. STAT. ANN. art. 1532 (Vernon 1925), which provided properly registered foreign corporations "all the rights and privileges conferred by the laws of this State on corporations organized under the laws of this State").

[458]*See id.*

[459]*See* TEX. R. APP. P. 56.1(c).

[460]*See* '21' Int'l Holdings, Inc., v. Westinghouse Elec. Corp., 856 S.W.2d 479, 481 (Tex. App.—San Antonio 1993, no writ).

[461]*Smith Barney*, 975 S.W.2d at 597-98.

[462]VE Corp. v. Ernst & Young, 860 S.W.2d 83, 84 (Tex. 1993) (per curiam).

convenient than the other.[463] When the plaintiff's first choice of forum is undone by a forum non conveniens dismissal, the plaintiff must file again in the forum thought to be more convenient, and presumably this must be done within a reasonable time. The plaintiff's appeal of the first forum's dismissal does not necessarily eliminate the need for a timely filing in the second forum. An important question is whether the plaintiff's filing in the second forum renders the appeal of the forum non conveniens dismissal in the first moot.

The Texas Supreme Court answered the question in the negative in *VE Corp. v. Ernst & Young*.[464] VE Corporation ("VE") sued Ernst & Young for accounting malpractice for work performed in California.[465] The district court granted Ernst & Young's forum non conveniens dismissal motion and VE appealed.[466] Pending appeal of the dismissal, VE filed an identical suit in California.[467] Ernst & Young argued on appeal that the California action indicated VE's acquiescence to California as the forum of convenience and thus rendered the Texas appeal moot.[468] The court of appeals agreed and dismissed for mootness,[469] but the Texas Supreme Court reversed:

> Generally, an appeal is moot when the court's action on the merits cannot affect the rights of the parties. The court's action in this case does affect the rights of the parties.
>
> Identical suits may be pending in different states. In such a situation, the principle of comity generally requires the later-filed suit to be abated. Merely filing suit in California does not affect moot [sic] the issue of whether Texas is a proper forum for VE's suit against Ernst & Young, nor does it, without more, indicate VE's agreement that California is the forum of convenience. The court of appeals erred in dismissing the appeal as moot.[470]

---

[463]*See, e.g.*, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).

[464]860 S.W.2d at 84.

[465]*See id.*

[466]*See id.*

[467]*See id.*

[468]*See id.*

[469]VE Corp. v. Ernst & Young, 860 S.W.2d 116, 117 (Tex. App.—Ft. Worth 1993), *rev'd*, 860 S.W.2d 83 (Tex. 1993).

[470]*VE Corp.*, 860 SW.2d at 84 (citations omitted).

Most states apply some version of the forum non conveniens doctrine, generally resembling the *Gulf Oil v. Gilbert* test, although some codify the doctrine.[471] North Carolina's statute requires a stay of the local action instead of dismissal and further provides a five year "jurisdictional" period over the stayed case, after which the case must be dismissed.[472] The statute does not provide a test, but case law does enumerate relevant factors that North Carolina courts may consider, including: (1) the nature of the case, (2) witness convenience; (3) availability of compulsory process for witnesses; (4) relative access to sources of proof; (5) the applicable law; (6) the burden of litigating matters not of local concern; (7) the desirability of litigating matters of local concern in local courts; (8) convenience and access to another forum; (9) plaintiff's choice of forum; and (10) all other practical considerations.[473] Alabama did not have forum non conveniens doctrine, under statutory or common law, until 1987.[474] In that year, the state legislature adopted a statutory provision that considers "the location where the acts giving rise to the action occurred, the convenience of the parties and witnesses, and the interests of justice" and calls for dismissal if the factors suggest "that there exists a more appropriate forum."[475] Georgia appears not to subscribe to forum non conveniens law.[476] Louisiana has a doctrine far more restrictive than the federal one.[477]

---

[471]*See* Robertson & Speck, *supra* note 269, at 950 n.74. This appears to be the most complete recent attempt at assessing state forum non conveniens laws. Whether the authors' narrow focus on personal injury and wrongful death actions affects the accuracy of their state compilations in regard to commercial and other non-injury actions is unclear. Recent illustrative cases include Beckman v. Thompson, 6 Cal. Rptr. 2d 60 (Ct. App. 1992) (noting the California presumption against forum non conveniens if the plaintiff is a forum resident); Vinson v. Allstate, 579 N.E.2d 857 (Ill. 1991) (dismissing a case for indemnification in favor of Missouri courts); Sturman v. Singer, 623 N.Y.S.2d 883 (App. Div. 1995) (dismissing the case in favor of refiling in Delaware); Cheung v. General Slicing, Inc., 618 N.Y.S.2d 304 (App. Div. 1994) (finding that New Jersey was the appropriate forum).

[472]*See* N.C. GEN. STAT. § 1-75.12 (1999).

[473]*See* Motor Inn Management, Inc. v. Irvin-Fuller Dev. Co., 266 S.E.2d 368, 371 (N.C. Ct. App. 1980).

[474]*See* Employers Ins. v. Alabama Ins. Guaranty Assoc., 590 So. 2d 888, 892 (Ala. 1991) (denying forum non conveniens dismissal despite parallel, but not identical, California case).

[475]Ala. Code § 6-5-430 (1993).

[476]*See* Smith v. Board of Regents, 302 S.E.2d 124, 126 (Ga. Ct. App. 1983).

[477]*See* Miller v. American Dredging Co., 595 So. 2d 615, 617 (La. 1992) (rejecting the federal forum non conveniens law in favor of the more restrictive Louisiana law in maritime case), *aff'd*, 510 U.S. 443 (1994). The Supreme Court's opinion in *American Dredging v. Miller* established the important point that state courts are free to apply their own forum non conveniens law, or read more narrowly, that federal law does not preempt statute forum non conveniens law

Finally, Montana has provided a personal jurisdiction twist for the effect of parallel cases on convenience balancing.[478] The constitutional test for personal jurisdiction over non-residents has, over time, developed a convenience-balancing prong strongly resembling *Gulf Oil*'s test.[479] In *Columbia Falls Aluminum Co.*, the court dismissed a second-filed Montana action in favor of a prior California action, but instead of using traditional comity and first-filed preferences, the court dismissed for lack of personal jurisdiction under the due process clause.[480] Specifically, the court found that jurisdiction failed on the "fair play and substantial justice" test, a five-factor balancing test from a series of Supreme Court cases.[481] Interestingly, the court found that without the California litigation, Montana would have had jurisdiction, but that when comity was added to the jurisdictional test, California was the more appropriate forum.[482]

## 5. Staying the Local Action

If a challenge to the parallel Texas action is not premised on its being a second-filed declaratory action, or based on a forum selection clause or a forum non conveniens motion, then the challenger will likely have to be satisfied with a stay of the local action. A stay allows the local action to remain pending, awaiting the outcome of the other litigation. At that time, the other action may be given preclusive effect, and any issues not precluded may be tried.

As noted in Part III.B.1, Texas courts do not dismiss Texas actions in deference to parallel actions in sister states.[483] The related suit may,

---

in admiralty-type actions brought in state courts under the "savings to suitors" clause of 28 U.S.C. § 1333(1). 510 U.S. 443, 456-57 (1994). This does not mean, however, that federal interests will not override state interests in some forum non conveniens issues involving foreign interests. *See* EUGENE SCOLES & PETER HAY, CONFLICT OF LAWS 384-88 (2d ed. 1992). Note that states may distinguish between United States residents and foreign country residents in applying forum non conveniens. Texas is one example, as noted above in the discussion of 71.051(a) and 71.051(b).

[478]*See* Columbia Falls Aluminum Co. v. Hindin/Owne/Engelke, Inc., 728 P.2d 1342, 1345 (Mont. 1987).

[479]*See, e.g.*, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985).

[480]728 P.2d at 1345.

[481]*See id.* at 1344.

[482]*See id.*

[483]*See, e.g.*, Mexican Cent. Ry. Co. v. Charman, 24 S.W. 958 (Tex. Civ. App. 1894, no writ) (stating that the rule of no dismissal is almost unbroken in American states, but abating the action in question).

however, be grounds for a discretionary stay.[484] One ground for denying a stay is unreasonable delay in serving process on the defendant.[485] Where such a delay occurs, the trial court does not abuse its discretion in refusing to stay the later filed case.[486] Other factors that a court will consider include: (1) the action filed first; (2) the degree of party and issue identity; and (3) the timing of the motion to stay.[487] One of the more instructive examples of what can go wrong is found in the twin cases *Merritt v. Harless*[488] and *Brosseau v. Harless*.[489] These involved a dispute comprising six separate legal actions excluding appeals and including two different mandamus actions against a Texas district court judge by both of the opposing litigants Merritt and Brosseau.[490]

Other states are generally aligned with Texas in providing for discretionary stays and rejecting dismissals for second-filed local actions. New Jersey applies comity which requires that "the court which first acquires jurisdiction has precedence in the absence of special equities."[491] California's underlying policy for staying interstate parallel actions includes comity, the prevention of multiple and vexatious litigation, judicial economy, forum state interests, and party convenience.[492] Delaware law presumes against an identical second-filed Delaware case, calling for the trial court's discretion to "be exercised freely in favor of the stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the

---

[484]*See* Dawson-Austin v. Austin, 920 S.W.2d 776, 785 (Tex. App.—Dallas 1996), *rev'd on other grounds*, 968 S.W.2d 319 (Tex. 1998); Project Eng'g USA Corp. v. Gator Hawk, Inc. 833 S.W.2d 716, 724 (Tex. App.—Houston [1st Dist.] 1992, no writ); Space Master Int'l, Inc. v. Porta-Kamp Mfg. Co., Inc., 794 S.W.2d 944, 946 (Tex. App.—Houston [1st Dist.] 1990, no writ) (dismissing, rather than staying, a declaratory action); Mills v. Howard, 228 S.W.2d 906, 908 (Tex. Civ. App.—Amarillo 1950, no writ) (reversing the dismissal of an in rem, child custody case that does not illustrate the rule well since in rem cases almost compel a deference to the court first having jurisdiction).

[485]*See Dawson-Austin*, 920 S.W.2d at 785.

[486]*See id.* at 785-86 (citing Reed v. Reed, 158 Tex. 298, 304, 311 S.W.2d 628, 631 (1958)).

[487]*See Project Eng'g*, 833 S.W.2d at 724 (denying a stay where Texas action was filed first, the parties were not identical, and the motion was filed on the morning of the Texas trial).

[488]685 S.W.2d 708 (Tex. App.—Dallas 1984, no writ).

[489]697 S.W.2d 56 (Tex. App.—Dallas 1985, no writ).

[490]*See id.* at 57; *Merritt*, 685 S.W.2d at 709.

[491]*American Home Prods. Corp. v. Adriatic Ins. Co.*, 668 A.2d 67, 72 (N.J. Super. App. Div. 1995) (quoting Yancoskie v. Delaware River Port Auth., 395 A.2d 192, 193 (N.J. 1978)).

[492]*See* Leadford v. Leadford, 8 Cal. Rptr. 2d 9, 12 (Ct. App. 1992).

same issues."[493] This presumption is exercised along with typical balancing factors: "(1) . . . access to proof; (2) availability of compulsory process for witnesses; (3) the possibility of the view of the premises, if appropriate; (4) whether Delaware law will govern; and (5) all other practical problems that would make the trial of the case easy, expeditious, and inexpensive."[494] Conversely, first-filed local cases will survive except in rare cases where the defendant establishes that litigating in Delaware will cause "undue hardship and inconvenience."[495] In comparison, the discretion of a Colorado court may be guided by considerations, such as: (1) whether the subsequent action was filed solely to harass; (2) the nature of the actions; (3) which court could provide complete relief, if the actions are not identical; (4) where the cause of action arose; (5) which state's law will apply; (6) expense and inconvenience; (7) witness availability; (8) the cases respective progress; and (9) delay in obtaining trial.[496] New York provides for stays but requires a "complete identity of the parties, causes of action and relief sought."[497] Some courts will deny stays because of a perceived procedural defect in the other forum.[498] Other cases provide for a stay without announcing a test, or simply invoking comity.[499] North Carolina has used its forum non conveniens statute to stay parallel cases.[500]

---

[493]McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co., 263 A.2d 281, 283 (Del. 1970).

[494]General Foods Corp. v. Cryo-Maid, Inc., 198 A.2d 681, 684 (Del. 1964).

[495]Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. Partnership, 669 A.2d 104, 107 (Del. 1995).

[496]*See* Nationwide Mut. Ins. Co. v. Mayer, 833 P.2d 60, 62 (Colo. Ct. App. 1992) (holding that trial court should have stayed rather than dismissed the second-filed declaratory action by insurer in favor of first action in New Mexico).

[497]Del-Val Fin. Corp. v. Federal Ins. Co., 598 N.Y.S.2d 197, 198 (App. Div. 1993) (denying stay regarding related New Jersey case, quoting from *In re* Bozorth, 555 N.Y.S.2d 131, 132 (App. Div. 1993)).

[498]*See, e.g.,* Newell v. Newell, 293 P.2d 663, 670 (Idaho 1956) (denying stay regarding related California case because California lacked personal jurisdiction over the defendant).

[499]*See, e.g.,* Sauter v. Sauter, 495 A.2d 1116, 1118 (Conn. App. Ct. 1985); Merrill Lynch Pierce Fenner & Smith, Inc. v. Ainsworth, 630 So. 2d 1145, 1147 (Fla. Dist. Ct. App. 1993) (citing Siegel v. Siegel, 575 So. 2d 1267, 1272 (Fla. 1991)); Fitch v. Whaples, 220 A.2d 170, 172 (Me. 1966); Commercial Union Ins. Co. v. Wheeling Pittsburgh Corp., 666 N.E.2d 571, 577 (Ohio Ct. App. 1995); Singer v. Dong Sup Cha, 550 A.2d 791, 793 (Pa. Super. Ct. 1988); Power Train, Inc. v. Stuver, 550 P.2d 1293, 1294 (Utah 1976).

[500]*See* Lawyers Mut. Liab. Ins. Co. v. Nexsen Pruet Jacobs & Pollard, 435 S.E.2d 571, 573 (N.C. Ct. App. 1993) (granting stay in deference to first-filed South Carolina action).

Both the Uniform Child Custody Jurisdiction Act ("Uniform Act"),[501] and the federal Parental Kidnapping Prevention Act,[502] require the stay of a local action for child custody in deference to a parallel action in a court having superior jurisdiction.[503]  The Uniform Act also provides that if a Texas court has assumed jurisdiction under emergency grounds after another state has established primary jurisdiction, the Texas court will communicate with the other state to resolve the emergency.[504]  The Uniform Act has been adopted in all fifty states, the District of Columbia, and the Virgin Islands.

## C.  Antisuit Injunctions Against Sister State Litigation

Every state has the inherent power to issue antisuit injunctions in its equity power over persons subject to its in personam jurisdiction.[505]  The state law standards for interstate injunctions are often similar to those for international injunctions, and the authoritative cases tend to be used interchangeably.[506]  One reason is the inapplicability of the full faith and credit clause to interstate antisuit injunctions.  The clause, and its statutory counterpart, 28 U.S.C. § 1738, require states to give full faith and credit to the judicial proceedings of other states and would seemingly bar antisuit injunctions.  They do not do so[507] because full faith and credit only applies to final judgments, which antisuit injunctions are not.[508]

In his article on international antisuit injunctions, Professor Bermann briefly surveys interstate practice in the United States and finds three categories of interstate antisuit injunctions:  (1) protecting local residents

---

[501]The Texas version is codified at TEX. FAM. CODE ANN. §§ 152.001-.025 (Vernon 1996 & Supp. 1999).

[502]28 U.S.C. § 1738A (1994).

[503]See, e.g., Adoption of Zachariah K., 8 Cal. Rptr. 2d 423, 429 (Ct. App. 1992) (requiring stay in deference to related Oregon proceeding); Ex rel. S.A.V., 837 S.W.2d 80, 88 (Tex. 1992).

[504]See TEX. FAM. CODE ANN. § 152.204(d) (Vernon Supp. 2000); see also C.A.D. v. Roberts, 839 P.2d 165, 171-72 (Okla. 1992).

[505]See Roscoe Pound, The Progress of the Law, 33 HARV. L. REV. 420, 426 (1920); see also, infra Parts IV.C, VIII.C. Although Professor Bermann's article provides general examples of state practice, the number of states that are inclined to use that power for interstate parallel conflicts is unclear. See Bermann, supra note 36, at 594-97 nn.22-38.

[506]See e.g., Gannon v. Payne, 706 S.W.2d 304, 305-06 (Tex. 1986) (reversing international injunction); Golden Rule Ins. Co. v. Harper, 925 S.W.2d 649, 651 (Tex. 1996) (reversing injunction of action filed in another state).

[507]See Cole v. Cunningham, 133 U.S. 107, 134 (1890).

[508]See Texas Employers Ins. Ass'n v. Jackson, 820 F.2d 1406, 1421 (5th Cir. 1987), rev'd on rehearing, 862 F.2d 491 (5th Cir. 1988).

from inconvenience, vexatious, or harassing litigation in another forum, a forum non conveniens argument; (2) enforcement of a prior obligation not to sue, for example, forum selection clauses, arbitration clauses, or injunctions from the other court; and (3) preventing interference with the court's own jurisdiction, giving examples of gambling statutes, divorce, preferences from an insolvent debtor, garnishment of exempt wages, probate administration, and the likelihood of a less favorable choice of law, which interferes with a state's legislative jurisdiction rather than its judicial jurisdiction.[509] In contrast, Texas law observes four categories, or grounds for enjoining a party from sister state litigation: (1) protecting the forum's jurisdiction; (2) protecting the forum's public policy; (3) preventing a "multiplicity of lawsuits;" or (4) protecting a party "from vexatious or harassing litigation."[510]

### 1. General Principles in Texas

Notably, the Texas Supreme Court has denied antisuit injunctions in its last three opportunities, one as to a foreign lawsuit[511] and two as to sister state actions.[512] In spite of the Texas Supreme Court's reluctance to enjoin parallel litigation, lower courts are using these standards to issue injunctions.[513]

Texas first considered its power to enjoin litigation outside the state in 1890 in *Moton v. Hull.*[514] Otis Hull lived in Denison, Texas, and worked there for the Missouri Pacific Railroad.[515] In 1887, he incurred a debt to local merchant Moton & Son.[516] Moton was unable to collect from Hull in Texas, so he filed an action in Missouri to garnish Hull's wages from his employer, Missouri Pacific Railway Company, for whom Hull worked in

---

[509]Bermann, *supra* note 36, at 595-97.

[510]*Golden Rule*, 925 S.W.2d at 651. These four grounds are drawn intact from Texas' bellwether antisuit injunction case, *Gannon*, 706 S.W.2d. at 307, which involved a Canadian lawsuit rather than one from a sister state. *See infra* Part VIII.C.

[511]*See Gannon*, 706 S.W.2d at 308.

[512]*See* Christensen v. Integrity Ins. Co., 719 S.W.2d 161, 164 (Tex..1986); *Golden Rule*, 925 S.W.2d at 649-50.

[513]*See* Admiral Ins. Co. v. Atchison, Topeka & Santa Fe Ry. Co., 848 S.W.2d 251, 256-58 (Tex. App.—Ft. Worth 1993, writ denied) (upholding the trial court's injunction against a later-filed Illinois action, citing *Gannon*'s special circumstances test and finding that there was a multiplicity of suits and that the other action was vexatious and harassing).

[514]77 Tex. 80, 13 S.W. 849 (1890).

[515]*See id.* at 850.

[516]*See id.*

Texas.[517]   Under Texas law, then and now, wages were exempt from garnishment, and Moton was obtaining a remedy in Missouri it could not obtain in Texas.[518]   Hull filed an action in Texas to enjoin Moton from pursuing the Missouri garnishment.[519]   In upholding the lower court's granting of the injunction against the Missouri litigation, the Texas Supreme Court gave a thorough statement of the theory underlying injunctions against foreign litigation:

> [I]f the averments of the petition for injunction are of such a character as to make it the duty of the court to restrain or enjoin the party from instituting or conducting like proceedings in a court of this state, it would be a proper case for restraining him by a similar process from prosecuting such suit in the courts of another state. . . . This power or authority is exercised upon the ground of the right of the state to compel its citizens to respect its laws beyond its territorial jurisdiction.  "Although the courts of one country have no authority to stay proceedings in the courts of another, they have an undoubted authority to control all persons and things within their own territorial limits.  When, therefore, both parties to a suit in a foreign country are resident within the territorial limits of another country, the courts of equity in the latter may act in personam upon those parties, and direct them by injunction to proceed no further in such suit."  Such is the principle laid down by Mr. Justice Story. The exercise of this power does not proceed upon any claim of right to interfere with or in any manner control or stay the proceedings in the courts of another state, but upon the ground that the person to whom the restraining process is directed is residing within the court's jurisdiction, and that he is in the power of the court issuing such process.  The decree acts directly upon the person, and its validity as to him is not affected by the fact that it does not extend to the court in which the proceedings are directed to be restrained.[520]

---

[517]*See id.* at 849.

[518]*See id.*

[519]*See id.*

[520]*Id.* at 849-50 (citations omitted).

*Moton* was the precedent for years in Texas appellate opinions. One recent example of a Texas court considering enjoining litigation outside of the state is *New Process Steel Corp. v. Steel Corp. of Texas*, in which the court denied the plaintiff's antisuit injunction against the defendant's prosecution of a second-filed Oklahoma case, one in which a receiver had been appointed, thus creating an in rem jurisdiction for the Oklahoma court.[521] Despite the in rem nature of the Oklahoma case, the Texas appellate court examined several factors and found no clear equity that compelled the enjoining of the Oklahoma litigation.[522] The court distinguished the instant case from two others in which injunctions were granted against Louisiana litigation, pointing out that in the other two cases, the Texas court had both in personam and in rem jurisdiction and that Texas was more convenient.[523]

Texas law on antisuit injunctions was significantly updated in 1984 with *Gannon v. Payne*.[524] *Gannon* involved a second-filed Canadian case and thus did not necessarily announce standards applicable to interstate jurisdictional conflicts.[525] The Texas Supreme Court had a second opportunity to address jurisdictional conflicts that year with *Christensen v. Integrity Insurance Co.*, a case involving Texas and California lawsuits.[526] In *Christensen*, the court employed *Gannon*'s standards in an interstate setting and illustrated the difficulty in meeting the requirements for enjoining parallel litigation.[527] Christensen, a California resident, owned apartments in Houston that sustained hurricane damage in 1983 and freeze damage a few months later.[528] Integrity was the insurer.[529] While claims discussions were occurring in California, Integrity sued in Texas, alleging that Christensen and others had misrepresented the losses and collected

---

[521]638 S.W.2d 522, 525 (Tex. App.—Houston [1st Dist.] 1982, no writ).

[522]*See id.* at 526.

[523]*See id.* at 525 (distinguishing its holding from the holdings in PPG Indus., Inc. v. Continental Oil Co., 492 S.W.2d 297 (Tex. Civ. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.) (affirming injunction against Louisiana action); Chapman v. Marathon Mfg. Co., 590 S.W.2d 549 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) (affirming injunction against Louisiana action); *cf.* Gurvich v. Tyree, 694 S.W.2d 39 (Tex. App.—Corpus Christi 1985, no writ) (reversing trial court's injunction against Louisiana action)).

[524]706 S.W.2d 304 (Tex. 1986).

[525]*See id.* at 305.

[526]719 S.W.2d 161 (Tex. 1986).

[527]*Id.* at 163.

[528]*See id.* at 162.

[529]*See id.*

excessive reimbursement.[530] The California defendants filed a parallel action in California six days later, seeking a declaratory judgment of nonliability and damages for breach of contract.[531] Integrity then sought a temporary injunction from the Texas court to prohibit Christensen from pursuing the California litigation.[532] The Texas court granted the injunction, and the court of appeals affirmed.[533] However, the Texas Supreme Court reversed:

> No question exists that Texas courts are empowered to issue injunctions to prevent parties from going forward with litigation in a sister state. The principle of comity, however, requires that courts exercise this equitable power sparingly, and only in very special circumstances. A party seeking to enjoin an out-of-state lawsuit must show that a clear equity demands the Texas court's intervention. Christensen contends that Integrity failed to demonstrate that a clear equity is present in this case. We agree.
>
> An anti-suit injunction may be justified when the injunction will prevent a multiplicity of suits or will protect a party from vexatious or harassing litigation. A single parallel proceeding in a foreign forum, however, does not constitute a multiplicity nor does it, in itself create a clear equity justifying an anti-suit injunction. While both proceedings here undoubtedly concern the same general subject matter, Christensen's California lawsuit raises issues and involves parties that differ from those in the Texas litigation. Moreover, there is no indication that Christensen filed suit for purposes of vexation or harassment.
>
> Integrity maintains that the trial court properly enjoined the parties from participating in the California suit because Christensen failed to prove that Texas was not a convenient forum in which to try Integrity's suit. If Christensen were attempting to prevent Integrity from proceeding with the Texas litigation, this argument might be relevant, but such is not the case: Christensen only asks

---

[530]*See id.*
[531]*See id.* at 163.
[532]*See id.*
[533]*See id.*

this court to allow both lawsuits to go forward. The only question before us is whether the trial court abused its discretion in enjoining the California lawsuit.[534]

The Texas Supreme Court reaffirmed these principles in 1996, again refusing an antisuit injunction in *Golden Rule Insurance Co. v. Harper*.[535] Harper, an Illinois resident, sued Golden Rule Insurance Company in state district court in Houston for reimbursement of medical costs for his wife's cancer treatments at M.D. Anderson Hospital, where she was treated and where she died.[536] Golden Rule moved for a venue change from Harris County to Dallas County, where it had an agent.[537] Harper objected, and Golden Rule withdrew the motion.[538] Golden Rule then filed a declaratory judgment action in state court in Illinois, the state in which Harper resided and in which the policy was issued.[539] Harper obtained a temporary injunction from the Houston court, which enjoined Golden Rule from pursuing the Illinois litigation.[540] The court of appeals affirmed.[541] Golden Rule then sought a writ of error from the Texas Supreme Court, which granted the writ and reversed, dissolving the injunction.[542] The court began its analysis with three important premises.[543] First, "comity requires that courts exercise the power to enjoin foreign suits 'sparingly, and only in very special circumstances.'"[544] Second, antisuit injunctions are "appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation."[545] Third, the party seeking the injunction must show

---

[534]*Id.* (citations omitted).

[535]925 S.W.2d 649 (Tex. 1996).

[536]*See id.* at 650.

[537]*See id.*

[538]*See id.*

[539]*See id.*

[540]*See id.*

[541]*See id.*

[542]*See id.* at 652.

[543]*See id.* at 651.

[544]*Id.* (citing Christensen v. Integrity Ins. Co., 719 S.W.2d 161, 163 (Tex. 1986); Gannon v. Payne, 706 S.W.2d 304, 306 (Tex. 1986)).

[545]*See id.* (citing *Gannon*, 706 S.W.2d at 307). The fourth category, preventing vexatious or harassing litigation, has been likened to a forum non conveniens analysis in a pre-*Gannon* decision. That is, enjoining another state's litigation is inappropriate when the Texas forum is not preferable under a forum non conveniens analysis. *See* PPG Indus., Inc. v. Continental Oil Co., 492 S.W.2d 297, 300 (Tex. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.) (using the

that "a clear equity demands" the injunction.[546] Fourth, "[a] single parallel proceeding in a foreign forum . . . does not constitute a multiplicity nor does it, in itself create a clear equity justifying an anti-suit injunction."[547]

With this foundation, the court first noted that the court of appeals had not fit the instant case squarely within one of the four antisuit injunction categories, but had merely held that the trial court had not abused its discretion.[548] However, the supreme court agreed with the dissenting opinion in the appellate court, which had stated that the circumstances amounted "to nothing more than the added inconvenience and expense which are common to, and largely inevitable in, situations involving a single parallel lawsuit."[549] Such circumstances could not "justify an injunction without eliminating *Christensen*'s rule that anti-suit injunctions require 'very special circumstances.'"[550] Observing that even the court of appeals deemed these actions to be mirror images, the supreme court dissolved the injunction.[551]

> In *Gannon*, we did not accept the argument that pursuing a declaratory judgment action in a Canadian court on issues that could have been brought as defenses in the first filed Texas proceeding was a waste of resources, let alone that such additional expense would justify an injunction against the Canadian proceedings. Nor did we agree that the risk of inconsistent judgments was a significant one, since "the second forum is usually obliged to respect the prior adjudication . . .," so that "even if both proceedings continue, there should be only one judgment recognized in both forums."
>
> Moreover, we have never accepted the notion that a mirror image proceeding is sufficiently different from an ordinary single parallel proceeding to justify an injunction. We reject the implicit distinction of the court below between single parallel proceedings and mirror image

---

analysis from Flaiz v. Moore, 359 S.W.2d 872, 874-75 (Tex. 1962) and Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507-09 (1947)).

[546]*Id.* (citing *Christensen*, 719 S.W.2d at 163).

[547]*Id.* (citing *Christensen*, 719 S.W.2d at 163); *see also Gannon*, 706 S.W.2d at 307.

[548]*See id.*

[549]*Id.* (quoting Golden Rule Ins. Co. v. Harper, 905 S.W.2d 804, 811 (Tex. App.—Houston [14th Dist.] 1995) (Edelman, J., dissenting), *rev'd*, 925 S.W.2d 649 (Tex. 1996)).

[550]*Golden Rule*, 925 S.W.2d at 651 (quoting *Christensen*, 719 S.W.2d at 163).

[551]*See id.* at 652.

> proceedings . . . . This approach fails to give adequate weight to the principle of comity and threatens to allow the exception to swallow the rule. As we have said before, "if the principle of comity is to have any application, a single parallel proceeding . . . cannot justify issuing an anti-suit injunction." Such a suit must be allowed to proceed absent some other circumstances which render an injunction necessary "to prevent an irreparable miscarriage of justice." Merely because the suits present identical issues does not make their proceeding an "irreparable miscarriage of justice."[552]

In *Total Minatome Corp. v. Santa Fe Minerals*, the court of appeals reversed the trial court's injunction against related Montana litigation, holding that the equitable arguments raised by the party seeking the anti-suit injunction must be balanced against the comity considerations of interfering with another state's litigation.[553] The court first noted that the special circumstances required for an antisuit injunction included the traditional elements for injunctive relief: (1) irreparable injury; (2) with no adequate remedy at law; and (3) a likelihood of success on the merits.[554] The court then found that "[e]quity unquestionably permits an injunction to prevent a multiplicity of suits" and that such cases offered no adequate remedy at law, but that the mere existence of a related action did not justify the injunction.[555] To prevail, the party seeking an injunction would have to show the other action to be vexatious or some other injury showing irreparable harm.[556] Although Santa Fe did make such distinctions, the court held that they did not warrant the imposition of an injunction on the Montana action.[557]

---

[552]*Id.* at 651-52 (citations omitted).

[553]851 S.W.2d 336, 339 (Tex. App.—Dallas 1993, no writ).

[554]*See id.* at 339.

[555]*Id.* (citing *Christensen*, 719 S.W.2d at 163).

[556]*See id.* at 340.

[557]*See id.* at 340-41; *see also* Manufacturers Hanover Trust Co. v. Kingston Investors Corp., 819 S.W.2d 607, 612 (Tex. App.—Houston [1st Dist.] 1991, no writ) (holding that a single parallel proceeding in a foreign court does not constitute a multiplicity of suits or create a clear equity justifying an anti-suit injunction in a promissory note action with a parallel lawsuit in New York).

## 2. Other States

Antisuit injunctions are generally available under standards resembling those in *Golden Rule*, or more likely, the federal standards cited in cases such as *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*[558] or *Seattle Totems Hockey Club, Inc. v. National Hockey League*.[559] An example of a court not applying these somewhat restrictive federal standards is *Hoover Realty Co. v. American Institute of Marketing Systems, Inc.*, in which the Michigan court affirmed the enjoining of a party from pursuing a first-filed Missouri action because the Missouri court had indicated it would not apply Michigan's pertinent corporation law.[560] In *Williams v. Payne*, the Kansas Supreme Court approved a late-filed motion for injunction against the Kansas plaintiff who had filed a repetitive suit in Missouri and then engaged in several venue changes and other procedural maneuvers there.[561] The defendant became exasperated with the plaintiff's actions and moved to enjoin him from the Missouri action.[562] The court held that laches did not bar the motion and enjoined the already-developed Missouri action.[563]

A 1995 Delaware case highlighted the need to raise all appropriate defenses in the first forum before seeking an antisuit injunction in the second.[564] Transamerican Natural Gas Corporation, which transports natural gas throughout the United States for sale to public utilities, lost a suit to the El Paso Natural Gas Company in a Texas court.[565] After judgment and during the pending appeal, the parties reached a settlement agreement that included a forum selection clause designating Delaware as the forum for any lawsuits concerning the settlement agreement.[566] Transamerican later sued El Paso Gas in a Texas court, alleging fraud and breach of the settlement agreement.[567] El Paso Gas filed its claim in Delaware, requesting an injunction against the Texas lawsuit and specific performance of the forum clause.[568] The Delaware Chancery Court

---

[558]731 F.2d 909, 926-45 (D.C. Cir. 1984).

[559]652 F.2d 852, 855 (9th Cir. 1981); *see also infra* Part VII.B.2.

[560]179 N.W.2d 683, 686 (Mich. Ct. App. 1970).

[561]94 P.2d 341, 342 (Kan. 1939).

[562]*See id.*

[563]*See id.* at 344.

[564]*See* El Paso Natural Gas Co. v. Transamerican Natural Gas Corp., 669 A.2d 36 (Del. 1995).

[565]*See id.* at 38.

[566]*See id.*

[567]*See id.*

[568]*See id.*

dismissed the case, and the Delaware Supreme Court affirmed, holding that Transamerican had an adequate remedy at law to raise the forum clause as a defense in the Texas case.[569]

### 3. Refusal to Recognize Another State's Injunction

Although the Full Faith and Credit Clause requires states to honor "judicial proceedings" from sister states, the Supreme Court has held that it does not apply to antisuit injunctions.[570] Professor Bermann has expressed surprise at this by stating, "Curiously, although sister-state anti-suit injunctions plausibly constitute just the sort of denial of full faith and credit to 'Judicial Proceedings' in courts of other states that the Clause means to forbid, the Supreme Court has held that the Clause does not pose a bar to their issuance."[571] Bermann also stated that while "other courts whose proceedings have been targeted by sister-state anti-suit injunctions have accorded recognition to those decrees, in some instances reinforcing them with their own orders of prohibition and in others simply dismissing the action in question;" often courts ignore such injunctions, and "American law provides no satisfactory solution to the problem."[572] Where this happens, "the suit in question presumably will proceed to judgment."[573]

In *Great Global Assurance Co. v. McFarlin*, the court refused to honor a "stay" order from an Arizona court which had appointed a receiver for Great Global.[574] The court stated, "The injunctive clauses designed to discontinue or enforce any suit proceeding against appellant [Great Global] certainly could by no stretch of the imagination be binding on the 88th District Court of Hardin County, Texas, until and unless the latter had notice of it, *if then*."[575] In fact, the Arizona "stay" order had no effect in Texas. The order's only effect was in Arizona as to Great Global, which could face sanctions for violating the injunction.

## V. FEDERAL COURTS AND PENDING STATE LITIGATION

Conflicts with parallel state lawsuits are handled with four very distinct approaches in federal courts: (1) dismissal based on forum selection

---

[569]*See id.* at 41.

[570]*See* Cole v. Cunningham, 133 U.S. 107, 112 (1890).

[571]Bermann, *supra* note 36, at 599.

[572]*Id.* at 600-01.

[573]*Id.* at 601.

[574]728 S.W.2d 401, 402-03 (Tex. App.—Beaumont 1987, writ ref'd n.r.e.).

[575]*Id.* at 402 (emphasis added).

agreement;[576] (2) abstention, dismissal or stay, under the Colorado River doctrine, based on judicial economy or "wise judicial administration";[577] (3) abstention, dismissal or stay, based on federalism under the *Pullman, Burford* and *Thibodeaux* doctrines;[578] and (4) injunctions against the state action under the strict limits of the Younger doctrine and the Anti-Injunction Act.[579]    Other remedies such as transfer and forum non conveniens have only an incidental presence in this setting.

## A. *Transferring the Federal Case to State Court*

At least one state, Pennsylvania, has a law authorizing the transfer to its courts of a federal case with non-federal claims over which the court had, but now lacks, jurisdiction.[580]    The Third Circuit has approved this procedure, holding that "the state could authorize transfer of cases even though Congress had not spoken on the issue by analogy to procedures adopted by states for certifying questions of state law."[581]

Importantly, the Third Circuit based its holding on two important factors: (1) the federal court's jurisdiction over the state law claims that were later transferred; and (2) the presence of Pennsylvania's enabling legislation, similar to state legislation authorizing certified questions from federal court to a state supreme court.[582] The First Circuit rejected a similar argument based on a Maine "savings statute" that permitted transfer when the original action fails "for any matter of form."[583] Although the First Circuit distinguished its case from the Third Circuit's *Weaver* on several grounds, it questioned the Third Circuit's position that a court "bereft of jurisdiction has an 'inherent power' to transfer a case."[584]    In this questioning, the First Circuit apparently intended the term "bereft of jurisdiction" to mean a court that currently lacks jurisdiction whether it

---

[576]*See* International Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112, 115 (5th Cir. 1996).

[577]*See* Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 818 (1976).

[578]*See* CHARLES ALAN WRIGHT, LAW OF FEDERAL COURTS § 52, at 303-12 (1983).

[579]*See id.* § 52A, at 320-26.

[580]*See* Electronic Lab Supply Co. v. Cullen, 782 F. Supp. 1016, 1021 (E.D. Pa. 1991) (citing 42 PA. CONS. STAT. ANN. § 5103(b)(l) (West 1991)), *aff'd*, 977 F.2d 798 (3d Cir. 1992).

[581]*Id.* (citing Weaver v. Marine Bank, 683 F.2d 744, 747-48 (3d Cir. 1982)); *cf.* Rehberg v. Glassboro State College, 745 F. Supp. 1113, 1117 (E.D. Pa. 1990) (acknowledging 42 PA. CONS. STAT. ANN. § 5103(b), but refusing to utilize it in a transfer to a New Jersey Court).

[582]*See Weaver*, 683 F.2d at 746-47.

[583]Mills v. State of Maine, 118 F.3d 37, 51-52 (1st Cir. 1997) (citing ME. REV. STAT. ANN. tit. 14, § 855 (West 1980)).

[584]*Id.* at 52 n.4 (quoting Dantes v. Western Found Corp., 614 F.2d 299, 301 n.2 (1st Cir. 1980)).

once existed or not. Although the cases cited in the First Circuit's *Mills* opinion were all being considered for intra-federal transfers, the First Circuit's analogy is appropriate.[585]

The American Law Institute ("ALI") has proposed a more significant possibility for inter-system transfer.[586] The ALI's Complex Litigation Project has designed a series of procedures for transfer and consolidation between various courts, both state and federal, for the more efficient adjudication of duplicative litigation. The proposal calls for removal of state court cases by using supplemental jurisdiction under 28 U.S.C. § 1367[587] for cases "transactionally related" to ones in federal court, for consolidation there.[588] The ALI also calls for the availability of antisuit injunctions to suspend proceedings in the transferor court.[589] Interestingly, the proposal also calls for the availability of state courts as transferee courts for consolidation of actions that would include cases "transferred" from federal courts.[590]

## B. Dismissing the Federal Action Based on a Forum Selection Agreement

When contracting parties designate a state court in a forum clause and a subsequent lawsuit is filed in federal court in derogation of that clause, what law governs the clause's interpretation and enforceability? Enforcing forum selection clauses in a state-federal setting is complicated by an Erie doctrine issue, the determation of what law governs the forum clause's interpretation and enforceability. The Fifth Circuit resolved this issue and surveyed other circuit's laws, in *International Software Systems, Inc. v. Amplicon, Inc.*[591] The choices for governing law are more complicated than merely choosing federal or state law. Federal law on this issue may be

---

[585]*Cf.* Moravian Sch. Advisory Bd. v. Rawlins, 70 F.3d 270, 274-76 (3d Cir. 1995) (rejecting plaintiff's various theories for transferring her action brought under territorial law to the local courts).

[586]*See* American Law Institution, Complex Litigation Proposal: Statutory Recommendations and Analysis, § 5.01 (1994).

[587]28 U.S.C. § 1367 (1994).

[588]*See* American Law Institution, *supra* note 586, § 5.01.

[589]*See id.* § 5.04.

[590]*See id.* § 4.01; Sherman, *Antisuit Injunction and Notice of Intervention and Preclusion: Complementary Devices to Prevent Duplicative Litigation*, 1995 B.Y.U. L. REV. 925 (1995); Symeon Symeonides, *The ALI's Complex Litigation Project: Commencing the National Debate*, 54 LA. L.J. 843, 844 (1994).

[591]77 F.3d 112 (5th Cir. 1996).

subdivided into federal common law, enunciated in the *Bremen* case,[592] and federal statutory law,[593] which though not intended for a federal-state forum conflict, may be applied by analogy. After reviewing the options, the Fifth Circuit choose federal common law under *Bremen*.[594]

In *International Software*, International leased property from Amplicon, with lease agreements designating "the California Superior Court for the County of Orange" as the forum for any resulting lawsuits.[595] When International later decided that the leases were fraudulently induced, it sued Amplicon in Texas state court.[596] Amplicon removed the case to federal court based on diversity jurisdiction and then filed a motion to dismiss based on the leases' forum clause.[597] The district court dismissed, enforcing the forum clause under the *Bremen* test.[598] On appeal, the Fifth Circuit identified two issues: (1) whether a federal court may dismiss, as opposed to transfer, based on a forum selection clause designating a state court, where personal jurisdiction and venue are proper; and (2) what test determines whether dismissal is appropriate if the federal court has the power to dismiss.[599]

The court found that dismissal was available under 28 U.S.C. § 1406 to enforce a forum clause choosing a non-federal court, under both Fifth Circuit precedent[600] and implicitly in the Supreme Court's *Carnival Cruise Lines* decision.[601] Choosing the applicable test was more problematic. The Fifth Circuit first noted the Supreme Court's decision to apply the

---

[592]The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972); *see also infra* Part VII.A.3.a.

[593]*See* 28 U.S.C. § 1404(a) (1993).

[594]See *International Software*, 77 F.3d at 115.

[595]*Id.* at 113-14.

[596]*See id.* at 113.

[597]*See id.*

[598]*See id.* at 114.

[599]*See id.*

[600]*See, e.g.*, Zapata Marine Serv. v. O/Y Finnlines, Ltd., 571 F.2d 208, 209 (5th Cir. 1978) (affirming Texas district court's dismissal to enforce forum selection clause). Despite the court's reliance on section 1406, a federal district court in Texas has used Federal Rule of Civil Proceedure 12(b)(3) regarding improper venue to dismiss a case to enforce a forum clause. *See* Kessman & Assoc., Inc. v. Barton-Aschman Assoc., Inc., 10 F. Supp. 2d 682, 687 (S.D. Tex. 1997).

[601]*See International* Software, 77 F.3d at 114. In *Carnival Cruise Lines, Inc. v. Shute*, the Court upheld the dismissal of a federal action in Washington state that had ignored the contract's choice of Florida forum. 499 U.S. 585, 595 (1991). The Court acted on personal jurisdiction grounds, thus failing to utilize dismissal under 28 U.S.C. § 1406. *See id.* at 593-95. The Fifth Circuit nonetheless noted that this was an implicit approval of using dismissal to enforce a forum clause. *See International Software*, 77 F.3d at 114.

balancing test in 28 U.S.C. § 1404(a) to forum clause conflicts between two federal courts.[602] The Fifth Circuit would have preferred the same test for this case, that is, a forum clause conflict between a federal and a state court, but felt obliged to follow other federal courts' decisions and apply *Bremen*.[603] The important distinction is that *Bremen* tends to favor the enforcement of forum clauses as matters of contract, while the section 1404(a) balancing test merely treats the forum clause as one of several factors to be considered in a forum non conveniens analysis that tends to favor the plaintiff's non-contractual choice of forum. Interestingly, having decided that *Bremen* applies, the Fifth Circuit then enforced the forum clause, but under an analysis that more resembles section 1404(a) than *Bremen* in its discussion of burdens and convenience.[604] Forum clauses are discussed fully in the International section of this Article.[605]

The Fifth Circuit's statement in *International Software* that it wished to follow other federal courts[606] indicated some agreement on the issue of which law should govern the interpretation and enforceability of forum clauses that designate a non-federal, state or foreign, forum. To the contrary, federal courts are split. The Second and Fifth Circuits, for example, apply federal common law as expressed in *Bremen*.[607] The Third and Fourth Circuits use state law.[608] The Eight Circuit has applied both and in the same case.[609]

Nonparties raise another issue dealing with how close someone must be to the contract to be covered by the forum clause. This is illustrated in

---

[602]*See International Software*, 77 F.3d at 114-15 (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)).

[603]*See id.* at 115 ("We choose to join the other courts rather than make a circuit split and further complicate this area of the law.").

[604]*See id.* at 114-16.

[605]*See infra* Part VII.A.3; *see also* American Airlines, Inc. v. Rogerson ATS, 952 F. Supp. 377, 379, 383-84 (N.D. Tex. 1996) (enforcing the parties' agreement to submit to the jurisdiction of "the courts of the State of Texas," and further retaining jurisdiction over challenges by a nonsignatory to the contract containing the forum selection clause); Roberts & Schaefer Co. v. Merit Contracting, Inc., 99 F.3d 248, 254 (7th Cir. 1996) (holding that the trial court committed "clear error" in finding no forum selection clause).

[606]77 F.3d at 115.

[607]*See id.*; Jones v. Weibrecht, 901 F.2d 17, 18-19 (2d Cir. 1990).

[608]*See* Nutter v. Rents, Inc., 1991 WL 193490, at *5 (4th Cir. 1991); *In re* Diaz Contracting, Inc., 817 F.2d 1047, 1050 (3d Cir. 1987); *accord*, Rindal v. Seckler Co. 786 F. Supp. 890, 892 (D. Mont. 1992).

[609]*See* Farmland Indus. v. Frazier-Parrott Commodities, 806 F.2d 848, 852 (8th Cir. 1986) (finding federal law and Missouri law applied to deny the clause's selection of Illinois state courts); *infra* Part VII.A.3.

*Kessman & Assoc. v. Barton-Aschman Assoc.*, where defendant Parsons, a.k.a Barton-Aschman, obtained a contract with the Nevada Department of Transportation ("NDOT") to upgrade the Las Vegas Area Traffic Computer System.[610] Parsons in turn subcontracted with plaintiff Kessman regarding an aspect of the NDOT contract.[611] Parsons' primary contract with NDOT included a clause providing that any disputes with subcontractors would be submitted to an NDOT referee.[612] The clause did not appear expressly in the Parsons-Kessman subcontract.[613] A dispute arose and Kessman sued in federal court in Houston.[614] Parsons moved to dismiss for improper venue.[615] The court upheld the NDOT forum clause, holding that it was incorporated by reference from Parsons's primary NDOT contract.[616] The court also disallowed plaintiff's argument that the dispute arose from work done subsequent to the expiration of the NDOT contract.[617] The court dismissed the case under Federal Rule of Civil Procedure 12(b)(3), improper venue, for refiling with NDOT or in a Nevada state court.[618]

## C. Stays and Dismissals Based on the Abstention Doctrines

Four abstention doctrines exist by most accounts, although the count varies both in Supreme Court opinions and scholarship. Professor Wright identifies these doctrines as *Pullman, Burford, Younger,* and *Colorado River,* but suggests that their number is irrelevant.[619] Some discuss a *"Thibodeaux"* abstention as a separate doctrine,[620] while Wright treats *Thibodeaux* as a *Burford* variant though noting its failure to fit neatly within either the *Pullman* or *Burford* doctrines.[621]

While most abstention discussions begin with *Pullman,* it is appropriate to begin with *Colorado River* as the doctrine most pertinent to state-federal

---

[610]10 F. Supp. 2d 682, 684 (S.D. Tex. 1997).

[611]*See id.*

[612]*See id.* at 689-90.

[613]*See id.* at 689.

[614]*See id.* at 687.

[615]*See id.*

[616]*See id.* at 692.

[617]*See id.* at 692-93.

[618]*See id.* at 693.

[619]*See* 17A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 4241, at 28 (1988).

[620]*See, e.g.,* Weinberg, FEDERAL COURTS 598-99 (1994).

[621]17A WRIGHT, *supra* note 619, § 4244 , at 89-90 n.11.

parallel litigation and the only doctrine not based primarily on federalism. *Pullman and Burford* impose limits on federal courts' attempts to resolve matters of substantive law that are better left to the states. This article deals separately with the *Younger* doctrine, which involves a different limit on federal courts. That limit being interference with the state litigation process by issuing an antisuit injunction. The *Younger* discussion is followed by a brief summation of the Anti-Injunction Act, which combines with *Younger* to provide strict limits on federal courts enjoining parties from pursuing state litigation.

Recurring themes include whether a particular doctrine calls for stay or dismissal and whether it is imposed on a discretionary standard or as a matter of law. All but *Colorado River* may be raised at any time, including on appeal, and may be raised by the court.[622] The Tenth Circuit has ruled that *Colorado River* abstention requires a timely objection, since its purpose is to prevent excessive litigation, which will occur anyway if no timely objection is raised.[623]

### 1. *Colorado River* Abstention: Economy, Convenience and "Wise Judicial Administration"

*Colorado River v. United States* provides the essential state-federal parallel doctrine.[624] The case arose from a water rights dispute that would seem to implicate federal interests to the degree of requiring a federal forum, but did not because of a federal statute providing for state litigation of federal water interests.[625] Responding to increasing water rights claims, several southwestern states created procedures for allocating water rights and resolving conflicting claims.[626] One such state was Colorado, which in

---

[622]*See* Grimes v. Crown Life Ins. Co., 857 F.2d 699, 706-07 (10th Cir. 1988) ("[U]nder *Colorado River*, once a federal court has tried the case on the merits, it would be rare that the judicial resources would be conserved by abstaining on appeal."); Waldron v. McAtee, 723 F.2d 1348, 1351 (7th Cir. 1983) (finding court has the power and in the appropriate case the duty to order abstention, if necessary for the first time at the appellate level, even though no party requests it); Naylor v. Case & McGrath, Inc., 585 F.2d 557, 563 (2d Cir. 1978) (noting *Colorado River* abstention may be raised sua sponte); AFA Distrib. Co. v. Pearl Brewing Co., 470 F.2d 1210, 1213 (4th Cir. 1973) (noting that abstention may be raised on appeal); Urbano v. Board of Managers, 415 F.2d 247, 254 n.20 (3d Cir. 1969) (concluding abstention may be raised on appeal).

[623]*See* New Mexico v. Molybdenum Corp. of Am., 570 F.2d 1364, 1367 (10th Cir. 1978).

[624]424 U.S. 800 (1976).

[625]*See id.* at 804-806.

[626]*See id.* at 804 n.2.

1969 enacted a law dividing the state into seven Water Divisions.[627] Each division encompassing one or more entire drainage basins had adjudication occurring continuously in state courts.[628] Although not yet joined as a party, the United States claimed water rights in Division 7 relating to Indian reservations and other federal lands, such as national parks and forests.[629]

On November 14, 1972, the Government sued in federal district court in Denver, 300 miles from Division 7.[630] The federal action asserted rights under federal and state law, and was against some 1,000 water users.[631] The United States had earlier adjudicated non-Indian claims and other water claims based on state law in state courts in Water Divisions 4, 5, and 6.[632] This litigation continued at the time of this suit.[633] A defendant in the federal suit then joined the United States in the state action in Division 7 under the McCarran Amendment.[634] Several defendants and intervenors in the federal proceeding then moved to dismiss the federal action for lack of jurisdiction, citing to the McCarran Amendment.[635] The federal district court granted the motion and dismissed on abstention grounds.[636] On appeal, the Tenth Circuit Court of Appeals reversed, holding that the suit of the United States was within district court jurisdiction under 28 U.S.C. § 1345 and that abstention was inappropriate.

The Supreme Court granted certiorari to consider whether the McCarran Amendment terminated jurisdiction of federal courts to adjudicate federal water rights and "whether, if that jurisdiction was not terminated, the District Court's dismissal in this case was nevertheless appropriate."[637] The Court found that: (1) 28 U.S.C. § 1345 created federal

---

[627]*See id.* at 804

[628]*See id.*

[629]*See id.* at 805.

[630]*See id.*

[631]*See id.*

[632]*See id.* at 806.

[633]*See id.*

[634]*See id.* The McCarran Amendment (also known as the McCarran Water Rights Suit Act), consents to the United States being joined as a defendant in state or federal court "in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit." 43 U.S.C. § 666 (1994).

[635]*See Colorado River,* 424 U.S. at 806.

[636]*See id.*

[637]*Id.*

jurisdiction over the case;[638] (2) the state court had jurisdiction over Indian water rights under the Amendment;[639] and (3) none of the federal abstention doctrines warranted dismissal.[640] The Court then considered another basis for dismissal.[641]

> Although this case falls within none of the abstention categories, there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." Generally, as between state and federal courts, the rule is that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction. . . ." As between federal district courts, however, though no precise rule has evolved, the general principle is to avoid duplicative litigation. This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them. Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist.
>
> It has been held, for example, that the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts. This has been true even where the Government was a claimant in

---

[638] *See id.* at 809.

[639] *See id.*

[640] *See id.* at 813.

[641] *See id.* at 817-20.

existing state proceedings and then sought to invoke
district-court jurisdiction under the jurisdictional provision
antecedent to 28 U.S.C. § 1345. In assessing the
appropriateness of dismissal in the event of an exercise of
concurrent jurisdiction, a federal court may also consider
such factors as the inconvenience of the federal forum, the
desirability of avoiding piecemeal litigation, and the order
in which jurisdiction was obtained by the concurrent
forums. No one factor is necessarily determinative; a
carefully considered judgment taking into account both the
obligation to exercise jurisdiction and the combination of
factors counselling against that exercise is required. Only
the clearest of justifications will warrant dismissal.[642]

Applied to the facts, the Court first found an overriding federal policy
in the McCarran Amendment for the avoidance of "piecemeal adjudication
of water rights," which the Court likened to the first-filed rule for *in rem*
cases.[643] Apart from federal policy and applying the eclectic multi-factor
test, the Court found that: (1) the federal action had not progressed; (2) a
significant interest in the underlying action existed; (3) the 300-mile
distance between the District Court in Denver and the court in Division 7
was inconvenient; and (4) an ongoing participation by the United States in
other water rights actions in Colorado state courts undercut the federal
government's argument that it required a federal forum.[644] Notably, the
Court did not stay the case, as is common in some abstention doctrines, but
affirmed the decision to dismiss it.[645] In doing so, the Court emphasized
that it did "not overlook the heavy obligation to exercise jurisdiction."[646]

From this, we have a strong presumption favoring ongoing jurisdiction
in a federal case with a state parallel, but with a multi-faceted test that
provides, in extraordinary circumstances, for dismissal. The decision was
not easily derived, with a strong dissent by Justice Stewart with whom
Justices Blackmun and Stevens joined.[647] The *Colorado River* test is
obviously derived from the factors used in dealing with intra-federal
parallel actions. One important difference is the preference for dismissal

---

[642]*Id.* at 817-19 (citations omitted).

[643]*See id.* at 819.

[644]*See id.* at 820.

[645]*See id.* at 821.

[646]*Id.* at 819.

[647]*See id.* at 821.

or transfer in a pure federal conflict,[648] contrasted with the presumption favoring the exercise of jurisdiction in state-federal conflicts.[649]

Of course, the *Colorado River* opinion was not the first approach to this problem[650] and understanding the current doctrine requires a brief look at *Colorado River's* forebears. Most prominent is *Brillhart v. Excess Insurance Co.*, in which the Supreme Court dismissed a federal declaratory judgment action paralleling a state action on the grounds that a district court is "under no compulsion" to exercise jurisdiction that overlaps a pending state action.[651] This "under no compulsion" standard was

---

[648]*See* Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952).

[649]*See Colorado River*, 424 U.S. at 817, 820. *But see* Wilton v. Seven Falls Co., 515 U.S. 277, 279 (1995) (discussed *infra* at Part V.C.1.a).

[650]Illinois federal court had a distinct approach prior to *Colorado River*, applying an Illinois statute that permitted involuntary dismissal where "there is another action pending between the same parties for the same cause." 735 ILL. COMP. STAT. 5/2-619(a)(3) (West 1992). *See, e.g.,* Seaboard Fin. Co. v. Davis, 276 F. Supp. 507, 518 (N.D. Ill. 1967). Even though the Illinois statute would seem procedural and therefore inappropriate in federal court, the practice was arguably justified under the Erie Doctrine since federal law was relatively undeveloped at the time and no direct conflict existed. Later federal cases have rejected its use, in part because of the body of law developed under *Colorado River*. *See* Basic v. Fitzroy Engineering, Ltd., 949 F. Supp. 1333, 1336 (N.D. Ill. 1996); W.E. O'Neil Const. Co. v. National Union Fire Ins. Co., 721 F. Supp. 984, 990 (N.D. Ill. 1989).

[651]316 U.S. 491, 494 (1942). PPG Indus., Inc. v. Continental Oil Co. depicts the *Brillhart*-based standard prior to *Colorado River* for dealing with second-filed federal actions that duplicated state lawsuits. 478 F.2d 674 (5th Cir. 1973). In that case, the Fifth Circuit stayed a Louisiana diversity action regarding a gas sale contract that paralleled an action in Texas state district court in Harris County. *See id.* at 697. The court found that federal case law "made manifest a policy against dual litigation which applies with equal force to declaratory actions and ordinary equity suits." *Id.* at 679 (providing for "discretionary power in the federal courts to stay proceedings in equity suits" in reliance on *Brillhart*. In *PPG*, the decision was simplified by two factors. First, both actions were in rem, qualifying for an almost mandated stay of the second-filed action under the *Princess Lida* doctrine. *See supra* Part I.D. Second, this parallelism was not the first in the dispute. Prior to filing the federal diversity action in Louisiana, which the Fifth Circuit later stayed, PPG Industries had filed a duplicative action in Louisiana state court that, because of the in rem issues, led to the Texas state court's issuing an antisuit injunction against PPG, which effectively ended the Louisiana state case. *See* PPG Indus., Inc. v. Continental Oil Co., 492 S.W.2d 297, 301 (Tex. Civ. App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.). When PPG then filed the same action in a Louisiana federal court, Conoco could not use the Texas state court to enjoin that action. *See* Donovan v. City of Dallas, 377 U.S. 408 (1964) (discussed *infra* at Part VI.B.3). Accordingly, Conoco had to ask the federal court to stay its own action. *See Continental*, 492 S.W.2d at 305. The standards cited in *PPG Industries* for dealing with parallel state-federal litigation resemble those in *Colorado River*, with the significant difference of lacking a strong presumption favoring the continuation of both parallel actions to judgment.

seemingly overruled by *Colorado River*'s "unflagging obligation" standard for jurisdiction, but two years after *Colorado River*, the Court resuscitated *Brillhart* in greatly expanding *Colorado River*-type abstention in *Will v. Calvert Fire Insurance Co.*[652] *Will* was a second-filed federal declaratory judgment action, seeking to litigate a securities claim that was an affirmative defense in a state court action.[653] Four justices relied on *Brillhart*'s "no compulsion standard,"[654] and Justice Blackmun concurred based on *Colorado River*'s "exceptional circumstances" test, believing that the facts overcame the strong presumption favoring jurisdiction.[655] The four dissenters agreed that *Colorado River* governed, and that exceptional circumstances were not present.[656] *Will* thus appeared to greatly relax the federal standard for staying or dismissing a federal case paralleling a state case, although the expanded standard was limited on its facts to federal declaratory judgment actions.

### a. Moses Cone *and* Wilton *Refine the Test*

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* retreated from and distinguished *Will* more narrowly defining the concept of abstention in duplicative state-federal litigation.[657] In the initial state court action, the plaintiff, Moses Cone Hospital, sought declaratory relief to avoid arbitration in a dispute with a builder and architect.[658] Mercury Construction then filed a federal diversity action to compel arbitration under the Federal Arbitration Act.[659] The federal district court stayed its action in deference to the prior state litigation, citing *Colorado River*, and the court of appeals reversed, finding *Colorado River* abstention inappropriate.[660] The Supreme Court upheld the appellate court, underscoring the point that parallel litigation was not *per se* inappropriate and that *Colorado River* abstention required exceptional circumstances missing in this dispute.[661]

---

[652]437 U.S. 655 (1978).

[653]*Id.* at 657.

[654]*See id.* at 662-64.

[655]*See id.* at 667-68.

[656]*See id.* at 668-77.

[657]460 U.S. 1 (1983).

[658]*See id.* at 6-7.

[659]*See id.* at 7.

[660]*See id.* at 7-8.

[661]*See id.* at 29.

The analysis reiterated *Colorado River*'s factors and added two.[662] *Colorado River*'s four primary factors ("primary" only in *Colorado River*, since *Moses Cone* uses all factors evenly) are: (1) which court first assumed jurisdiction over property, if applicable; (2) the relative convenience of the state and federal forums; (3) the desirability of avoiding piecemeal litigation; and (4) the order in which jurisdiction was obtained.[663] *Colorado River*'s other factors, usually credited to *Moses Cone*, are: (5) the relative progress in the two actions; (6) the extent to which federal substantive law applies; and (7) any other special factors (in *Colorado River*, one was the federal government's previous willingness to litigate similar claims in state court).[664] *Moses Cone* then added: (8) the adequacy of the state forum in protecting the parties' rights; and (9) whether the federal court action was vexatious or filed in bad faith.[665]

Although the first four factors are treated as primary considerations, the language in both *Colorado River* and *Moses Cone* suggests that none has priority,[666] that any one factor might stand out in a given case,[667] and that there is a need for case-specific balancing rather than using the factors as a checklist.[668] *Moses Cone* expressly avoids any decision as to whether a stay or dismissal "should ordinarily be the preferred course of action" when *Colorado River* abstention is appropriate, but notes that both are refusals to exercise jurisdiction.[669] Presumably, then, the district court would select the appropriate remedy for the case—stays where the court has reason to retain the case and dismissals otherwise. Several federal actions have now opted for a stay.[670]

*Wilton v. Seven Falls Co.* clarified the confusion surrounding the *Colorado River/Moses Cone* standard, under which federal courts must exercise jurisdiction except in exceptional circumstances, and *Brillhart/Will*, which endorsed a broad discretionary standard without

---

[662]*See id.* at 19-28.

[663]*See id.* at 15 (quoting Colorado River v.United States, 424 U.S. 800, 818 (1976)).

[664]*Colorado River*, 424 U.S. at 820 (providing factors 1-4 and 7); *see Moses Cone*, 460 U.S. at 21-26 (providing factors 5 and 6).

[665]460 U.S. at 17 n.20.

[666]*See id.* at 15 (stating they are merely "some of the factors").

[667]*See id.* at 16; *Colorado River*, 424 U.S. at 818-19.

[668]*See Moses* Cone, 460 U.S. at 15-16.

[669]*Id.* at 28.

[670]*See, e.g.*, Trent v. Dial Medical of Florida, Inc., 33 F.3d 217 (3d Cir. 1994); LaDuke v. Burlington Northern R.R. Co., 879 F.2d 1556 (7th Cir. 1989); Allen v. Louisiana State Bd. of Dentistry, 835 F.2d 100 (5th Cir. 1988); Lumen Const., Inc. v. Brant Const. Co., 780 F.2d 691 (7th Cir. 1986). *See also* 17A WRIGHT ET AL., *supra* note 619, § 4247 n.83.

*Colorado River*'s balancing test.[671] Upholding the stay of an insurer's federal declaratory judgment action, *Wilton* held that *Brillhart* is valid, but limited to staying federal declaratory judgment actions that parallel state actions.[672] From these cases, it appears that a federal court may: (1) apply the *Brillhart/Will* standard to stay a federal declaratory judgment action that parallels a state action; or (2) apply the more rigorous *Colorado River/Moses Cone* balancing test to stay or dismiss a federal action, whether it seeks declaratory relief or not.[673]

Having stated the current *Colorado River* doctrine, other issues are ongoing. For example, when are actions parallel enough? In *Exxon Corp. v. St. Paul Fire and Marine Insurance Co.*, the court refused to stay the federal action because it was not sufficiently similar to the related state case.[674] The court identified the necessary similarity as involving "the same parties and the same issues," and noted that in the instant case, the state court proceeding did not have the same precise claims before it.[675]

Another issue, in light of the number of *Colorado River* abstentions granted, is how difficult the standard is in practice, that is, how often is the doctrine declined? As discussed above, the *Colorado River* standard is a difficult one; cases are rejected, although if the standard were as tough as its rhetoric sounds, more cases would be refused. *Tucker v. First Maryland Savings & Loan, Inc.,* is one example of a strict application of *Colorado River*'s "'virtually unflagging obligation' to exercise jurisdiction."[676]

---

[671]515 U.S. 277 (1995).

[672]*Id.* at 289. For an example of a denial of a stay motion under *Wilton*, see *Exxon Corp. v. St. Paul Fire and Marine Insurance Co.*, 129 F.3d 781 (5th Cir. 1997).

[673]For examples of stays, rather than dismissals, granted under *Colorado River*, see *Lumen Construction, Inc. v. Brant Conststruction Co.*, 780 F.2d 691, 698 (7th Cir. 1985); *Garber v. Sir Speedy, Inc.*, 930 F. Supp. 267, 271 (N.D. Tex. 1995), *aff'd*, 91 F.3d 137 (5th Cir. 1996); *Morisada Corp. v. Beidas*, 939 F. Supp. 732, 741 (D. Haw. 1995).

[674]129 F.3d 781, 788 (5th Cir. 1997). For additional cases discussing the necessary degree of parallelism, see *Ryan v. Johnson*, 115 F.3d 193, 196 (3d Cir. 1997); *Trent v. Dial Medical of Florida, Inc.*, 33 F.3d 217, 223-24 (3d Cir. 1994); *Schneider National Carriers, Inc. v. Carr*, 903 F.2d 1154, 1156 (7th Cir. 1990).

[675]*Exxon Corp.*, 129 F.3d at 785.

[676]942 F.2d 1401, 1407 (9th Cir. 1991) (quoting Colorado River Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)); *see also* Ryan v. Johnson, 115 F.3d 193 (3d Cir. 1997) (reversing the trial court's dismissal under *Colorado River*); St. Paul Insur. Co. v. Trejo, 39 F.3d 585, 591 (5th Cir. 1994) (reversing the trial court's dismissal under *Colorado River*); Burns v. Watler, 931 F.2d 140, 147-48 (1st Cir. 1991) (reversing the district court's stay); In re Chicago Flood Litigation, 819 F. Supp. 762, 767 (N.D. Ill. 1993) (denying abstention in damage suit for river flooded downtown tunnel); National Union Fire Ins. Co. v. Texaco Ref. & Mktg., Inc., 803

When the doctrine is declined, which standard of review is appropriate? The abstention doctrines are discretionary, but some exercises of discretion are greater than others. In *Doctor's Associates., Inc. v. Distajo*, the Second Circuit affirmed the district court's refusal to abstain in an action to compel arbitration and enjoin numerous state court actions by Subway restaurant franchisees.[677]   The court noted that the standard of review for declining abstention was less rigorous than for exercising abstention.[678]

### b.   Other Federal Tests for State-Federal Parallels

Apart from reliance on *Brillhart* or *Colorado River*, a distinct approach to dealing with federal declaratory judgment actions that parallel state actions is to highlight the Declaratory Judgment Act's discretionary nature. In *Travelers Insurance Co. v. Louisiana Farm Bureau Federation Inc.*, the Fifth Circuit held that a federal court has discretion to adjudicate or dismiss a declaratory judgment action under factors that

> include, but are not limited to, (1) whether there is a pending state action in which all of the matters in controversy may be fully litigated, (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant, (3) whether the plaintiff engaged in forum shopping in bringing the [federal] suit, (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist, (5) whether the federal court is a convenient forum for the parties and witnesses, and (6) whether retaining the lawsuit in federal court would serve the purposes of judicial economy.[679]

Some federal courts have continued to use the first-filed rule in federal-state parallel actions without referring to *Colorado River* or any of the other cases discussed above.[680]   This statement is especially true of in rem cases. As in other settings, the *Princess Lida* rule giving absolute priority to the first filed in rem case applies here:

---

F. Supp. 1247, 1251 (S.D. Tex. 1992) (a thorough application of *Colorado River/Moses Cone* factors, denying motion to dismiss first-filed federal claim in favor of parallel state action).

[677]107 F.3d 126, 136-38, 139 (2d Cir. 1997).

[678]*See id.* at 138.

[679]996 F.2d 774, 778 (5th Cir. 1993) (citations omitted).

[680]*See* Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169, 1173 (11th Cir. 1982); Commercial Union Ins. Cos. v. Torbaty, 955 F. Supp. 1162, 1163 n.1 (E.D. Mo. 1997) (denying dismissal of second-filed federal case because of plaintiff's bad faith conduct).

> To avoid unseemly and disastrous conflicts in the administration of our dual judicial system, and to protect the judicial processes of the court first assuming jurisdiction, the principle, applicable to both federal and state courts, is established that the court first assuming [in rem] jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other.[681]

### 2. Dismissals or Stays Based on Federalism-The Other Abstention Doctrines

While state-federal parallel litigation is best addressed by *Colorado River* abstention and its derivatives, the other federal abstention doctrines may be useful to parties who: (1) wish to reinforce a *Colorado River* argument; or (2) were contemplating a state court action when the opponents filed a federal case first and otherwise meet certain requirements discussed below. These other doctrines have vague boundaries that have prompted calls for a more comprehensive and succinct statement of this important federalism concept.[682] While *Pullman* is thought of as authorizing a stay and *Burford* a dismissal, these are not necessarily rigid. Dismissals have been granted in *Pullman* abstentions,[683] as stays have in *Burford* abstentions.[684]

#### a. Pullman *Abstention—Unclear State Law with Constitutional Implications*

The *Pullman* abstention doctrine comes from *Railroad Commission of Texas v. Pullman Co.*, which began with an administrative ruling from the Texas Railroad Commission that "no sleeping car shall be operated on any

---

[681]United States v. $270,000 in United States Currency, Plus Interest, 1 F.3d 1146, 1147-48 (11th Cir. 1993) (quoting Penn Gen. Casualty Co. v. Commonwealth, 294 U.S. 189, 195 (1935)); *see also* Cassity v. Pitts, 995 F.2d 1009, 1012 (10th Cir. 1993) (citing Princess Lida v. Thompson, 305 U.S. 456, 466 (1939)); Scarabin v. Drug Enforcement Admin., 966 F.2d 989, 995 (5th Cir. 1992) (finding that an initial state action regarding the forfeiture of alleged drug proceeds had priority over the federal agency's subsequent actions in federal court).

[682]*See generally* 17A WRIGHT ET AL., *supra* note 619, § 4241, at 28; BT Inv. Mgrs., Inc., v. Lewis, 559 F.2d 950 (5th Cir. 1977).

[683]*See* Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 383-84 (1949); Roe v. Rampton, 535 F.2d 1219, 1221 (10th Cir. 1976); Henson v. Atchley, 453 F. Supp. 555, 556 (E.D. Tenn. 1978).

[684]*See* Ankenbrandt v. Richards, 504 U.S. 689, 706 n.8 (1992); Kaiser Steel Corp. v. W. S. Ranch Co., 391 U.S. 593, 594 (1968) (per curiam); Feige v. Sechrest, 90 F.3d 846, 851 (3d Cir. 1996); *see also* 17A WRIGHT ET AL, *supra* note 619, §§ 4243, 4245.

line of railroad in the State of Texas . . . unless such cars are continuously in the charge of an employee . . . having the rank and position of Pullman conductor."[685] The order had been requested by Pullman conductors who disagreed with the decision by the Railroad Commission to require a conductor on trains having only one Pullman sleeping car.[686] These cars would have otherwise been left in the charge of one Pullman porter.[687] The conductors were white and the porters were black, so the railroads, no doubt, had a purely economic motive in keeping the lower paid porters.[688]

The Pullman Company and the railroads sued in federal court to enjoin the Commission's order.[689] The Pullman porters were allowed to intervene as complainants, and the Pullman conductors intervened in support of the order.[690] Plaintiffs argued that the Commission's order violated both Texas law and the federal Constitution.[691] The Commission's decision was based on a Texas statute that charged it with general regulatory oversight, although nothing in the statute addressed this particular issue.[692] Because the underlying Texas statute was ambiguous on this point and because the Commission's order had not been reviewed for its conformity to Texas law, the Supreme Court ordered the federal district court to defer further adjudication pending a state court review of the matter "to be brought with reasonable promptness."[693] The Supreme Court reasoned that if the Texas court found the Commission's order to be a violation of Texas law, then the federal constitutional issue would be moot, and if the Texas court upheld the order, then the federal court could adjudicate the constitutional issues.[694] From this comes the doctrine that federal courts should defer, or stay, litigation regarding constitutional challenges to unresolved issues of ambiguous state law, where the state's resolution of the question might moot the constitutional issue.

The test for *Pullman* abstention, that is, how to recognize an appropriate abstention setting is as vague as the state statutes it protects from premature constitutional scrutiny. *Pullman* clearly, requires: (1) a vague

---

[685] 312 U.S. 496, 497-98 (1941).
[686] *See id.* at 498.
[687] *See id.*
[688] *See id.* at 497.
[689] *See id.* at 498.
[690] *See id.*
[691] *See id.*
[692] *See id.* at 498-99.
[693] *Id.* at 501-02.
[694] *See id.* at 501.

or ambiguous question of state law that is one of first impression in that state's courts and under attack on constitutional grounds; and (2) a reasonable possibility that the state court's construction of the question will avoid the need for federal constitutional review, or at least materially change the inquiry.[695] Beyond that, the Supreme Court has not provided a clear test for the variety of fact settings that come under Pullman scrutiny.

Various circuits have developed their own tests. The Second Circuit has a three-part test for *Pullman* abstention: (1) unclear state law; (2) a constitutional issue based on the construction of the unclear state law; and (3) the unclear state law susceptible to a reasonable interpretation that would avoid the constitutional issue.[696] The Third Circuit also has a three part test, with the first two elements embracing the *Cuomo* test, and a third directed to "state interest": (1) unclear state law underlying federal constitutional claims; (2) subject to state court interpretation that would obviate the need for, or substantially narrow the scope of, federal adjudication; and (3) where an erroneous federal court decision on state law would disrupt important state policies.[697] The Ninth and Tenth Circuits' test mirrors that of the Third Circuit: (1) uncertain state law; (2) for which a definitive ruling would obviate the need for constitutional adjudication in the federal court; and (3) which touches on a sensitive area of state social policy.[698]

The Fifth Circuit also adopted a three-part 'test that was used in three cases from 1980 to 1984, but it was an erroneous statement of *Pullman* precedents.[699] *High Ol' Times, Inc. v. Busbee*, held that *Pullman* abstention is appropriate if any *one* of the following. factors is present: (1) if the "disposition of a question of state law can eliminate or narrow the scope of the federal constitutional issue"; (2) if the "state law question presents difficult, obscure or unclear issues of state law"; or (3) if "a federal decision could later conflict with subsequent state court resolutions

---

[695]*See* Bellotti v. Baird, 428 U.S. 132, 147 (1976); Baggett v. Bullitt, 377 U.S. 360, 375-77 (1964).

[696]*See* United Fence & Guard Rail Corp. v. Cuomo, 878 F.2d 588, 594 (2d Cir. 1989).

[697]*See* Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman, 99 F.3d 101, 106 (3d Cir. 1996).

[698]*See* Cedar Shake & Shingle Bureau v. City of Los Angeles, 997 F.2d 620, 622 (9th Cir. 1993); Lehman v. City of Louisville, 967 F.2d 1474, 1478 (10th Cir. 1992).

[699]*See* Mireles v. Crosby County, 724 F.2d 431, 433 (5th Cir. 1984); Pietzsch v. Mattox, 719 F.2d 129, 131 (5th Cir. 1983); High Ol' Times, Inc. v. Busbee, 621 F.2d 135, 139-40 (5th Cir. 1980); Note, *Pullman Abstention: Reconsidering the Boundaries* 59 TEMPLE L. Q. 1243, 1255-57 (1986).

concerning the same regulatory program or scheme, thus engendering more confusion."[700]

A better statement of Fifth Circuit law is found in *BT Investment Managers, Inc. v. Lewis*, which states that the *Pullman* case "teaches that in certain federal constitutional challenges to state statutes a federal district court should exercise its discretion[701] to stay its action pending interpretation of the challenged statute by the courts of the enacting state and thereby avoid an unnecessary federal constitutional decision," based on the doctrines of comity and federalism.[702] This somewhat broader test mirrors the Supreme Court's reluctance to define the *Pullman* doctrine in terms of distinct elements. This broader definition, however, narrows in two later cases. *Nissan Motor Corp. in U.S.A. v. Harding* held that "a federal court must find that the case presents a difficult, obscure, or unsettled issue of state law, the resolution of which could eliminate or substantially narrow the scope of the federal constitutional issue."[703] Then in 1993, *Word of Faith World Outreach Center Church, Inc. v. Morales*, held that "*Pullman* abstention . . . is addressed to the inappropriateness of federal court resolution of difficult or unsettled questions of state law and the undesirability of reaching constitutional questions that might be mooted by the application of state law."[704] Again in 1995, the Fifth Circuit deemed Pullman "appropriate only when there is an issue of uncertain state law that is 'fairly subject to an interpretation [by a state court] which will

---

[700]621 F.2d at 139; *see also Pietzch*, 719 F.2d at 131; *Mireles*, 724 F.2d at 433. The third factor seems to invoke *Burford* abstention concepts. *See infra* Part V. C. 2. b. During the 1980s, the Fifth Circuit issued at least one *Pullman* ruling without applying anything more than a basic definition. *See* O'Hair v. Hill, 641 F.2d 307, 310 (5th Cir. 1981). In O'Hair v. Hill, the plaintiff Madalyn Murray O'Hair filed a federal action asking for an injunction against the continued prosecution of four civil suits in Texas state courts, on the grounds that under Texas law, prospective jurors would be asked to "acknowledge the existence of a Supreme Being." *Id.* The Fifth Circuit upheld the lower court's denial, citing *Pullman*, to which the court referred to as mandating the "avoidance of a decision which would be based upon a tentative interpretation of state law." *Id.*

[701] 559 F.2d 950 (5th Cir. 1997). *Pullman's* discretionary nature is another unresolved issue, or at least one at variance. The Supreme Court has held that *Pullman* abstention was a matter of law. *See, e.g.* City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 640 (1959). The Court has also held that it was discretionary. *See* Baggett v. Bullitt, 377 U.S. 360, 375 (1964). The Fifth Circuit deems it discretionary as well. *See* Louisiana Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1491 (5th Cir. 1995). *See also* 17A WRIGHT ET AL., *supra* note 619, § 4241, 8 n.11.

[702]*Lewis*, 559 F.2d at 953.

[703]739 F.2d 1005, 1008 (5th Cir. 1984).

[704]986 F.2d 962, 967 (5th Cir. 1993).

render unnecessary or substantially modify the federal constitutional question.'"[705]  The Fifth Circuit would seem, then, to have a two part test: (1) a constitutional challenge to a difficult, obscure, or unsettled question of state law; (2) whose resolution may eliminate or substantially narrow the scope of the federal constitutional issue.  Other circuits seem to act as the Fifth, citing broader and more general descriptions of the *Pullman* doctrine and declining consistent distinct-element tests.[706]

The *Pullman* doctrine has seen cyclical use in the Supreme Court, and, to a large extent, the doctrine has been supplanted by the time and cost-saving practice of certifying unresolved questions of state law to state supreme courts.[707]  This shift in favor of utilizing certified questions applies mostly to cases with no parallel lawsuit.  *Pullman* abstention remains appropriate for staying a federal case involving a novel question of the constitutionality of state law where the same issue is being litigated in a parallel state case.

To the extent that Pullman cases arise, one recurring question is the degree of uncertainty or ambiguity required for abstention.  *Baggett v. Bullitt* held that mere constitutional challenges to state law does not call for abstention unless there is a substantial likelihood that the state court's ruling will avoid the need for a federal constitutional review.[708]  In so holding, *Baggett* distinguished between two categories of statutory vagueness:  (1) vagueness as to whom the statute applies, which is grounds for abstention; and (2) vagueness as to conduct required by the statute, which is not grounds for abstention.[709]

This requirement may be better illustrated in cases rejecting *Pullman* abstention for lack of ambiguity.  In *Hawaii Housing Authority v. Midkiff*, the Court found that a state law that condemned privately held property in an effort to redistribute land ownership was not subject to *Pullman*

---

[705]Baran v. Port of Beaumont Navigation Dist., 57 F.3d 436, 442 (5th Cir. 1995) (quoting Louisiana Debating and Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1492 (5th Cir. 1995) (quoting Harman v. Forssenius, 380 U.S. 528, 534-35 (1965))).

[706]*See generally* 17A WRIGHT ET AL., *supra* note 619, §§ 4242-4243 (2d ed. 1988) (giving examples of the various interpretations of the *Pullman* doctrine by the circuits).

[707]*See* Arizonans for Official English v. Arizona, 520 U.S. 43, 76 (1997); *see generally* 17A WRIGHT ET AL., *supra* note 619, §§ 4242-4243 (2d ed. 1988) (discussing the *Pullman* abstention doctrine and state certification procedures).

[708]377 U.S. 360, 376 n.12 (1964); *see also* Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 306 (1979) (holding that the state law must be "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question" to justify abstention.) (quoting harman v. Forssenius, 380 U.S. 528, 535 (1965)).

[709]*See id.* at 375-78; *see also*, Procunier v. Martinez, 416 U.S. 396, 401 & n.5 (1974).

abstention because the state law was clear on its face, even though the Hawaii courts had not had an opportunity to review it.[710] Similarly, *City of Houston v. Hill* held that when a statute is not ambiguous, the federal courts do not need to abstain even if the state courts have never interpreted the statute.[711] The Court has also held that the availability of certification to the state supreme court is not by itself sufficient to justify abstention.[712]

Where ambiguity does exist, it may be appropriate to resort to state court if two other important issues emerge regarding the need for, or viability of, a parallel case. First, state court resolution of ambiguous questions is not an exhaustion of the remedies requirement.[713] The second issue is the problem of delay seriously harming constitutional rights. Where awaiting the state court resolution will seriously harm constitutional rights, the court may refuse otherwise appropriate abstention.[714] These rulings provide guidance not only to the federal court ruling on a *Pullman* motion, but for parties contemplating a parallel state action and state courts ruling on the appropriateness of a stay there.

Although *Pullman* may be applicable without parallel state and federal cases (where only a federal case has been filed), it is applicable in parallel cases.[715] In fact, the Supreme Court has emphasized that a pending state court action makes *Pullman* abstention more likely.[716] In *Employers Association, Inc. v. United Steelworkers of America*, the Eighth Circuit withdrew its opinion when it learned that the Minnesota Supreme Court

---

[710]467 U.S. 229, 236-37 (1984).

[711]482 U.S. 451, 468-69 (1987); *see also* Wisconsin v. Constantineau, 400 U.S. 433, 438-39 (1971); Peyote Way Church of God, Inc. v. Smith, 742 F.2d 193, 199 (5th Cir. 1984); Johnson v. American Credit Co. of Georgia, 581 F.2d 526, 529-30.

[712]*See Hill*, 482 U.S. at 470.

[713]*See* Constantineau, 400 U.S. at 433. At issue in this case was the constitutionality of a Wisconsin statute permitting a police chief to post a person's picture in liquor stores to prohibit his purchase of alcohol for one year. *See id.* at 434-35. Three dissenting justices viewed this as appropriate for *Pullman* abstention to give Wisconsin courts a chance to review it under Wisconsin's due process clause, which was identical to the federal clause. The majority disagreed, holding that Pullman abstention was not appropriate merely to give a state court the chance to declare the state statute unconstitutional. *See id.* at 439. The Court reasoned that such a requirement would undermine the federal courts' role as the constitutional watchdog.

[714]*See* Nissan Motor Corp. v. Harding, 739 F.2d 1005, 1011 (5th Cir. 1984); Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 628 (1974).

[715]*See* Word of Faith World Outreach Center Church, Inc. v. Morales, 986 F.2d 962, 969 n.11 (5th Cir. 1993).

[716]*See* Arizonans for Official English v. Arizona, 520 U.S. 43, 79-80 (1997); *see also* Morales, 986 F.2d at 969 n.12.

had already issued an opinion on state law.[717] The state opinion did not eliminate the constitutional question, and the federal court ruled that it would hold the case on its docket pending the United States Supreme Court's review of the certiorari petition.[718] The federal court stated that it would consider the merits of the constitutional claim later, if necessary.[719]

### b. Burford *Abstention--Avoiding Conflict With Complex State Regulatory Systems*

The *Burford* abstention doctrine, from *Burford v. Sun Oil Co.*, requires dismissal of federal actions involving questions governed by a complex state regulatory scheme that raises a constitutional issue.[720] The case involved the Texas Railroad Commission's regulation of drilling permits.[721] Sun Oil filed suit in federal court challenging the validity of the Commission's decision granting Burford permission to drill four oil wells on a small plot of land in an East Texas oil field.[722] The action was based both on diversity of citizenship and Sun Oil's due process claim.[723] If Sun Oil had sought judicial review within the Texas courts, it would have been required to file its claim in the courts of Travis County, the location of the state capitol.[724] As do many states, Texas had created a centralized judicial review system for complex regulatory areas, such as oil and gas.[725] This judicial review system was designed to enhance judicial expertise in Travis County regarding oil and gas regulation.[726] Moreover, oil and gas fields require regulation as a single unit, necessitating a consistency in judicial review that was provided by the centralized appeal process.[727] To allow federal court review of the Commission's orders would disrupt this centralized process.[728] Accordingly, the Supreme Court upheld the District Court's dismissal of the action, resulting in a doctrine that federal courts should completely abstain by dismissal from interference with complex

---

[717]23 F.3d 214, 215 (8th Cir. 1994).

[718]*See id.*

[719]*See id.*

[720]319 U.S. 315, 331-334 (1943).

[721]*See id.* at 317.

[722]*See id.*

[723]*See id.*

[724]*See id.* at 326.

[725]*See id.*

[726]*See id.* at 327.

[727]*See id.* at 333-34.

[728]*See id.* at 332.

state regulatory schemes that would disrupt state efforts to establish a coherent policy with respect to a matter of substantial public concern.[729]

In *New Orleans Public Service, Inc. v. Council of New Orleans*, Justice Scalia summarized the Burford doctrine:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; [sic] or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."[730]

*Quackenbush v. Allstate Insurance Co.*, clarified *Burford*'s test, describing it as balancing the federal interest in retaining jurisdiction against the "concern for the 'independence of state action,'" which, it noted, "only rarely favors abstention."[731] But as with *Pullman* abstention, the Court has been reluctant to offer a test with distinct elements, cautioning that there is no "formulaic test for determining when dismissal under *Burford* is appropriate."[732] *Quackenbush* also emphasized that *Burford* abstention is not limited to equity cases, but instead applies to "all cases in which a federal court is asked to provide some form of discretionary relief."[733] The Court added that in this damages action, which is neither equitable nor discretionary, a stay might have been more appropriate than dismissal.[734] A *Burford* abstention resulting in remand to state court is immediately appealable under both 28 U.S.C. § 1291 and the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*[735]

Until *Quackenbush*, the Fifth Circuit based *Burford* abstention on two distinct situations, either of which justifies abstention:

---

[729]*See id.* at 332-34.

[730]491 U.S. 350, 361 (1989) (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 814 (1976)).

[731]517 U.S. 706, 728 (1996) (quoting *Burford*, 319 U.S. at 334).

[732]*Id.* at 727.

[733]*Id.* at 730.

[734]*See id.* at 730-31.

[735]337 U.S. 541, 545-547 (1949).

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."[736]

The Fifth Circuit appears to have abandoned those standards because of *Quackenbush*'s "no formulaic test" language.[737]

With *Quackenbush*'s caveat in mind, an attempted synthesis is: *Burford* abstention requires that federal courts abstain from diversity jurisdiction in matters where a state has a unified scheme for review of its administrative order, and federal adjudication would be disruptive of the state's efforts to establish consistent and coherent policy in matters of substantial public concern.[738] The balancing of federal and state interests should only rarely result in abstention. When it does, dismissal is appropriate in equity cases and matters of discretion, while damages actions require stays. Unlike *Pullman*, *Burford* does not necessarily require an unclear or ambiguous state law.[739] Although *Burford* does not require a pending parallel state case, it does apply where review is underway in an administrative agency[740] or a state court.[741]

### c. Thibodaux *Abstention: Difficult Questions of State Law*

A seldom used third variety of abstention is the dismissal or stay of diversity cases involving difficult or unclear questions of state law where no constitutional issue is present. The introductory case establishing precedent opposing this third type of absenteion was *Meredith v. City of Winter Haven*, holding that mere difficulty in deciding state law questions

---

[736]St. Paul Insur. Co. v. Trejo, 39 F.3d 585, 588 (5th Cir. 1994) (quoting New Orleans Pub. Serv. Inc. v. Council of New Orleans, 491 U.S. 350, 361 (1989)); *see also* Baran v. Port of Beaumont Navigation Dist., 57 F.3d 436, 441-42 (5th Cir. 1995).

[737]*See* Sierra Club v. City of San Antonio, 112 F.3d 789, 793-97 (5th Cir. 1997) (granting *Burford* abstention without stating any particular test, instead noting the similarity of its facts to those in *Burford*'s).

[738]*See* 17A WRIGHT ET AL, *supra* note 619, § 4244 (2d ed. 1988).

[739]*See id.* § 4244.

[740]*See, e.g.*, Atlantic Coast Line R.R. Co. v. City of St. Petersburg, 242 F.2d 613, 615-16 (5th Cir. 1957).

[741]Forest Hills Util. Co. v. City of Heath, 539 F.2d 592, 596 (6th Cir. 1976).

did not justify abstention.[742] This precedent was undercut in 1959 with the issuance of the *Thibodaux*[743] and *Mashuda*[744] cases on the same day.

*Louisiana Power & Light Co. v. City of Thibodaux*, was an eminent domain case removed to federal court on diversity grounds that did not involve any issue of constitutionality or federal law.[745] The Court ordered abstention on the grounds that Louisiana law was unclear in pertinent parts and federal courts should not interfere with or construe unclear state law in matters of the state's sovereign prerogative.[746] The companion case of *County of Allegheny v. Frank Mashuda Co.*, held that eminent domain in that diversity case did not justify abstention.[747] The only difference in the two decisions was the Court's assessment in *Mashuda* that the pertinent Pennsylvania law was clear,[748] while Louisiana law was not in *Thibodeaux*.[749]

For a time this seemed to authorize abstention in matters of state importance where the law was unclear and no federal law was implicated. For example, *Harris County Commissioners Court v. Moore* appeared to expand *Thibodaux* beyond eminent domain to matters "peculiarly within the province of the local courts."[750] The clear trend, however, is a reaffirmation of *Meredith* and the principle that mere difficulty in deciding state law issue, or the possibility of conflicting state and federal decision do not justify abstention.[751] Rather than abstention, the better action is now certification of the difficult question to the state supreme court, if that procedure is available.[752] Another possibility is to postpone the litigation (a form of abstention) to await a decision on the difficult issue from a pending (not necessarily parallel) state case.[753]

---

[742]320 U.S. 228, 234 (1943).

[743]Louisiana Power & Light Co. v. City of Thiboaux, 360 U.S. 25 (1959).

[744]County of Allegheny v. Frank Mashuda Co., 360 U.S. 185 (1959).

[745]360 U.S. 25, 25-26 (1959).

[746]*See id.* at 25-31.

[747]360 U.S. 185, 191-96 (1959).

[748]*See id* at 196.

[749]*See Thibodeaux*, 360 U.S. at 30.

[750]420 U.S. 77, 83-84 (1975); *see also* United Servs. Life Ins. Co. v. Delaney, 328 F.2d 483, 489 (5th Cir. 1964).

[751]*See* McNeese v. Board of Educ. for Community Unit Sch. Dist. No. 187, 373 U.S. 668, 671-73 & n.5 (1963); Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 816 (1976).

[752]*See* Lehman Bros. v. Schein, 416 U.S. 386, 391-92 (1974).

[753]*See* Federated Rural Elec. Ins. Corp. v. Arkansas Elec. Coops., Inc., 48 F.3d 294, 299 (8th Cir. 1995) (cited at 17A WRIGHT ET AL, *supra* note 619, § 4246 n.3 (2d ed. Supp. 1998)).

But *Thibodaux* may have a special purpose in parallel litigation. Although *Thibodeaux*'s use may have been minimized by the Supreme Court allowing certification of unclear state law questions to that state's supreme court, that procedure is very likely undermined where a state court action is pending.

*Thibodeaux* abstention would seem ideal to permit the state judiciary to answer the question. That answer would preclude further federal inquiry if all claims were resolved in the state court action. But where claims remained in the federal action, the state court answer would then permit the resumption of federal litigation, under the same circumstances as having a certified question answered. While *Colorado River* may also apply here, the *Thibodaux* doctrine has fewer elements and perhaps a lesser presumption for continuing the federal litigation.

### 3. Abstention Procedure: Reserving Rights to a Federal Forum

In *England v. Louisiana State Board of Medical Examiners*,[754] the Court clarified the means of ensuring access to federal court when faced with abstention. The Supreme Court held that if a party is required to seek a ruling from a state court, the party may either submit all issues to the state court (which would very likely resolve the case under preclusion principles) or make a reservation of the federal issues. The reservation is made by notifying the state court that it is including the federal issues only as a matter of information and that it reserves their resolution for the federal court.[755] The holding was rendered in a *Pullman*-type case, but should apply to any exercise of abstention by stay or deferral. *Babbitt v. United Farm Workers National Union* added to this protection by providing that in cases where enforcement of state law during abstention will cause serious harm to the federal plaintiff, the federal court may provide appropriate interim relief to protect the plaintiff until the case is either resolved in the state court or reactivated in federal court.[756]

Texas federal courts have a special procedure on this point. Texas law bars advisory opinions, and this bar is implicated when a federal court retains jurisdiction, even over nothing more than the federal claims.[757] Because of this, the Fifth Circuit practice is to dismiss the federal case without prejudice rather than staying it.[758]

---

[754]375 U.S. 411 (1964).

[755]*See id.* at 418-22.

[756]442 U.S. 289, 312 n.18 (1979).

[757]*See* United Servs. Life Ins. Co. v. Delaney, 396 S.W.2d 855, 863-64 (Tex. 1965).

[758]*See* Harris County Comm'r Court v. Moore, 420 U.S. 77, 88-89 & n.14 (1975).

In contrast, the Eighth Circuit provides for stays. *Employers Association, Inc. v. United Steelworkers of America*, concerned Minnesota's attempt to enforce a state law prohibiting employers from hiring permanent replacements for striking workers, and Employers attempt to enjoin its enforcement by federal injunction.[759] The federal district court had ruled that the National Labor Relations Act preempted the state law.[760] The Eighth Circuit then stayed that ruling pending the Minnesota Supreme Court's ruling on the state law.[761] Two months later, the Eighth Circuit withdrew the stay upon learning that the Minnesota Supreme Court had already issued its opinion.[762] The state opinion did not eliminate the constitutional question, and the federal court ruled that it would hold the case on its docket pending the United States Supreme Court's review of the certiorari petition. Then, if necessary, the federal court would litigate the merits of the constitutional claim.[763] Apparently the certiorari petition was never filed, and the Eighth Circuit upheld the original federal district court ruling that federal law preempted the Minnesota labor law.[764]

## D. Enjoining the State Action

Antisuit injunctions against parallel litigation can be effective, but it can also be the most difficult remedy to obtain. In any setting a domestic or international movant must meet rigid standards to persuade the court to enjoin an action in another court. The highest hurdles, however, are found in the federal-state setting where a movant must meet not only comity standards, but narrow federalism standards as well.[765] Attorneys seeking the help of federal courts to delay or stop *pending* state court litigation must clear two significant hurdles.[766] The *Younger/Pennzoil* doctrine is equitable and is basically nothing more than a rigid application of the equity test for injunctive relief, which requires that the party show: (1) irreparable harm, and (2) no adequate remedy at law in the state court

---

[759]19 F.3d 405, 405-06 (8th Cir. 1994), *withdrawn*, 23 F.3d 214 (8th Cir. 1994).

[760]*See id.* at 406.

[761]*See id.* at 408.

[762]Employers Ass'n, Inc. v. United Steelworkers of America, 23 F.3d 214, 215 (8th Cir. 1994).

[763]23 F.3d at 215.

[764]*See id.*

[765]*See* Younger v. Harris, 401 U.S. 37, 44 (1971).

[766]*See* First Alabama Bank of Montgomery v. Parsons Steel, Inc., 825 F.2d 1475, 1482-83 (11th Cir. 1987).

action.[767] The other hurdle is statutory: the Anti-Injunction Act,[768] the Tax Injunction Act,[769] and the Johnson Act.[770] Although these separate grounds may at times seem to interact or overlap, they are distinct barriers that must be satisfied independently before a federal court may enjoin state court litigation.[771]

Before examining the limitations on federal antisuit injunctions against state litigation, an examination of the authority for those injunctions is helpful. Congress provided such authority through the All Writs Act.[772] The Act is a jurisdictional grant for injunctions against potential, but not pending state court actions under the same grounds as the "in aid of jurisdiction" exception to the Anti-Injunction Act.[773] It reads:

> (a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.
>
> (b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.[774]

As stated, these two requirements apply only to pending state litigation; federal courts may enjoin future state court litigation without clearing these hurdles.[775]

## 1. The *Younger/Pennzoil* Doctrine and Equitable Abstention

### a. The Younger *and* Pennzoil *Cases*

Equitable abstention began with *Younger v. Harris*,[776] dictating that a federal court may not enjoin a pending state criminal proceeding absent a showing of (1) bad faith, (2) irreparable harm, and (3) no adequate remedy

---

[767]*See* Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 10 (1987).

[768]*See* 28 U.S.C.A. § 2283 (West 1994).

[769]*See id.* § 1341 (West 1993).

[770]*See* 28 U.S.C.A. § 1342 (West 1993).

[771]*See First Alabama Bank of Montgomery v. Parsons Steel, Inc.*, 825 F.2d at 1483 (stating the fact that because an injunction fits an exception to the Anti-Injunction Act does not mean the court should not also consider appropriateness under principles of *Younger*).

[772]*See* 28 U.S.C. § 1651 (1994).

[773]*See id.*

[774]*Id.*

[775]*See* Dombrowski v. Pfister, 380 U.S. 479, 484 n.2 (1965).

[776]401 U.S. 37, 43-49 (1971).

at law. *Younger's* earliest progeny highlighted three fact settings that implicate all three elements: an inadequate state forum,[777] bad faith state prosecutions,[778] and patently unconstitutional state laws.[779] From these criminal and quasi-criminal cases, the *Younger* Doctrine leapt into civil proceedings with *Pennzoil v. Texaco,* which extended *Younger* to civil cases involving important state interests.[780]

In the *Pennzoil* case, the plaintiff had negotiated an agreement to purchase about three-sevenths of Getty Oil's outstanding shares for $110 a share.[781] Late into the transaction, Texaco paid $128 a share and stepped into Pennzoil's shoes.[782] Pennzoil sued Texaco in a Texas state court for tortious interference with contract, eventually winning a judgment of $7.53 billion in actual damages and $3 billion in punitive damages.[783] Under Texas law, Texaco was required to file a supersedeas bond for the entire judgment amount to stay execution pending appeal.[784] It was clear that Texaco could neither get a bond for that amount nor post a cash bond.[785] The judgment was so large that Texaco immediately began to suffer on the stock market, its bond rating was lowered, and creditors refused to sell it crude oil on customary terms.[786]

Texaco wished to challenge the constitutionality of the Texas bond and lien provisions, but it did so in a New York federal court instead of a Texas state or federal court.[787] In fact, at no time did Texaco raise the supersedeas bond issue in the Texas state court that issued the judgment.[788]

In the New York federal court, and prior to the finality of the Texas state court judgment, Texaco sought to enjoin Pennzoil from its collection attempts on the Texas judgment.[789] Texaco claimed the Texas proceedings violated the Constitution and federal statutes.[790]

---

[777]*See* Gibson v. Berryhill, 411 U.S. 564, 578-81 (1973).

[778]*See* Juidice v. Vail, 430 U.S. 327, 331-36 (1977).

[779]*See* Trainor v. Hernandez, 431 U.S. 434, 447 (1977).

[780]481 U.S. 1 (1987).

[781]*See id.* at 4.

[782]*See id.*

[783]*See id.*

[784]*See id.* at 4-5.

[785]*See id.* at 5.

[786]*See id.*

[787]*See id.* at 6.

[788]*See id.* at 6 n.5.

[789]*See id.* at 6.

[790]*See id.* at 6 n.6.

Pennzoil responded to the New York federal action with an objection under the Anti-Injunction Act and the *Younger* doctrine.[791] The federal district court found that the Anti-Injunction Act did not apply because Texaco had sought the injunction under 28 U.S.C. § 1983, a statute the Supreme Court has interpreted as providing an express authorization for injunctive relief.[792] The court further found that *Younger* did not apply because an injunction would not interfere with a state official's pursuit of a fundamental state interest.[793] The New York federal court then issued the injunction.[794] On Pennzoil's appeal, the Second Circuit upheld the injunction, finding that (1) Texaco did state a claim under § 1983 because execution necessarily involved state agent, and that because § 1983 is an exception to the Anti-Injunction Act, it did not apply; (2) common law abstention was unnecessary in that *Pullman* did not apply because the mere possibility that a court would find the Texas supersedeas law unconstitutional did not require abstention; and, (3) that *Younger* did not apply because the state interests required for *Younger* abstention differ in both kind and degree.[795] The Second Circuit further found that Texas had failed to provide adequate procedures for adjudicating Texaco's federal claims and that the balance of hardships favored Texaco.[796]

The Supreme Court reversed, finding a new, expanded role for abstention.[797] In particular, the Court found that the bases for *Younger* in this civil case were (1) equity jurisprudence, specifically the injunction element of "adequate remedy at law,"[798] (2) comity, which justifies abstention not only when the pending state proceedings are criminal (as in *Younger*), but also when certain categories of civil cases are pending "if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and National Government;"[799] and (3) avoiding unwarranted determinations of federal constitutional questions regarding state law.[800] Because federal interpretations of state law are not binding on state courts, they could be

---

[791]*See id.* at 6-7.
[792]*See id.* at 7 (citing Mitchum v. Foster, 407 U.S. 225 (1972)).
[793]*See id.*
[794]*See id.* at 7-8.
[795]*See id.* at 8-9.
[796]*See id.* at 9.
[797]*See id.* at 10.
[798]*Id.*
[799]*Id.* at 11.
[800]*See id.*

discredited by a state court's later clarification of the statute that would render it constitutional.[801]

Texaco chose not to raise its constitutional claims in the Texas state court, thus making it impossible for the court to determine whether the Texas supersedeas and post judgment procedures violated the Constitution, as Texaco alleged.[802]    Moreover, the Court found that the Texas Constitution's "open courts" provision was more on point than the Due Process Clause of the Fifth and Fourteenth amendment.[803]  The Court noted that "[t]he common thread of [the Texas Supreme Court's] decisions construing the open courts provision is that the legislature has no power to make a remedy by due course of law contingent on an impossible condition."[804]    As a final note on this expansion of *Younger*, the Court emphasized a narrow reading of its opinion.[805]  In concurring opinions, Justices Brennan, Blackmun and Stevens agreed that the *Younger* doctrine should not be applied to purely civil proceedings.[806]

*Pennzoil*'s application of *Younger* was merely an exercise in strict equity oversight to injunctive relief.[807]  That is, for a court to issue any injunction, the applicant must show irreparable harm and no adequate remedy at law.[808]    A dimension added by *Pennzoil* is that the *Younger* Doctrine may overlap *Pullman* in its interest in avoiding constitutional litigation on ambigous state laws that the state has not had a chance to review.[809]

### b. *Younger's Application in Civil Cases*

*Pennzoil* may be read narrowly as holding that the enforcement of judgments is an important state interest in which federal courts may not interfere.[810] It may also be read broadly as applying to all civil proceedings where the state is exercising some executive power, or where the state proceedings are capable of resolving the constitutional problem (with a corollary that a defendant who fails to exhaust those state procedures may

---

[801]*See id.* at 11-12.

[802]*See id.* at 11.

[803]*See id.* at 11-12.

[804]*Id.* at 15 (quoting Nelson v. Krusen, 678 S.W.2d 918, 921 (Tex. 1984)).

[805]*See id.* at 17-18.

[806]*See id.* at 18-34.

[807]*Id.* at 10 (noting that each court failed to apply the appropriate standard for injunctive relief).

[808]*See id.*

[809]*See id.* at 14-19.

[810]*See id.* at 13.

not resort to a federal court in order to interfere with the pending proceeding).[811]

Subsequent case law has provided some guidance. For example, the *New Orleans Public Service Inc. v. City of New Orleans* ("NOPSI") case clarified that the *Younger/Pennzoil* doctrine does not apply to all civil litigation, but only to those cases "involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."[812] Furthermore, the doctrine does not require abstention to a "state judicial proceeding reviewing legislative or executive action."[813] The Fifth Circuit has interpreted *NOPSI* as limiting *Younger/Pennzoil* abstention to antisuit injunctions against state civil cases involving an important state interest.[814]

Current attempts to define *Younger*'s parameters after its expansion into civil cases are at best obtuse. A better explanation is that the *Younger/Pennzoil* doctrine limits federal interference with important state executive power related to pending state adjudication. This explanation does not contradict *NOPSI*'s statement that *Younger* does not apply to state courts reviewing executive action; rather, it suggests that *Younger* applies to federal interference with the state's performance of its executive power that would have an immediate impact because of the pending litigation.[815]

In *Younger*, the injunction interfered with the district attorney's executive function of prosecuting a criminal action against Harris.[816] In *Trainor*, the injunction interfered with the state attorney's executive function of recouping welfare benefits wrongfully paid to Hernandez.[817] In *Pennzoil*, the injunction interfered with the sheriff's executive function to enforce Pennzoil's judgment against Texaco.[818] Thus, in each case the federal court was interfering with the state's performance of its executive function in pending state court litigation.[819] If *Younger/Pennzoil* is defined in this way, the definition simplifies determinations of its criminal and civil overlap and requires that the federal court identify a state executive

---

[811]*See id.* at 14-15.

[812]491 U.S. 350, 367-68 (1989).

[813]*Id.*

[814]*See* Louisiana Debating and Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1490 (5th Cir. 1995).

[815]*See* New Orleans Public Service, 491 U.S. at 367-68.

[816]*See* Younger v. Harris, 401 U.S. 37, 38-39 (1971).

[817]*See* Trainor v. Hernandez, 431 U.S. 434, 438 (1977).

[818]*See* Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 6 (1987).

[819]*See Pennzoil Co.*, 481 U.S. at 6; *Trainor*, 431 U.S. at 438; *Younger*, 401 U.S. at 38-39.

function that will be affected by the injunction. If the injunction would affect a state interest other than its executive power, then *Younger* would not apply; however, the Anti-Injunction Act might.

### c. *Perfecting a* Younger *Objection*

*Younger* always involves a pending state lawsuit that allegedly violates a constitutional right and the alleged victim of the constitutional injury seeking a federal injunction against the state action.[820] To the extent that the state is a party, it may waive its *Younger* defense by arguing the merits of the constitutional issue to the federal court.[821]

It is unclear whether this waiver would apply in a *Pennzoil* situation involving only private parties in a civil case. On the one hand, a private party stands in the state's position when it submits the constitutional issue to the federal court, thus inviting the federal court to enjoin the state action in order to maintain the status quo pending the resolution of the constitutional issue.

On the other hand, the *Younger* doctrine's very purpose is to protect certain state governmental interests from federal interference, an interest that can only be waived by the state itself.[822]

### 2. Statutory Abstention: The Anti-Injunction Act

Two federal statutes provide another layer of regulation for federal courts looking to enjoin state court lawsuits. The Anti-Injunction Act addresses the same problem as *Younger*; both restrict federal courts from interfering with states, but they use different guidelines.[823] The statute reads: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[824]

---

[820]*See* Louisiana Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1489-90 (5th Cir. 1995).

[821]*See* Ohio Bureau of Employment Serv. v. Hodory, 431 U.S. 471, 480 & n.10 (1977) (holding that a state's decision to submit constitutional issues to federal court waived the *Younger* doctrine objection to injunction against state action).

[822]*See generally* Brian Stagner, *Avoiding Abstention: The Younger Exceptions*, 29 TEX. TECH. L. REV. 137 (1998) (describing generally the *Younger* doctrine and its purpose).

[823]In considering an injunction against state court litigation, the Fifth Circuit stated, "Nevertheless, we are guided by the overarching principle that federal courts are to be cautious about infringing on the legitimate exercise of state judicial power." State of Texas v. United States, 837 F.2d 184, 186 (5th Cir. 1988) (citing *Younger*, 401 U.S. 37, 44-45 (1971)).

[824]28 U.S.C. § 2283 (1994).

The Act thus provides three exceptions that allow injunctions: (1) expressly authorized, (2) in aid of jurisdiction, or (3) to protect or effectuate its judgments.[825] These exceptions are exclusive and may not be expanded by judicial interpretation or federal common law.[826] The Act does not apply if the injunction issues before the state court action is filed.[827] However, if a state official is the party to be enjoined, the movant must also satisfy the Eleventh Amendment.[828] On the other hand, the Act does not apply to suits brought by the United States[829] or federal agencies.[830]

The Fifth Circuit has noted the difficulty of meeting one of the exceptions:

> These statutory exceptions "are narrow and are not [to] be enlarged by loose statutory construction,". . . and are the exclusive exceptions under the act; "the prohibition [of section 2283] is not to be whittled away by judicial improvisation." Furthermore, under the Anti-Injunction Act, the presumption is that state courts are the best arbiters of state court jurisdiction; thus, state proceedings "should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately [the Supreme] Court." Thus, "any doubts are to be resolved in favor of allowing the state court action to proceed." This holds true even when the state proceedings "interfere with a protected federal right or invade an area pre-empted by federal law, *even when the interference is unmistakably clear.*"[831]

The exceptions require further explanation.

### a. "Expressly Authorized" Injunctions

*Mitchum v. Foster* held that the "expressly authorized" exception does not require express reference to the underlying federal statute.[832] Thus, 42

---

[825]*See id.*

[826]*See* Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 630 (1977).

[827]*See* Dombrowski v. Pfister, 380 U.S. 479, 484 n.2 (1965).

[828]*See* Pennhurst State Sch. and Hosp. v. Haldeman, 465 U.S. 89, 106 (1984).

[829]*See* Leiter Minerals, Inc. v. United States, 352 U.S. 220, 226 (1957).

[830]*See* N.L.R.B. v. Nash-Finch Co., 404 U.S. 138, 146 (1971).

[831]Total Plan Serv., Inc. v. Texas Retailers Ass'n., Inc., 925 F.2d 142, 144 (5th Cir. 1991) (citations omitted).

[832]407 U.S. 225, 237 (1972).

U.S.C. § 1983, with no express authorization to enjoin state lawsuits, nonetheless indicates a congressional intent to do so under its general power for injunctive relief.[833] In *Mitchum*, the prosecuting attorney of Bay County, Florida, sued to close down Mitchum's bookstore as a public nuisance.[834] The state court entered a preliminary order prohibiting continued operation of the bookstore.[835] After further inconclusive proceedings in the state courts, Mitchum filed a complaint in the United States District Court for the Northern District of Florida, alleging that the actions of the state judicial and law enforcement officials were depriving him of First and Fourteenth Amendment rights.[836] Under 42 U.S.C. § 1983,[837] he requested injunctive and declaratory relief against the state court proceedings on the ground that the state court unconstitutionally applied Florida laws and caused irreparable harm.[838]

The language of § 1983 does not provide for an antisuit injunction to remedy violations of civil rights. In inferring one, the Supreme Court articulated the test as "whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding."[839] This reduces to a two-prong test for a non-express statute to meet the "expressly authorized" exception: (1) whether the statute in question provided for equitable relief, and (2) whether legislative history established that the statute was enacted due to a mistrust of state court ability or willingness to protect federal constitutional rights. In finding that § 1983 actions provide an exception to the Anti-Injunction act, the Court recalled its holding a year earlier in *Younger v. Harris* that equity and comity also prevent federal courts from enjoining state criminal proceedings.[840] Thus, a

---

[833]*See id.* at 242-43.

[834]*Id.* at 227.

[835]*See id.*

[836]*See id.*

[837]*See id.* at 227-28 & n.5. Federal jurisdiction was based upon 28 U.S.C. § 1343(3) (1994). The statute states in relevant part:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . .

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . .

[838]*Id.* at 227.

[839]*Id.* at 238.

[840]*See id.* at 243.

federal court injunction against a state criminal prosecution must clear two
hurdles: the Anti-Injunction Act and the *Younger* doctrine.

While *Mitchum* illustrates that "expressly authorized by Congress" does
not mean expressed in the statute, *Total Plan Services, Inc. v. Texas
Retailers Assoc., Inc.*, illustrates the converse, that is, express injunction
language in a federal statute may not overcome the strong presumption
against federal courts enjoining state litigation.[841]   The dispute began in
state court, where the Texas Retailers Association sued regarding pension
claims.[842]   The Texas Retailers Assocation obtained a preliminary state
court ruling that the Employee Retirement Income Security Act (ERISA)
did not preempt its claims; Total Plan Services, the state court defendant,
immediately sued in federal court for a contrary declaratory judgment and
an injunction against further state court proceedings.[843]   The federal trial
court dismissed the action for failure to state a claim, and the Fifth Circuit
affirmed over Total's objection that ERISA expressly provided for the
injunction.[844]   Specifically, Total relied on 29 U.S.C. § 1132(a)(3),[845] which
allows a civil action to be brought "to enjoin any act or practice which
violates any provision of this subchapter . . . ."[846] Evaluating the legislative
intent, the Fifth Circuit found that "act or practice" did not apply to
lawsuits, and that Congress had not created a federal right in ERISA which
"could be given its intended scope only by the stay [read "enjoining"] of a
state court proceeding."[847]

There are examples of "expressly authorized" exceptions where the
language is express and it means what it says.   Under the federal
interpleader statute,[848] an interpleader plaintiff may obtain an injunction
under a corollary statute[849] against the prosecution of pending state actions
so as to protect the limited fund that is a predicate to interpleader
practice.[850]   Similarly, in admiralty and maritime law a vessel owner may
file a petition in federal court seeking protection under the Limitation of

---

[841]925 F.2d 142, 144 (5th Cir. 1991).

[842]*See id.* at 143.

[843]*See id.* at 143.

[844]*See id.*

[845]*Id.* at 144.

[846]29 U.S.C. § 1132(a)(3) (1994).

[847]*See Total*, 925 F.2d at 144 (quoting Mitchum v. Foster, 407 U.S. 225, 238 (1972)).

[848]28 U.S.C. § 1335 (1994).

[849]28 U.S.C. § 2361 (1994).

[850]*See* State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 524 (1967).

Vessel Owner's Liability Act,[851] and upon depositing security in the value of the vessel and its freight, the court may use Federal Rule of Civil Procedure Supp. R. F(3) to enjoin claimants from filing or prosecuting actions in other courts.[852]

*Vendo Co. v. Lektro-Vend Corp.* established that "expressly authorized" may turn on plurality votes.[853] In *Vendo*, a five vote plurality held that Section 16 of the Clayton Act did not expressly authorize a federal injunction against state court action.[854] Justices Rehnquist, Stewart and Powell found that Section 16 did not under any circumstance expressly authorize federal injunctions against state court litigation.[855] Justices Blackmun & Burger held that it did if certain factors are present which were not present here.[856] Justices Stevens, Brennan, White and Marshall argued that Section 16 did in all cases expressly authorize the injunction.[857]

Compulsory counterclaims may also qualify as "expressly authorized" exceptions. In *Seattle Totems Hockey Club, Inc. v. The National Hockey League*, the Ninth Circuit noted that Federal Rule of Civil Procedure 13(a) (compulsory counterclaims) was not an expressly authorized exception, and that "accordingly, a federal court is barred by § 2283 from enjoining a party from proceeding in state court on a claim that should have been pleaded as a compulsory counterclaim in a prior federal suit."[858]

### b. *Injunctions "In Aid of Its Jurisdiction"*

Congress amended the Anti-Injunction Act in 1948 in response to the Supreme Court's holding in *Toucey v. New York Life Insurance Co.* that the Act did not empower a federal court to enjoin a state court from relitigating a case already litigated in federal court.[859] After *Toucey*, Congress amended the Anti-Injunction Act to include the words "to protect or effectuate its judgments," enabling federal courts to enjoin the relitigation of cases in state courts.[860] The phrase "in aid of its jurisdiction"

---

[851]46 U.S.C.A. app. § 183(a) (1999).

[852]*See* Beiswenger Enterprises Corp. v. Carletta, 86 F.3d 1032, 1033-34 (11th Cir. 1996).

[853]433 U.S. 623, 626, 643 (1977).

[854]*Id.* at 630-45.

[855]*See id.* at 630-43.

[856]*See id.* at 643-45 (Blackmun, J., concurring).

[857]*See id.* at 647-66 (Stevens, J., dissenting).

[858]652 F.2d 852, 855 n.5 (9th Cir. 1981) (referencing Nolen v. Hammet Co., Inc., 56 F.R.D. 361, 362 (D.S.C. 1972), and 6 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1418, at 106) (2d ed. 1988).

[859]314 U.S. 118, 137-141 (1941).

[860]28 U.S.C. § 2283 (1994).

was added to make clear the already recognized power of federal courts to stay proceedings in state courts that have been removed to a federal court.[861]

The leading case is *Kline v. Burke Construction Co.*[862]  Burke Construction, a Missouri paving company, contracted with the city of Texarkana, Arkansas to repave city streets.[863]  In a subsequent dispute on the contract, Burke filed a diversity claim against Kline (a Texarkana city board member) in federal district court in Arkansas, seeking damages.[864] Kline then filed a parallel equity action against Burke in an Arkansas chancery court.[865]  Both actions were in personam, and both sought money damages.[866]  Kline removed the state action to federal district court, but it was remanded.[867]  The federal court lawsuit ended in a mistrial.[868]  Pending retrial, Burke asked the federal district court to enjoin Kline from proceeding with the state action, citing the "in aid of its jurisdiction" exception to the Anti-Injunction Act.[869]  The federal district court denied the injunction, and the Eighth Circuit reversed the district court decision and remanded the case, ordering the issuance of an injunction.[870]  The Supreme Court held that the Act's "in aid of its jurisdiction" exception was for in rem actions in which the federal court had assumed jurisdiction over the res, and that it did not extend to in personam actions such as this one.[871]

In *Texas v. United States*, the Interstate Commerce Commission (ICC) disagreed with the State of Texas about jurisdiction over a series of in-state truck shipments.[872]  Reeves was transporting carpet made by Armstrong Carpets in Arlington, Texas to other points in Texas.[873]  The State of Texas sought to regulate this as an intrastate shipment and began an investigation. Upon petition by Reeves seeking a declaratory ruling an administrative action, seeking to regulate the carpet shipments as interstate because some

---

[861]*Id.*
[862]260 U.S. 226 (1922).
[863]*See id.* at 227.
[864]*See id.*
[865]*See id.*
[866]*See id.* at 228.
[867]*See id.*
[868]*See id.*
[869]*See id.*
[870]*See id.*
[871]*See id.* at 230-31.
[872]837 F.2d 184, 184-85 (5th Cir. 1988).
[873]*See id.*

of the carpet materials originated out of state.[874] Texas then initiated state court proceedings.[875] The ICC then filed a federal court action seeking to enjoin the state proceeding.[876] No ruling on the request for injunction was made, but the State of Texas filed a direct appeal to the Fifth Circuit from an ICC decision not to reconsider its declaratory order.[877] There, the ICC asked the federal appellate court to enjoin the state court proceeding pending the review of the ICC's declaratory order.[878] The Fifth Circuit held that the injunction was not necessary to protect the federal court's eventual jurisdiction over the ICC's agency ruling in the case.[879] The Fifth Circuit also held that the "in aid of its jurisdiction" exception was ordinarily limited to the preservation of in rem jurisdiction, and that it may not be invoked merely to avoid the prospect of inconsistent state and federal judgments.[880]

Although perhaps focused on in rem cases, the "in aid of its jurisdiction" exception is not limited to them. For example, where the court has declared ongoing jurisdiction it may enjoin inconsistent state court proceedings. In *Doctor's Associates, Inc. v. Distajo*, the Second Circuit affirmed a federal district court's order enjoining various Subway restaurant franchisees from pursuing state court actions, both in aid of the federal district court's jurisdiction over its order enforcing an arbitration agreement, and as the injunction continued, to effect the federal district court's judgment.[881] Similarly, in *Wesch v. Folsom*, the Eleventh Circuit affirmed a federal district court's injunction of a state suit seeking congressional redistricting in Alabama because the Anti-Injunction Act did not bar the injunction when there was an active federal district court order imposing a congressional redistricting plan for Alabama effective until the state legislature adopted a valid plan of its own.[882] In *Flanagan v. Arnaiz*, the Ninth Circuit held that where the federal district court "expressly retains jurisdiction to enforce a settlement agreement, and to resolve disputes that may arise under it," injunction is appropriate under the "in aid

---

[874]*See id.*

[875]*See id.* at 186.

[876]*See id.*

[877]*See id.*

[878]*See id.*

[879]*See id.*

[880]*See id.* at 186-87 n.4 (citing Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engr's, 398 U.S. 281, 295-96 (1970)).

[881]107 F.3d 126, 135-36 (2d Cir. 1997).

[882]6 F.3d 1465, 1467-69, 1474 (11th Cir. 1993).

of its jurisdiction" exception.[883] These cases seem to rest on the federal court having made a dispositive judgment that takes on an in rem character. In all three cases, the injunction is based both on the "in aid of its jurisdiction" and the "to protect or effectuate its judgments" exceptions.

### c.  Injunctions to Prevent Relitigation

The Full Faith and Credit Act requires "every court within the United States" to give state judicial proceedings "the same full faith and credit . . . as they have by law or usage in the courts of such State . . . from which they are taken."[884] This requirement applies to state and federal courts equally.[885] Coupled with this, the Anti-Injunction Act prohibits federal courts from granting an injunction to stay proceedings in a state court, but excepts from that prohibition the issuance of an injunction by a federal court "where necessary . . . to protect or effectuate its judgments."[886] These two considerations regulating federal injunctions of state court actions and mandating the state judgment's preclusive effect, are highlighted in *Parsons Steel, Inc. v. First Alabama Bank*,[887] and illustrate an important requirement in obtaining claim preclusion rulings to protect a prior judgment.

This raises the question:  what is a "judgment?" In *Chick Kam Choo v. Exxon Corp.*, the Supreme Court established the standard, stating that "an essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court."[888] This standard is illustrated in a recent Third Circuit case. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation* involved a nationwide settlement class in the Eastern District of Pennsylvania, to which eleven "gas tank" class actions had been transferred by the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407.[889] Rejecting the settlement of a $1,000 coupon for each class member, the Third Circuit decertified the settlement class but left open the possibility of curing the settlement class problem.[890] Instead of attempting to cure the problem, the

---

[883]143 F.3d 540, 545 (9th Cir. 1998).

[884]28 U.S.C. § 1738 (1994).

[885]*See* Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 525-26 (1986).

[886]28 U.S.C. § 2283 (1994).

[887]474 U.S. 518, 519 (1986).

[888]486 U.S. 140, 148 (1988).

[889]134 F.3d 133, 137 (3d Cir. 1998).

[890]*See id.* at 137, 146.

settling parties renewed their attempts in a parallel case in a Louisiana state court, which had certified a nationwide class action.[891] Several non-settling class members in the Pennsylvania Multidistrict proceeding moved for an injunction against the Louisiana class action.[892] The federal court denied the request and the Third Circuit affirmed, rejecting defendants' argument that the injunction should issue "to protect or effectuate" the federal court decision decertifying the class.[893] The Third Circuit held that denial of class certification was not a final judgment because the case was still pending, and the decertifying order could not have a preclusive effect in the Louisiana state court.[894] Here the court relied on the Fifth Circuit's holding, under identical facts, in *J.R. Clearwater, Inc. v. Ashland Chemical Co.*[895] In *General Motors*, the Third Circuit also rejected defendant's argument that the "in aid of its jurisdiction" exception warranted injunctions against the state court actions; instead, the court held that the exception applied only "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."[896]

A second fundamental issue is the effect of the Full Faith and Credit Act on the religitation exception. In *Parsons Steel, Inc. v. First Alabama Bank,* Parsons Steel and its owners, Jim and Melba Parsons, sued First Alabama Bank of Montgomery and Edward Herbert, a bank officer, in Alabama state court in February 1979, "alleging that the bank had fraudulently induced the Parsonses to permit a third person to take control

[891]*See id.* at 137.

[892]*See id.*

[893]*See id.* at 146.

[894]*See id.* at 145-46.

[895]93 F.3d 176, 179 (5th Cir. 1996)

[896]134 F.3d at 144 (quoting Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295 (1970)); *see also* Royal Ins. Co. of America v. Quinn-L Capital Corp., 960 F.2d 1286, 1293-97 (5th Cir. 1992). ("In determining what was 'actually decided, the emphasis is on the record and on what the earlier federal court actually stated, not on the current court's post hoc judgment as to what the previous judgment was intended to state.'" *Id.* at 1294 (quoting Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 148 (1988)). The court further held that "[a]ny doubt[s] as to whether the order precludes subsequent claims must be resolved in favor of allowing the state court to proceed." *Id.* (citing Texas Employers' Ins. Ass'n v. Jackson, 862 F.2d 491, 501 (5th Cir. 1988) (en banc), *cert denied*, 490 U.S. 1035 (1989); Flanagan v. Arnaiz, 143 F.3d 540 (9th Cir. 1998); Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 135-36 (2d Cir. 1997) (discussing the intersection of "in aid of its jurisdiction" and "to protect or effectuate its judgments"); Wesch v. Folsom, 6 F.3d 1465 (11th Cir. 1993); 17 WRIGHT MILLER & COOPER, *supra* note 619, § 4226 (discussing what amounts to a "judgment" for these purposes).

of a Parsons Steel subsidiary and eventually to obtain complete ownership."[897]   In April of 1979, the subsidiary was found to be in involuntary bankruptcy, and the bankruptcy trustee was joined as a plaintiff in the state suit.[898]  In May 1979, without the participation of the bankruptcy trustee, Parsons Steel and the Parsons brought suit against the bank in federal district court alleging that the bank's conduct giving rise to the state suit also violated the federal Bank Holding Company Act ("BHCA") amendments, 12 U.S.C. § § 197-198.[899]

Before the state action proceeded to trial, the federal action went to trial on the issue of liability.[900]  The federal jury found in favor of the Parsonses, but the federal district court granted judgment n.o.v. to the bank, and the decision was affirmed by the Eleventh Circuit.[901]  In the state action, the bank plead the defenses of res judicata and collateral estoppel based on the federal court judgment.[902]  The Alabama court, however, ruled that the federal judgment did not bar the state action.[903]  Almost a year after the federal judgment, plaintiffs amended their petition to include a Uniform Commercial Code ("UCC") claim that the bank's foreclosure sale of the subsidiary's assets was commercially unreasonable.[904]  The jury in the state court returned a verdict in favor of plaintiffs, awarding four million and one dollars in damages.[905]

After losing in state court, the defendants returned to the federal court and sought an injunction against the Parsons.[906]  The federal district court found that the federal and state lawsuits were based on the same factual allegations and claimed substantially the same damages.[907]  The federal court held that the state claims should have been raised in the federal action as pendent claims to the federal question claims, barring the state claims under res judicata.[908]  Determining that the Alabama state judgment

---

[897]474 U.S. 518, 520 (1986).
[898]*See id.*
[899]*See id.*
[900]*See id.*
[901]*See id.*
[902]*See id.*
[903]*See id.*
[904]*See id.*
[905]*See id.*
[906]*See id.* at 520-21.
[907]*See id.* at 521.
[908]*See id.*

nullified the earlier federal-court judgment in favor of the bank, the District Court enjoined the Parsonses from further prosecuting the state action.[909]

A divided appellate panel affirmed, holding that the issuance of the federal injunction was not an abuse of discretion, and that the parties to the federal action and their privies, including the trustee in bankruptcy, were barred by res judicata from raising these claims in state court after the entry of the federal judgment.[910] The majority then held that the injunction was proper under the relitigation exception to the Anti-Injunction Act.[911]

The Supreme Court reversed, finding that the appellate court had given "unwarrantedly short shrift to the important values of federalism and comity embodied in the Full Faith and Credit Act,"[912] and further that the court had ignored the Supreme Court's recent decision reaffirming "that under the Full Faith and Credit Act a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give."[913] The Court then quoted the basic rule from *Kremer v. Chemical Construction Corp.*:

> It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken.[914]

Rather than heed this clearly-established rule, the appellate court concluded that the Anti-Injunction Act's relitigation exception was a limit on the Full Faith and Credit.[915] The Supreme Court rejected this, again quoting from *Kremer* that "an exception to § 1738 will not be recognized unless a later statute contains an express or implied partial repeal."[916] The Court decided the case based on the fact that § 2283 lacks any express repeal of the Full Faith and Credit Act, and rejected the notion that an implied repeal can overcome the full faith and credit mandate.[917] The Court

---

[909]*See id.*

[910]*See id.*

[911]*See id.* at 521-22.

[912]*Id.* at 523.

[913]*Id.* (citing Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373 (1985))

[914]*Parsons*, 474 U.S. at 523 (quoting Kremer v. Chemical Constr. Corp., 456 U.S. 461, 481-482 (1982)).

[915]*See Parsons* Steel, 474 U.S. at 523.

[916]*Id.* at 523 (quoting *Kremer*, 456 U.S. at 468).

[917]*See id.*

held that it was best to read the two statutes harmoniously by "limiting the relitigation exception of the Anti-Injunction Act to those situations in which the state court has not yet ruled on the merits of the res judicata issue."[918] Thus, "[o]nce the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act becomes applicable and federal courts must turn to state law to determine the preclusive effect of the state court's decision."[919]

One of the more evasive issues is the "last in time" rule. In *Treinies v. Sunshine Mining Co.*, the Supreme Court held that when a first court reaches a valid and final judgment in a matter, and a second court erroneously fails to give preclusive effect to that first judgment, that the first judgment holder must appeal the second court's error; failure to appeal results in the second judgment taking precedence over the first both as to enforcement and as to preclusive effect in any later litigation.[920] The appeal of the second court's error could reach the Supreme Court under a Full Faith and Credit argument.[921] Failure to seek certiorari in the second case presumptively waives all rights under the first judgment.[922] This result may seem illogical but is consistent with the concept of finality. Consider what would happen if one could contest the second court's error by filing yet a third lawsuit to correct the error in order to have the first judgment honored. That result could in turn be contested in a fourth lawsuit, and so on.

Thus, a party having a favorable judgment (state or federal) but facing parallel litigation in a second court must raise the claim preclusion issue and obtain a favorable ruling from the second court. If the claim preclusive effect of the first judgment is not raised in the second action, it is waived and the second action takes precedent under *Treinies*.[923] If the preclusion argument is raised but ruled against in the second court, then that issue must be appealed (after final judgment is acceptable).[924] If it is not appealed, it is again waived and the second judgment takes precedent.[925] Where the first judgment is from a federal court, *Parsons*

---

[918]*Id* at 524.
[919]*Id.*
[920]308 U.S. 66, 74-78 (1939).
[921]*See id.* at 74-77.
[922]*See id.*
[923]308 U.S. at 77.
[924]*See id.*
[925]*See id.*

*Steel* offers an additional remedy.[926] In addition to raising the claim preclusion argument in state court, a party may immediately seek an injunction from the federal court, enjoining any further state court proceedings under the "protect or effectuate its judgments" exception to the Anti-Injunction Act.[927]

The anti-suit injunction's breadth is another critical feature, and *Chick Kam Choo v. Exxon Corp.*, provides the definitive discussion.[928] The action arose from the death of Leong Chong, a Singapore resident killed while working on a ship.[929] His widow, Chick Kam Choo, sued in federal court in Texas.[930] The federal district court granted defendants a summary judgment on plaintiff's claims under federal law, on the grounds that Singapore law applied, and dismissed the other claims on forum non conveniens grounds.[931] Plaintiff then sued in Texas state court, bringing the same claims under federal maritime law, Texas law, and Singapore law.[932] The federal district court then enjoined her from state court litigation.[933] The Fifth Circuit affirmed the injunction under the "relitigation" exception to the Anti-Injunction Act.[934] The Supreme Court affirmed in part and reversed in part: it affirmed (1) as to claims under federal law that were resolved by summary judgment in the first action in federal court, and (2) as to the claim under Texas law that was necessarily resolved by the federal court's ruling that Singapore law governed. The Supreme Court reversed as to plaintiff's claims under Singapore law.[935] The Court underscored the preclusion basis for the "protect or effectuate its judgments" exception, stating that "[t]he relitigation exception was designed to permit a federal court to prevent state [court] litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of res judicata and collateral estoppel."[936]

---

[926]474 U.S. 518, 525-26 (1985).

[927]*See id.* at 524-26.

[928]486 U.S. 140 (1988).

[929]*See id.* at 142.

[930]*See id.*

[931]*See id.* at 143.

[932]*See id.* at 143-44.

[933]*See id.* at 144.

[934]*See id.* at 144-45.

[935]*See id.*

[936]*Id.* at 147. *See also* Santopadre v. Pelican Homestead & Savings Assoc., 937 F.2d 268, 272-74 (5th Cir. 1991).

*Deus v. Allstate Ins. Co.*, is another instructive case.[937] In this case insurance agent, Deus, sued his employer in federal court for breach of contract and workers' compensation benefits.[938] The employer, however, obtained a judgment as a matter of law.[939] Deus then filed a state court action, which the federal court enjoined.[940] The Fifth Circuit held that the injunction was proper as to claims adjudicated in federal court, but that it was too broad to the extent that it barred the employee from litigating claims that were not adjudicated earlier, or as to new parties that were not joined in the first action.[941]

Another aspect of the anti-suit injunction's breadth is that it applies to fully adjudicated issues as well as claims. The Fifth Circuit, in *Quintero v. Klaveness Ship Lines*, held that a plaintiff whose federal action was dismissed on forum non conveniens grounds may not relitigate in a later state court action the choice of law issue that was an element of the federal court's decision to dismiss.[942] The Fifth Circuit has established more than its share of precedents on this point.[943]

Other less than fundamental examples illustrate the variety of issues arising under the relitigation exception. One example is enjoining the relitigation of amenability. In *Foyt v. Championship Auto Racing Teams, Inc.*, a federal court in Houston dismissed the plaintiffs' antitrust claims for lack of personal jurisdiction in Texas.[944] Plaintiffs then filed a related claim in a Texas state court arguing tortious interference instead of antitrust, with slightly different parties, but including Championship Auto Racing Teams ("CART").[945] CART asked the federal court to enjoin the second action, which it argued was an attempt to thwart the first court's ruling on CART's non-amenability in Texas.[946] The court agreed and enjoined plaintiffs from suing CART "in any state or federal court in the State of Texas."[947] The

---

[937]15 F.3d 506 (5th Cir. 1994).

[938]*See id.* at 511-13.

[939]*See id.* at 513.

[940]*See id.* at 523-24.

[941]*See id.* at 523-25. *Cf.* Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1523-26 (9th Cir. 1983) (holding that the plaintiff was enjoined from relitigating the just-dismissed claims, or any remotely related to them).

[942]914 F.2d 717, 720-22, 726 (5th Cir. 1990).

[943]*See* Royal Ins. Co. of American v. Quinn-L Capital Corp., 960 F.2d 1286, 1297-1301 (5th Cir. 1992); 17 WRIGHT MILLER & COOPER, *supra* note 619, § 4226 n.12.

[944]947 F. Supp. 290, 295 (S.D. Tex. 1996)

[945]*See id.* at 292.

[946]*See id.*

[947]*Id.* at 295.

court rejected plaintiffs argument that the Anti-Injunction Act, forbade this anti-suit injunction because (1) the state action had been removed to federal court, and (2) even if it had not, the injunction was authorized under § 2283's relitigation exception.[948]

Declaratory judgment actions also fall under the exception. Litigants sometimes file federal declaratory judgment actions seeking a resolution on the merits of a pending state court case. Because the declaratory judgment could have preclusive effect in the state action, this practice has been deemed an attempt to make "an end run around the requirements the Anti-Injunction Act."[949] Accordingly, courts have held that declaratory judgment actions in these circumstances must satisfy the requirements of § 2283.[950]

Tax injunctions have their own specific federal bar. The Tax Injunction Act provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."[951] Fox River Valley Railroad sued the Wisconsin Department of Revenue for civil rights violations under color of state law for setting a tax assessment as the purchase price of another railroad it had purchased.[952] Specifically, Fox sued for a declaration that the tax assessment method was unconstitutional and for an injunction against collection.[953] In dismissing the case, the federal court noted that the underlying principle against enjoining state taxation had been around "[l]ong before the passage of § 1341."[954] The court invoked the Supreme Court's recognition of the importance of a government's ability to levy taxes unimpeded by outside forces, and the resulting comity owed the states.[955]

---

[948]*See id.*

[949]Travelers Ins. Co. v. Louisiana Farm Bureau Federation, Inc., 996 F.2d 774, 776 (5th Cir. 1993).

[950]*See id.*

[951]28 U.S.C. § 1341 (1994).

[952]*See* Fox River Valley R.R. Corp. v. Dept. of Revenue, 863 F. Supp. 893, 895 (E.D. Wis. 1994).

[953]*See id.*

[954]*Id.* at 896.

[955]*See id.* (citing Dows v. Chicago, 78 U.S. [1 Wall.] 108, 110 (1871)).

### E. Summary of Limits on Federal Courts Enjoining State Court Litigation

Parallel litigation in distinct jurisdictions, such as two states or two countries, has somewhat similar rules applicable to the staying, dismissing, or enjoining of one case, or alternatively, the ongoing prosecution of both cases. The rules for state-federal parallel litigation differ significantly, and the difference is federalism and its delicate balance of state and federal power. Federalism affects parallel litigation in two areas: stays/dismissals and antisuit injunctions.

The stay and dismissal remedies are addressed by three common law abstention doctrines, giving federal courts discretion to decline jurisdiction in three settings (very broadly and approximately described here): *Pullman* abstention applies to disputes raising a constitutional issue in regard to an ambiguous state law, where the dispute might be resolved without constitutional concern if addressed first by the state court. *Burford* abstention applies to disputes in areas of complex state regulation, where review by a federal court would be inconsistent with the centralized state judicial review system. *Thibodeaux* abstention applies to diversity cases with unclear questions of state law with no constitutional implications, that would ideally be addressed by certification to the state supreme court but cannot because of a pending state court action. *Pullman* and *Burford* apply whether a state court action is pending or not, but this use of *Thibodeaux* applies only where a state action is pending, thus undermining the use of certification. In a situation with parallel state and federal actions, whether in the same state or not, these doctrines support the stay or dismissal of the federal case regardless of its first or second filed status.

A fourth abstention doctrine, *Colorado River*, is not substantially based on federalism and is merely the stay/dismissal test for all parallel state-federal litigation. Because *Colorado River* applies to all instances of parallel state-federal litigation, its presumption against abstention could clash with strong federalism concerns in a case also covered by *Pullman*, *Burford*, or *Thibodeaux*, and presumably the federalism concerns would prevail. Although some cases have raised *Colorado River* with another abstention doctrine, none has discussed a priority of underlying policies.[956]

The second area is the antisuit injunction remedy against a pending state action, governed both by the Anti-Injunction Act and the traditional equitable rules embodied in the *Younger* doctrine. In spite of their seeming

---

[956]*See* University of Maryland v. Peat Marwick Main & Co., 923 F.2d 265, 275-76 (3d Cir. 1991); Tucker v. First Md. Sav. & Loan, Inc., 942 F.2d 1401, 1408 (9th Cir. 1991).

interaction and overlapping, *Younger* and the Anti-Injunction Act are distinct requirements that create separate barriers to federal injunctions against state court actions. Thus, federal courts may enjoin *potential* state court litigation under the All Writs Act, but a federal injunction against *pending* state court litigation must satisfy both the equitable standards of *Younger/Pennzoil* and one of the three exceptions to the Anti-Injunction Act.

## VI. STATE COURTS AND PENDING FEDERAL LITIGATION

### A. *"Transfers" from State to Federal Court: Federal Removal*

Cases may not be transferred from state to federal court (or between any jurisdictions), but removal to federal court readily achieves the same effect. This is a common procedural tool in remedying parallel litigation, used to consolidate duplicate cases or obtain a federal forum for ruling on a motion to dismiss the immediate case or enjoin the other one.[957] For this tactic to work, however, there must be a basis for removal. That is, the state claims must be subject to federal jurisdiction and the fact that they are related to the federal claims is not enough. In *Carpenter v. Wichita Falls I.S.D.*, plaintiff Rose Carpenter sued her employer, the Wichita Falls Independent School District, simultaneously in state court for breach of contract and in federal court for infringement of free speech.[958] The defendant removed the state action to federal court and had it consolidated with the similar federal action.[959] The Fifth Circuit reversed based on the lack of any basis for federal jurisdiction over the breach of contract claim in state court.[960] The fact that Carpenter could have brought the contract action as a supplemental claim under 28 U.S.C. § 1367 was irrelevant.[961]

While the Fifth Circuit practice reflects the strong majority, there are exceptions and the future may provide more. Thus, in spite of the basic notion of non-transferability between state and federal courts, Pennsylvania has statutorily authorized a transfer to its state courts of a

---

[957]*See* International Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112, 115 (5th Cir. 1996) (forum selection agreement); American Dredging Co. v. Miller, 510 U.S. 443, 453-57 (1994) (forum non conveniens).

[958]44 F.3d 362, 365 (5th Cir. 1995).

[959]*See id.* at 565.

[960]*See id.* at 368-72.

[961]*See id.* at 368.

claim that has lost its jurisdictional basis in federal court.[962] In addition, the American Law Institute has proposed a system of transfer of transactionally-related cases from state to federal court, using removal and supplemental jurisdiction, for possible venue transfer and consolidation with federal cases, and antisuit injunctions to suspend the state proceedings.[963]

## B. *Dismissing or Staying the State Case*

### 1. Forum Selection Clauses

It is unlikely that a forum selection agreement would specify a federal court for a non-federal matter that could be filed in state court, but there is no reason that such an agreement could not be enforced under the same terms courts enforce any other choice of forum clause. Courts currently enforce the converse, that is, parties' choices of specific state courts.[964] The question would seem to be one of the forum choosing to decline otherwise valid jurisdiction in deference to the forum selection agreement, rather than a court creating or diminishing the jurisdiction of another court.[965]

### 2. Other Grounds

Texas law is unclear on the standard to be applied to state-federal conflicts in litigation, but appears to favor the venerable "mere pendency" rule, that is, the mere pendency of a federal action does not abate the Texas action.[966]   In *Taiwan Shrimp Farm Village Ass'n. v. U.S.A. Shrimp Farm Development, Inc.*, the court explained its refusal to abate the action in deference to a first-filed federal action.[967]   The court observed that the test

---

[962]*See supra* V.A.

[963]*See* Complex Litigation Proposal, §§ 5.01-.04, discussed *supra* V.A; *see also* Edward F. Sherman, Comment, *Antisuit Injunction and Notice of Intervention and Preclusion: Complementary Devices to Prevent Duplicative Litigation*, 1995 B.Y.U. L. REV. 925, 926 (1995).

[964]*See* American Airlines, Inc. v. Rogerson ATS, 952 F. Supp. 377, 381 (N.D. Tex. 1996).

[965]*See* Stewart Org., Inc. v. Ricoh Corp., 810 F.2d 1066, 1075-76 (Tjoflat, J., concurring).

[966]*See* Space Master Int'l, Inc. v. Porta-Kamp Mfg. Co., 794 S.W.2d 944, 946 (Tex. App.--Houston [1st Dist.] 1990, no writ); Green Oaks Apts., Ltd. v. Cannan, 696 S.W.2d 415, 418 (Tex. App.--San Antonio 1985, no writ); Williamson v. Tucker, 615 S.W.2d 881, 885 (Tex. App.--Dallas 1981, writ ref'd n.r.e.); Byrnes v. University of Houston, 507 S.W.2d 815, 816-17 (Tex. Civ. App.--Houston [14th Dist.] 1974, writ ref'd n.r.e.).

[967]915 S.W.2d 61, 68 (Tex. App.--Corpus Christi 1996, writ denied).

is "inherent interrelation" between the two cases, and found further that the test resembled by the rules "governing persons to be joined if feasible and the compulsory counterclaim rule."[968] While the parties were identical in the two cases, the court found that the claims were distinct, although arising from an ongoing dispute.[969] The federal action involved a deceptive trade practice claim by Taiwan's owner, while the state court action was U.S.A. Shrimp Farm's claim for Taiwan's alleged conversion of six water pumps.[970] Taiwan had attempted its answer to raise the federal claims as counterclaims in the state action.[971] Nevertheless, while the two lawsuits were related on a personal level, they were legally distinct.[972] Even though all claims could have been litigated in one court, the Texas state court refused to abate.[973] Although a parallel federal action does not automatically abate the state case, Texas law does provide for a discretionary stay.[974]

At least one Texas appellate court has applied the first-filed rule in a state-federal conflict to justify its refusal to stay or dismiss its action in deference to a second-filed declaratory judgment action in a New York federal court.[975] This rule was applied in the federal court's favor in *Alpine Gulf, Inc. v. Valentino*,[976] in which the court reversed the trial court and granted a stay of the Texas second-filed action in favor of the first-filed New York federal action.

Dismissals may be available in Texas in two instances: where the federal action is a first-filed in rem case,[977] and, at least in Texas, where the state action is a second-filed declaratory judgment action.[978] Presumably, forum non conveniens is not a grounds in regard to federal courts in Texas.

---

[968] *Id.*

[969] *See id.*

[970] *See id.*

[971] *See id.* at 66.

[972] *See id.*

[973] *See id.* at 65-66.

[974] *See* Williamson v. Tucker, 615 S.W.2d 881, 886 (Tex. App.--Dallas 1981, writ ref'd n.r.e.).

[975] *See* '21' Int'l Holdings, Inc. v. Westinghouse Elec. Corp., 856 S.W.2d 479, 484-85 (Tex. App.--San Antonio 1993, no writ) (noting the "mere pendency" rule).

[976] 563 S.W.2d 358, 259-60 (Tex. Civ. App.--Houston [14th Dist.] 1978, writ ref'd n.r.e.).

[977] *See* '21' *International Holdings*, 856 S.W.2d at 484 (negative inference from statement that mere pendency of second action is not grounds for abatement of an in personam action).

[978] *See* Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970).

For federal courts outside of Texas, the analysis is presumably the same as that for interstate forum non conveniens.[979]

Other states' practices vary, often applying similar rules for both instate and interstate parallel cases. Florida has one of the older cases dealing directly with state federal parallels, providing a presumption for the stay of a second-filed Florida case.[980] The current Florida test is stated in *City of Miami Beach v. Miami Fraternal Order of Police*; it is a presumptive dismissal in deference to a first-filed federal case unless outweighed by factors such as a congested federal docket.[981] New York, however, requires, consistent with its treatment of all parallel cases, a complete identity of the parties and claims, or alternatively, a showing that a determination in the federal action would necessarily dispose of all issues in both actions.[982] Absent this, neither stay nor dismissal is available.[983] Many states, however, will at least stay a state case that is sufficiently similar to a federal one.[984]

Delaware has what may be the most multi-faceted rules for parallel conflicts. It treats state-federal parallel conflicts the same as interstate conflicts, providing that comity and judicial economy ordinarily call for a stay of a second-filed Delaware case.[985] The Delaware Supreme Court has included "similar claims" in this provision,[986] but has also stated the requirement as cases "'involving the same parties and the same issues.'"[987] Conversely, for first-filed local cases, "a motion to stay or dismiss should

---

[979]*See supra* Part IV.B.4.

[980]*See* Wade v. Clower, 114 So. 548 (Fla. 1927).

[981]619 So. 2d 447, 448 (Fla. Dist. Ct. App. 1993). *See also* State v. Harbour Island, Inc., 601 So. 2d 1334, 1335 (Fla. Dist. Ct. App. 1992) (granting stay for non-identical cases because resolution of first-filed federal action would determine many issues in state case); Ricigliano v. Peat, Marwick, Main & Co., 585 So. 2d 387, 387 (Fla. Dist. Ct. App. 1991) (staying of second-filed Florida action in deference to substantially similar federal case).

[982]*See* Guilden v. Baldwin Sec. Corp., 189 A.2d 716, 592 N.Y.S.2d 725, 726 (N.Y. App. Div. 1993) (denying stay for lack of complete identity); Hope's Windows v. Albro Metal Prods. Corp., 460 N.Y.S.2d 580, 581 (N.Y. App. Div. 1983).

[983]*See Guilden*, 592 N.Y.S.2d at 726.

[984]*See* Kaselaan & D'Angelo Assoc. v. Soffian, 675 A.2d 705, 707 (N.J. Super. Ct. App. Div. 1996); Caiafa Prof'l Law Corp. v. State Farm Fire & Cas. Co., 19 Cal. Rptr. 2d 138, 139-40 (Cal. Ct. App. 1993); Polaris Pub. Income Funds v. Einhorn, 625 So. 2d 128, 129 (Fla. Dist. Ct. App. 1993); *see also* Tonnemacher v. Touche Ross & Co., 920 P.2d 5, 8-10 (Ariz. Ct. App. 1996) (holding that discretionary stay is available, although dismissal is not).

[985]*See* Local Union 199, Laborers' Int'l Union v. Plant, 297 A.2d 37, 38-39 (Del. 1972).

[986]*See* Prezant v. De Angelis, 636 A.2d 915, 919-20 (Del. 1994).

[987]Acierno v. New Castle County, 679 A.2d 455, 458 (Del. 1996) (quoting McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co., 263 A.2d 281, 283 (Del. 1970)).

be granted only in a rare case, after defendant has established that litigating in Delaware will cause undue hardship and inconvenience."[988] After stating these guidelines, the *Acierno* court refused to stay the state action on different grounds.[989] Determining the first-filed case was difficult because of the parties' race to the courthouse indicated filings minutes apart.[990] The court disregarded the first-filed status and held that the nature of the dispute, the denial of a building permit, was a distinctly local government issue, and thus worthy of on-going litigation in a Delaware state court.[991] Delaware law, however, is not clear as to how far from identical two cases may be to qualify for these tests and presumptions.

### 3. Enjoining the Federal Litigation

State courts may not enjoin parties from pursuing federal litigation, parallel or otherwise, as explained in the less-than-unanimous *Donovan v. City of Dallas*.[992] James P. Donovan had filed a pro se federal class action suit against the City of Dallas and others to stop the construction of a new runway at Love Field, the primary Dallas airport at that time.[993] The action had already been litigated and lost through the Texas Supreme Court, including a certiorari denial by the United States Supreme Court.[994] Following the state court loss, Donovan filed in federal court in Dallas, seeking to relitigate the claim which included injunctive relief to stop construction and a declaration that the fund-raising bonds were illegal and void.[995] Under Texas law, the bonds could not be issued while the litigation was pending.[996] The City of Dallas answered in federal court, but also applied to the state court of appeals for a writ of prohibition barring plaintiffs from the federal action.[997] The state appellate court denied the writ on the grounds that it lacked the power to enjoin federal litigation.[998] The Texas Supreme Court reversed and directed the lower court to issue

---

[988]*Id.* at 458 (citing Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd., 669 A.2d 104, 107 (Del. 1995)); *see also supra* Part IV.B.5 for additional aspects of Delaware's test.

[989]*See Acierno*, 679 A.2d at 458.

[990]*See id.* at 457.

[991]*See id.* at 458.

[992]377 U.S. 408 (1964).

[993]*See id.* at 408-09.

[994]*See id.* at 409.

[995]*See id.*

[996]*See id.*

[997]*See id.* at 409-10.

[998]*See id.*

the writ, which it did.[999]   The United States Supreme Court reversed and dissolved the injunction, noting the underlying premise regarding state injunctions against federal litigation as described by Justice Black.[1000]

Justice Black described a seemingly inviolable rule: "Early in the history of our country a general rule was established that state and federal courts would not interfere with or try to restrain each other's proceedings. That rule has continued substantially unchanged to this time."[1001]

Noting the sole exception of in rem cases in which the first-filed action has exclusive jurisdiction, the Court quoted the overriding rule that "'where the judgment sought is strictly in personam, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other.'"[1002]

The Court then examined the role of res judicata, since a state court judgment had already been rendered.

> It may be that a full hearing in an appropriate court would justify a finding that the state-court judgment in favor of Dallas in the first suit barred the issues raised in the second suit, a question as to which we express no opinion. But plaintiffs in the second suit chose to file that case in the federal court. They had a right to do this, a right which is theirs by reason of congressional enactments passed pursuant to congressional policy. And whether or not a plea of *res judicata* in the second suit would be good is a question for the federal court to decide.[1003]

In spite of the apparent lack of controversy in the majority's statement of the law, a three-justice dissent argued that the question was narrower than the majority had described:

> The question presented by this case is not the general one stated by the Court at the outset of its opinion, but a much narrower one:  May a state court enjoin resident state-court suitors from prosecuting in the federal courts vexatious, duplicative litigation which has the effect of thwarting a state-court judgment already rendered against

---

[999]*See id.* at 410.

[1000]*See id.* at 411-12.

[1001]*Id.* at 412 (citations omitted).

[1002]*Id.* (quoting Princess Lida v. Thompson, 305 U.S. 456, 465-68 (1939)).

[1003]*Id.*

> them? Given the Texas Supreme Court's finding, amply
> supported by the record and in no way challenged by this
> Court, that this controversy "has reached the point of
> vexatious and harassing litigation," I consider both the
> state injunction and the ensuing contempt adjudication to
> have been perfectly proper.[1004]

Justice Harlan's dissent correctly suggests that the rule is not absolute.
Three years before the Supreme Court decided *Donovan*, the Texas
Supreme Court upheld a state court injunction against a parallel action in a
New Mexico federal court, where both lawsuits were *in personam*.[1005] The
court of appeals had reversed the trial court's issuance of the injunction,
but the supreme court reversed again, with an analysis that did not address
any issues of federalism or treat the federal court in any manner other than
an out of state court.[1006]

In *Blanchard v. Commonwealth Oil Co.*, the Fifth Circuit upheld a
dismissal of a federal action based on the state court's injunction against
the federal litigation.[1007] The Fifth Circuit stated that while state courts may
not enjoin federal proceedings *per se*, the following was offered by the
court as a substitute:

> Nevertheless, under the proper equitable circumstances the
> *parties* to a suit in another state or in the federal courts
> may be enjoined from continuing to prosecute. Although
> the court need not heed such an injunction where
> jurisdiction has properly attached, it may recognize the
> order of another court as a matter of comity and terminate
> the proceedings or stay them for the duration of the
> injunction. Where the two courts involved are a state and
> a federal court, special attention should be given to such an
> anti-suit injunction.[1008]

The court cited special concerns where the state and federal courts had
concurrent territorial jurisdiction, where the claim arose under state law,
and the need to avoid "an unseemly conflict between the state and federal

---

[1004]*Id.* at 414-15 (Harlan, J., dissenting) (citations omitted).

[1005]*See* University of Texas v. Morris, 344 S.W.2d 426, 429 (Tex. 1961).

[1006]*See id.* at 427, 429.

[1007]294 F.2d 834, 841 (5th Cir. 1961).

[1008]*Id.* at 839 (citations omitted).

system."[1009] This illustrates the Anti-Injunction Act's proscription on federal anti-suit injunctions against state litigation.[1010]

Another earlier example of a state court enjoining federal litigation is *Southern Railway Co. v. Painter*, in which the Supreme Court reversed a federal court injunction against a second-filed Tennessee chancery suit, and where the Tennessee court had enjoined the first-filed federal litigation.[1011] One justification was the application of *Toucey v. New York Life Insurance Co.*, decided on the same day, which reactivated the use of the Anti-Injunction Act as a severe limit on federal courts' ability to enjoin state litigation.[1012] The case is perhaps equally-well explained by the federal plaintiff's (the target of the state injunction) failure to appeal the Tennessee injunction, thus letting it become final and triggering the "last in time" rule for preclusion, that is, preclusive effect is given to the last judgment on point.[1013]

## VII. FEDERAL COURTS AND FOREIGN LITIGATION

### A.  Dismissing or Staying the Federal Action

Historically, a parallel foreign case was not grounds for dismissal, although stays were possible.[1014] That rule has broken down, and both state and federal courts may now grant dismissals as well as stays. On the other hand, no jurisdiction has gone as far as authorizing dismissal under a first-filed rule. As one court has noted, the first-filed rule was never meant to apply in cases where two courts were not of the same sovereignty.[1015]

Federal law has a variety of doctrines on point. Two are fairly precise: dismissals of the second-filed in rem action, and dismissals based on forum selection clauses. Another forum non conveniens is reasonably precise even with its balancing factors. These apply in specific settings, with two (forum non conveniens and forum selection dismissals) not requiring a

---

[1009]*Id.* (citing Toucey v. New York Life Ins. Co., 314 U.S. 118 (1941)).

[1010]*See supra* Part V.D.2.

[1011]314 U.S. 155, 159-60 (1941).

[1012]314 U.S. 118, 141 (1941).

[1013]*See* Treinies v. Sunshine Mining Co., 308 U.S. 66, 78 (1940); *see also supra* Part V.D.

[1014]*See* Lynch v. Hartford Fire Ins. Co., 17 F. 627, 628 (C.C.D.N.H. 1883) (using "abatement" for dismissal, and speculating that the court's inherent power to stay cases was preferrable).

[1015]*See* Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 887 n.10 (3d. Cir. 1981), *aff'd*, 456 U.S. 694 (1982).

parallel case in order to be useful. Before examining these fact-specific doctrines, this Article will analyze the least clear of the dismissal/stay areas: in personam parallel litigation with no forum selection clause and when not argued under forum non conveniens grounds. The test(s) for these generic parallel cases is far from clear, although the following analysis suggests a uniform approach, drawn from *Colorado River Water Conservation District v. United States*, which may be a reconfiguration of the *Bremen* forum non conveniens test.[1016]

### 1. The General In Personam Tests: *Landis* and *Colorado River*

Federal law has at least three doctrines applicable to a motion for stay or dismissal of an in personam federal action that is duplicated in a foreign court. With overlapping concepts and policies, these grounds are far from distinct. Each has been deemed sufficient, standing alone, to grant or deny a stay or dismissal of a federal action in deference to a foreign one. The first doctrine is comity, drawn from what may be a misreading of the comity formula stated in *Hilton v. Guyot*.[1017] Comity is also a factor in the second and third doctrines, which are derived from parallel litigation remedies aimed at conflicts within the United States. The second doctrine is drawn from *Landis v. North American Co.*,[1018] dealing with parallel federal cases, and the third is from *Colorado River Water Conservation District v. United States*, addressing parallel state-federal cases.[1019] Federalism plays a role in *Colorado River* that is missing in *Landis*, and one might expect the tests to differ. In fact, their elements are similar, as discussed below, but a principal distinction is that *Colorado River* has a stronger presumption for retaining the challenged case and allowing both actions to proceed until one reaches judgment. *Colorado River* thus has a higher burden of proof, at least as stated, but whether it is higher in application is another question. *Landis* and *Colorado River* are well-developed doctrines; the comity standard, on the other hand, is vague and may be a misreading of *Hilton*. Accordingly, this analysis begins with the cases relying on *Landis* and *Colorado River*, and then examines the comity standard.

In contemplating a stay or dismissal in deference to foreign litigation, most federal courts have relied on either *Landis* or *Colorado River*.[1020]

---

[1016]424 U.S. 800, 820 (1976) (stating the *Colorado River* test).

[1017]159 U.S. 113, 228 (1895).

[1018]299 U.S. 248, 254 (1936). *See supra* Part II.D.1 for additional discussion of *Landis*.

[1019]424 U.S. at 820. *See supra* Part V.C.1 for additional discussion of *Colorado River*.

[1020]*See* BORN, INTERNATIONAL CIVIL LITIGATION, *supra* note 6, at 462-64.

Some have used both. Understanding the less-than-uniform tests for foreign cases first requires a brief statement of the two domestic cases. *Colorado River* is used for state-federal parallels and has a strong presumption favoring the exercise of jurisdiction, based on a federal court's "virtually unflagging obligation" to exercise its Article III jurisdiction when properly invoked.[1021] In spite of this strong presumption, federal courts have the discretion to dismiss based on a vague test of at least nine components drawn from *Colorado River* and a successor case, *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*[1022] The nine components are (1) which court first assumed jurisdiction over a res, if applicable; (2) the relative convenience of the alternative forums; (3) the desirability of avoiding piecemeal litigation; (4) which cases was first filed; (5) the relative progress of the two actions; (6) the extent to which federal law applies; (7) any other special factors[1023] (in *Colorado River*, it was the government's willingness to litigate similar claims in state court); (8) the adequacy of the alternative forum in protecting the litigants' rights; and (9) whether the action in the immediate forum was vexatious or filed in bad faith.[1024] These factors may be summarized as federalism, comity, fairness to parties, and judicial economy. The original cases favored dismissal as a remedy, but some have now gone to stays, especially when dealing with foreign litigation.[1025]

The *Landis* case, an instance of intra-federal parallel litigation, is not often cited as authority in intra-federal parallel disputes.[1026] The reason may be that the *Landis* text fails to provide clear standards to determine which case should have priority. More recent cases, primarily in the international setting, have provided those standards: they include (1) comity; (2) the adequacy of relief available in the other forum; (3) judicial efficiency; (4) the degree of identity of the parties and issues in the two cases; (5) the likelihood of prompt disposition in the other forum; (6) convenience to the parties, counsel, and witnesses; and (7) the possibility of prejudice if the stay or dismissal is granted.[1027] *Landis*, like *Colorado River*, is discretionary. A key distinction, though is *Landis'* lack of a stated presumption favoring ongoing exercise of jurisdiction in both courts. The

---

[1021]*Colorado River*, 424 U.S. at 817.

[1022]460 U.S. 1 (1983).

[1023]See id.

[1024]*See id.* at 15-28.

[1025]*See, e.g.*, Lumen Constr. Inc. v. Brant Constr. Co., Inc., 780 F.2d 691 (7th Cir. 1985).

[1026]*See supra* Part II.D.1.

[1027]*See* I.J.A., Inc. v. Marine Holdings, Ltd., 524 F. Supp. 197, 198 (E.D. Pa. 1981).

original case favored a stay as the remedy rather than dismissal, but some courts now use *Landis* to grant dismissals, as discussed in the following cases.

The two tests are similar in their elements, in their balancing approach, and in that they are discretionary. They are distinct in that *Colorado River* raises federalism concerns and appears to have a higher burden for a party seeking dismissal. The two tests may be reconciled through agreement that *Colorado River*'s dismissal remedy requires a higher burden than the *Landis* stay. This explanation is undermined, however, by the current tendency to use these cases somewhat interchangeably for both stays and dismissals.

From this confusion, three arguments emerge as to which test is appropriate. The first is that *Landis* is clearly the appropriate standard for federal/foreign conflicts because federalism is not an issue in federal-foreign conflicts, as was the case in *Landis* which concerned parallel federal cases. The second is that *Landis* is clearly inappropriate because it over-emphasizes judicial economy, which gives too little weight in reactive litigation to each plaintiff's right to a forum. The *Colorado River* test therefore has the appropriate emphasis. Third, in spite of somewhat distinct language in *Colorado River* and *Landis*, the similarity of their tests, the discretionary standard, and their integrated use by the courts suggests that the tests are the same, and either may be used.

There is no satisfactory answer at present, and some confusion results. Some cases rely on only one test, while others cite both with no specificity as to which one was followed. A reading of the cases may endorse Argument Three (the tests are the same in application), but caution suggests that courts subscribe to Argument Two. That is, use *Colorado River* to provide an appropriate emphasis on a plaintiff's right to choose a forum absent compelling reasons to intervene.

*Ingersoll Milling Machine Co. v. Granger* used a *Colorado River* test to uphold the trial court's stay of the Illinois federal action, awaiting the outcome on appeal of a Belgian action regarding job termination benefits.[1028]

Ingersoll had hired Granger in Illinois to work in its Brussels plant.[1029] After that job ended (for unstated reasons), Granger sued Ingersoll in Belgium for benefits due under Belgian labor law.[1030] He won at trial, but

---

[1028]833 F.2d 680, 685 (7th Cir. 1987).

[1029]*See id.* at 682.

[1030]*See id.*

while the Belgian action was on appeal, Ingersoll sued in federal court in Illinois.[1031] The Illinois federal court stayed the action, and the Seventh Circuit upheld it.[1032] Just two years before, the Seventh Circuit had occasion to apply the *Colorado River* precedent to dismiss a federal action that paralleled a state court proceeding.[1033] Noting that this situation involving a foreign action was "somewhat different," the court found that those factors could nonetheless "serve as a helpful guide" when faced with duplicative foreign litigation.[1034] The pertinent factors were (1) no strong federal interest in having a United States forum; (2) what interest the United States might have was countered by a very significant Belgian interest; (3) that the United States also had an interest in exercising international comity favoring deference to the Belgian action; (4) that judicial economy favored a stay pending the outcome of the Belgian appeal, since that action had been fully litigated; and (5) that in light of a careful balancing of these factors, the trial court's stay was "a common sense approach . . . clearly within the sound discretion of the trial court."[1035]

The same standards led to the reversal of the trial court's stay in *Neuchatel Swiss General Insurance Co. v. Lufthansa Airlines*.[1036] Emphasizing *Colorado River*'s "exceptional circumstances" language, the court held that this action for the loss of a sealed carton of gold and jewels, which became a bag of lead at the end of its transport to Switzerland, was an unexceptional commercial dispute.[1037] A significant distinction from *Ingersoll* was that the Swiss action had not gone any further than the one in California.[1038] It is unclear which was filed first. Addressing the foreign aspect, the court found the distinction immaterial, rejecting "the notion that a federal court owes greater deference to foreign courts than to our own state courts."[1039] While the *Neuchatel* case underscored *Colorado River*'s emphasis on presuming against dismissal or stay, its facts did not warrant a stay under any test.[1040]

---

[1031] *See id.*

[1032] *See id.*

[1033] *See* Lumen Constr., Inc. v. Brant Constr. Co., 780 F.2d 691, 698 (7th Cir. 1985).

[1034] *Id.* at 685.

[1035] *Id.* at 686. (citing *Landis*, 299 U.S. at 254). *See also* Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 1998 WL 698900 (N.D. Ill. 1998).

[1036] 925 F.2d 1193, 1194 (9th Cir. 1991).

[1037] *See id.* at 1194-5.

[1038] *See id.* at 1195.

[1039] *Id.*

[1040] *See id.*

The *Landis* test, with the arguably lighter burden, has also been used in denying stays. In *Itel Corp. v. M/S Victoria U*, the Fifth Circuit vacated the trial court's stay in an action for breach of leases of cargo containers.[1041] The trial court had imposed the stay to permit a defendant to pursue its third party claim against Iran in the Iran-United States Claims Tribunal.[1042] After citing *Landis*, the Fifth Circuit vacated the stay to permit the parties to litigate the remaining claims, observing that the Claims Tribunal lacked power to render effective relief as to all the claims in the local case.[1043] On the other hand, courts granting dismissals have used *Landis* as well.[1044]

Some courts use both *Landis* and *Colorado River* to justify a granting or denying of stay or dismissal requests.[1045]

### a.   The First-to-Judgment Rule, the Laissez-Faire Approach

The Colorado River doctrine begins with a strong presumption against interfering with parallel litigation.[1046] The same principle is found in citations to *Laker Airways*[1047] and *China Trade*,[1048] two cases involving antisuit injunctions. Language such as the following, referring to judicial reluctance to enjoin foreign litigation, is used by analogy to reject motions for dismissal or stay:

---

[1041]710 F.2d 199, 204 (5th Cir. 1983).

[1042]*See id.* at 200.

[1043]*See id.* at 203-04;  *see also* Modern Computer Corp. v. Ma, 862 F. Supp. 938, 949 (E.D.N.Y. 1994) (denying stay because case in Taiwan would not resolve all the issues); Ronar, Inc. v. Wallace, 649 F. Supp. 310, 318-19 (S.D.N.Y. 1986) (denying stay and rejecting arguments of inconvenience and different West German discovery laws); I.J.A., Inc. v. Marine Holdings, Ltd., Inc., 524 F. Supp. 197, 198-99 (E.D. Pa. 1981) (denying stay because the Canadian litigation was in initial stages, and the claims and parties were not identical; thus the stay would not lead to preclusion and would not favor judicial economy).

[1044]*See* Continental Time Corp. v. Swiss Credit Bank, 543 F. Supp. 408, 410 (S.D.N.Y. 1982) (dismissing in favor of first-filed Swiss action).

[1045]*See, e.g.,* Caspian Inv., Ltd. v. Vicom Holdings, Ltd., 770 F. Supp. 880, 884 (S.D.N.Y. 1991) (dismissal in favor of Irish litigation, relying equally on *Landis* and *Colorado River*); Brinco Mining, Ltd. v. Federal Ins. Co., 552 F. Supp. 1233, 1240-42 (D.D.C. 1982) (deferring to Canadian action, citing comity, forum shopping, and judicial economy; relying more heavily on *Colorado River*).

[1046]*See* Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817-18 (1976).

[1047]Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926-27 (D.C. Cir. 1984); *see also infra* Part VII.B.2.

[1048]China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36-37 (2d Cir. 1987); *see also infra* Part VII.B.2.

> [p]arallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in which one can be plead as res judicata. The mere filing of a suit in one forum does not cut off the pre-existing right of an independent forum to regulate matters subject to its prescriptive jurisdiction.[1049]

While this "first-to-judgment" language has developed its own following, it is drawn from the *Colorado River* presumption favoring the exercise of jurisdiction.[1050]

### b. *Comity as a stand-alone test*

Apart from the *Landis* and *Colorado River* tests, a few courts have used comity inappropriately based on too narrow an interpretation of *Hilton v. Guyot*.[1051] As discussed in the Introduction, comity is a broad doctrine with a number of variations.[1052] The use in *Hilton* was for the recognition of foreign judgments, either for preclusion or enforcement, providing the basic norm that international comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation . . . ."[1053] But *Hilton* was directed to the preclusive effect of *final* judgments from foreign countries, which dictated a greater deference for comity as well as preclusion reasons.[1054] *Hilton's* language and application alludes to the full faith and credit mandated for state and federal judgments in the United States, but reliance on this strong comity argument is inappropriate when applied to pending actions in foreign countries.[1055] That is, a pending lawsuit is not a "legislative, executive or

---

[1049]Black & Decker Corp. v. Sanyei Am. Corp., 650 F. Supp. 406, 408 (N.D. Ill. 1986) (quoting *Laker Airways*, 731 F.2d at 926-27); *see also* Madanes v. Madanes, 981 F. Supp. 241, 263-64 (S.D.N.Y. 1997) (rejecting dismissal related to parallel Swiss case and citing the "exceptional circumstances" test from Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25-26 (1983)); Herbstein v. Bruetman, 743 F. Supp. 184, 188 (S.D.N.Y. 1990) (rejecting stay related to parallel Argentine case).

[1050]*See Laker Airways Ltd.*, 731 F.2d at 926-27, n.48. (discussing the "first-to-judgment" concept and citing Colorado River Water Conservatory Dist. v. United States, 424 U.S. 800, 817 (1976)).

[1051]159 U.S. 113 (1895).

[1052]*See supra* Part I.D.

[1053]159 U.S. at 164.

[1054]*Id.* at 114-15.

[1055]*See id.* at 181-82.

judicial act" entitled to recognition.[1056]    Moreover, to the extent that *Hilton*'s comity evokes comparisons to full faith and credit, the latter doctrine does not apply to pending, non-final lawsuits.[1057] This is not to say that comity is inappropriate in parallel litigation questions.[1058]    To the contrary, it is a cited factor in countless instances of parallel litigation, and at all intersections: intrastate, interstate, state-federal and international.[1059] While comity in its larger sense may be an appropriate consideration, the *Hilton* language, which mirrors the full faith and credit directive, should be irrelevant to the local effect of pending foreign litigation.

Nonetheless, courts have cited *Hilton* in this setting, and at least one may have strayed in this direction by applying comity as an independent, stand-alone justification for dismissing or staying an action in deference to a *pending* parallel action in a foreign country, without regard to other factors such as convenience, fairness, or economy.[1060] In *Ensign-Bickford Co. v. ICI Explosives USA Inc.*, the court dismissed the case in deference to a pending Canadian case on the sole grounds of international comity.[1061] The court noted the requirement of comity to defer to foreign judgments, and it articulated an additional requirement "that domestic courts take reasonable steps to prevent potential conflicts form ripening into overt confrontations with foreign tribunals."[1062]    In its analysis, the court observed the distinction between pending cases and final judgments, but held that comity applied to both.[1063] The court then cited to two cases. The first, *EEOC v. University of Pennsylvania*, involved a refusal to dismiss the EEOC's lawsuit seeking enforcement of a subpoena against the University of Pennsylvania for peer review records.[1064]    While subpoenas, as an exercise of executive power, might well call for comity, the point is lost since the court rejected dismissal.[1065] The second case cited by the *Ensign Bickford* court was, *Timberlane Lumber Co. v. Bank of America National*

---

[1056]*Id.* at 164.

[1057]*See* Texas Employers Ins. Ass'n v. Jackson, 820 F.2d 1406, 1422 (5th Cir. 1987) *rev'd*, 862 F.2d 491 (5th Cir. 1988).

[1058]*See* discussion *supra* Part I.D.

[1059]*See id.*

[1060]*See* Ensign-Bickford Co. v. ICI Explosives USA Inc., 817 F. Supp 1018, 1032 (D. Conn. 1993).

[1061]*See id.* at 1031-32.

[1062]*Id.* at 1032.

[1063]*See id* at 1031-33.

[1064]850 F.2d 969, 969 (3d Cir. 1988).

[1065]*See id.* at 971-72.

*Trust & Savings Association.*[1066] This case was dismissed for lack of subject matter jurisdiction, and the case involved the inapplicability of United States antitrust law, not parallel litigation.[1067] Essentially, while comity might be an appropriate factor to consider along with other bases for dismissal, there appears to be very little authority for using comity as the sole determining factor. As illustrated here, cases using comity as exclusive authority for dismissal are either misconstruing it or using strained and inappropriate analogies.

*Basic v. Fitzroy Engineering, Ltd.* is another case citing *Hilton* as an appropriate standard, though rejecting the stay or dismissal.[1068] This case was dismissed for lack of subject matter jurisdiction, and the court stated that even if the court had subject matter jurisdiction, the case still would have been dismissed based on international comity toward the pending New Zealand action.[1069] Other courts have avoided this excessive application of comity. For example, *Sumitomo Corp. v. Parakopi Compania Maritima, S.A.*, acknowledged the *Hilton* standard but declined its application because until the foreign court issued a judgment, there was "no legislative, executive or judicial act of another nation . . . involved."[1070] Conversely, in rem litigation may justify a pure comity dismissal based on the almost universal rule that defers to the court first assuming jurisdiction.[1071]

## 2. Dismissals Based on Forum Selection Agreements

Even more so than the other topics in this Article, a discussion of forum selection clauses requires a unitary treatment to understand both the basic doctrine and its variations. The unitary treatment is best placed in this international section where, as with forum non conveniens, its factors are the most exaggerated and best contrasted, and where its most important precedents have arisen.

---

[1066]749 F.2d 1378 (9th Cir. 1984).

[1067]*See id.* at 1379-80.

[1068]949 F. Supp. 1333, 1340-41 (N.D. Ill. 1996). *Cf.* Herbstein v. Bruetman, 743 F. Supp. 184, 188 (S.D.N.Y. 1990) (holding that the action would not be stayed based on comity because of pending Argentine litigation).

[1069]*See Basis,* 949 at 1340-41.

[1070]477 F. Supp. 737, 742 (S.D.N.Y. 1979).

[1071]*See* Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 998-1000 (2d Cir. 1993) (acknowledging the *Hilton* standard by dismissing a United States case in favor of an Australian bankruptcy action).

A forum selection clause, known alternatively as a "forum selection agreement," "choice of forum clause," or "forum clause," is any clause in a contract indicating the location and possibly the manner of dispute resolution for disputes related to the contract.[1072] It may call for a specific location or court, or merely designate any court in the identified state or country.[1073] It may be exclusive, electing one court or jurisdiction and excluding others, or merely authorize the filing of suit there without excluding others.[1074] It may designate adjudication or arbitration.[1075] At the very least, it is consent by each party to be sued in the chosen forum, possibly to the exclusion of others.[1076] The question is whether the clause will be enforced.

These clauses are generally enforceable in state and federal courts in the United States if they are reasonable, but this was not always so.[1077] Before 1972, courts routinely rejected forum selection clauses as improper attempts by the parties to oust the court's jurisdiction.[1078] Thus, the law of forum selection agreements has only recently been developed, and many questions remain. Because forum selection clauses arise in contracts, the issue is how clear must the choice be and what law governs. The answer varies depending on the setting.

The old view rejecting forum selection clauses gave way in a set of five Supreme Court cases dating from 1972 to 1991. The five cases do not provide a single principle, and to the extent they appear to, there are deviations in both state and federal courts. Nonetheless, these decisions are the key to understanding forum selection clauses in state and federal courts in the United States.

### a. Five Foundational Cases

### i. The Bremen v. Zapata Off-Shore Company

Houston-based Zapata Off-Shore Company contracted with Unterweser, a German company, "to tow Zapata's ocean-going, self

---

[1072]See BLACK'S LAW DICTIONARY 665 (7th ed. 1999).

[1073]See id.

[1074]See, e.g., Insurance Co. of North America v. ABB Power Generation Inc., 112 F.3d 70, 72 (2d. Cir. 1997).

[1075]See generally Allied-Bruce Terminex Cos. Inc. v. Dobson, 513 U.S. 265 (1995).

[1076]See Blanco v. Banco Industrial De Venezuela, S.A., 997 F.2d 974, 979 (2d Cir. 1993).

[1077]See Carbon Black Export, Inc. v. Monrosa, 254 F.2d 297, 300-01 (5th Cir. 1958); see also EUGENE SCOLES & PETER HAY, CONFLICT OF LAWS, §§ 11.3-.4 (2d ed. 1992).

[1078]See id.

elevating drilling rig (*Chaparral*) from Louisiana to a point off Ravenna, Italy, in the Adriatic Sea."[1079]  The contract, drafted by Unterweser in bidding for the job, had a forum clause designating the London Court of Justice as the forum to resolve disputes.[1080]  A dispute arose when Unterweser's tug, the Bremen, encountered rough seas in the Gulf of Mexico and was forced to limp into port at Tampa, Florida.[1081]  Each party claimed the other was negligent.  Zapata claimed that the Bremen was not a seaworthy tug and that its crew was negligent, and Unterweser claimed that the Chaparral was not a seaworthy rig.[1082]  Zapata ignored the contract's London forum clause and filed an admiralty action in federal court in Tampa, Florida.[1083]  Unterweser responded with an action in England, seeking to compel litigation there.[1084]  The Tampa court denied Unterweser's motion to enforce the forum selection clause by dismissing its action, and enjoined Unterweser from continuing in the latter-filed English action.[1085]  The English court responded by denying Zapata's motion to stay or dismiss that action.[1086]

Back in the United States, the Fifth Circuit upheld the lower federal court's ruling against Unterweser based on *Carbon Black*'s holding that "agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced," on the in rem nature of Zapata's admiralty claim and the convenience of litigating in Florida near the site of the damage.[1087]  The Fifth Circuit later reaffirmed its holding in a sharply divided en banc opinion, with eight judges favoring the prior holding and six opposed.[1088]

The Supreme Court reversed, and in doing so restated the basic rules for forum selection clauses.[1089]  The policy underlying the change was clear, with strong references to the "expansion of overseas commercial activities" and the demise of the "barrier of distance that once tended to confine a

---

[1079]Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 2 (1972).

[1080]*See id.*

[1081]*See id.* at 3.

[1082]*See id.* at 3-4.

[1083]See id.

[1084]*See id.* at 6.

[1085]*See id.* at 6-7.

[1086]*See id.* at 4.

[1087]Zapata Off-Shore Co. v. Bremen (*in re* Unterweser Reederei GMBH), 428 F.2d 888, 893 (5th Cir. 1970) (quoting Carbon Black Export, Inc. v. The SS Monrosa, 254 F.2d 297, 300-01 (5th Cir. 1958)).

[1088]*See id.* at 908.

[1089]*See Bremen*, 407 U.S. at 8-20.

business concern to a modest territory."[1090]   These changes required a legal endorsement of the necessary contractual obligations:

> The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts .... We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.[1091]

Applying this policy shift to the instant facts, the Court noted that the contracting parties were sophisticated companies from different countries, and that the contract was for a specific one-time service towing of "an extremely costly piece of equipment from Louisiana across the Gulf of Mexico and the Atlantic Ocean, through the Mediterranean Sea to its final destination in the Adriatic Sea."[1092]   The fact that the towing would pass through many distinct national jurisdictions, and that a problem could have occurred at any point along the way, was ample justification for the parties to agree on a forum:

> It cannot be doubted for a moment that the parties sought to provide for a neutral forum for the resolution of any disputes arising during the tow.   Manifestly much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place where the Bremen or Unterweser might happen to be found.  The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting.[1093]

The Court then generalized the new rule:

> [I]n the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside. . . . [I]t seems reasonably clear that

---

[1090]*See id.* at 8.

[1091]*Id.* at 9.

[1092]*Id.* at 13.

[1093]*Id.* at 13 (emphasis in original).

> the District Court and the Court of Appeals placed the
> burden on Unterweser to show that London would be a
> more convenient forum than Tampa, although the contract
> expressly resolved that issue. The correct approach would
> have been to enforce the forum clause specifically unless
> Zapata could clearly show that enforcement would be
> unreasonable and unjust, or that the clause was invalid for
> such reasons as fraud or overreaching.[1094]

*Bremen* also addressed a concern that, in some cases, the enforcement
of a forum selection clause would subject a local party to an unfriendly
forum or unfair law. The Court held that a forum clause "should be held
unenforceable if enforcement would contravene a strong public policy of
the forum in which suit is brought, whether declared by statute or by
judicial decision."[1095] The Court embraced the dissenters' view from the
*Bremen* appellate opinion, finding that the enforcement of the clause in
*Bremen* did not violate public policy because the conduct occurred outside
United States territory, and that "we should not invalidate the forum
selection clause here unless we are firmly convinced that we would thereby
significantly encourage negligent conduct within the boundaries of the
United States."[1096]

The Court also suggested that an "unreasonable" forum clause would be
unenforceable in situations where the chosen forum was "seriously
inconvenient."[1097] The Court placed the burden for establishing
unreasonableness on the party challenging the clause, noting that "it should
be incumbent on the party seeking to escape his contract to show that trial
in the contractual forum will be so gravely difficult and inconvenient that
he will for all practical purposes be deprived of his day in court."[1098]

## ii. *Scherk v. Alberto-Culver Co.*

Arbitration clauses were the next step in expanding forum selections
clauses. In *Scherk*, the Court considered whether the parties' freely-
negotiated arbitration clause, designating the International Chamber of
Commerce in Paris, should be enforced against a domestic corporation's

---

[1094]*Id.* at 15.

[1095]*Id.* at 15 (citing Boyd v. Grand Trunk W.R. Co., 338 U.S. 263 (1949)).

[1096]*Id.* at 16 (quoting Zapata Off-Shore Co. v. Bremen (In re Unterweser Reeder GMBH), 428 F.2d 888, 907-08 (5th Cir. 1970)).

[1097]*See id.* at 16 (emphasis in original).

[1098]*See id.* at 18.

wish to litigate its securities fraud claim in the United States.[1099]  The case arose from Illinois-based Alberto-Culver's expansion into the European market.[1100]    One of its initial moves was to contract with German businessman Fritz Scherk to acquire his rights to three interrelated business entities organized under German and Liechtenstein law.[1101]   Scherk's express warranty that he was conveying "the sole and unencumbered ownership of these trademarks" was overstated, and Alberto-Culver sued for securities fraud in federal court in Illinois.[1102]  Scherk sought to enforce the contract's arbitration clause, but the lower courts denied Scherk's motion to dismiss on forum non conveniens grounds, drawing from the holding in *Wilko v. Swan*,[1103] which stated that actions under the Securities Act of 1933 were exempt from arbitration clauses.[1104]   The decision in *Wilco* was based on statutory language in the 1933 Act that barred "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter."[1105] The *Wilko* opinion noted the policy clash between this language and the policies underlying the United States Arbitration Act.  As recounted in *Scherk*:

> The [*Wilko*] Court found that "[t]wo policies, not easily reconcilable, are involved in this case."  On the one hand, the Arbitration Act stressed "the need for avoiding the delay and expense of litigation," and directed that such agreements be "valid, irrevocable, and enforceable" in federal courts.  On the other hand, the Securities Act of 1933 was "[d]esigned to protect investors" and to require "issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale," by creating "a special right to recover for misrepresentation."[1106]

---

[1099]*See* Scherk v. Alberto-Culver Co., 417 U.S. 506, 508-10 (1974).

[1100]*See id.* at 508.

[1101]*See id.*

[1102]*Id.*

[1103]346 U.S. 427 (1953).

[1104]*See Scherk,* 417 U.S. at 509-10.

[1105]15 U.S.C.A. § 77n (West 1997).

[1106]417 U.S. at 512 (quoting *Wilko,* 346 U.S. at 431, 438) (citations omitted)).

While *Wilko* struck this balance in favor of litigation of securities fraud claims and the non-enforcement of arbitration clauses, *Scherk* did the opposite, finding that the strong international flavor of *Scherk*'s facts called into play policy interests that dictated an opposite result from *Wilko*.[1107] *Scherk* also noted that neither an arbitration clause nor any other forum selection clause could be defeated by allegations of securities fraud, or presumably any other fraud.[1108] That is, a mere allegation of fraud did not negate the contract containing the choice of forum agreement.[1109] However, the forum selection clause could be defeated by showing the "*inclusion of that clause in the contract* was the product of fraud or coercion."[1110]

There was significant dissent in *Scherk*. While *Bremen*'s enforcement of a forum clause was an 8-1 decision, *Scherk*'s enforcement of a foreign arbitration agreement was a 5-4 vote, owing to concerns about federal securities policy rather than the distinction between adjudication and arbitration. The four dissenters would have enforced the arbitration clause had it been a mere trademark dispute,[1111] but argued that the Congressional policy underlying securities fraud claims compelled support for the plaintiff's choice of a federal judicial forum, and that the majority's "invocation of the 'international contract' talisman" was insufficient to override that policy.[1112]

### iii. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*

Eleven years after *Scherk*, the Court had another close vote along similar lines, this time with antitrust as the non-arbitral federal right.[1113] In *Mitsubishi*, the Court held by a 5-3 vote that in international cases, unlike domestic ones, the federal policy favoring enforcement of arbitration clauses prevailed over a conflicting federal policy that made antitrust claims non-arbitrable.[1114] The case arose from a dispute between car maker Mitsubishi (a joint venture of Chrysler International, a Swiss corporation,

---

[1107]*See id.* at 515.

[1108]See id. at 518.

[1109]*See id.*

[1110]*Id.* at 519 n.14.

[1111]*See id.* at 522 (Douglas, J., dissenting).

[1112]*Id.* at 529 (Douglas, J., dissenting).

[1113]*See generally* Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 473 U.S. 614 (1985).

[1114]*Id.* at 631-40.

and Mitsubishi Heavy Industries, a Japanese corporation) and Soler, a Puerto Rican corporation located in Pueblo Viejo, Puerto Rico.[1115] Two years into the parties' distributorship agreement, Soler's sales declined and it sought to delay or cancel some shipments and "transship" other cars to be sold in the continental United States and Latin America.[1116] Mitsubishi refused, and when attempts to resolve the dispute failed, it sued in federal court in Puerto Rico, seeking to compel arbitration under the terms of the distributorship agreement.[1117]    Soler objected to arbitration and counterclaimed for violations of the Sherman Antitrust Act and the related Automobile Dealers' Day in Court Act.[1118]    The district court ordered arbitration of all claims.[1119]  The First Circuit reversed as to the antitrust claims, following *American Safety Equipment Corp. v. J.P. Maguire & Co.*,[1120] which had held that antitrust claims were non-arbitrable.[1121] Focusing narrowly on the arbitrability of an antitrust claim arising in an international agreement, the Supreme Court reversed.[1122]  Recognizing that not "all controversies implicating statutory rights are suitable for arbitration,"[1123] the Court nonetheless found that the concerns raised in *American Safety* were insufficient in international cases to overcome the federal presumption favoring arbitration clauses.[1124]  The majority further noted that where foreign arbitration did not, in hindsight, protect antitrust concerns, that the problem could be addressed at the award-enforcement stage even though this assumes that the award would be enforced in a United States court.[1125]

As in *Scherk v. Alberto-Culver Co.*, we conclude that concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context.[1126]

---

[1115]*See id.* at 616-17.

[1116]*See id.* at 617-18.

[1117]*See id.* at 618-19.

[1118]*See id.* at 619-20.

[1119]*See id.* at 620.

[1120]391 F.2d 821, 827-28 (2d Cir. 1968).

[1121]*See Mitsubishi*, 473 U.S. at 621-23.

[1122]*See id.* at 640.

[1123]*Id.* at 627.

[1124]*See id.* at 629.

[1125]*See id.* at 635-36.

[1126]*Id.* at 629.

In a lengthy dissent, Justices Stevens, Brennan and Marshall contested the concept that "vague notions of international comity" compelled a different treatment for international disputes than for local ones regarding antitrust claims.[1127]   The dissent derided the majority's "repeated incantation of the high ideals of 'international arbitration' [that] creates the impression that this case involves the fate of an institution designed to implement a formula for world peace."[1128]

### iv. *Stewart Organization, Inc. v. Ricoh Corp.*

New Jersey-based Ricoh Corporation had a dealership agreement with Stewart Organization, a closely-held Alabama corporation, containing a choice of forum clause "providing that the courts in New York City, the Borough of Manhattan, would have 'exclusive jurisdiction over any case or controversy arising under or in connection with this Agreement and shall be a proper forum in which to adjudicate such case or controversy.'"[1129]   In 1984, Stewart sued in federal court in Alabama for breach of contract and related claims, as well as antitrust claims.[1130]   Invoking the forum clause, Ricoh moved for a 28 U.S.C. § 1404(a) transfer to the Southern District of New York.[1131]   The federal district court denied the motion on the grounds that this was a contract issue controlled, under the *Erie* Doctrine, by Alabama law which disfavored forum clauses.[1132]   The Eleventh Circuit reversed:  it agreed that the *Erie* Doctrine applied, but determined that the issue was one of venue, not contract, and that for venue issues the *Erie* analysis favored federal law.[1133]   In doing so, the appellate court obviously believed that section 1404(a) did not apply, and in the absence of federal law on point, the Eleventh Circuit applied the federal common law found in *Bremen*.[1134]

The Supreme Court affirmed, but on very different grounds under the *Erie* Doctrine, setting the stage for a circuit split on what law governed forum clauses in federal courts.[1135]   The Court agreed with the Eleventh

---

[1127]*Id.* at 641 (Stevens, J., dissenting).

[1128]*Id.* at 665 (Stevens, J., dissenting).

[1129]Stewart Org., Inc. v. Ricoh Corp., 810 F.2d 1066, 1067 (11th Cir. 1987) (en banc) *aff'd on other grounds*, 487 U.S. 22 (1988).

[1130]*See Stewart Org., Inc.*, 487 U.S. at 24 n.1.

[1131]*See id.*

[1132]*See id.*

[1133]*See Stewart*, 810 F.2d at 1068.

[1134]*See id.* at 1069 (citing Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9-12 (1972)).

[1135]*See Stewart*, 487 U.S. at 28.

Circuit that this was a venue issue, but there was a federal statute on point, namely 28 U.S.C. § 1404(a).[1136] The *Erie* Doctrine flows from the Rules of Decision Act, which provides that state law is the rule of decision in federal courts, "except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide."[1137] In this case, the Court determined that Congress had otherwise provided by enacting 28 U.S.C. § 1404(a), which the Court found on point.[1138] In doing so, the Court took care to highlight the difference between the Eleventh Circuit's analysis under *Bremen* and its own under 28 U.S.C. § 1404(a).[1139] *Bremen* enforces the parties' forum clause as a contractual obligation with comity as an additional consideration.[1140] Section 1404(a) does not automatically enforce the forum clause, but uses it as a trigger for a § 1404(a) analysis, in which the parties' expectations, convenience, economy, and "those public-interest factors of systemic integrity and fairness . . . under the heading of 'the interest of justice'" are elements.[1141] All this is to be done in an "individualized, case-by-case consideration of convenience and fairness."[1142]

Thus, for intrafederal conflicts, *Stewart* holds that a forum clause may or may not be enforced, depending on the balancing of section 1404(a) factors.[1143] In federal-foreign conflicts under *Bremen*, on the other hand, the federal court will honor the forum clause unless it is strongly contrary to public policy, or seriously inconvenient to the extent that the local plaintiff will be denied a fair trial.[1144] The Supreme Court's affirmance on a different ground, that section 1404(a)'s role as a federal statute precluded *Erie* analysis, made no difference on the typical diversity case where the chosen forum was in the United States.[1145] This holding had a significant impact, however, where the chosen forum was in a foreign country, for which transfers under 28 U.S.C. § 1404(a) are unavailable.[1146]

### v. *Carnival Cruise Lines, Inc. v. Shute*

---

[1136] *See id.*

[1137] 28 U.S.C. § 1652 (1994).

[1138] *See Stewart*, 487 U.S. at 29-32.

[1139] *See Stewart*, 810 F.2d at 1068.

[1140] *See id.* at 1069.

[1141] *Stewart*, 487 U.S. at 30.

[1142] *Id.* at 29 (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).

[1143] *Id.* at 29-30.

[1144] *See* Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 13-18 (1972).

[1145] *See id.* at 15.

[1146] *See infra* Part VII.A.3.

The last of the five cases expanded the enforcement of forum clauses from *Bremen*'s "freely negotiated agreement" standard to one honoring even fine print clauses in adhesion contracts.[1147] The cruise began with the Shutes' purchase of tickets through a local Seattle travel agency for a Pacific cruise departing from Los Angeles.[1148] Among other fine print in the three attached pages, the ticket included a clause requiring that all suits related to the cruise be litigated in Florida.[1149] Mrs. Shute was injured in a fall aboard ship while off the west coast of Mexico, allegedly caused by Carnival's negligence.[1150] The Shutes filed suit in federal court in Washington state, which dismissed for lack of personal jurisdiction.[1151] The Ninth Circuit reversed and further rejected Carnival's attempt to enforce the forum selection clause, finding that it was not freely negotiated and that the Shutes were physically and financially incapable of pursuing the litigation in Florida.[1152] The Supreme Court reversed the Ninth Circuit's holding, taking forum selection clauses to new extremes by holding that a non-freely-negotiated clause was sufficient to oust a court's otherwise valid jurisdiction and compel litigation in the selected forum, subject, of course, to judicial scrutiny for fundamental fairness.[1153]

A brief summary is appropriate before examining the divergent law. In these five opinions, the Supreme Court held that: (1) forum selection clauses are enforceable unless they are unreasonable or violate public policy;[1154] (2) adhesion contacts are not *per se* unreasonable;[1155] and (3) the burden to show unreasonableness is on the party challenging the clause.[1156] Thus, the Supreme Court has created a presumption favoring the enforcement of forum clauses. In international contracts, forum clauses calling for foreign arbitral tribunals are enforceable even for antitrust and securities claims that would not be arbitrable domestically.[1157] Finally, forum selection clauses arising in federal courts, designating another federal courts as the proper forum for disputes are deemed venue contracts

---

[1147]*See* Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 597-98 (1991).

[1148]*See id.* at 587-88.

[1149]*See id.* at 587-88.

[1150]*See id* at 588.

[1151]*See id.*

[1152]*See id.* at 589.

[1153]*See id.* at 590-98.

[1154]*See* Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972).

[1155]*See Carnival Cruise*, 499 U.S. at 593.

[1156]*See Bremen*, 407 U.S. at 15.

[1157]*See* Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 473 U.S. 614, 640-41 (1985); Scherk v. Alberto-Culver Co., 417 U.S. 506, 519-20 (1974).

and are to be evaluated under 28 U.S.C. § 1404(a), the inconvenient forum statute.[1158] *Stewart Organization Inc.* reversed an Eleventh Circuit opinion holding that the law governing forum clauses is an *Erie* question for which the answer may vary.[1159] Additionally, Professor Lowenfeld concludes that the choice of law that may be made by the chosen forum is irrelevant. "Putting *Zapata [Bremen]*, *Piper Aircraft*, and *Carnival Cruise* together, it seems fairly clear that the 'heavy burden' required to overcome enforcement of a forum selection clause would not be satisfied by a showing by plaintiffs that if the clause were upheld they would be subject to a less favorable law . . . ."[1160]

*Bremen, Scherk,* and *Mitsubishi Motors* involved forum clauses choosing foreign tribunals.[1161] *Carnival Cruise and Stewart*, on the other hand, are domestic.[1162] While these first three cases seemingly turned on the issues surrounding the involvement of a foreign forum, subsequent cases often seem to apply precedents without weighing the foreign factor as heavily. Thus, *Bremen* is sometimes used for conflicts not involving a foreign court[1163] while *Stewart* and *Carnival Cruise* have been used in cases that do.[1164]

### b. Divergence as to Governing Law

In spite of an apparently smooth synthesis in these five cases, a problematic question arises as to which law should be applied to forum clauses.[1165] This confusion gives rise to several issues. The first is which

---

[1158]28 U.S.C. § 1404(a) (1994). *See also* Stewart Org. Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1987).

[1159]487 U.S. 22, 28 (1988).

[1160]Andreas F. Lowenfeld, INTERNATIONAL LITIGATION AND ARBITRATION 327 (West 1993).

[1161]*Mitsubishi Motors*, 473 U.S. at 640; *Sherk*, 417 U.S. at 508; *Bremen*, 407 U.S. at 15.

[1162]499 U.S. 585, 587-88 (1991); 487 U.S. 22, 24 (1988).

[1163]*See, e.g.*, International Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112, 113 (5th Cir. 1996) (following *Bremen* in state-federal conflict).

[1164]*See, e.g.*, Royal Bed and Spring Co. v. Famousssul Industria e Commercio de Moveis, Ltda., 906 F.2d 45, 50 (1st Cir. 1990) (applying *Stewart* to an international case).

[1165]*See* BORN, INTERNATIONAL CIVIL LITIGATION, *supra* note 6, at 448-53 nn.1-12 (discussing various courts' approaches to the question of what law governs forum selection agreements); *see also* LAWRENCE W. NEWMAN & DAVID ZASLOWSKY, LITIGATING INTERNATIONAL COMMERCIAL DISPUTES, Ch. 6 (1996) (hereinafter "Newman & Zaslowsky, INTERNATIONAL COMMERCIAL DISPUTES"). *See generally* Comment, *Your Place or Mine: The Enforceability of Choice-of-Law/Forum Clauses in International Securities Contracts*, 8 DUKE J. COMP. & INT'L L. 469 (1998); Levin & Morrison, *Kubis and the Changing Landscape of Forum Selection Clauses*, 16 FRANCHISE L. J. 97 (1997); Comment, *Forum Selection Clauses and*

law governs the clause's acceptability? In a federal court, the possibilities are (1) federal statutory law,[1166] (2) federal common law,[1167] (3) state law under the *Erie* Doctrine, or (4) the law governing the contract. In a state court, the choices are (1) the forum state's law, (2) the law governing the contract, and (3) in international cases, federal common law under *Bremen* to promote national uniformity. The second issue: if forum clauses are acceptable under the governing law, which law governs the contract's validity, and which law governs its interpretation? The answer depends not only on which court considers the clause, but on the forum to which the case might move. This analysis breaks into the categories employed in this article: intrajurisdictional, interstate, state-federal, and international. This section will discuss the entire range of answers briefly, with cross references to other sections.

A third important choice of law issue is the prorogation/derogation distinction. "Prorogation" is the conferral of jurisdiction by the agreement of the parties, for example, in the contract containing the forum selection clause.[1168] "Derogation" occurs if the forum clause is exclusive, that is, the forum clause is in derogation of other courts jurisdiction.[1169] In prorogation instances, the question is whether the chosen forum will accept the parties' agreement as a conferral of jurisdiction on its court.[1170] In derogation instances, where one party ignores the forum clause and files in a different forum, the question is whether a forum not selected by the parties will enforce the forum clause and subordinate its own jurisdiction to the chosen forum's.[1171] There is an important difference in the applicable law. In derogation cases, as most of these are, the issue is whether the forum will enforce the forum clause under any of the theories discussed below.[1172] But in prorogation cases where a party has filed in the chosen forum consistent with the parties' earlier agreement, and the other party challenges the clause, the issues may include amenability.[1173] Although amenability may

---

*Forum Non Conveniens in International Employment Contracts,* 4 J. INT'L L. & PRAC. 117 (1995); Park, *Bridging the Gap in Forum Selection: Harmonizing Arbitration and Court Selection,* 8 TRANSNAT'L L. & CONTEMP. PROBS. 19 (1998); Rapore & Stockel, *Selecting the Proper Forum To Enforce One's Choice of Forum,* 18 FRANCHISE L. J. 7 (1998).

[1166]*See* 28 U.S.C. § 1404(a) (1994).

[1167]*See generally* Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).

[1168]*See* EUGENE SCOLES & PETER HAY, CONFLICTS OF LAW 361 (2d ed. 1992).

[1169]*See id.*

[1170]*See id.*

[1171]*See id.*

[1172]*See id.*

[1173]*See id.*

have elements in common with some of the theories for enforcing forum clauses, the distinction could nonetheless be outcome determinative if, for example, a federal court in a diversity case would apply the state long arm statute, along with the due process test, to amenability questions, and federal law to forum selection questions.[1174]

### c. Intrajurisdictional Cases

Where both the considering court and the chosen court are federal, forum clauses are viewed as contractual venue choices, requiring the instant court to conduct a venue transfer analysis under 28 U.S.C. § 1404(a), in which the factors that are considered include the parties' contractual choice of forum, convenience and economy.[1175]

There are at least three instances where forum selection clauses are not governed by section 1404(a). The first is where the plaintiff files the suit in a federal court in the designated location, but the defendant challenges personal jurisdiction, and federal law differs from that state's law on whether a forum selection clause waives personal jurisdiction objections.[1176] The second is where the forum clause specifies a state court, making a section 1404(a) venue transfer irrelevant.[1177] The third is where the designated forum is a foreign country.[1178] Where both courts are in the same state, the law will vary by state. Texas, for example, authorizes venue by agreement,[1179] which presumably applies to forum clauses, although no cases are reported.[1180]

---

[1174]*See infra* Part VII.A.2.f.ii.

[1175]*See In re* Fireman's Fund Ins. Cos., 588 F.2d 93, 94-95 (5th Cir. 1979) (honoring a forum selection clause and transferring to federal court in New Jersey, despite venue rule appearing to fix venue at the place of the contract's performance in Louisiana); Texas Source Group, Inc. v. CCH, Inc., 967 F. Supp. 234, 238-39 (S.D. Tex. 1997) (holding that forum selection clause was valid in spite of allegations of breach of underlying contract, resulting in transfer to Illinois); Wellons v. Numerica Sav. Bank, FSB, 749 F. Supp. 336, 337-38 (D. Mass. 1990) (transferring of first-filed action from Massachusetts to New Hampshire for consolidation with second-filed action, consistent with forum selection clause).

[1176]*See supra* Part II.B.4.

[1177]*See supra* Part II.B.4.

[1178]*See supra* Part II.B.4.

[1179]*See* TEX. CIV. PRAC. & REM. CODE § 15.063(3) (Vernon's 1986).

[1180]*See supra* Part III.A.3.c. for a discussion of intra-state forum clause issues.

### d. Interstate Cases

Many states now follow the *Bremen* guidelines presuming the enforceability of forum clauses,[1181] although some, like Texas, may disregard a forum selection clause if the witnesses' and the public's interest strongly favors jurisdiction in a forum other than the one the parties agreed to in the contract.[1182] In *Greenwood v. Tillamook County Smoker, Inc.* and *Sarieddine v. Moussa*, forum law governed the clause's acceptability and validity.[1183]

Some states have yet to rule definitively on the issue. For example the Oklahoma Supreme Court, as of 1995, had not ruled on forum clauses' enforceabilty, even in an interstate setting.[1184] Until recently, Alabama maintained the older view that the clauses are an unacceptable ousting of jurisdiction,[1185] replacing that with a *Bremen*-based rule in 1997.[1186] The issue of which law governs the enforcement issue is, for the most part, not discussed in these cases, but presumably forum law governed.[1187]

### e. State-Federal Cases

Federal courts will enforce a forum clause that specifically designates a state court, dismissing the federal action for refiling in the chosen state court.[1188] Here too, choice of law is an ongoing issue. In *International Software Systems, Inc. v. Amplicon, Inc.*, the Fifth Circuit examined the circuit split, finding that other federal courts had considered the different possible choices of (1) federal common law under *Bremen*, (2) the "importing" of federal statutory law under section 1404(a), and (3) state law.[1189] The court chose *Bremen*, explicitly rejecting the Fourth Circuit's choice of state law.[1190] The Second Circuit also applies federal law.[1191]

---

[1181]*See, e.g.,* Accelerated Christian Educ., Inc. v. Oracle Corp., 925 S.W.2d 66, 73-74 (Tex. App.--Dallas 1996, no writ).

[1182]*See* Greenwood v. Tillamook Country Smoker, Inc., 857 S.W.2d 654, 656 (Tex. App.--Houston [1st Dist.] 1993, no writ); Sarieddine v. Moussa, 820 S.W.2d 837, 839 (Tex.App.--Dallas 1991, writ denied); *see also supra* Part IV.B.3.

[1183]*Greenwood*, 857 S.W.2d at 656; *Sarieddine*, 820 S.W.2d at 839.

[1184]*See* Bakhsh v. JACRRC Enters., Inc., 895 P.2d 746 (Okla. Ct. App. 1995) (citing the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 187 (1971)).

[1185]*See* White Spunner Constr., Inc. v. Cliff, 588 So. 2d 865 (Ala. 1991).

[1186]*See* Professional Ins. Corp. v. Sutherland, 700 So. 2d 347, 350 (Ala. 1997).

[1187]*See supra* Part IV.B.3 (listing states enforcing forum clauses under *Bremen* guidelines and others with qualifications).

[1188]*See, e.g.,* International Software Sys., Inc. v. Amplicon, Inc., 77 F.3d 112 (5th Cir. 1996).

[1189]*See* International Software Sys. Inc., 77 F.3d at 115.

[1190]*See id; see also* Nutter v. Rents, Inc., 945 F.2d 398 (4th Cir. 1991) (unpublished opinion).

The Third Circuit, like the Fourth, applies state law to determine the enforceability of forum clauses that designate a state forum.[1192] *In re Diaz Contracting, Inc.* used New Jersey law to enforce a contract's designation that "all actions arising under the contract be brought in the courts of the State of New York."[1193]    The court reiterated prior Third Circuit law rejecting *Bremen*'s application to all forum selection issues.[1194] Applying New Jersey law, the court found that *Bremen* applied anyway, because the parties had chosen New York law, which applied *Bremen*, and New Jersey also followed *Bremen*.[1195]

In *Farmland Industries, Inc. v. Frazier-Parrott Commodities, Inc.*, the Eighth Circuit applied both federal law and Missouri state law to reject the clause's selection of Illinois state courts.[1196]    The parties had entered a commodities futures trading agreement which included a clause providing that suits could be brought "only in courts located within Cook County, Illinois. . . ."[1197]    Plaintiff Farmland sued in the Western District of Missouri, alleging federal securities fraud as well as other state and federal claims.[1198]    The court held that plaintiff's claims were broader than those contemplated by the agreement, and that "where a fiduciary relationship . . . is created by a contract tainted by fraud, the person defrauded can not [sic] be held to the contractual forum selection clause."[1199]    The court also stated that "consideration should be given to the public policy of Missouri forbidding forum clauses."[1200]    Note that this case was decided prior to *Stewart*, when some federal courts were applying state law even to intra-federal conflicts.

*Kessman & Associates v. Barton-Aschman & Associates* illustrates the application of a forum clause to a subcontractor whose contract did not expressly contain the clause,[1201] though this is countered by other cases

---

[1191]*See* Jones v. Weibrecht, 901 F.2d 17 (2d Cir. 1990).

[1192]*See In re* Diaz Contracting, Inc., 817 F.2d 1047, 1050 (3d Cir. 1987).

[1193]*Id.*

[1194]*See id.*

[1195]*See id; accord*, Rindal v. Seckler Co., 786 F. Supp. 890 (D. Mont. 1992).

[1196]806 F.2d 848, 852 (8th Cir. 1986).

[1197]*Id.* at 849.

[1198]*See id.*

[1199]*Id.* at 851.

[1200]*Id.* at 852.

[1201]10 F. Supp. 2d 682, 692 (S.D. Tex. 1997).

holding that parties may not be compelled to arbitrate absent "clear and unmistakable evidence" of an agreement to arbitrate.[1202]

As for state courts enforcing forum clauses directed to federal courts, no cases were found. Such clauses would probably be enforceable in states that otherwise honor forum clauses.[1203]

### f. International Cases

State and federal courts in the United States will generally enforce forum clauses designating foreign courts under the same standards applied to domestic forum clauses; a forum clause will be applied unless it is unreasonable or violates forum public policy. Boiler plate clauses are not unreasonable, and the possibility of a less favorable governing law is not necessarily a violation of public policy.[1204] In spite of this pro-forum clause standard, if the reasonableness and policy factors have any meaning at all, they are magnified by the prospect of litigation in a foreign forum. Thus, a non-western forum is more likely to raise local public policy concerns, directed both to procedural and substantive legal issues, as well as raising convenience issues undermining the clause's reasonableness.[1205] On the other hand, federal practice mandates the enforcement of foreign forum clauses in circumstances where they would not be enforced in a domestic conflict.[1206] This has led one treatise to compare the United States standard for enforcing foreign forum clauses to that of many other countries where

---

[1202]Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1294 (3d Cir. 1996) (citing First Options Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

[1203]*See infra* Part VIII.B.2.

[1204]*See supra* Part VII.A.2.a.

[1205]The cases rejecting foreign forum clauses after *Bremen* are rare. *See, e.g.*, Itek Corp. v. First Nat'l Bank of Boston, 566 F. Supp. 1210, 1216 (D. Mass. 1983), *aff'd* 730 F.2d 19 (1st Cir. 1984) (rejecting a forum clause choosing Iran, because of the Khomeni revolution and unstable conditions there). Perhaps the better illustration of the strong presumption favoring forum clauses is found in cases upholding forum clauses under strained circumstances. *See* Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 327 (9th Cir. 1996) (dismissing an Arizona federal case to uphold a clause designating Mexico, despite evidence that plaintiff would be in danger if he returned to Mexico to litigate); Haynsworth v. Corporation, 121 F.3d 956, 963 (5th Cir. 1997) (illustrating the difficult burden of proving fraud and overreaching or, alternatively, illustrating the lengths plaintiffs will pursue to challenge forum clauses).

[1206]*See* Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 639 (enforcing foreign arbitration clauses that overrode federal law and policy regarding the inviolability of a United States forum for, respectively, securities and antitrust claims); Sherk v. Alberto-Calver Co., 417 U.S. 506 (1974); *supra* Part VII.B.3.

such clauses create exclusive jurisdiction that voids any judgment from another forum.[1207]

More difficult questions arise in federal courts, where choice of law is an issue. As discussed above, federal courts use section 1404(a) to govern intra-federal transfers arising from forum clauses. For cases where section 1404(a) does not apply, forum clauses choosing non-federal courts, the applicable law is disputed.

Although *Bremen* established a federal common law that set the basis for the entire area of forum clauses in United States courts, the holding was limited to its subject matter, admiralty. While there has been no clear Supreme Court mandate for *Bremen*'s application to all federal question cases, at the very least it has become the dominant standard in federal question cases.[1208]

Thus, for all cases except possibly admiralty, the question remains as to what law governs the various questions surrounding forum selection clauses. Born notes four possibilities: (1) federal substantive common law (*Bremen*); (2) federal procedural law, treated as a venue issue but with dismissal as the remedy rather than transfer; (3) state law, under an Erie analysis; and (4) the law chosen by parties, which may or may not be the same as (3).[1209] These possibilities are illustrated in the cases that follow. This discussion assumes that a forum clause choosing a foreign tribunal differs from one choosing a domestic state court; thus, no conclusions are reached as to circuits or lower courts that applied federal or state law in a purely domestic setting.

### i.   Federal Question Cases

Although the *Bremen* precedent is limited by its facts to admiralty cases, federal courts have tended to apply *Bremen* to a variety of federal questions.[1210] On the other hand, *Bremen*'s application to admiralty has not

---

[1207]See EUGENE SCOLES & PETER HAY, CONFLICT OF LAWS 368-69 nn.3-4 (2d ed. 1992). The authors point out that the Uniform Foreign Money-Judgment Recognition Act implicitly assumes that a forum clause creates exclusive jurisdiction, even though it does not mandate nonrecognition of a judgment from a non-chosen forum. See id. at 368 nn.1-3.

[1208]See BORN, INTERNATIONAL CIVIL LITIGATION, supra note 6, at 432 (discussing *Bremen*'s persuasive but not binding authority in federal question cases other than admiralty).

[1209]See id. at 431-32.

[1210]See generally TAAG Linhas Aereas v. Transamerica Airlines, Inc., 915 F.2d 1351 (9th Cir. 1990) (involving claim against foreign sovereigns under the Foreign Sovereign Immunities Act); Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190 (3d Cir. 1983) (concerning bankruptcy); Bense v. Interstate Battery Sys. Inc., 683 F.2d 718 (2d Cir. 1982) (concerning federal antitrust); Envirolite Enters. Inc. v. Glastechnische Indus. Peter Lisec

fully resolved forum clause issues in that area. In 1995, the Supreme Court held that actions under the Carriage of Goods by Sea Act[1211] were now subject to arbitration clauses, reversing a long-standing statutory bar under 46 U.S.C. § 1303(8).[1212] In 1997, the Fifth Circuit extended this liberalization to forum selection clauses directed at foreign litigation generally.[1213] In spite of this general use of *Bremen* in federal question cases, problematic areas remain. One notable example is federal securities regulation, where the key issue is the enforceability of forum clauses in light of the strong public policy behind securities claims and a statutory bar on agreements in derogation of those rights. The strong majority has held that reasonable forum clauses designating foreign adjudication or arbitration are enforceable. The most recent example is *Richards v. Lloyd's of London*, arising from an underwriting agreement with a clause specifying that "the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at Lloyd's."[1214] Plaintiffs sued in the Southern District of California, alleging federal securities fraud and RICO violations, along with other state and federal claims.[1215] Defendants moved for dismissal to enforce the forum clause, which plaintiffs argued was overridden by the anti-waiver provisions of the 1933 Securities Act.[1216] The Ninth Circuit affirmed the lower court's dismissal, holding that *Bremen* applied to international contracts with forum clauses in spite of Congress' anti-waiver provisions in the 1933 Act.[1217]

*Richards* and its forerunners seemingly extend the *Scherk* principle to non-arbitration cases requiring that federal securities fraud claims arising from international contracts are subject to forum clauses that designate

---

Gesellschaft M.B.H., 53 B.R. 1007 (S.D.N.Y. 1985), *aff'd* 788 F.2d 5 (2d Cir. 1986) (applying *Bremen* in general federal question cases); *see also*, BORN, INTERNATIONAL CIVIL LITIGATION, *supra* note 6, at 452 n.6(e).

[1211] 46 U.S.C. app. §§ 1300-1315 (1994).

[1212] *See* Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 540 (1995).

[1213] *See* Mitsui & Co. Inc. v. MIRA M/V, 111 F.3d 33, 35 (5th Cir. 1997).

[1214] 135 F.3d 1289, 1292 (9th Cir. 1998).

[1215] *See id.* at 1290-92.

[1216] *See* 15 U.S.C.A. § 77(n) (West 1998).

[1217] *See Richards*, 135 F.3d at 1294.

foreign adjudication tribunals.[1218]   *Richards* also discussed the important issue of whether the contract is "international."[1219]

### ii.   Diversity Cases Applying Federal Law to the Forum Clause

The issue of diversity cases applying federal law to the forum clause has been more difficult, producing a circuit split with no clear majority rule.   Many, perhaps most forum clause contests arise in diversity cases where the forum clause is found in a contract between the litigants, the action in most cases arises at least in part on that contract, and contracts are generally questions of state law.   In discussing the choice of law issue, many courts do not distinguish clauses choosing foreign courts from those choosing domestic state courts.   Instead, they merely lump them all together as cases not governed by section 1404(a).   Two are discussed in the following paragraphs.

*Manetti-Farrow, Inc. v. Gucci America, Inc.*, is a leading authority for the application of the *Bremen* test in diversity cases.[1220]   It involved parallel cases in Italy and California, and provides a full *Erie* analysis, justifying the application of federal common law rather than California law to the parties' forum clause favoring Italy.[1221]   The case arose from an exclusive dealership contact between Manetti-Farrow, a California corporation, and Gucci Parfum, an Italian corporation, and its U.S. counterpart, Gucci American, Inc., to sell Gucci perfume in the United States.[1222]   The contract had a forum clause specifically stating that in "any controversy regarding interpretation or fulfillment of the present contact, the Court of Florence [Italy] has sole jurisdiction."[1223]   In July 1986, Gucci terminated Manetti-Farrow's exclusive agreement and brought suit in Florence for breach of

---

[1218]*See supra* Part VII.A.2.a.ii.

[1219]135 F.3d at 1294.   *See also* Stamm v. Barclays Bank of New York, 153 F.3d 30 (2d Cir. 1998); Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285 (11th Cir. 1998); Haynsworth v. The Corporation, 121 F.3d 956 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir. 1996); Shell v. R.W. Sturge, Ltd., 55 F.3d 1227 (6th Cir. 1995); Bonny v. Society of Lloyd's, 3 F.3d 156 (7th Cir. 1993); Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir. 1993); Riley v. Kingsley Underwriting Agencies, Ltd. 969 F.2d 953 (10th Cir. 1992).   *See generally* Comment, *Your Place or Mine: The Enforceability of Choice-of-Law/Forum Clauses in International Securities Contracts*, 8 DUKE J. COMP. & INT'L L. 469 (1998).

[1220]858 F.2d 509 (9th Cir. 1988).

[1221]*See id.* at 512-13.

[1222]*See id.* at 511.

[1223]*Id.*

*BAYLOR LAW REVIEW* [Vol. 51:4

contract.[1224] One month later, Manetti-Farrow sued in a California federal court for various state law claims in contract and tort, alleging that Gucci terminated in bad faith by seeking to bring the sales in the United States under its own corporate structure.[1225] The federal district court granted Gucci's motion to enforce the forum clause and dismissed the case.[1226]

The Ninth Circuit affirmed the lower court's dismissal of Manetti-Farrow's United States action, addressing first the question of what law governed the effect and scope of the forum selection clause.[1227] The court noted that, unlike *Stewart* where section 1404(a) controlled, there was no statute here; consequently, the *Erie* doctrine required consideration to determine what law governed.[1228] Noting further that a circuit split had occurred on this issue, the court used an *Erie/Byrd* balancing test and concluded that this was primarily a venue matter, even though not governed by federal statutory venue law, and accordingly, held that United States' interests outweighed California's interest in controlling this issue.[1229] Thus, federal law controls in the Ninth Circuit for forum selection clauses not governed by section 1404(a). The court relied heavily on an earlier analysis conducted by the Eleventh Circuit in *Stewart*.[1230] Although that opinion was displaced (affirmed on other grounds) by the Supreme Court, its *Erie* analysis and conclusion that federal law controlled in such cases was persuasive in the Ninth Circuit.[1231] The dispute here was primarily as to Manetti-Farrow's tort claims, which it argued were not covered by the contract or the forum clause.[1232] The Ninth Circuit disagreed, finding that forum clauses did cover tort claims that related to the interpretation of the underlying contract.[1233] *Manetti-Farrow* did not distinguish between forum clauses choosing foreign courts and domestic state courts, and is used as precedent for both.[1234]

---

[1224]*See id.*

[1225]*See id.*

[1226]*See id.* at 511-12.

[1227]*See id* at 512.

[1228]*See id.*

[1229]*See id.*

[1230]810 F.2d 1066, 68 (11th Cir. 1987) (per curiam) (en banc), *aff'd on other grounds*, 487 U.S. 22 (1988).

[1231]*See Mannetti-Farrow*, 858 F.2d at 513.

[1232]*See id.*

[1233]*See id.* at 514.

[1234]*See* Spradlin v. Lear Siegler Management Serv. Co., 926 F.2d 865, 867 (9th Cir. 1991) (applying *Bremen* to Saudi foreign forum clause).

*Haynsworth v. The Corporation* was a suit by "names," Lloyd's underwriters, against Lloyd's for various wrongs.[1235] Several actions were filed in various federal courts throughout the United States; two were consolidated for this opinion regarding dismissal based on a forum clause designating England.[1236] The Fifth Circuit distinguished between the two cases in that one was based on a federal question (securities fraud) and the other on diversity.[1237] The court pointed out that the law was settled as to federal question claims, and that after *Scherk*, federal law and *Bremen* controlled forum selection clauses in federal question cases.[1238] As to diversity, the court found that the Fifth Circuit had already addressed this in *International Software Systems v. Amplicon Inc.*, even though that case did not involve an international contract, but instead one designating a specific state court.[1239] Thus, the Fifth Circuit does not distinguish between federal-state and federal-foreign conflicts and holds that *Bremen* controls in all such cases.

*Afram Carriers, Inc. v. Moeykens* is perhaps more instructive because it applies *Bremen* in a pure diversity claim for wrongful death.[1240] The death occurred on a job governed by an employment contract with a choice of Peruvian forum.[1241] The opinion cites *Haynsworth* but has no choice of law discussion, and further holds the plaintiff's claim that the contract was fraudulently induced could not defeat the forum clause, unless the clause itself was fraudulent or otherwise illegal.[1242]

Another approach in diversity cases has been to forego *Bremen* and federal common law and view the issue as one of federal venue. Reasoning from *Stewart* that forum clauses are primarily a venue matter, and wishing to take advantage of *Stewart*'s invocation of the section 1404(a) test, these opinions apply section 1404(a) by analogy. For example, in *Royal Bed and Spring Co. v. Famossul Industria E Commercio de Moveis, Ltda.*, a Puerto Rican company sued a Brazilian defendant in Puerto Rico, alleging breach of their distributorship agreement which had a

---

[1235]121 F.3d 956, 958-59 (5th Cir. 1997).

[1236]*See id.* at 958.

[1237]*See id.* at 961.

[1238]*See id.* at 962.

[1239]77 F.3d 112, 114-15 (5th Cir. 1996).

[1240]145 F.3d 298, 300 (5th Cir. 1998).

[1241]*See id.* at 301.

[1242]*See id.* at 301-02.

Brazilian forum clause.[1243] The district court enforced the forum clause and dismissed the case.[1244] The First Circuit affirmed, holding:

> In this case, since we are dealing with a forum-selection clause that refers to a forum outside of the United States, and not within the scope of the statute, section 1404(a) does not apply. Nonetheless, even though a foreign jurisdiction was chosen by the parties, that fact should not preclude the application of the sound principles of *forum non conveniens* enunciated in *Stewart* and similar cases.[1245]

Under this approach, the court observed that "the forum selection provision in the [parties' agreement] is not given dispositive effect. Rather, it is simply one of the factors that should be considered and balanced by the courts in the exercise of sound discretion."[1246] However, three years later in *Lambert v. Kysar*, the First Circuit ignored this precedent and avoided the Erie choice of law questions entirely.[1247]

The Seventh Circuit applied *Bremen* to validate a forum clause in an international case in *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*.[1248] Although there was no choice of law discussion, the court cited *Northwestern National Insurance Co. v. Donovan*, in which Judge Posner observed the circuit split on governing law and held in dicta that federal law no doubt governs.[1249] Similarly, the D.C. Circuit applied *Bremen* to validate a forum clause pointing to Italy in a diversity case, but without a choice of law analysis.[1250] The Second Circuit has applied *Bremen* to an international contract in a diversity case, but the issue was interpretation and not validity.[1251] There was no choice of law discussion, but if *Bremen* applies to forum clause interpretation in the Second Circuit, it would presumably apply to validity.

---

[1243]906 F.2d 45, 46 (1st Cir. 1990).

[1244]*See id.*

[1245]*Id.* at 51.

[1246]*Id.*

[1247]983 F.2d 1110, 1116 (1st Cir. 1993).

[1248]972 F.2d 753, 756 (7th Cir. 1992).

[1249]916 F.2d 372, 374 (7th Cir. 1990).

[1250]*See* Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, S.p.A., 867 F.2d 697, 700 (D.C. Cir. 1989).

[1251]*See* John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers and Distribs. Inc., 22 F.3d 51, 52-53 (2d Cir. 1994).

### iii. Diversity Cases Applying State Law to the Forum Clause

Several federal courts have applied state law to validity and enforcement issues for forum clauses. The Third Circuit held in a domestic case that *Erie* compels the application of state law to forum clause issues.[1252] A more recent case applies this precedent in an international case but does not offer the *Erie* analysis.[1253] In *Snider v. Lone Star Art Trading Co.*, the parties' contract provided for litigation in the courts of Harris County, Texas.[1254] The plaintiff sued in Michigan, and defendant invoked the forum clause.[1255] The court held that the *Erie* doctrine called for state law, relying heavily on the Third Circuit's opinion in *General Engineering Corp.*[1256] Applying Michigan law, the court looked to Michigan's choice of law clause, which pointed to Texas.[1257] Under Texas law, as the court perceived it, the forum clause was subordinated to a federal venue rule in the civil RICO statute on which plaintiff sued.[1258]

In a domestic forum clause case, the Fourth Circuit applied state law and further held that the applicable state was the one designated in the contract's choice of law clause.[1259] This approach was contrary to the Fourth Circuit's earlier application of *Bremen* in a domestic case, affirming the lower court's application of state law to the forum clause.[1260] That case, however, may have been no more than the court's confirming that the same result was reached under *Bremen* and state law, rather than a decision that federal law governed.

When applying state law to forum clauses, the question arises as to how much further the choice of law process goes. The standard approach found in *Klaxon Co. v. Stentor Electric Manufacturing Co.* requires that the court look to the forum state's choice of law rule, and apply the law that the local state court would apply.[1261] Another approach is to defer to the parties'

---

[1252]*See* General Eng'g Corp. v. Martin Marietta Alumina, Inc., 783 F.2d 352, 357 (3d Cir. 1986).

[1253]*See* Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1298 (3d Cir. 1996) (enforcing the parties' choice of abitration in Italy against the signatories of the agreement).

[1254]672 F. Supp. 977, 979 n.3 (E.D. Mich. 1987), *aff'd,* 838 F.2d 1215 (6th Cir. 1988).

[1255]*See id.*

[1256]*See id.* at 981-82.

[1257]*See id.* at 982.

[1258]*See id.* at 982-83.

[1259]*See* Nutter v. Rents, Inc., 945 F.2d 398 (4th Cir. 1991) (unpublished opinion).

[1260]*See* Bryant Elec. Co., v. City of Fredericksburg, 762 F.2d 1192, 1196-97 (4th Cir. 1985).

[1261]313 U.S. 487, 486 (1941).

contractual choice of law.[1262] The better view is that the parties choice of law may only control issues of contract interpretation.[1263]

Some cases are erroneously listed in the state law category, most notably *Alexander Proudfoot Co. World Headquarters v. Thayer*.[1264] At least three texts list this as an *Erie* decision, directing the application of state law to a forum clause enforcement issue, in the same vein as *Manetti-Farrow*'s decision to apply federal law.[1265] To the contrary, *Proudfoot* was a prorogation case involving a correct filing in the chosen forum and defendants challenge to jurisdiction.[1266] Choice of law as to amenability is quite distinct from choice of law for a contractual forum clause.[1267]

### iv. Undecided as to Which Law Governs in Diversity Cases

The First Circuit originally applied *Bremen* in diversity cases involving international contracts,[1268] but backed away in *Lambert v. Kysar*, opting to find false conflicts where state and federal law were the same.[1269] The Eleventh Circuit is even more difficult to pin down.  In *Stewart Organization Inc. v. Ricoh Corp.*, an en banc court held that *Bremen*'s federal common law governed forum clauses in all forum clause cases; but *Stewart* concerned a contest between two federal courts, and the Supreme Court elected instead to apply section 1404(a) to intra-federal forum choices.[1270] *Proudfoot* then applied state law in a different context to an amenabilty question in a prorogation case, which has since been miscited as putting the Eleventh Circuit in the state law camp.[1271] As of 1998, the Eleventh Circuit remains undecided on this issue.  In *Smith v. Professional*

---

[1262]*See, e.g.,* Lambert v. Kysar, 983 F.2d 1110, 1118 (1st Cir. 1993) (applying parties' choice of Washington law to validate forum clause because that was the practice under Massachusetts law, where the court was located); Nutter v. Rents, Inc., 945 F.2d 398 (4th Cir. 1991) (unpublished opinion) (applying parties' choice of Louisiana law to validate forum clause because West Virginia forum law so directed).

[1263]*See* Northwestern Nat'l Ins. Co. v. Donovan, 916 F.2d 372, 376 (7th Cir. 1990).

[1264]877 F.2d 912, 919 (11th Cir. 1989).

[1265]*See* EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS § 11.5 n.11 (2d. ed. 1992 & Supp. 1995); William W. Park, INTERNATIONAL FORUM SELECTION, at 34 n.129 (Kluwer, 1995); BORN, INTERNATIONAL CIVIL LITIGATION, *supra* note 6, at 448-49 n.3.

[1266]877 F.2d at 914-15.

[1267]*See infra* Part VII.A.2.h. for additional discussion of *Proudfoot*.

[1268]*See* Royal Bed & Spring Co. v. Famossul Industria e Comercio de Moveis Ltda., 906 F.2d 45, 48-49 (1st Cir. 1990).

[1269]983 F.2d 1110 (1st Cir. 1993).

[1270]487 U.S. 22, 28 (1988).

[1271]*See supra* note 1265.

*Claims, Inc.*, the district court observed that the Eleventh Circuit was still undecided but that it was now irrelevant for federal courts in Alabama since the state had adopted *Bremen*.[1272] Although *Smith* was a domestic conflict, its statement no doubt applies to the Eleventh Circuit's position on international cases as well.

Although the Eleventh Circuit's position on this issue is not clear, the best indicator is the majority opinion in *Stewart*.[1273] Notably, the Seventh Circuit cites *Stewart* as establishing the Eleventh Circuit's position in the camp applying *Bremen*.[1274] If this is the Eleventh Circuit's position on domestic forum conflicts, surely it would be the position for forum clauses choosing foreign tribunals where the federal interest is stronger. In any event, the Eleventh Circuit cannot be placed in the "state law" category on the basis of *Proudfoot*.

### g. What Law Governs Interpretation?

*AmerMed Corp. v. Disetronic Holding AG* held that state law governs interpretation issues.[1275] The forum clause provided that "the courts of the canton of Berne, Switzerland, shall have jurisdiction for all disputes arising out between [sic] the parties and waive any claim to the contrary."[1276] The issue was whether this was permissive or mandatory.[1277] Disetronic argued that Swiss law governed this issue, but the court rejected this noting that forum clauses "are interpreted without reference to the contractual choice of law clause."[1278] The court applied Georgia law, which for this issue, was ironically *Bremen*.[1279] The court then held that ambiguity required that the clause be construed against the drafter, and that the clause must use language indicating exclusivity.[1280] The Second Circuit disagrees, instead applying federal law to interpretation issues.[1281]

The Seventh Circuit offers a different approach. In dicta, Judge Posner has stated that "[v]alidity and interpretation are separate issues, and it can

---

[1272]19 F. Supp. 2d 1276, 1280 (M.D. Ala. 1998) (citing Professional Ins. Corp. v. Sutherland, 700 So. 2d 347, 350 (Ala. 1997)).

[1273]810 F.2d 1066, 1067 (11th Cir. 1987), *aff'd on other grounds*, 487 U.S. 22 (1988).

[1274]*See* Northwestern Nat'l. Ins. Co. v. Donovan, 916 F.2d 372, 374 (7th Cir. 1990).

[1275]6 F. Supp. 2d 1371, 1374 (N.D. Ga. 1998).

[1276]*Id.* at 1373.

[1277]*See id.* at 1374.

[1278]*Id.* at 1374-75.

[1279]*See id.*

[1280]*See id.* at 1374.

[1281]*See* John Boutari and Son, Wines and Spirits, S.A. v. Attiki Importers & Distribs. Inc., 22 F.3d 51, 52-53 (2d Cir. 1994).

be argued that as the rest of the contract in which a forum selection clause is found will be interpreted under the principles of interpretation followed by the state whose law governs the contract, so should that clause be."[1282] That case applied *Bremen* to validity issues, and Posner's approach thus calls for federal common law to govern forum clause validity, and the law governing the contract to govern interpretation issues.[1283] The Third Circuit followed this approach, without citation, in *Instrumentation Associates, Inc. v. Madsen Electronic*, holding that the parties' choice of Ontario law applied to interpretation of the forum clause as permissive or exclusive although it was a false conflict since Pennsylvania forum law would interpret it the same.[1284] In *Terra International, Inc. v. Mississippi Chemical Corp.*, the court avoided the issue and applied contract law from all three possibilities: federal common law, Iowa forum law, and Mississippi as the parties' chosen law.[1285]

### h. The Prorogation Distinction

The forum clause cases discussed to this point have been *derogation* cases involving suits filed in forums other than the one chosen in the forum clause. These cases address whether the clause successfully derogated from the immediate court's jurisdiction. The issues and applicable law may differ in *prorogation* cases, where the plaintiff sues in the contracted-for forum, and the defendant challenges both the forum clause and personal jurisdiction. The *Proudfoot* case is a well-reasoned example.[1286]

Alexanander Proudfoot Company filed suit in Florida to enforce a non-compete agreement against a former employee, Thayer, who had worked at various locations in Brazil and Europe.[1287] The employment contract had a forum clause exclusively designating "the federal and state courts located in the state of Florida."[1288] When Thayer resigned and took a job with a competitor in California, Proudfoot sued in Florida state court.[1289] Thayer removed the case to federal court and then challenged Florida's

---

[1282]Northwestern Nat'l. Ins. Co. v. Donovan, 916 F.2d 372, 374 (7th Cir. 1990).

[1283]*See id.* at 375-76.

[1284]859 F.2d 4, 9 (3d Cir. 1988).

[1285]119 F.3d 688, 697 (8th Cir. 1997).

[1286]Alexander Proudfoot Co. World Headquarters L.P. v. Thayer, 877 F.2d 912, 916 (11th Cir. 1989).

[1287]*See id.* at 915.

[1288]*Id.* at 915 n.6.

[1289]*See id.* at 915.

jurisdiction.[1290] The federal district court dismissed, finding that the forum clause was not sufficient to confer jurisdiction under Florida's long arm statute.[1291] The Eleventh Circuit reversed, finding that while the lower court was correct to apply the Florida long arm, it was not applied correctly.[1292] That is, Florida did have personal jurisdiction over Thayer under Florida law.

In reaching this conclusion, the court conducted a thorough *Erie* analysis and carefully distinguished its earlier holding in *Stewart*, along with the Supreme Court's affirmance of *Stewart* on other grounds.[1293] *Proudfoot* concluded that *Stewart* was inapplicable because it dealt with a defendant's attempt to *enforce* a forum clause by dismissing a case filed in a different forum, while *Proudfoot* dealt with Thayer's attempt to *defeat* jurisdiction in a case filed in the contractual forum.[1294] *Proudfoot* thus holds that in defendant's challenge to the contractual forum's jurisdiction, state law is an essential element.

As discussed above, the Eleventh Circuit's position is unclear on the law governing derogation cases, but as *Proudfoot* establishes, it is quite clear on the law governing prorogation cases where the issue is the forum clause's effectiveness in establishing jurisdiction. We may extrapolate from *Proudfoot* that merely because a circuit applies federal law to forum clause enforceability in derogation cases does not mean it will in prorogation cases. The argument that defendant waived any objection to jurisdiction by agreeing to the forum clause is not valid where the governing state law does not treat the forum clause as a per se waiver to jurisdictional objections, or would not otherwise enforce that particular clause.

*Proudfoot*'s rationale is that the issue in prorogation cases is jurisdiction, not venue, and that cases analyzing the *Erie* question as to venue are inapplicable. The question is whether state or federal law determines the foreign defendant's amenability. *Proudfoot*'s answer is the same as that for personal jurisdiction generally. In both federal question and diversity cases, amenability is controlled by two tests: the forum state's long arm statute, and the due process "minimum contacts" test (except where Congress has passed a federal long arm statute).[1295]

---

[1290]*See id.* at 916.

[1291]*Id.*

[1292]*See id.* at 921.

[1293]*See id.* at 918.

[1294]*Id.* at 916-19.

[1295]*See id.* at 919.

*Proudfoot* was not an international case; it involved only one forum, the one chosen in the forum clause, and defendant was a resident of the United States. *Proudfoot* seems nonetheless applicable to international cases since a foreign defendant would have at least as much right to challenge personal jurisdiction of the chosen forum. Thus, although there are no international cases on point, state law would seem to govern forum selection clauses when personal jurisdiction challenges arise.

The Seventh Circuit provides a contrasting prorogation case. In *Northwestern National Insurance Co. v. Donovan*, the plaintiff filed five diversity suits in a Wisconsin federal court to enforce indemnity claims arising from contracts with a forum clause pointing to Wisconsin courts.[1296] It was undisputed that the plaintiff's choice of forum was consistent with the forum clause.[1297] The defendant objected to personal jurisdiction, and the trial court agreed and dismissed on the grounds that (1) the forum clause was part of an adhesion contract and thus invalid, and (2) there was no other basis for personal jurisdiction in Wisconsin.[1298] The Seventh Circuit reversed, finding that the clause was valid under *Bremen* and other federal cases addressing the specific issue of adhesion contracts.[1299] It noted that the circuits are split on the issue of which law governs forum clauses in diversity cases, but held that, "the signing of a valid forum selection clause is a waiver of the right to move for a change of venue on the ground of inconvenience to the moving party."[1300] The court also stated: "[T]herefore, the parties before us are correct to concede that the issue of validity is one of federal law, though we need not decide this, since litigants are, within limits not exceeded here, permitted to designate what law shall control their case."[1301]

These cases offer contrasts that help explain the choice of law dispute here. Using a bit of speculation as to the judges' thinking, *Proudfoot* holds that Florida's long arm statute is pertinent to the issue of whether a nonresident defendant has waived amenabilty objections by signing a contract with a forum clause designating Florida courts.[1302] *Northwestern* holds that federal law governs a forum clause's validity in federal court,

---

[1296]916 F.2d 372, 373-74 (7th Cir. 1990).

[1297]*See id.* at 374.

[1298]*See id.* at 375.

[1299]*See id.* at 378.

[1300]*Id.* at 378 (citing 883 F.2d 1286, 1293 (7th Cir. 1989)).

[1301]*Id.* at 374 (citing Casio, Inc. v. S.M.G.R. Co., 755 F.2d 528, 531 (7th Cir. 1985); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971)).

[1302]877 F.2d 912 (11th Cir. 1989).

and if valid, the defendant has consented to jurisdiction.[1303] One important point is that these opinions are shaped by the arguments made by counsel in each case, and the attorneys in *Northwestern* made only federal arguments.[1304] Both approaches have merit, and no court has yet ruled clearly on this issue in a prorogation case.

### i. Form of Motion and Standard of Review

The courts are also split as to which procedural device is appropriate to challenge a forum clause, which in turn affects the standard of appellate review. The First Circuit uses Federal Rule of Civil Procedure 12(b)(6), failure to state a claim, leading to a de novo review.[1305] The Second Circuit uses Federal Rule of Civil Procedure 12(b)(1), lack of subject matter jurisdiction, also reviewable de novo.[1306] The Fifth, Sixth, and Tenth Circuits have not determined the proper pleading form, but conduct de novo reviews.[1307] The Eighth, Ninth, and D.C. Circuits use Federal Rule of Civil Procedure 12(b)(3), improper venue, which leads to an abuse of discretion review.[1308] The Seventh and Eleventh Circuits follow the other three using Rule 12(b)(3), but impose a de novo review rather than abuse of discretion.[1309]

### j. Ensuring the Case's Survival

Because transfers under section 1404(a) are not available when the chosen forum is a foreign country, plaintiffs facing objections to suits filed in the United States contrary to the forum clause should ensure that the case may be litigated in the other forum. Although defendant's attempt to enforce the forum clause may take one of several forms, plaintiff should take care that the dismissal is conditional on the successful refiling in the other forum. This is routinely done in forum non conveniens dismissals

---

[1303]916 F.2d at 374.

[1304]*Id.*

[1305]*See* Lambert v. Kysar, 983 F.2d 1110, 1112 n.1 (1st Cir. 1993).

[1306]*See* AVC Nederland B.V. v. Atrium Inv. Partnership, 740 F.2d 148, 153 & n.8 (2d Cir. 1984).

[1307]*See* Haynsworth v. Lloyd's of London, 121 F.3d 956, 961 (5th Cir. 1997); Shell v. R. W. Sturge, Ltd., 55 F.3d 1227, 1229 (6th Cir. 1995); Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 956 (10th Cir. 1992).

[1308]*See* Richards v. Lloyd's of London, 135 F.3d, 1289, 1292 (9th Cir. 1998); Commerce Consultants Int'l, Inc. v. Vetrerie Riunite, 867 F.2d 697, 698 (D.C. Cir. 1989); Sun World Lines, Ltd. v. March Shipping Corp., 801 F.2d 1066, 1068 & n.3 (8th Cir. 1986).

[1309]*See* Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1289-90 (11th Cir. 1998); Hugel v. Corporation of Lloyd's, 999 F.2d 206, 207 (7th Cir. 1993).

and is well advised in forum clause dismissals. Another option for plaintiffs facing the enforcement of a forum clause is to request a stay or administrative closing in lieu of the dismissal.

### 3. Forum non conveniens dismissals

#### a. Generally

A modern legal myth is that forum non conveniens originated in Scotland in 1866, in the case *Clements v. Macauley*.[1310] Recent scholarship has disputed this myth, arguing that Paxton Blair's 1929 article concocted this notion in order to promote the concept in the United States of a discretionary dismissal on less-than-jurisdictional grounds.[1311] This controversy aside, there is at least one earlier account of a similar procedure in a United States court, predating the Scottish and English cases. In 1817, a New York court used a discretionary standard to dismiss one British seaman's action against another for assault and battery aboard a British ship on the high seas.[1312] The court did not use the term "forum non conveniens," and it is unclear what factors supported the decision. However, it is clear that the court had personal jurisdiction over the defendant, and that the dismissal was premised on the availability of an English court. Although this early example clearly was not a basis for *Gulf Oil Corp. v. Gilbert*, it is an example of an American court declining otherwise valid jurisdiction in preference to a more appropriate forum.

Forum non conveniens is perhaps best illustrated in the international setting, with its exaggerated issues of fairness, convenience and adequacy of the remedy in a culturally-distinct forum. In all settings, including interstate and international, it is used for nonjurisdictional challenges to plaintiff's choice of forum, and it is frequently pleaded alternatively with a motion to dismiss for lack of personal jurisdiction. In federal courts, it applies only where the alternative forum is not within the United States; if

---

[1310] 4 Macpherson (Sess. Cas., 3d ser.) 583, 592 (1866). *Clements* is credited in any number of sources, including EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS § 11.9 at 373 n.2 (2d ed. 1992).

[1311] *See* Robertson & Speck, *supra* note 269, at 948-49, n.68 (citing Paxton Blair, *The Doctrine of Forum Non Conveniens in Anglo-American Law*, 29 COLUM. L. REV. 1, 20-23 (1929)). Robertson and Speck point out that Blair based his conclusion on early Scottish cases that were dismissed on abuse of process grounds, that is, the Scottish court lacked any reasonable connection to the claim. Robertson & Speck, *supra* note 269, at 949 & n.68. They further note that the purported early Scottish doctrine ran counter to a common law mandate to exercise jurisdiction. *Id.* Robertson & Speck, supra note 269 at n.70.

[1312] *See* Gardner v. Thomas, 14 Johns. 134 (N.Y. 1817).

it were, the appropriate motion would be for change of venue under 28 U.S.C. § 1404(a).[1313] The doctrine is not designed specifically for resolving parallel cases, and its application does not depend on a parallel pending lawsuit. But it is appropriate in that setting, in fact, the other lawsuit enhances the forum non conveniens motion by providing the necessary alternative forum.

Federal common law provided the basis in *Gulf Oil Corp. v. Gilbert,*[1314] providing the operative test in United States federal courts and many state courts.[1315] *Gilbert* was an action in a New York federal court by a Virginia plaintiff against a Pennsylvania defendant, based on a fire in Virginia.[1316] At the time, 28 U.S.C. § 1404(a) motions were not available, and forum non conveniens was used for purely domestic forum contests, as well as foreign ones. In dismissing the suit, the Court held that the essential precondition is an adequate alternative forum.[1317] This means that there must be at least one other jurisdiction where the defendant is amenable to process or agrees to jurisdiction. The dismissing court may ensure this by conditioning the dismissal on defendant's agreement to litigate on the merits in the other forum.[1318] Under these circumstances, the other forum will ordinarily be sufficient unless the remedy there is "so clearly inadequate or unsatisfactory that it is no remedy at all . . . ."[1319] However, the fact that the other forum's substantive law is "decidedly less favorable to the plaintiff should not be given substantial weight..."[1320]

Once the availability of an adequate alternative forum is established, the court must conduct a dual-focus balancing test, examining 'private and public interests' to determine if dismissal is warranted. The focus on "private factors" looks to the litigants' interests:

> [(1)] the relative ease of access to sources of proof; [(2) the] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [(3) the] possibility of view[ing] of premises, if

---

[1313]*See supra* Part II.B.5.

[1314]330 U.S. 501 (1947).

[1315]*See, e.g.,* Sarieddine v. Moussa, 820 S.W.2d 837, 840 (Tex. App.--Dallas 1991, writ denied).

[1316]330 U.S. at 503.

[1317]*See id.* at 506-07.

[1318]*See* De Melo v. Lederle Lab., 801 F.2d 1058, 1059 (8th Cir. 1986); Constructora Spilimerg, C.A. v. Mitsubishi Aircraft Co., 700 F.2d 225, 226 (5th Cir. 1983).

[1319]Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981).

[1320]*De Melo,* 801 F.2d at 1061 (citing *Piper Aircraft,* 454 U.S. at 247).

. . . appropriate to the action; and [(4)] all other practical
problems that make trial of a case easy, expeditious and
inexpensive.[1321]

The second focus of the balancing test looks to public factors: (1) the
administrative difficulties flowing from court congestion; (2) the "local
interest in having localized controversies decided at home;" (3) the interest
"in having the trial of a diversity case in a forum that is at home with the
state law that must govern" the action; (4) the avoidance of unnecessary
problems in conflict of laws or in the application of foreign law; and (5)
the unfairness of burdening citizens in an unrelated forum with jury
duty.[1322]

The Second Circuit's forum non conveniens dismissal regarding the
Bhopal disaster is an instructive example of imposing conditions on the
dismissal that favor plaintiff.[1323]   The trial court had granted dismissal
provided that Union Carbide consent to India's jurisdiction and waive
limitations defenses, agree to satisfy any resulting judgment, and submit to
discovery under the Federal Rules of Civil Procedure.[1324]   The Second
Circuit upheld the dismissal but removed the requirements as to judgment
payment and discovery, because of possible later problems in construing
the meaning of those requirements and the standards that might attach.[1325]

When using this test in a parallel litigation setting, as opposed to one in
which no other lawsuit has been filed, there should be no difference in the
argument or the analysis.  The movant should bear the same burden of
persuasion in both instances, and it should be understood that the mere fact
of having a parallel case does not compel the dismissal of other cases. The
court must apply just as strict an analysis under *Gilbert* as it would in the
absence of a pending parallel case.[1326]   In that case, the court denied both a
stay and a forum non conveniens dismissal of the United States action,[1327]
noting that the defendant bears the burden of persuasion at all times.[1328]
The court concluded that the defendant had not met that burden, and that

---

[1321]*Gilbert*, 330 U.S. at 508.
[1322]*Id.* at 508-09.
[1323]*See In re* Union Carbide Corp. Gas Plant Disaster, 809 F.2d 195, 205-06 (2d Cir. 1987).
[1324]*See id.* at 198.
[1325]*See id.* at 205-06.
[1326]*See generally* American Cyanamid Co. v. Picaso-Anstalt, 741 F. Supp. 1150 (D. N.J.
1990) (holding that dismissal under the doctrine of forum non conveniens is not warranted even
if the French forum could not respolve the dispute).
[1327]*See id.* at 1159.
[1328]*See id.* at 1155.

the alternative French forum did not satisfy the public and private interests tests.[1329] Moreover, plaintiffs should not rely on the fact that the other forum has already taken jurisdiction of the controversy. Rather, plaintiffs should insist that the dismissing court condition such dismissal upon the case being litigated on the merits in the other forum, with a fall back position that if the other case is resolved other than on the merits, the dismissing forum will reassume jurisdiction.[1330]

In spite of the *Gilbert* test's unquestioned dominance of international forum non conveniens in federal courts, not all issues are settled. One split among the United States courts of appeals concerns the application of forum non conveniens in antitrust cases involving foreign parties. In *United States v. National City Lines, Inc.*, hereinafter *National City I*, the Supreme Court held that forum non conveniens could not be applied in antitrust suits involving domestic parties.[1331] *National City I*, was overruled in United States v. *National City Lines Inc.* due to the Court's interpretation of the then-recently-enacted 28 U.S.C. § 1404, as governing inconvenient forum transfers within the federal system.[1332] This resolved the question of forum non conveniens in domestic antitrust cases, but left open the international question. The Fifth Circuit held that *National City I* governs all instances of forum non conveniens, both domestic and international, and that *National City II* overruled it only in regard to intrafederal transfers.[1333] The United States Courts of Appeals for the First and Second Circuits disagree with the Fifth Circuit, holding that *National*

---

[1329]*See id.* at 1157-58; *accord* Biblical Archaeology Soc'y v. Qimron, No. CIV.A.92-5590, 1993 WL 39572, at *4 (E.D. Pa. 1993); *see generally* Lacey v. Cessna Aircraft Co., 862 F.2d 38 (3d Cir. 1988) (dicussing the burden of proof for forum non conveniens dismissals).

[1330]*See generally* Rolls Royce (Canada), Ltd. v. Cayman Airways, Ltd., 617 F. Supp. 17 (S.D. Fla. 1985) (holding that in a suit against a Cayman Island defendant by a resident plaintiff in federal court, dismissal on grounds of forum non conveniens is appropriate). For other useful discussions of forum non conveniens in an international setting, though not necessarily a parallel litigation setting, see generally *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147 (5th Cir. 1987) (holding that the district court did not abuse its discretion in denying a motion to dismiss on grounds of forum non conveniens in a suit by Uruguayan plaintiffs); DeYoung v. Beddome, 707 F. Supp. 132 (S.D.N.Y. 1989) (dismissing on grounds of forum non conveniens and comity in light of pending Canadian litigation); MAURICE ROSENBERG, CONFLICT OF LAWS 189-92 (10th ed. 1996).

[1331]334 U.S. 573, 580 (1948).

[1332]United States v. Nat'l City Lines, Inc., 337 U.S. 78, 83-84 (1949) (holding that 28 U.S.C. § 1404 overruled *National City I*).

[1333]*See* Industrial Inv. Dev. Corp. v. Mitsui & Co., 671 F.2d 876, 890 (5th Cir. 1982); *accord* Kempe v. Ocean Drilling & Exploration Co., 876 F.2d 1138, 1144-45 (5th Cir. 1989).

*City I* did not consider international cases, which are therefore subject to forum non conveniens motions.[1334]

### b. Removal to Federal Court to Obtain Different Forum Non Conveniens Law

Removal to federal court is one tactic in seeking a forum non conveniens dismissal. That is, defendants in state court cases based partly or wholly on foreign events, with claims arising under federal law or having the elements of diversity jurisdiction, may remove the case to federal court to file the forum non conveniens motion. Reasons for removing a case to federal court range from a perception of the federal court's more liberal application of *Gilbert* to an outright unavailability of forum non conveniens in the state court.

Removing the case to federal court will not work if the desired forum is another state in the United States.[1335] This is so because in *American Dredging Co. v. Miller,* the Supreme Court held that federal courts should apply state law in forum non conveniens issues in a domestic setting.[1336] Although the Supreme Court has refrained from ruling on the same question involving a foreign setting,[1337] the negative implication in *American Dredging* nonetheless suggests a uniform federal law of forum non conveniens in cases involving some foreign parties. In spite of the Court's avoidance in *Piper,* this rule has been followed consistently and is clearly the appropriate choice according to Professor Wright.[1338] The First, Fifth, Tenth and Eleventh Circuits have held that federal law applies to forum non conveniens motions in federal courts,[1339] and that a federal court may dismiss for forum non conveniens where a state court would not.[1340]

Plaintiffs hoping to take advantage of state forum non conveniens law, or the lack thereof, will understandably attempt to avoid removal by restricting the prayer for damages to less than the diversity amount until

---

[1334]*See* Howe v. Goldcorp Inv., Ltd., 946 F.2d 944, 948-49 (1st Cir. 1991); Capital Currency Exch., N.V. v. National Westminster Bank PLC, 155 F.3d 603, 607-08 (2d Cir. 1998).

[1335]*See* American Dredging Co. v. Miller, 510 U.S. 433, 456 (1994).

[1336]*Id.*

[1337]*See* Piper Aircraft Co. v. Reyno, 454 U.S. 235, 248 n.13 (1981).

[1338]*See* C. WRIGHT, FEDERAL PRACTICE & PROCEDURE § 3828, at n.42.

[1339]That is, those not governed by 28 U.S.C. § 1404. *See supra* Part II.B.4.

[1340]*See* Seguros Comercial Am. S.A. v. American President Lines, Ltd., 105 F.3d 198, 199 (5th Cir. 1996); Rivendell Forest Products, Ltd. v. Canadian Pac. Ltd., 2 F.3d 990, 993-94 (10th Cir. 1993); Royal Bed & Spring Co. v. Famossul Industria, 906 F.2d 45, 50 (1st Cir. 1990); Sibaja v. Dow Chem. Co., 757 F.2d 1215, 1216-17 (11th Cir. 1985).

the one year removal time has passed under 28 U.S.C. § 1446(b). Defendants will understandably try to establish the potential for a higher recovery. This forum-selection struggle was at issue in *De Aguilar v. Boeing Co.*, a case involving a wrongful death claim in a Texas state court based on an airplane crash in Mexico.[1341] Plaintiffs, or others with related claims, had filed at least four other lawsuits in state and federal courts in the United States, all dismissed either voluntarily, or on grounds of sovereign immunity or forum non conveniens.[1342] In this case, plaintiffs wished to restrict their damages to an amount less than the federal jurisdictional amount, $50,000 at the time, but were thwarted by Texas law which did not allow pleading for a specific amount of damages.[1343] When defendants removed the case to federal court, plaintiffs submitted affidavits stipulating their damages as less than the diversity jurisdiction amount.[1344] The district court denied remand, and the Fifth Circuit affirmed.[1345] Defendants then moved for a forum non conveniens dismissal.[1346] The court noted that in wrongful death cases, forum non conveniens was unavailable in Texas at the time the action accrued,[1347] but because removal was valid, federal law governed forum non conveniens and the case was dismissed.

*Torres v. Southern Peru Copper Corp.*, provides an additional point on removal aimed at dismissal.[1348] *Torres* involved a toxic tort claim by Peruvian citizens against the defendant, a Delaware corporation with its principal place of business in Peru.[1349] The government of Peru submitted a letter to the State Department urging dismissal on the grounds of adverse effects on foreign policy.[1350] The *Torres* court first noted that it could not consider a forum non conveniens motion until it had resolved questions of subject matter jurisdiction.[1351] The court found questions as to subject matter juridiction under both federal question (federal common law regarding the case's implications to United States foreign policy) and

---

[1341]47 F.3d 1404, 1406 (5th Cir. 1995).

[1342]*See id.* at 1406-07.

[1343]*See id.* at 1407.

[1344]*See id.*

[1345]*See id.* at 1408

[1346]*See id.*

[1347]*See id.*

[1348]113 F.3d 540, 542 (5th Cir. 1997).

[1349]*Id.* at 541.

[1350]*See id.* at 542.

[1351]*Id.* at 542-43.

diversity jurisdiction (as a Delaware corporation with its principal place of business in Peru; the defendant was solely a Delaware citizen for diversity purposes, thus creating diversity with the Peruvian plaintiffs).[1352]   Two conclusions flow from *Torres*.   First, a state court defendant seeking a federal ruling on forum non conveniens dismissals must clearly establish federal removal jurisdiction.   Second, removal jurisdiction in a typical state court action may exist not only on diversity grounds, but also as a federal question in cases where foreign policy is implicated by adjudication in the United States of a foreign dispute.

*Torres* must be read, however, in light of the Supreme Court's recent holding in *Ruhrgas AG v. Marathon Oil Co.*[1353]   In *Ruhrgas*, the defendant removed a state action to federal court seeking dismissal on personal jurisdiction grounds, an issue that could have been decided in state court.[1354]   Plaintiff challenged the basis for removal, and in a nine to seven en banc opinion, the Fifth Circuit held that after removal from state court, a federal court must first resolve questions of subject matter jurisdiction before addressing dismissal on personal jurisdiction grounds.[1355]   The Supreme Court reversed, holding that although questions of subject matter jurisdiction should ordinarily be decided first, a federal court has discretion to decide a straightforward question of personal jurisdiction first, if faced with a complex issue of subject matter jurisdiction that is "resolved" by dismissal on personal jurisdiction grounds.[1356]

*Torres* and *Ruhrgas* may be analogous in that both involved the defendant's removal to federal court for a dismissal motion rather than adjudication on the merits.   The analogy is weakened in that forum non conveniens is a discretionary question while personal jurisdiction is a question of law.   In other words, while it may be permissible to dismiss on legal grounds prior to resolving subject matter jurisdiction questions, it may not be permissible to dismiss on discretionary grounds without establishing subject matter jurisdiction.   This point is underscored by the accepted view that forum non conveniens is inapplicable in a court that lacks either subject matter jurisdiction or personal jurisdiction.[1357]   Nonetheless, the Supreme Court's reversal in *Ruhrgas* raises questions about *Torres*.

---

[1352]*Id.* at 543-44.

[1353]526 U.S. 574.

[1354]*Id.* at 587-88.

[1355]*See* Marathon Oil Co. v. A.G. Ruhrgas, 145 F.3d 211, 225 (5th Cir. 1998).

[1356]*See Marathon*, 526 U.S. at 588.

[1357]*See* Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 504 (2d Cir. 1947).

### c. *Enjoining Repetitive Litigation of Foreign Claims Previously Dismissed on Forum Non Conveniens Grounds*

Injuries and deaths in foreign countries often end up as claims in state or federal courts in the United States, if there is a basis for personal jurisdiction. Whether our courts should provide a forum for such claims is controversial.[1358] These claims are sometimes dismissed on forum non conveniens grounds,[1359] but claimants are not always deterred by the first or second dismissal. *Villar v. Crowley Maritime Corp.*, arose from Renerios Villar's drowning death in Saudi Arabia, where he worked for a Saudi corporation on a tug boat registered in Panama.[1360] The Philippino employment contract governing Villar's employment provided that any resulting injuries could be compensated either under Philippine law or Panamanian law.[1361] His survivors, all from the Phillipines, sued first in a California federal court, then in a California state court, then in a Texas state court.[1362] The two California state courts dismissed the cases on forum non conveniens grounds, conditioned on defendants' agreement to litigate in the Philippines.[1363] Plaintiffs did not sue in the Philippines, in Saudi Arabia, or in Panama, but instead brought a third claim in Texas

---

[1358]*See generally* George D. Brown, *The Ideologies of Forum Shopping: Why Doesn't a Conservative Court Protect Defendants?*, 71 N.C. L. REV. 649 (1993)) (identifying inconsistencies in the Supreme Court's treatment of federal law vs. state law forum shopping and state law vs. state law forum shopping); Laurel E. Miller, *Forum Non Conveniens and State Control of Foreign Plaintiff Access to U.S. Courts in International Tort Actions*, 58 U. CHI. L. REV. 1369 (1991) (stating that the federal courts' interpretation of the forum non coveniens doctrine has closed the federal courts' doors to foreign plaintiffs); William L. Reynolds, *The Proper Forum for a Suit: Transnational Forum Non Conveniens and Counter-Suit Injunctions in the Federal Courts*, 70 TEX. L. REV. 1663 (1992) (examining the effects of expansive interpretations of forum non conveniens on transactional litigation); David W. Robertson, *The Federal Doctrine of Forum Non Conveniens: An Object Lesson in Uncontrolled Discretion*, 29 TEX. INT'L L.J. 353 (1994); Linda J. Silberman, *Developments in Jurisdiction and Forum Non Conveniens in International Litigation: Thoughts on Reform and a Proposal for a Uniform Standard*, 28 TEX. INT'L L.J. 501 (1993) (discussing forum shopping as part of a responsible litigator's job as well as legislation in Texas that permits forum non conveniens dismissal where it was previously unavailable); Russell J. Weintraub, *International Litigation and Forum Non Conveniens*, 29 TEX. INT'L L.J. 381 (1994) (advocating understandable choice of law rules for liability issues).

[1359]*See, e.g.*, De Melo v. Lederle Labs., 801 F.2d 1058, 1059 (8th Cir. 1986).

[1360]990 F.2d 1489, 1492 (5th Cir. 1993).

[1361]*See id.*

[1362]*See id.* at 1492-93

[1363]*See id.* at 1492.

state court.[1364]   The suit was removed to federal court and dismissed on grounds of lack of personal jurisdiction (as to some defendants) and forum non conveniens.[1365]   On its own motion, the federal trial court enjoined plaintiffs from filing any other action "in any other state or federal court in the United States."[1366]   The Fifth Circuit affirmed,[1367] holding that since the Anti-Injunction Act[1368] applies only to pending state actions the court could enjoin plaintiffs from future filings both in federal courts, citing *Harrelson v. United States*,[1369] and in state courts.   An injunction against repetitive litigation has been issued in a domestic setting limited to federal courts.[1370] However, in a federal-state setting, litigation may be barred by the Anti-Injunction Act, under which the Supreme Court limits antisuit injunctions to matters actually decided in the federal action.[1371]

### 4. Dismissal or Stay of In Rem Cases

The requirements are somewhat clearer and more predictable for in rem litigation, that is, cases involving jurisdiction over property that is at least theoretically within the court's possession.   In these cases, the first-filed rule is applied far more uniformly, with fewer exceptions based on misconduct and forum shopping.   The general rule is that the court first obtaining jurisdiction over the property be allowed to adjudicate the matter without interference.[1372]   The doctrine is attributed to the *Princess Lida* case, involving a dispute over a trust in parallel domestic cases.[1373]   The Court stated the rule broadly:

> We have said that the principle applicable to both federal and state courts that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other, is not restricted to cases where property has been actually seized . . . but

---

[1364]*See id.* at 1493.

[1365]*See id.*

[1366]*Id.*

[1367]*See id.* at 1499.

[1368]28 U.S.C. § 2283 (1994). *See supra* Part V.D.2.

[1369]613 F.2d 114, 116 (5th Cir. 1980).

[1370]*See* Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1518 (9th Cir. 1983).

[1371]*See* Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 148 (1988);  *see also* Deus v. Allstate Ins. Co., 15 F.3d 506, 524 (5th Cir. 1994).

[1372]*See* Princess Lida v. Thompson, 305 U.S. 456, 466 (1939).

[1373]*Id.*

> applies as well where suits are brought to marshal assets, administer trusts, or liquidate estates, *and in suits of a similar nature where, to give effect to its jurisdiction, the court must control the property.*[1374]

The italicized phrase embraces quasi in rem jurisdiction, now disapproved in the United States to the extent that it authorizes jurisdiction based only on the presence of defendant's unrelated property in the forum.[1375]    In fact, in *Princess Lida* the state court's jurisdiction was described as quasi in rem,[1376] even though the state court action related to a Pennsylvania trust and sought an accounting and specific performance by the trustee, all seemingly in rem matters.[1377]    Nevertheless, because of *Shaffer*'s disapproval of quasi in rem jurisdiction, the rule should currently be read without the italicized phrase, but only in regard to parallel actions within the United States.  Where the first-filed case is in a foreign forum that exercises quasi in rem jurisdiction, arguably, the *Princess Lida* rule mandates deference to that first-filed case, even though its language is limited to "federal and state courts."[1378]

*Princess Lida*'s rule for state and federal courts applies equally where one of the actions is foreign.[1379]  In *Dailey v. The National Hockey League*, the Third Circuit dismissed a United States action in deference to a parallel Canadian action involving a trust, stating that the *Princess Lida* doctrine is "a 'mechanical rule' which requires that the court in which the second suit is brought yield its jurisdiction if the requisite 'property' showing is made." [1380]  *Dailey* employed a two-part test from *Princess Lida*:  "(1) the litigation in both the first and second fora are in rem or quasi in rem in nature, and (2) the relief sought requires that the second court exercise control over the property in dispute and such property is already under the control of the first court."[1381]

The most common examples are bankruptcy and receiverships, wherein the rule is statutory and perhaps more favorable to local creditors who need

---

[1374]*Id.* (emphasis added).

[1375]*See* Shaffer v. Heitner, 433 U.S. 186, 212 & n.39 (1977).

[1376]305 U.S. at 467.

[1377]*Id.* at 458.

[1378]*Id.* at 466.

[1379]*See* Dailey v. The National Hockey League, 987 F.2d 172, 176 (3d Cir. 1993).

[1380]*Id.* (quoting PPG Industries, Inc. v. Continental Oil Co., 478 F.2d 674, 677 (5th Cir. 1973)).

[1381]*Id.* (citing *Princess Lida*, 305 U.S. at 466); *see also* Poseidon Schiffahrt v. M/S Netuno, 335 F. Supp. 684, 687 (S.D. Ga. 1972) (dismissing in favor of parallel Canadian action).

protection. Federal law requires its courts to defer to foreign bankruptcy proceedings,[1382] "provided the foreign laws comport with due process and fairly treat claims of local creditors."[1383] The Bankruptcy Code further authorizes the dismissal or suspension of a United States bankruptcy action if "there is pending a foreign proceeding" and certain factors are met.[1384] For these purposes, a "foreign proceeding" is one "in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization."[1385] Under these and similar provisions, a number of federal courts have deferred to foreign proceedings.[1386]

There are exceptions, and United States courts need not invariably defer to foreign insolvency proceedings.[1387] In *Underwood* an involuntary bankruptcy petition filed in the United States was held not to violate an injunction by the High Court of Nevis (in Malaysia) against other insolvency proceedings.[1388] This holding is mitigated by the fact that the Nevis court had not formally obtained jurisdiction over the assets, and that its injunction was not operative against the United States creditors who filed the involuntary bankruptcy proceeding.[1389] Nonetheless, the *Underwood* opinion notes that under the United States Bankruptcy Code, the court had the discretion to dismiss the local action, but was not required

---

[1382]*See* 11 U.S.C. § 304 (1994).

[1383]Victrix S.S. Co. v. Salen Dry Cargo, 825 F.2d 709, 714 (2d Cir. 1987) (citing Canada S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883)).

[1384]11 U.S.C. § 305(a)(2)(A)-(B) (1993).

[1385]11 U.S.C. § 101(23) (1994); *see also* Underwood v. Hilliard, 98 F.3d 956, 960 (7th Cir. 1996).

[1386]*See generally* Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 1002 (2d Cir. 1993) (deferring to Australia); Cunard S.S. Co., v. Salen Reefer Servs., 773 F.2d 452, 461 (2d Cir. 1985) (deferring to Sweden); Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 165 B.R. 379, 386 (S.D.N.Y. 1994) (deferring to Peru); Lindner Fund, Inc. v. Polly Peck Int'l PLC, 143 B.R. 807, 810 (S.D.N.Y. 1992) (deferring to the United Kingdom); Caddel v. Clairton Corp., 105 B.R. 366, 368 (N.D. Tex. 1989) (dismissing district court claim in deference to Canadian bankruptcy proceeding); Daniels v. Powell, 604 F. Supp. 689, 698 (N.D. Ill. 1985) (deferring to Bermuda); Kenner Prods. Co. v. Societe Fonciere et Financiere Agache-Willot, 532 F. Supp. 478, 480 (S.D.N.Y. 1982) (deferring to France). The *Pravin, Linder,* and *Caddel* decisions, although reported in the Bankruptcy Reporter, are dismissals of district court claims in deference to foreign insolvency proceedings.

[1387]*See* Underwood v. Hilliard, 98 F.3d 956, 961 (7th Cir. 1996).

[1388]*Id.*

[1389]*See id.*

to do so.[1390]  Similarly, in *Elgin Sweeper Co. v. Melson Inc.*, the court held that the principle of comity and the parties failure to obtain permission from the Canadian court in a pending Canadian bankruptcy proceeding, could be sufficient grounds for dismissal of a related United States action for fraud.[1391]

Forum selection agreements may provide other grounds to override in rem jurisdiction.  For example, in *Bremen*, the Supreme Court vacated and remanded the Fifth Circuit's endorsement of an in rem admiralty case, based on a policy favoring forum selection agreements, thus dismissing the first-filed United States action in deference to a second-filed English action that fulfilled the parties' contractual choice of forum.[1392]

## B.   *Federal Injunctions Against Foreign Litigation*

### 1.   Historical Development

Authorities describe four circumstances for antisuit injunctions:   (1) stopping litigation of the same dispute in another forum;[1393]   (2) consolidating related but not identical claims in the moving party's preferred forum;[1394]  (3) the prevailing party in a completed case, stopping the relitigation in the other forum;[1395] and (4) preventing the opponent from seeking an antisuit injunction in the other forum through an anit-antisuit injunction.[1396]   As with federal antisuit injunctions against parallel state litigation, federal courts derive their injunctive authority from the All Writs Act,[1397] although the power to enjoin foreign litigation may exist independently.[1398]  Unlike federal injunctions against state litigation, federal courts may enjoin parties from foreign litigation without regard to the

---

[1390]*Id.* at 960.

[1391]884 F. Supp. 641, 650 (N.D.N.Y. 1995).

[1392]Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972);  *supra* Part VII.A.2.a.

[1393]*See* Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 887 (3d Cir. 1981);  Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626 (5th Cir. 1996).

[1394]*See* Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 854-55 (9th Cir. 1981).

[1395]*See* Bethell v. Peace, 441 F.2d 495, 498 (5th Cir. 1971);  Scott v. Hunt Oil Co., 398 F.2d 810, 811 (5th Cir. 1968).

[1396]*See* Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 930 (D.C. Cir. 1984);  Owens-Illinois, Inc. v. Webb, 809 S.W.2d 899, 902 (Tex. App.—Texarkana 1991, writ dism'd w.o.j.);  *see generally* BORN, INTERNATIONAL CIVIL LITIGATION, *supra* note 6, at 475.

[1397]28 U.S.C. § 1651 (1994).

[1398]*See* Cole v. Cunningham, 133 U.S. 107, 124 (1890) (stating that courts of equity have power to enjoin parties within their jurisdiction from prosecuting actions in foreign countries).

federalism concerns found in enjoining state court litigation. Those issues are replaced, however, by considerations of comity and deference to foreign policy that can result in an equally difficult standard.

Because of the other disagreements in remedies for parallel litigation, it is no surprise that federal law is split on the requirements for issuing an antisuit injunction against foreign litigation. This split is best understood by briefly recounting the cases sequentially. One of the earlier reported cases is *Gage v. Riverside Trust Co.*, in which defendants were restrained from an action in England on claims regarding loan securities pending in the California federal court.[1399] The court drew from Justice Story, among others, in finding authority to grant the antisuit injunction:

> But, although the courts of one country have no authority to stay proceedings in the courts of another, they have an undoubted authority to control all persons and things within their own territorial limits. When, therefore, both parties to a suit in a foreign country are resident within the territorial limits of another country, the courts of equity in the latter may act in personam upon those parties, and direct them, by injunction, to proceed no further in such suit. In such a case these courts act upon acknowledged principles of public law in regard to jurisdiction. They do not pretend to direct or control the foreign court, but, without regard to the situation of the subject-matter of the dispute, they consider the equities between the parties, and decree in personam according to those equities, and enforce obedience to their decrees by process in personam. . . . It is now held that, whenever the parties are resident within a country, the courts of that country have full authority to act upon them personally, with respect to the subject of suits in a foreign country, as the ends of justice may require, and, with that view, to order them to take, or omit to take, any steps and proceedings in any other court of justice, whether in the same country, or in any foreign country.[1400]

---

[1399]86 F. 984, 999 (C.C.S.D. Cal. 1898).

[1400]*Id.* (citing Story, Eq. Jur. §§ 899, 900).

Although the defendants were British corporations, their offices in Riverside were sufficient to qualify them as residents for purposes of in personam enforcement.[1401]

Prior to *Laker* and the current circuit split,[1402] the legal standard for injunctions against foreign litigation was sometimes slim. In *Bethell v. Peace* the Fifth Circuit enjoined Florida defendants from a quiet title action in the Bahamas in regard to a sale of Bahama property that was negotiated and executed between Florida residents in Florida, and in which the federal court had already ruled on the merits of a related contract issue.[1403] The court's sources for the injunction were a citation to Florida law authorizing injunctions from equity courts and a quote from Professor Ehrenzweig on the point that American courts

> will be willing to enjoin foreign proceedings which involve the same parties and the same cause of action . . . where the foreign suit was brought by a resident of the forum state against another resident of the state to evade a protection provided for the latter under forum law . . . or where the foreign suit would be vexatious in other respects.[1404]

## 2. Current Law

The modern discussion starts with a Fifth Circuit case, *In re Unterweser Reederei, GMBH.*[1405] Zapata's drilling barge was damaged while being towed by Unterweser's tug.[1406] Both parties sued in federal court in Florida, and Unterweser filed an action in the High Court of Justice in

---

[1401]See *id.* at 985.

[1402]*See infra* notes 1488-1496.

[1403]441 F.2d 495, 497 (5th Cir. 1971).

[1404]*Id.* at 498 (quoting from EHRENZWEIG, CONFLICT OF LAWS 129-30 (1962)); *see also* American Home Assurance Co. v. Insurance Corp. of Ireland, Ltd., 603 F. Supp. 636, 643 (S.D.N.Y. 1984) (describing English action enjoined under two-part test: (1) the parties must be the same; and (2) the adjudication of one case must resolve the other); *cf.* Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542, 546 (7th Cir. 1960) (reversing the trial court's injunction against foreign suit having different issues that would not be resolved in the United States action, and there was no evidence that the foreign suit was vexatious or harassing).

[1405]428 F.2d 888 (5th Cir. 1970), *aff'd on reh'g en banc*, 446 F.2d 907 (1971), *rev'd on other grounds sub nom.* Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972). Readers should note that the precedent here is the Fifth Circuit opinion in the *Bremen* case, and not its Supreme Court reversal on other grounds. See *supra* Part VII.A.2.a. for a full discussion of the *Bremen* case and its application to forum selection clauses.

[1406]*See Unterweser,* 428 F.2d at 889.

London.[1407]    The Florida federal court enjoined Unterweser from proceeding in England.[1408]    The Fifth Circuit affirmed, holding that injunctions against foreign litigation were appropriate where the foreign action would "(1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing courts in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations."[1409]    The court then noted that "allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in 'inequitable hardship' and 'tend to frustrate and delay the speedy and efficient determination of the cause.'"[1410]    The Supreme Court reversed on the grounds that the parties' contractual choice of forum designating England required the lower court to dismiss on forum non conveniens grounds unless the forum clause was unreasonable, unjust or invalid.[1411]

In spite of the Supreme Court reversal, the Fifth Circuit *Unterweser* opinion not only retained its vitality for cases not involving forum selection clauses, but picked up an endorsement from the Ninth Circuit in *Seattle Totems Hockey Club, Inc. v. National Hockey League*.[1412]    The owners of the Seattle Totems ice hockey team filed an antitrust action against the National Hockey League, Northwest Sports, and other defendants, alleging "unlawful monopolization of the ice hockey industry in North America."[1413]    The action also sought to void plaintiffs' executory agreement to sell the Totems to Northwest Sports.[1414]    More than two years later, Northwest Sports sued the Totems' owners in Canada for damages for breach of the same agreement.[1415]    The district court enjoined Northwest from pursuing the Canadian action, noting that Northwest's claims were compulsory counterclaims in the United States action.[1416]    Northwest responded that Canadian law governed under the contract's choice of law clause, and that their claims were permissive in Canada.[1417]    The Ninth

---

[1407]*See id.* at 889-90.

[1408]*See id.* at 890.

[1409]*Id.*

[1410]*Id.* at 896.

[1411]*See* Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972); *supra* Part VII.A.2.a.

[1412]652 F.2d 852, 855-56 (9th Cir. 1981).

[1413]*Id.* at 853.

[1414]*See id.*

[1415]*See id.*

[1416]*See id.*

[1417]*See id.* at 853-54.

Circuit upheld the district court's injunction on the grounds that: (1) the compulsory status of Northwest's claims was a procedural issue governed by forum law, and (2) the action should be litigated in one forum.[1418] In doing so, the Ninth Circuit observed that injunctions against foreign litigation should be used sparingly, but justified its use here because of party and witness convenience, the courts' interest in promoting the efficient administration of justice, and the lack of prejudice to Northwest.[1419]

A significant change in reasoning occurred in the D.C. Circuit's opinion in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*,[1420] and current discussions of federal injunctions against foreign litigation turn on its stringent standards. The U.S.-English dispute involved the once-notorious Freddie Laker, perhaps the originator of the cut-rate transatlantic air fare.[1421] When his business eventually failed, Mr. Laker filed an antitrust action against several airlines in a United States district court in Washington, D.C.[1422] The defendant airlines went to an English court to obtain an injunction against Mr. Laker, an English citizen, to stop his United States antitrust action.[1423] Laker then persuaded the United States district court to issue an anti-antisuit injunction against the American and remaining foreign litigants, countering the English injunction.[1424] On appeal, the United States Court of Appeals for the D.C. Circuit rejected the relaxed standard fround in *Unterweser* and *Seattle Totems*, and held instead that antisuit injunctions could only be issued to protect the forum's jurisdiction or to prevent evasion of the forum's important public policies.[1425] Finding these rigid criteria satisfied, the court upheld the injunction against the English antisuit injunction.[1426] The Second Circuit adopted this narrow test in *China Trade & Development Corp. v. M.V. Choong Yong*,[1427] and the D.C. Circuit reaffirmed its decision in *Sea Containers Ltd. v. Stena AB*.[1428]

---

[1418]*See id.* at 854-55.

[1419]*See id.* at 855-56.

[1420]731 F.2d 909 (D.C. Cir. 1984).

[1421]*See id.* at 916-17.

[1422]*See id.* at 917.

[1423]*See id.* at 917-18.

[1424]*See id.* at 918-19.

[1425]*See id.* at 927-28.

[1426]*See id.* at 956.

[1427]837 F.2d 33, 36 (2d Cir. 1987). For a pre-*China Trade* decision in the Second Circuit, using broader standards to justify an antisuit injunction, see Garpeg, Ltd. v. United States, stating that "a foreign action should be enjoined 'when it would (1) frustrate a policy in the forum

This decision created a tie among the circuit courts that was broken in Sixth Circuit's 1992 opinion in *Gau Shan Co., v. Bankers Trust Co.*[1429] *Gau Shan* provided a valuable explanation of the various circuits' positions and the underlying policies, and has additional merit because it involved parallel litigation in a routine international business transaction (as opposed to an American litigant's attempt to prosecute United States antitrust law in foreign countries), thus illustrating the underlying policy concerns in a more typical lawsuit.[1430]

It began in October 1989, when the People's Republic of China approached the Gau Shan Company ("Gau Shan"), a Hong Kong cotton merchant, about buying American cotton.[1431] Gau Shan in turn contacted one of its American suppliers, the Julien Company of Memphis, Tennessee ("Julien").[1432] Julien financed its cotton trading through Bankers Trust Company of New York ("Bankers Trust"), and it was through Julien that Gau Shan had first dealt with Bankers Trust.[1433] On Bankers Trust's assurances that it would finance the large transaction, Gau Shan contracted with the People's Republic to ship fifteen million metric tons of cotton, for two shipments in late October 1989.[1434]

Julien, however, had a momentary problem, a $20 million outstanding debt to LOR, Ltd. ("LOR"), for prior unpaid cotton acquisitions that undermined Julien's ability to acquire more cotton.[1435] Bankers Trust, which apparently worked quite closely with Julien, agreed that it would structure the Gau Shan deal so as to buoy Julien's finances.[1436] Bankers Trust then advised Gau Shan that it could not advance the loan money to Julien (to acquire the cotton) unless Gau Shan signed a $20 million

---

issuing the injunction, (2) be vexatious, (3) threaten the issuing court's in rem or quasi in rem jurisdiction or (4) where the proceedings prejudice other equitable considerations.' Similarly, an injunction is appropriate if adjudication of the same issue in separate actions would result in 'unnecessary delay, substantial inconvenience and expense to the parties and witnesses, and where separate adjudications could result in inconsistent rulings or a race to judgment.'" 538 F. Supp. 789, 798 (S.D.N.Y. 1984) (quoting Cargill, Inc. v. Hartford Accident & Indem. Co., 531 F. Supp. 710, 715 (D. Minn. 1982)).

[1428]890 F.2d 1205, 1214 (D.C. Cir. 1989).
[1429]956 F.2d 1349, 1349 (6th Cir. 1992).
[1430]*Id.* at 1351.
[1431]*See id.*
[1432]*See id.*
[1433]*See id.*
[1434]*See id.*
[1435]*See id.*
[1436]*See id.*

promissory note payable to Bankers Trust.[1437]  Gau Shan agreed under protest, and signed the note which contained a New York choice of law clause.[1438]

Bankers Trust then instructed Julien that Gau Shan would pre-pay for the cotton with the proceeds of the $20 million note.[1439]  Bankers Trust would credit the $20 million to Julien's account, and then debit that account to pay the unrelated debt to LOR.[1440]  LOR would then release cotton for shipment to Mocatta Fixtures Corporation ("Mocatta"), an unrelated transaction.[1441]  Mocatta would, in turn, pay Julien for the cotton, which would be used to buy the Gau Shan cotton.[1442]  No one told Gau Shan of these aspects of the deal.[1443]  On October 26, 1989, Bankers Trust deposited $20 million in Julien's account, then wired the money to LOR.[1444]  The arrangement did not work out as planned from that point, resulting in Julien's shipment to China of only about 24% of the cotton agreed upon.[1445]  Gau Shan thus only partially performed its contract with the People's Republic.[1446]

In February 1990, Gau Shan received Bankers Trust's demand on the $20 million note, with a warning that Bankers Trust would sue to collect in Hong Kong if payment was not received by February 26.[1447]  Gau Shan ignored the demand and instead filed suit in federal district court in Memphis, seeking rescission of the note and damages for fraud and negligence.[1448]  In addition, Gau Shan feared that if Bankers Trust were allowed to proceed in Hong Kong, it could take advantage of a local legal procedure called a "Deed of Charge," which would permit Bankers Trust "to appoint a receiver of its choice for Gau Shan without court approval," who would then have the power to seize Gau Shan's assets, discharge its employees, and abandon the Tennessee federal litigation, all without court oversight.[1449]  The Sixth Circuit analogized this to an "authorization to

---

[1437]*See id.*
[1438]*See id.*
[1439]*See id.*
[1440]*See id.*
[1441]*See id.*
[1442]*See id.*
[1443]*See id.*
[1444]*See id.*
[1445]*See id.*
[1446]*See id.*
[1447]*See id.* at 1351-52.
[1448]*See id.* at 1352.
[1449]*Id.* at 1352, 1356.

confess judgment," which was a violation of public policy under the controlling New York law.[1450] Gau Shan accordingly moved to enjoin Bankers Trust from suing in Hong Kong.[1451] After a hearing on "international comity" issues, in which the federal district court determined that Gau Shan would suffer irreparable harm and that it would likely succeed on the merits because of Bankers Trust's lies both in the transaction and in the hearing, the court granted an antisuit injunction, which succeeded the temporary restraining order it had already granted.[1452] Bankers Trust appealed.[1453] The Sixth Circuit noted at the outset the opposing policies.[1454] First, "American courts have the 'power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions.'"[1455] This contrasts with the idea that "'parallel proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one [jurisdiction] which can be pled as res judicata in the other.'"[1456] As to how to resolve these conflicting policies, the court noted that the circuits were split and that the Sixth Circuit had not addressed the question.[1457]

The court analyzed the circuit split as follows: The Fifth and Ninth Circuit Courts hold that "'foreign litigation may be enjoined when it would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing courts [sic] in rem or quasi in rem jurisdiction, or (4) where the proceedings prejudice other equitable considerations.'"[1458] On the other side of the split, the Second and D.C. Circuit Courts have a narrower view, holding that a foreign antisuit injunction may only be granted "(1) to protect the forum's jurisdiction, or (2) to prevent evasion of the forum's important public policies," and that "a duplication of the parties and issues, alone, is not sufficient to justify a

---

[1450]*Id.* at 1356 n.1.

[1451]*See id.* at 1352.

[1452]*See id.*

[1453]*See id.* at 1351.

[1454]*See id.* at 1352-53.

[1455]*Id.* at 1352 (quoting Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926) (D.C. Cir. 1984)).

[1456]*Id.* (quoting *Laker Airways*, 731 F.2d at 926-27).

[1457]*See id.* at 1352-53.

[1458]*Id.* (quoting Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir. 1981)).

foreign antisuit injunction."[1459] With these opinions as the range of standards, the appellate court noted that the district court had not adopted either of the opposing views, and instead

> used elements from each and found that 'because parallel proceedings duplicate the parties and issues, the federal courts' important public policy of a just, speedy and inexpensive determination of every action under Fed.R.Civ.P. 1 and 13 would be evaded should Bankers Trust be permitted to sue Gau Shan in Hong Kong.[1460]

Having noted the range of precedents and the lower court's lack of adherence to any of them, the court began its ruling with a policy statement:

> Comity dictates that foreign antisuit injunctions be issued sparingly and only in the rarest of cases. The days of American hegemony over international economic affairs have long since passed. The United States cannot today impose its economic will on the rest of the world and expect meek compliance, if indeed it ever could. The modern era is one of world economic interdependence, and economic interdependence requires cooperation and comity between nations. In an increasingly international market, commercial transactions involving players from multiple nations have become commonplace. Every one of these transactions presents the possibility of concurrent jurisdiction in the courts of the nations of the parties involved concerning any dispute arising in the transaction.[1461]

The present case was a prime example, and included plaintiff Gau Shan's request "to disregard the principles of international comity and affirm the issuance of an antisuit injunction which effectively denies the Hong Kong court jurisdiction over a matter otherwise properly before it, and reserves to a United States court exclusive jurisdiction over a dispute involving parties from different nations."[1462]

---

[1459]*Id.* at 1354 (citing China Trade and Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987)); *Laker Airways*, 731 F.2d at 928.

[1460]*Id.*

[1461]*Id.* (citation omitted).

[1462]*Id.*

The court also noted *Laker Airways*'s concern that while an antisuit injunction does not, in theory, "interfere in a foreign court's jurisdiction, it 'effectively restrict[s] the foreign court's ability to exercise its jurisdiction.'"[1463] The very issuance of the injunction restricts the Hong Kong court's jurisdiction by preventing (or at least discouraging) Bankers Trust from bringing suit there.[1464] Moreover, if both parties were to obtain antisuit injunctions, "both actions will be paralyzed and neither party will be able to obtain any relief" and "[t]he more readily courts resort to this extraordinary device, the more frequently this sort of undesirable stalemate will occur."[1465] Thus:

> The inappropriate use of antisuit injunctions can have unintended, widespread effects. International commerce depends in no small part on the ability of merchants to predict the likely consequences of their conduct in overseas markets. Predictability depends in turn on an atmosphere of cooperation and reciprocity between nations. The issuance of antisuit injunctions threatens predictability by making cooperation and reciprocity between courts of different nations less likely.[1466]

Following these policy underpinnings, the *Gua Shan* court rejected the district court's conclusion that the antisuit injunction "was justified in order to prevent 'vexatious' litigation in Hong Kong that would delay and complicate the litigation already pending in its court."[1467] The court held instead that it should adopt the stricter standards from *Laker Airways* and *China Trade*.[1468] The court explained this standard saying it would

---

[1463] *Id.* (quoting *Laker Airways*, 731 F.2d at 927).

[1464] *See id.*

[1465] *Id.* at 1354-55.

[1466] *Id.* at 1355.

[1467] *Id.* The appellate court further found that "the district court's reasoning . . . is more properly the analysis to be used when considering a motion for dismissal of a case on *forum non conveniens* grounds rather than a motion for a foreign antisuit injunction." *Id.*

[1468] *See id.* Specifically, the court stated that "[t]he policies of avoiding hardships to the parties and promoting the economies of consolidated litigation 'do not outweigh the important principles of comity that compel deference and mutual respect for concurrent foreign proceedings. Thus, the better rule is that duplication of parties and issues alone is not sufficient to justify issuance of an antisuit injunction.'" *Id.* (quoting *Laker Airways*, 731 F.2d at 928). The court further stated that "[f]actors such as 'vexatiousness' or 'oppressiveness' and a 'race to judgment' are 'likely to be present whenever parallel actions are proceeding concurrently.'" *Id.* (quoting China Trade and Dev. Corp. v. M.V. Choong Yang, 837 F.2d 33, 36 (2d Cir. 1987).

"consider only two factors in determining whether Bankers Trust should be enjoined from proceeding in its Hong Kong action: 1) whether this court's jurisdiction is threatened by the Hong Kong action, and 2) whether this court's important public policies are being evaded by the Hong Kong action."[1469]

The court then examined whether an injunction against the Hong Kong litigation was necessary to protect its own jurisdiction or uphold important forum policies.[1470] As to protecting the court's jurisdiction, the court identified two possibile situations that could require injunctions.[1471] The first was for in rem or quasi in rem cases, which this was not.[1472] The second addressed in personam actions where the foreign court attempts to "'carve out exclusive jurisdiction over the action.'"[1473] The court observed that this second possibility had prompted an antisuit injunction in *Laker Airways*, where the foreign lawsuit was not an action on the merits, but was filed solely to enjoin the United States action.[1474] In this case, however, Gau Shan had offered nothing to show such interference.[1475] Bankers Trust had agreed not to seek an antisuit injunction from the Hong Kong court, and not to exercise its receivership rights under the feared Deed of Charge.[1476]

The court then turned to the second grounds, noting that:

> While an injunction may be appropriate when a party attempts to evade compliance with a statute of the forum that effectuates important public policies, an injunction is not appropriate merely to prevent a party from seeking "slight advantages in the substantive or procedural law to be applied in a foreign court."[1477]

Gau Shan argued two procedural policies were being undermined by the Hong Kong litigation. First, under the rules of civil procedure the court has a duty to provide for "'the just, speedy, and inexpensive determination

---

[1469]*Id.*

[1470]*See id.*

[1471]*See id.* at 1356.

[1472]*See id.*

[1473]*Id.* (quoting *China Trade*, 837 F.2d at 36).

[1474]*See id.* (citing Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 915 (D.C. Cir 1984)).

[1475]*See id.* at 1356-57.

[1476]*See id.*

[1477]*Id.* at 1357 (quoting *China Trade*, 837 F.2d at 37, in turn quoting *Laker Airways*, 731 F.2d at 931 n.73).

of every action.'"[1478] Second, Gau Shan argued Bankers Trust was required to file a compulsory counterclaim in the United States action rather than raise it in a separate suit, which would promote the policy of preventing a "'multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters.'"[1479] But these arguments, the court noted, should be directed to a forum non conveniens dismissal motion rather than an antisuit injunction.[1480]

Gau Shan next argued that permitting the Hong Kong action to go forward to judgment might deny Gau Shan its treble damages remedy under Tennessee law, thereby subverting that state's policies.[1481] The court also rejected this argument, pointing out that: (1) "courts rarely resort to public policy as a basis for refusing to enforce a foreign judgment;"[1482] (2) "the unavailability of a treble damages remedy in Hong Kong is not so 'repugnant to fundamental notions of what is decent and just' as to permit the issuance of an antisuit injunction;"[1483] and (3) that to the extent that Tennessee policies were affected here, they were entitled to less weight in considering a foreign antisuit injunction than the policies of the United States, which Gau Shan had not referenced.[1484] Finding no justification under the two areas of inquiry - protecting jurisdiction and public policy - the Sixth Circuit dissolved the injunction against the Hong Kong litigation.[1485]

In the current circuit split on standards for antisuit injunctions, the Fifth, Seventh and Ninth Circuits have the more liberal standard, permitting an injunction if the foreign action "would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing courts [sic] in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations."[1486] The Second,

---

[1478]*Id.* (quoting FED. R. CIV. P. 1).

[1479]*Id.* (quoting Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 854 (9th Cir. 1981) in turn quoting Southern Construction Co. v. Pickard, 371 U.S. 57, 60 (1962)).

[1480]*See id.*

[1481]*See id.*; TENN. CODE ANN. § 47-50-109 (Michie 1995).

[1482]*Gau Shan,* 956 F.2d at 1358 (citing Tahan v. Hodgson, 662 F.2d 862, 866 (D.C. Cir. 1981)).

[1483]*Id.* at 1358 (quoting *Tahan,* 662 F.2d at 866).

[1484]*See id.*

[1485]*See id.* at 1358-59.

[1486]Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir. 1981); *see also* Allendale Mut. Ins. Co. v. Bull Data Sys., Inc. 10 F.3d 425, 428-33 (7th Cir. 1993); Unterweser Reederei, GMBH v. M/S Bremen, 428 F.2d 888, 890 (5th Cir. 1970), *aff'd on*

Sixth and D.C. Circuits have a stricter standard, limiting foreign antisuit injunctions: (1) to protect the forum's jurisdiction, or (2) to prevent evasion of the forum's important public policies.[1487] This view includes the concept that a "duplication of the parties and issues, alone, is not sufficient to justify a foreign antisuit injunction."[1488] *China Trade* added that the need to protect a federal court's jurisdiction from a parallel foreign action usually occurs when: (1) the jurisdiction is in rem or quasi in rem, or (2) in in personam actions, the foreign proceeding is an attempt to establish exclusive jurisdiction over the dispute.[1489] This narrower standard has been affirmed without significant discussion in the Eleventh Circuit, after adoption by an Alabama federal district court.[1490]

*Gau Shan* broke a tied circuit split concerning the standard applied to enjoining foreign lawsuits, and the other votes are not yet in. The Fifth Circuit examined the circuit split in *Kaepa, Inc. v. Achilles Corp.*, restating its own standard from *Unterweser* and *Bethell*, and noting that the Seventh and Ninth Circuits had more or less adopted this standard.[1491] The court then found that "other circuits have employed a standard that elevates principles of international comity to the virtual exclusion of essentially all other considerations."[1492] The court further expressed its disagreement with the stricter standard:

> Achilles urges us to give greater deference to comity and apply the latter, more restrictive standard. We note preliminarily that, even though the standard espoused in *Unterweser* and *Bethell* focuses on the potentially vexatious nature of foreign litigation, it by no means excludes the consideration of principles of comity. We decline, however, to require a district court to genuflect before a vague and omnipotent notion of comity every

---

*reh'g*, 446 F.2d 907 (1971), *rev'd on other grounds sub. nom.* Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).

[1487]*See Gau Shan*, 956 F.2d at 1353; Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1212-15 (D.C. Cir. 1989); China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 36 (2d Cir. 1987); Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 927-33 (D.C. Cir. 1984).

[1488]*Gau Shan*, 956 F.2d at 1355 (quoting *Laker Airways*, 731 F.2d at 928).

[1489]*China Trade*, 837 F.2d at 36-37. *See also Gau Shan*, 956 F.2d at 1356.

[1490]*See* Mutual Serv. Cas. Ins. Co. v. Frit Indus., Inc., 805 F. Supp. 919, 924-25 (M.D. Ala. 1992), *aff'd*, 3 F.3d 442 (11th Cir. 1993) (unpublished table decision).

[1491]76 F.3d 624, 626-27 (5th Cir. 1996).

[1492]*Id.* at 627 (citing *Gau Shan*, 956 F.2d at 1355; *China Trade*, 837 F.2d at 36; *Laker Airways*, 73 F.2d at 927, 937).

time that it must decide whether to enjoin a foreign action.[1493]

In regard to these distinct tests, the Seventh Circuit has complained,

> Comity—the respect that sovereign nations . . . owe each other—is a traditional, although in the nature of things a rather vague, consideration in the exercise of equitable discretion. . . . An injunction that has the effect of dictating the outcome of a suit in an Argentine court could conceivably though improbably ruffle relations between the United States and Argentina. Fear of that consequence has led some courts to withhold injunctive relief in such cases unless necessary to head off an "irreparable miscarriage of justice," while other courts are content with a lesser showing of a need for the relief - perhaps nothing more than a duplication of the parties and the issues, the sort of thing that might suffice where "respect for a co-equal sovereign's jurisdiction is not implicated."[1494]

### 3. Miscellaneous Points

A hasty conclusion in the international setting is reliance on the first-filed rule, which was never meant to apply in cases where the two courts were not of the same sovereignty.[1495]  But this is not true of the first-to-judgment rule.  Although foreign judgments are subject to more scrutiny than domestic ones whose recognition is compelled by full faith and credit, nonetheless the first case to judgment has preclusive effect whether the forum is foreign or domestic.[1496]

This does not mean, however, that filing first is not important to antisuit injunctions or any other tactical issue in litigation.  Both the strict *Laker*

---

[1493]*Id.*

[1494]Phillips Med. Sys. Int'l B.V. v. Bruetman, 8 F.3d 600, 604-05 (7th Cir. 1993) (citations omitted).

[1495]*See* Newman and Zaslowsky, INTERNATIONAL COMMERCIAL DISPUTES, *supra* note 1165, at 136-37 (citing Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 887 n.10 (3rd Cir. 1981)).

[1496]*See Laker Airways*, 731 F.2d at 926-27 & n.48.; Kline v. Burke Const. Co., 260 U.S. 226, 230 (1922).  Courts sometimes use the first-to-judgment approach to deny an injunction against a pending foreign case.  *See Compagnie des Bauxites* 651 F.2d at 887 (denying an injunction against parallel English litigation).

test and the more liberal *Unterweser* test identify the protection of the forum's public policy as a consideration in enjoining foreign litigation.[1497] Accordingly, if the first-filed rule is an important forum public policy, then it would be a factor in enjoining the second-filed foreign action. By filing first, parties thus gain: (1) the advantage of that presumption of priority; (2) the choice of forum; and (3) maybe the choice of law (in that the forum's choice of law rules will control). But if there is no injunction, then being the first to judgment is crucial for preclusion purposes.

There may be an exception in the "last-in-time rule" which provides, at least in the United States, that preclusive effect must be given to the last judgment rendered.[1498] The rule is articulated in *Treinies v. Sunshine Mining Co.*, where the Supreme Court held that when the first court reaches a valid and final judgment in a matter, and a second court erroneously fails to give preclusive effect to that first judgment, then the first judgment holder must appeal the second court's error.[1499] Failure to appeal results in the second judgment taking precedence over the first, both as to enforcement and as to preclusive effect in any later litigation.[1500] The appeal of the second court's error could reach the Supreme Court under a Full Faith and Credit Clause argument, and failure to seek certiorari in the second case presumptively waives all rights under the first judgment.

A question arises as to how this might be treated where the second court is foreign, thus barring direct appeal to the Supreme Court, and ruling out the Full Faith and Credit Clause argument. If the only issue is the foreign judgment's preclusive effect (presumably in yet a third case), then there is no basis for Supreme Court review and under *Treinies*, the second judgment is preclusive.[1501] But if the issue is enforcement, the foreign judgment must be domesticated under a state law such as the Texas Uniform Foreign Country Money Judgment Act.[1502] The recognition and enforcement procedure creates an opportunity for appeal, although not for United States Supreme Court review since foreign judgment enforcement is now deemed a state law question by most courts, state and federal.[1503] In

---

[1497]*See Gau Shan*, 956 F.2d at 1353-54; *In re* Unterweser Reederei, GMBH, 428 F.2d 888, 895 (5th Cir. 1970).

[1498]*See* Treinies v. Sunshine Mining Co., 308 U.S. 66, 77-78 (1939).

[1499]*Id.*

[1500]*See id.*

[1501]*See id.* at 77-78.

[1502]TEX. CIV. PRAC. & REM. CODE ANN. §§ 36.001 et seq. (Vernon 1997 & Supp. 2000).

[1503]*See* Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1003 (5th Cir. 1990) (applying Texas law to reject enforcement of Abu Dhabi judgment).

*BAYLOR LAW REVIEW* [Vol. 51:4]

those few federal and state jurisdictions that characterize foreign judgment enforcement as a question of federal law, the local party would still have a basis of Supreme Court review.[1504]

Antisuit injunctions against foreign litigation may raise constitutional issues, both in state and federal courts, although this concept is limited to scholarly speculation at this point. Bermann has described two potential problems.[1505] The first, applicable to federal courts, is a separation of powers concern regarding foreign policy, although no cases have yet addressed this issue.[1506] The second applies to state courts, which, in enjoining foreign litigation, may invade foreign policy interests reserved to the federal government.[1507] This, too, has not been raised in case law.[1508]

Professor Reynolds notes a marked reluctance to issue an antisuit injunction, at least if the foreign action is impartial.[1509] He points out Judge Wilkey's statement in *Laker Airways* that an injunction "should be granted only for vexatious conduct by the defendant which requires equitable relief, to protect the forum's jurisdiction, or to protect an important forum policy."[1510] Reynolds agrees with Professor Bermann that courts must be "wary of imposing our views on others," given the anti-suit injunction's extraordinary impact -- both personal and political -- in the foreign forum."[1511] Courts have also noted the antisuit injunction's effect on the foreign court's powers, and that an injunction against a party is tantamount to enjoining the foreign court.[1512]

---

[1504]*See* EUGENE SCOLES & PETER HAY, CONFLICT OF LAWS 999-1003 (2d Ed. 1992) (providing a discussion of federal and state courts in each position).

[1505]*See* Bermann, *Anti-Suit Injunctions, supra* note 36, at 604-05.

[1506]*See id.*

[1507]*See id.* at 605.

[1508]*See id.*

[1509]*See* William L. Reynolds, *The Proper Forum for a Suit: Transnational Forum Non Conveniens and Counter-suit Injunctions in the Federal Courts,* 70 TEX. L. REV. 1663, 1712 (1992).

[1510]*Id.* (citing Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 928-33 (D.C. Cir. 1984)).

[1511]*Id.* at 1713 (citing George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation,* 28 COLUM. J. TRANSNAT'L L., 589, 629 (1990)); *see also* Trevor C. Hartley, *Comity and the Use of Antisuit Injunctions in International Litigation,* 35 AM. J. COMP. L. 487 (1987).

[1512]*See* Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am., 651 F.2d 877, 887 (3rd Cir. 1981); Canadian Filters (Harwich) Ltd., v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir. 1969); Garpeg, Ltd., v. United States, 583 F.Supp. 789, 798 (S.D.N.Y. 1984); Laker Airways, Ltd. v. Pan American World Airways, 559 F. Supp. 1124, 1128 n.14 (D.D.C. 1983); Medtronic, Inc. v. Catalyst·Research Corp., 518 F.Supp. 946, 955 (D.Minn. 1981), *aff'd* 664 F.2d 660 (8th Cir. 1981). For a discussion of three other significant recent cases, see Andreas F. Lowenfeld, *Forum*

If the issuance of a foreign antisuit injunction is problematic, whether to honor the foreign court's antisuit injunction is equally so. In *Laker Airways*, the D.C. Circuit discussed a court's range of responses to a foreign court's antisuit injunction:

> Long experience derived from this country's federal system teaches that a forum state may, but need not, stay its own proceedings in response to an antisuit injunction against a party before the court. This is consistent with the general rule permitting concurrent proceedings on transitory causes of action. In extreme cases it may even be necessary to issue a counterinjunction to thwart another state's attempt to assert exclusive jurisdiction over a matter legitimately subject to concurrent jurisdiction.[1513]

The court continued that in interstate conflicts, the Full Faith and Credit Clause does not mandate the recognition of sister state antisuit injunctions, and concluded that the same result should be available here.[1514] Professor Bermann proposes a more open-minded judicial reception of foreign court orders involving interlocutory or provisional relief.[1515]

## VIII. STATE COURTS AND FOREIGN LITIGATION

There is a surprising paucity of state court opinions on parallel foreign litigation throughout United States history. It may be that few state/foreign parallel cases were filed until recently because of the low incidence of international interaction -- there was comparatively little international

---

*Shopping, Antisuit Injunctions, Negative Declarations, and Related Tools of International Litigation*, 91 AM. J. INT'L L. 314 (1997) (discussing parallel disputes involving courts in the United States and, respectively, Australia, Japan, and England). The Australian dispute is updated in Andreas F. Lowenfeld, *Forum Non Conveniens and Antitsuit Injunctions: An Update*, 92 AM. J. INT'L L. 41 (1998); *see also* Markus Lenenbach, *Antisuit Injunctions in England, Germany, and the United States: Their Treatment Under European Civil Procedure and the Hague Convention*, 20 LOY. L.A. INT'L & COMP. L.J. 257 (1998); Edward F. Sherman, *Antisuit Injunctions and Notice of Intervention and Preclusion: Complementary Devices to Prevent Duplicative Litigation*, 1995 B.Y.U. L. REV. 925 (1995); Steven R. Swanson, *The Vexatiousness of a Vexation Rule: International Comity and Antisuit Injunctions*, 30 GEO. WASH. J. INT'L L. & ECON. 1 (1996); Louise Ellen Teitz, *Taking Multiple Bites of the Apple: A Proposal to Resolve Conflicts of Jurisdiction and Multiple Proceedings*, 26 INT'L LAW. 21 (1992).

[1513]731 F.2d at 933-34 (footnotes omitted).

[1514]*See id.* at 934.

[1515]*See* George A. Bermann, *Provisional Relief in Transnational Litigation*, 35 COLUM. J. TRANSNAT'L L. 553, 615-17 (1997).

commerce, and where it existed parties were not in position to file two lawsuits simultaneously. There are, however, many examples of a party obtaining a foreign judgment and trying to enforce it here.

Another reason may be that state court cases were removed to federal court based on diversity between the local citizen and the foreign person or corporation; easily-found examples span this century.[1516] Yet another reason is that the interlocutory remedies discussed here, (i.e. the motions for stay, dismissal and injunction) may not have been appealable under state law, or if appealable, may not have been appealed, or may not have been reported. In any event, there is little case law from which to derive historic trends or current views.

For the cases that do exist, states have mixed and matched the tests used in federal courts. This analysis does not differ significantly from that of federal courts, but one de-emphasized element is the need for non-interference with foreign sovereigns. On the other hand, foreign litigation often magnifies the parties' concerns regarding distance and convenience, and intensifies the perception that the other lawsuit is vexatious or harassing, thus leading state courts to protect local parties by ignoring a forum selection clause pointing to a foreign tribunal, or enjoining a party from pursuing foreign litigation.

## A. Transferring the Case

As with interstate parallel litigation, it is not currently possible to transfer duplicate international actions, and there are no current proposals for a means to transfer in uniform or model acts or proposed conventions.

## B. Dismissing or Staying the Local Case

Dismissals are usually available only for: (1) in rem cases; (2) enforcement of a forum selection clause; or (3) granting of forum non conveniens motion.[1517] Other examples of pending parallel cases between a state court in the United States and one in a foreign country are subject to a strong presumption favoring jurisdiction. Where relief is granted it is almost always in the form of a stay, and generally under the doctrine of comity. Cases invoking comity to stay a local case in deference to a

---

[1516] *See* Ronar, Inc. v. Wallace, 649 F.Supp. 310, 319 (S.D.N.Y. 1986) (removing case to seek stay, unsuccessfully, regarding parallel West German action); Gage v. Riverside Trust Co., 86 F. 984, 989 (S.D. Cal. 1898) (removing case to obtain antisuit injunction against related suit in England).

[1517] *See supra* Part I.C.3.

foreign one do not provide much guidance, although the first-filed rule is evident, as noted below. As in other sections of this article, the term "abatement" is unclear and may mean either stay or dismissal, depending on the usage that state adopted after the merger of law and equity.[1518]

## 1. Comity

Some state's laws reflect a strong presumption for exercising jurisdiction, which is consistent with *Colorado River*'s underlying premise.[1519] For example, "[i]n Illinois, the rule is that the mere pendency of a lawsuit in a foreign country is not a bar to proceedings in our courts."[1520] Similarly,

> [t]he pendency of the action in the Republic of Mexico is not a bar to the institution of another action between the same parties and for the same cause of action in the courts of California, nor was it the duty of the Superior Court to stay the action pending the determination of the earlier suit in Mexico, even though the entire controversy might be there disposed of. As a matter of comity, although not a matter of right, the court had power to continue the case if the circumstances warranted such action.[1521]

The courts' willingness to ignore foreign parallel actions goes beyond commercial lawsuits to matters such as family law.[1522] On the other hand, some states will readily stay a local action in deference to an earlier filed foreign action.

> The pendency of an action in a court of competent jurisdiction *will* abate a later action filed in a court of like jurisdiction. *Birnholz v. Steisel*, 338 So. 2d 862 (Fla. 3d DCA 1976). Abatement is proper where the two pending

---

[1518] *See id.*

[1519] *See* discussion *supra* Part V.C.1.

[1520] Dayan v. McDonald's Corp., 382 N.E.2d 55, 58 (Ill. App. Ct. 1978) (affirming denial of stay in an action to enjoin McDonald's from terminating restaurant franchise in France).

[1521] Pesquera del Pacifico v. Superior Court, 201 P.2d 553, 554-55 (Cal. Ct. App. 1949) (denying stay in action for damages for seizure of raw shelled clams); *see also* Mexican Cent. Ry. Co. v. Charman, 24 S.W. 958 (Tex. Civ. App. 1894, no writ) (holding that an in personam parallel foreign action is not grounds for abatement, citing Drake v. Brander, 8 Tex. 352 (1849)).

[1522] *See, e.g.,* Farah v. Farah, 323 N.E.2d 361, 368-69 (Ill. App. Ct. 1975) (denying stay in Illinois/Lebanon parallel divorce actions).

actions involve the same parties and *substantially* the same causes of action.[1523]

Florida's apparently strong language (parallel foreign action "will abate" a later-filed Florida action) is modified in *Maraj v. Maraj*:

> Generally, Florida courts will acknowledge priority in favor of foreign courts first exercising concurrent jurisdiction.
>
> However, here, we cannot say that the trial court's decision departed from the essential requirements of law. There remains a degree of trial court discretion in applying comity principles where supported, as here, by the record.[1524]

As with the cases presuming against stays, here too the subject matter goes beyond contract and tort to family law.[1525]

New York has statutory law providing for discretionary dismissal of parallel actions involving courts within New York, as well as conflicts with sister-states' courts, and with United States federal courts.[1526] The law does not apply to actions in foreign courts,[1527] although New York courts may stay a local action that is identical to a foreign action.[1528] Illinois also statutorily provides an involuntary dismissal where "there is another action pending between the same parties for the same cause"[1529] which applies in deference to first-filed actions in foreign countries.[1530] However, dismissal

---

[1523]Banco Bilbao Vizcaya, S.A. v. Naiz, S.A., 615 So. 2d 233, 234 (Fla. Dist. Ct. App. 1993) (emphasis added) (discussing actions for fraud in Florida and Spain; "abate" apparently means "stay").

[1524]642 So. 2d 1103, 1104 (Fla. Dist. Ct. App. 1994) (involving parallel divorce actions in Florida and Trinidad-Tobago) (citations omitted).

[1525]*See* Mary F.B. v. David B., 447 N.Y.S.2d 375, 378 (N.Y. Fam. Ct. 1982) (involving parallel divorce actions in New York and France).

[1526]*See* N.Y. C.P.L.R. § 3211(a)(4) (Consol. 1994).

[1527]*See* Abkco Industries, Inc. v. Lennon, 377 N.Y.S.2d 362, 367-68 (N.Y. 1975) (denying dismissal under Rule 3211(a)(4) of parallel actions in New York and England regarding contract dispute between the Beatles and their management company); *accord Mary F.B.*, 447 N.Y.S.2d at 377.

[1528]*See, e.g.*, American Marine Ins. Group v. Price Forbes, Ltd., 560 N.Y.S.2d 638, 639 (N.Y. App. Div. 1990) (affirming stay of local action pending outcome of English lawsuit).

[1529]735 ILL. COMP. STAT. ANN. 5/2-619(a)(3) (West 1992).

[1530]*See* Kapoor v. Fujisawa Pharm. Co., 699 N.E.2d 1095, 1100 (Ill. App. Ct. 1998) (holding that the crucial test is whether the actions "arise out of same transaction or occurrence, not whether legal theory, issues, burden of proof or relief sought materially differ." *Id.*).

is discretionary, and the foreign action is not an outright bar to the Illinois proceedings.[1531]

Interestingly, there are no Texas reported opinions dismissing or staying a local action in deference to one in a foreign country, although Texas courts have done so for interstate parallels.[1532] The applicable rule - that while a foreign action is not grounds for dismissal, it may be appropriate for a stay - would seemingly apply to foreign country actions.

Another notable absence is a dismissal by any state court of a second-filed in rem case in deference to a foreign court's having assumed jurisdiction over the res. This apparent nullity is not caused by a non-occurrence of international parallel litigation concerning in rem issues. To the contrary, state courts have dismissed local cases in response to a foreign case that appears to be in rem,[1533] but the opinions turn on traditional comity rules that could apply to in personam cases, rather than a more definitive "Princess Lida" rule requiring the dismissal of a second-filed in rem case.[1534] Presumably that rule applies equally in this state-foreign setting, but when faced with the question, courts have chosen to act on a less stringent standard. Nonetheless, the rule does appear to be universal, as stated in a federal opinion involving a foreign conflict, "[a] long-standing exception to the usual rule tolerating concurrent proceedings has been recognized for proceedings in rem or quasi in rem, because of the threat a second action poses to the first court's basis for jurisdiction."[1535] The Second Circuit based this statement on two cases that did not involve a foreign conflict: *Donovan v. City of Dallas*,[1536] a state-federal conflict, and *Princess Lida v. Thompson*,[1537] an interstate conflict. *China Trade* was a federal-foreign conflict, and the apparent cross-application of these precedents supports the notion that they apply equally to state courts faced with first-filed in rem cases in foreign courts.

One ongoing issue that will vary from state to state is the degree of similarity required to grant a stay. As noted above, Florida case law

---

[1531]*See* Dayan v. McDonald's Corp., 382 N.E.2d 55, 58 (Ill. App. Ct. 1978).

[1532]*See supra* Part II.B.5.; *see, e.g.,* Project Eng'g USA Corp. v. Gator Hawk, Inc., 833 S.W.2d 716 (Tex. App.—Houston [1st Dist.] 1992, no writ).

[1533]*See, e.g.,* Safety-Kleen v. Canadian Universal Ins. Co., 631 N.E.2d 475, 484 (Ill. App. Ct. 1994) (dismissing an Illinois case in deference to Canadian court's orders regarding receivership).

[1534]*See supra* Part VII.A.4.

[1535]China Trade & Dev. Corp. v. M.V. Choong Yang, 837 F.2d 33, 36 (2d Cir. 1987).

[1536]377 U.S. 408, 408 (1964).

[1537]305 U.S. 456, 456 (1939); *supra* Part VII.A.4.

provides for stays in parallel actions that are merely "substantially the same."[1538] On the other hand, courts are likely to scrutinize allegations of parallel lawsuits for differences that remove the parallelism.[1539]

## 2. Forum Selection Agreements

Many states now enforce forum selection clauses.[1540] Examples of enforcement involving foreign judicial or arbitral tribunals include California,[1541] Florida,[1542] Georgia[1543] and Illinois.[1544]

New York statutorily endorses certain forum agreements, requiring that state courts honor forum clauses in transactions of $1 million or more that are subject to New York law.[1545] New York civil procedure further protects forum clauses by providing that

> the court shall not stay or dismiss any action on the ground
> of inconvenient forum, where the action arises out of or
> relates to a contract, agreement or undertaking to which
> section 5-1402 of the general obligations law applies, and
> the parties to the contract have agreed that the law of this
> state shall govern their rights or duties in whole or in
> part.[1546]

States using the Uniform Foreign Money Judgment Recognition Act (UFMJRA or "the Act") may provide another endorsement for forum clauses.[1547] The Act is a means of filing a foreign judgment for collection

---

[1538]*See* Banco Bilbao Vizcaya, S.A. v. Naiz, S.A., 615 So. 2d 233, 234 (Fla. Dist. Ct. App. 1993).

[1539]*See, e.g.*, Rocha Toussier y Asociados, S.C. v. Rivero, 457 N.Y.S.2d 798, 800 (App. Div. 1983) (denying stay in parallel actions in New York and Mexico regarding corporate management).

[1540]*See supra* Part IV.B.3.

[1541]*See generally* CQL Original Prods., Inc. v. National Hockey League Players' Ass'n, 46 Cal. Rptr. 2d 412, 416 (Ct. App. 1995) (enforcing Canada forum clause).

[1542]*See generally* Colonia Ins. Co. v. Assuranceforeningen Skuld, 588 So. 2d 1009, 1011 (Fla. Dist. Ct. App. 1991) (enforcing Sweden forum clause).

[1543]*See generally* Bradley v. British Fitting Group, PLC, 472 S.E.2d 146, 149 (Ga. Ct. App. 1996) (enforcing England forum clause).

[1544]*See generally* Whirlpool Corp. v. Certain Underwriters at Lloyd's London, 662 N.E.2d 467, 469-71 (Ill. App. Ct. 1996) (enforcing England forum clause).

[1545]*See* N.Y. GEN. OBLIG. LAW § 5-1402(1) (Consol. Supp. 1998).

[1546]N.Y. C.P.L.R. 327(b) (Consol. Supp. 1998). *See also* Gio, Buton, & C., S.p.A. v. Mediterranean Importing Co., Inc., 510 N.Y.S.2d 171, 172 (App. Div. 1986) (upholding dismissal based on forum clause designating the Court of Bologna, Italy).

[1547]UNIF. FOREIGN MONEY-JUDGMENTS RECOGNITION ACT § 3, 13 U.L.A. 265 (1986).

without necessarily going through the motions (literally) of the common law enforcement method, which requires filing a new lawsuit using the foreign judgment as a basis for summary judgment.[1548] The UFMJRA simplifies this somewhat, depending on the aspects of its adoption in a specific state. The Texas version of the Act enumerates seven grounds for nonrecognition, including that "the proceeding in the foreign country court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court."[1549] This would appear to apply to creditors who obtain judgments in violation of a forum clause designating any forum or arbitral tribunal other than the one issuing the judgment. To obtain this protection, however, a defendant or judgment debtor must attempt to enforce the forum clause. In *Dart v. Balaam*, judgment debtor Dart sought to avoid the Texas execution on an Australian judgment obtained in violation of a forum clause pointing to Vanuatu.[1550] Both the trial and appellate courts rejected the defense because Dart made no attempt to enforce the forum clause.[1551]

### 3. Forum Non Conveniens

This section will briefly cite to trends in other states' laws, followed by a closer look at Texas law.[1552] In reviewing forum non conveniens cases, readers should note that states such as Texas distinguish between plaintiffs who are residents of the United States and foreign plaintiffs.[1553] Thus, readers should treat this discussion only as the brief overview that it is, without concluding anything specific about any state's law in an interstate or international setting.

Almost all states now have a version of forum non conveniens law, and most are based on the federal model following *Gulf Oil v. Gilbert*,[1554] as noted in a 1990 article.[1555] Although the article's discussion is narrowly focused on personal injury and wrongful death, it appears to be the most complete recent attempt at assessing states' forum non conveniens laws. One significant event since that article's publication is the Florida Supreme

---

[1548]*See, e.g.*, Interamerican Lambs Wool Prods., Ltd. v. Doxsee Food Corp., 642 S.W.2d 823, 825 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.).

[1549]TEX. CIV. PRAC. & REM. CODE ANN., § 36.005(b)(5) (Vernon 1997).

[1550]953 S.W.2d 478, 479 (Tex. App.—Fort Worth 1997, no writ).

[1551]*See id.* at 482.

[1552]*See supra* Part VII.A.3.a. for a discussion of the history of forum non conveniens law.

[1553]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(a)-(b) (Vernon 1997).

[1554]330 U.S. 501, 501 (1947).

[1555]*See* Robertson & Speck, *supra* note 269 at 950-51.

Court's adoption of the federal forum non conveniens approach in *Kinney System, Inc. v. Continental Insurance Co.*,[1556] which also enacted emergency Rule of Civil Procedure 1.061 to implement the change.[1557] No other significant changes since the article's publication were found, although there are updated cases in California[1558] and New York.[1559] Georgia still does not subscribe to the forum non conveniens doctrine, and Louisiana has a restricted doctrine.[1560]    Of course, the doctrine's applications no doubt vary significantly from state to state, and several may have doctrines as restrictive as that of Louisiana.

Texas has three sources of forum non conveniens law: two statutes and a common law model based on *Gulf Oil v. Gilbert*. The first statute, section 71.051 of the Texas Civil Practice and Remedies Code, applies only to wrongful death and personal injury claims, and distinguishes between plaintiffs who are legal United States residents, and plaintiffs who are not.[1561] As to non-United States residents, section 71.051(a) authorizes a discretionary application of traditional forum non conveniens, as follows:

> if a court of this state, on written motion of a party, finds
> that in the interest of justice a claim or action to which this
> section applies would be more properly heard in a forum
> outside this state, the court may decline to exercise
> jurisdiction under the doctrine of forum non conveniens
> and may stay or dismiss the claim or action in whole or in
> part on any conditions that may be just.[1562]

---

[1556]674 So. 2d 86, 93 (Fla. 1996).

[1557]*See id.* at 94-95 (quoting the text of that rule).

[1558]*See generally* Stangvik v. Shiley, Inc., 819 P.2d 14 (Cal. 1991) (applying California's forum non conveniens statute to stay an action pending trials in two related cases in Sweden and Norway in a products liability action for a defective heart valve).

[1559]*See generally* Brooke Group, Ltd. v. JCH Syndicate 488, 663 N.E.2d 635 (N.Y. 1996) (dismissing for refiling in England); Zelouf v. Republic Nat'l Bank, 640 N.Y.S.2d 15 (App. Div. 1996) (dismissing in favor of pending English action);  State of Romania v. Former King Michael, 622 N.Y.S.2d 704 (App. Div. 1995) (granting dismissal in action by Romanian government against former king, for the return of art objects, based on claims under a 1899 will); Islamic Republic of Iran v. Pahlavi, 464 N.Y.S.2d 487 (N.Y. App.Div. 1983) (dismissing claim to seize assets from the estate of the former Shah of Iran).

[1560]*See* Miller v. American Dredging Co., 595 So. 2d 615 (1992) (rejecting federal forum non conveniens law in favor of more restrictive Louisiana law in maritime case), *aff'd*, 510 U.S. 443 (1994).

[1561]TEX. CIV. PRAC. & REM. CODE ANN. § 71.051 (Vernon Supp. 1999).

[1562]*Id.*

Section 71.051 was a 1993 legislative overruling of *Dow Chemical Co. v. Alfaro*, in which the Texas Supreme Court held that the Texas wrongful death statute (section 71.031) did not permit forum non conveniens dismissals.[1563]    Although this ruling has been clearly rejected by the enactment of section 71.051, one holdover case is the thoroughly-litigated claim by Philippine resident Chick Kam Choo for her husband's death in Singapore.[1564] Having suffered a forum non conveniens dismissal in federal court for her claims under federal and Texas law, Choo was left with only a claim under Singapore law, which she filed in a Texas state court in 1984.[1565] Exxon moved for dismissal on the grounds that her claim was governed by federal maritime law, which preempted Texas forum non conveniens law.[1566] The trial court dismissed, but the court of appeals reversed.[1567] The Texas Supreme Court affirmed and reinstated her case, based on the United States Supreme Court's ruling in *American Dredging Co. v. Miller*[1568] that federal law does not preempt state forum non conveniens law.[1569] Although the current Texas forum non conveniens law pertinent to Choo's claim would perhaps be identical to the federal maritime analysis, the fact that Choo had filed her claim prior to the 1993 enactment of section 71.051 meant that her claim was governed by the *Alfaro* holding, thus eliminating forum non conveniens.[1570]

Plaintiffs who are United States residents are considered in section 71.051(b), which statutorily recites *Gilbert*-like factors.[1571]    If Texas plaintiffs are joined with foreign plaintiffs (whether United States residents or not), the action may not be stayed or dismissed under the test in section 71.051(b) if the action arose from a single occurrence, although dismissal is mandatory under section 71.051(e) if a party was joined solely to create Texas jurisdiction, that is, to avoid forum non conveniens.[1572]

The second statute, section 71.052 of the Texas Civil Practice and Remedies Code, addresses claims for personal injury or wrongful death,

---

[1563]786 S.W.2d 674, 679 (Tex. 1990).

[1564]*See* Exxon Corp. v. Choo, 881 S.W.2d 301, 301 (Tex. 1994).

[1565]*See id.* at 302-03.

[1566]*See id.* at 303.

[1567]*See id.*

[1568]510 U.S. 443, 447 (1994).

[1569]*See Exxon*, 881 S.W.2d at 304.

[1570]*See id.*

[1571]*See supra* Part IV.B.4.

[1572]*See* Tex. Civ. Prac. & Rem. Code Ann. § 71.051(b),(e) (Vernon Supp. 2000).

caused by asbestosis, filed by nonresidents.[1573] This statute was enacted in response to large numbers of claims from plaintiffs in other states in the United States and has little impact on foreign country residents.[1574]

All other causes of action are governed by common law forum non conveniens, which follows the *Gulf Oil* test.[1575] A recent example is *Seguros Commercial America S.A. v. American President Lines, Ltd.*, an action in Texas by the subrogated insurer against shipper for the loss of cargo that had been hijacked at gunpoint in Mexico.[1576] The shipment had originated in Hong Kong and was being shipped to Mexico City.[1577] The contact with Texas was that after receipt of the Cargo in Long Beach, California, it was shipped by rail to San Antonio and from there by truck to Laredo, Texas, where it went through customs.[1578] Another shipper took over in Nuevo Laredo, and en route to Mexico City, the cargo was hijacked and stolen.[1579] The insurer, Seguros, sued both the original shipper and the one who took over in Nuevo Laredo and was in possession at the time of the theft.[1580] The plaintiff sued in Texas in spite of overwhelming contacts with Mexico.[1581] Noting these contacts, the trial court dismissed for forum non conveniens, and the court of appeals affirmed in spite of plaintiff's argument that the Texas legislature had abolished forum non conveniens in cases involving foreign corporations with permits to do business in Texas, which plaintiff Seguros had.[1582] The appellate court found that Texas general corporations law did permit foreign corporations to sue in Texas without worrying about forum non conveniens motions, but that plaintiff Seguros, as a foreign casualty insurer, was not governed by the Texas Business Corporations Act, but instead by the Texas Insurance Code, which made Seguros subject to a forum non conveniens motion.[1583]

---

[1573]Tex. Civ. Prac. & Rem. Code Ann. § 71.052 (Vernon Supp. 2000).

[1574]*See generally* Senate Bill Analysis, TX C.S.S.B. 220, 75th Leg. R.S. (1997).

[1575]*See* In re Smith Barney, Inc., 975 S.W.2d 593, 596 (Tex. 1998); Sarieddine v. Moussa, 820 S.W.2d 837, 839-40 (Tex. App.—Dallas 1991, writ denied) (holding forum non conveniens is not precluded by a forum selection clause).

[1576]966 S.W.2d 652, 653 (Tex. App.—San Antonio 1998, no writ).

[1577]*See id.*

[1578]*See id.*

[1579]*See id.*

[1580]*See id.*

[1581]*See id.*

[1582]*See id.* at 654.

[1583]*See id.*

Until recently, foreign corporate plaintiffs authorized to do business in Texas were exempt from forum non conveniens dismissals.[1584] This changed in 1998, and they are now subject to having actions dismissed.[1585]

A common tactic in state courts is to remove the case to federal court, provided a basis for federal court jurisdiction exists, and then move to dismiss on forum non conveniens grounds.[1586] Alternatively, a common tactic for plaintiffs is to structure the state court lawsuit so as to avoid removal.[1587]

Finally, state courts applying forum non conveniens in international disputes must consider constitutional limitations. The Supremacy Clause restricts states from denying access to their courts in violation of a treaty.[1588] The foreign relations power may further restrict states' ability to limit access to courts.[1589]

### 4. Another Dismissal Ground: Due Process and the Fair Play and Substantial Justice Test

Another grounds for dismissal in cases involving foreign parties or events may be available from the constitutional test for personal jurisdiction.[1590] That test is the subject of considerable disagreement, but a popular view is that it has two components. The first requires that a nonresident have some contact with the forum under one of several "contact theories."[1591] The second component is that even with a contact, the forum may not exercise personal jurisdiction inconsistent with "traditional notions of fair play and substantial justice."[1592] Most cases in which personal jurisdiction is lacking result from the lack of sufficient

---

[1584]*See* H. Rouw Co. v. Railway Exp. Agency, 154 S.W.2d 143, 145 (Tex. Civ. App.—El Paso 1941, writ ref'd), *overruled by In re* Smith Barney, Inc., 975 S.W.2d 593, 598 (Tex. 1998).

[1585]*See In re* Smith Barney, 975 S.W.2d at 595-98; *see also* discussion *supra* Part IV.B.4.

[1586]*See, e.g.*, Torres v. Southern Peru Copper Corp., 113 F.3d 540, 541-42 (5th Cir. 1997).

[1587]*See, e.g.*, De Aguilar v. Boeing Co., 47 F.3d 1404, 1414-15 (5th Cir. 1995) (holding that plaintiffs' attempt to restrict damages to less than $50,000 was ineffective to defeat removal of case to district court, where it was then dismissed for forum non conveniens).

[1588]*See* Clark v. Allen, 331 U.S. 503, 517 (1947); United States v. Pink, 315 U.S. 203, 230-31 (1942).

[1589]*See* EUGENE SCOLES & PETER HAY, § 11.16 (2d ed. 1992); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 84 comment i; Bermann, *supra* note 36 at 604-06.

[1590]*See* International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

[1591]*See id.* at 319.

[1592]*Id.* at 316 (borrowing the term from prior cases and using it to form a new jurisdictional model).

contacts.[1593]   Some, however, rest on the fair play and substantial justice test, a five-factor balancing test[1594] that strongly resembles the *Gulf Oil v. Gilbert* forum non conveniens test.[1595]   The fair play and substantial justice test measures the parties' interests and convenience, as well as that of the affected states or countries, and includes a vague reference to "the interstate judicial system's interest in obtaining the most efficient resolution of controversies."[1596]   This "interstate" interest was expanded, where appropriate, to include the "interests of other nations."[1597]

Thus, the due process test for amenability has elements that may provide an additional opportunity (that must be exercised at the outset of litigation) for dismissal based on the existence of another pending case. Although there are no examples available of a pending parallel case being a factor in declining personal jurisdiction, it is conceivable that the parallel filing in a United States court could be challenged on the basis of fairness and convenience.   One case that does offer support for this notion is *Asahi*, a product liability claim in California arising from a single motorcycle accident allegedly caused by a tire blowout.[1598]   The local plaintiff settled with the tire manufacturer, Cheng Shen of Taiwan.[1599]   But Cheng Shen wished to pursue its third party claim against Asahi, the Japanese valve manufacturer allegedly at fault.[1600]   Although it was clear that California had personal jurisdiction over Cheng Shen, and reasonably clear that it would have had personal jurisdiction over Asahi if the plaintiff had sued Asahi, the Supreme Court upheld Asahi's challenge to California's personal jurisdiction, where the only remaining claim was that of a foreign party, Cheng Shen.[1601]   The Court reasoned that when the local plaintiff settled, the forum state's interest was negated, thus shifting the balance in Asahi's favor.[1602]

---

[1593]*See, e.g.*, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 299 (1980); Hanson v. Denckla, 357 U.S. 235, 254 (1958).

[1594]*See* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985) (citing *World-Wide Volkswagen*, 444 U.S. at 292).

[1595]330 U.S. 501, 508-09 (1947).

[1596]*Burger King Corp.*, 471 U.S. at 477 (upholding personal jurisdiction based on fairness to the parties involved).

[1597]Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 115 (1987) (declining to find personal jurisdiciton because of a lack of forum state interest in the lawsuit).

[1598]*Id.* at 105-06.

[1599]*See id.* at 106.

[1600]*See id.*

[1601]*See id* at 113-14.

[1602]*See id.* at 114-16.

The *Asahi* analysis applies to a local case with multiple international parties and a foreign parallel case. If the local parties' claims are resolved, or if the local parties are significantly outnumbered by foreign parties, then the forum's interest may be sufficiently small such that personal jurisdiction is lacking. Interestingly, under *Asahi* it does not seem to matter that the underlying event occurred in the forum.[1603]

While it is true that the fair play and substantial justice test resembles the test for forum non conveniens because both the elements and the underlying policies are substantially the same, the advantage in a personal jurisdiction argument is that it has constitutional underpinnings absent in forum non conveniens. Thus, a personal jurisdiction challenge can lead to Supreme Court review, while a forum non conveniens argument in state court cannot. The disadvantage in a personal jurisdiction challenge is that it must be made at the outset of the litigation. Having to wait for local parties to settle may mean losing the opportunity to make the argument. The personal jurisdiction argument should be equally applicable in federal court.[1604]

## C. Enjoining the Foreign Litigation

### 1. The Basic Standard

Roscoe Pound observed the state's inherent power to enjoin foreign litigation, but cautioned against overuse:

> Undoubtedly a state may coerce its citizens not to sue abroad. It does not follow, however, that its courts of equity . . . ought to exercise such jurisdiction in every case where it exists. We have to ask: What are the legal rights of the plaintiff in equity, defendant abroad, and are the legal remedies which are open to him adequate to maintain those rights? We have then to ask, is the injustice and hardship upon the plaintiff such as to make it expedient for equity to act, in view of the delicate considerations involved in interference with legal proceedings in other states?[1605]

---

[1603]*See id.* at 105.

[1604]*See* FED. R. CIV. P. 4(k)(1)(A); *see, e.g.*, Bullion v. Gillespie, 895 F.2d 213, 215 (5th Cir. 1990).

[1605]Roscoe Pound, *The Progress of the Law 1918-1919: Equity*, 33 HARV. L. REV. 420, 426 (1920) cited in Bermann, *supra* note 36 at 594 & n.22.

Despite this inherent power, there are few examples of state courts enjoining parties from pursuing cases in foreign courts and standard principles are difficult to derive. Texas is one of the states that has announced standards and has used them repeatedly to deny both interstate and international antisuit injunctions. *Gannon v. Payne* is the foundational case in Texas, drawing from both *Laker Airways* and *Seattle Totems* to impose a restrictive standard.[1606]

Robert Payne and Fred Gannon were partners in an oil and gas venture in Alberta Province.[1607] When Gannon unilaterally reduced Payne's profit share by five percent, Payne sued Gannon in Canada and obtained a judgment that became final.[1608] Payne then sued Gannon again in Dallas County, and Gannon filed a parallel claim in Canada seeking a declaration that some of the issues in the Texas suit had been decided in the prior Canadian action.[1609] Next, Payne asked the Texas court to enjoin Gannon from the Canadian action.[1610] While Payne was seeking the Texas injunction, Gannon was also seeking one in Canada although he later withdrew the request.[1611]

The trial court granted Payne's injunction, noting the possibility of interference with its jurisdiction, the extra cost to Payne of the Canadian action, and the disfavor of multiple lawsuits and possible inconsistent judgments.[1612] The court of appeals affirmed.[1613] In its reversal, the Texas Supreme Court confirmed the power of Texas courts to enjoin parties from prosecuting parallel actions in Texas or sister states.[1614] However, where sister states were concerned, necessarily involving a second sovereignty, "the power to enjoin proceedings pending in a foreign jurisdiction should be exercised sparingly and only by reason of very special circumstances."[1615] Moreover, "[w]hen the sovereigns involved are not sister states but a state and a foreign nation, the policy of allowing parallel

---

[1606]706 S.W.2d 304, 307-08 (Tex. 1986).

[1607]*See id.* at 305.

[1608]*See id.*

[1609]*See id.*

[1610]*See id.*

[1611]*See id.* at 307.

[1612]*See id.*

[1613]*See* Gannon v. Payne, 695 S.W.2d 741, 745 (Tex. App.—Dallas 1985), *rev'd*, 706 S.W.2d 304 (Tex. 1986).

[1614]*See Gannon*, 706 S.W.2d at 305-06.

[1615]*Id.* at 306.

court proceedings to continue simultaneously requires more scrupulous adherence."[1616]

With the statement that enjoining parallel litigation in foreign countries requires "more scrupulous adherence" to the "special circumstances" standard, the Texas Supreme Court implicitly held for the first time that Texas courts could enjoin parties from prosecuting actions in foreign countries.[1617]   Then the court turned to the applicable standards and attendant problems. The court applied a comity standard, drawn from the standard definition in *Hilton v. Guyot* as "the recognition which one nation allows . . . another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."[1618] The foremost problem with this less-than-black-letter standard, particularly in regard to enjoining a parallel case, was the injunction's reception in the foreign court.  As to this, the court noted:

> No state or nation can demand that its laws have effect beyond the limits of its sovereignty . . . . Only comity can compel courts to act in a manner designed to advance the rule of law among and between nations.  An anti-suit injunction necessarily restricts a foreign court's ability to exercise its jurisdiction.  The foreign court cannot be compelled to recognize such an injunction, and if it responds by issuing a similar injunction, no party may be able to obtain a remedy.[1619]

The court then noted the lack of precise guidelines and the varying standards used in federal courts, from the stricter *Laker Airways* to the more liberal *Seattle Totems* and *Bethell*.[1620]

---

[1616]*Id.*

[1617]*See id.* at 306-07.

[1618]159 U.S. 113, 163-64 (1895).

[1619]*Gannon*, 706 S.W.2d at 306-07 (citations omitted).

[1620]*See id.* at 307.  The court observed,

> Some courts have issued anti-suit injunctions to protect their own jurisdiction or to prevent evasion of important public policies of the forum nation. *Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909.  Other courts have enjoined the prosecution of foreign actions to prevent a multiplicity of suits or to protect a party from vexatious or harassing litigation.

*Id.*(citing *Seattle Totems Hockey Club, Inc. v. National Hockey League*, 652 F.2d 852; *Bethell v. Peace*, 441 F.2d 495 (5th Cir. 1971)).

Without adopting any particular standard, but examining the request before it in terms of the range of standards, the court found Payne's injunction request to be without merit.[1621]  First, in applying the *Laker Airways* test, the court found that Gannon's Canadian action was neither a subversion of public policy nor an attempt "to carve out exclusive jurisdiction in this case."[1622] Second, under the *Seattle Totems* standard, the court held that a single parallel proceeding in a party's home country was not a "multiplicity," and that "the possibility of inconsistent judgments does not justify an injunction" because of the operation of res judicata in both Canada and Texas.[1623] Finally, the court found no indication that the Canadian suit was vexatious or harassing.[1624] Although Payne had already spent some $24,000 on the Texas action (which could be wasted if the Canadian action came to judgment first), such expenses could not be considered without creating a standard that would justify an injunction in every parallel case.[1625]

Because Payne's facts did not satisfy any of the exceptional circumstances raised by the court, his injunction was reversed.[1626]  More importantly, the Texas Supreme Court established that Texas courts could enjoin litigants from parallel litigation in foreign countries, but only under the strictest of standards.[1627]  *Gannon* noted the conflicting federal standards between *Laker Airways* and *Seattle Totems* but embraced neither. Instead, the court listed four aggregate factors that these opinions have used to justify foreign antisuit injunctions, and rather than stating them as standards under Texas law, merely held that the facts before the court were insufficient to meet any of the four standards.[1628] A prior Texas decision,

---

[1621]*See id.* at 308.

[1622]*Id.* at 307.

[1623]*Id.*

[1624]*See id.*

[1625]*See id.* at 307-08.

[1626]*See id.* at 308.

[1627]*See id.*

[1628]*See id.* Other standards have been suggested. Professor Bermann provides a fifth: the presence of a pre-existing and independent obligation not to file another suit, such as a forum selection clause or an arbitration agreement. *See* Bermann, *supra* note 36, at 595-96. Bermann also points out possible constitutional limitations on state court injunctions against foreign country litigation, suggesting that they may invade foreign policy interests reserved to the federal government. *See id.* at 604-05. This issue has not been litigated. *See id.*

however, did appear to adopt two of the standards: preventing a multiplicity of lawsuits, and preventing vexatious or harassing lawsuits.[1629]

Although *Gannon* did not expressly adopt the four standards it cited from other cases, the Texas Supreme Court did adopt standards in *Golden Rule Insurance Co. v. Harper*, rejecting an antisuit injunction against an Illinois case.[1630] The *Golden Rule* standards resemble those for forum non conveniens dismissals, and may be the result of a hasty reading of *Gannon*, or a well-considered decision to follow the Fifth Circuit's more generous view in granting antisuit injunctions. On the other hand, if the Texas Supreme Court has in fact adopted the more lax Fifth Circuit standard, it has used that standard to reject the three latest requests for antisuit injunctions—two affecting sister states and one involving Canada.[1631] Thus, despite an apparent embracing of the Fifth and Ninth Circuits' liberal *standards* for granting antisuit injunctions, the Texas Supreme Court has embraced the very restrictive *attitude* of the Second, Sixth and D.C. Circuits as embodied in the *Laker Airways* case, from which *Gannon* quotes heavily.

The Texas antisuit injunction standard appears to be the same for injunctions against sister-state litigation and foreign country litigation, as illustrated in *Christensen* and *Golden Rule*, both of which rely on *Gannon* without distinguishing between sister state settings and foreign settings. This result ignores the *Gannon* opinion, which noted that when antisuit injunctions in multiple litigation did not involve sister states, but rather a state and a foreign nation, the policy of permitting parallel actions to continue simultaneously requires more scrupulous adherence to the standards, that is, the court should be more reluctant to enjoin foreign litigation.[1632]

Antisuit injunctions are most often seen in commercial and tort cases, but also occur in domestic relations actions. In *Jacobsen v. Jacobsen*, the court upheld the trial court's injunction against the Canadian wife, directing her not to proceed with a Canadian divorce action.[1633] The appellate court found no Texas precedent authorizing an antisuit injunction

---

[1629]*See* University of Texas v. Morris, 162 Tex. 60, 344 S.W.2d 426, 428 (1961); *see also* Repka v. American Nat'l Ins. Co., 148 Tex. 542, 186 S.W.2d 977, 979-80 (1945).

[1630]925 S.W.2d 649, 651-52 (Tex. 1996); *supra* Part IV.C.1.

[1631]The two interstate parallel cases are Christensen v. Integrity Ins. Co., 719 S.W.2d 161 (Tex. 1986), and Golden Rule Ins. Co. v. Harper, 925 S.W.2d 649 (Tex. 1996), both discussed *supra* Part IV.C. *Gannon* is the Canadian parallel dispute.

[1632]*Gannon*, 706 S.W.2d at 306.

[1633]695 S.W.2d 44, 48 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

ordering a foreign citizen not to proceed with a lawsuit in that person's home country, but found sufficient persuasive authority from other jurisdictions.[1634]

## 2. Anti-Antisuit Injunctions

The D.C. Circuit upheld what is currently the best known anti-antisuit injunction in the *Laker Airways* case.[1635] A Texas appellate court offered its version of *Laker Airways* in *Owens-Illinois, Inc. v. Webb*, affirming an anti-anti-injunction to prevent parties from obtaining an anti-injunction suit in British Columbia.[1636] The underlying action was for one hundred and eighteen Canadian plaintiffs in an asbestosis action against Texas corporate defendants, for injuries arising in Canada.[1637] The Texas corporations filed a parallel action in Canada seeking to enjoin the Canadian plaintiffs from the Texas action.[1638] However, the Texas trial court enjoined the Texas defendants from seeking the Canadian anti-suit injunction.[1639] The appellate court affirmed, pointing to Texas's power to regulate its own corporate citizens' conduct outside of Texas territory.[1640]

---

[1634]*See id.* at 47-48.

[1635]731 F.2d 909, 956 (D.C. Cir. 1984); *supra* Part VII.B.2.

[1636]809 S.W.2d 899, 903 (Tex. App.—Texarkana 1991, writ dism'd w.o.j.).

[1637]*See id.* at 900.

[1638]*See id.*

[1639]*See id.*

[1640]*See id.* at 904. The court relied in part on the RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, which provides that a state has prescriptive jurisdiction (the power to apply its law) over "the activities, interests, status, or relations of its citizens outside as well as within its territory . . . " *See* § 402(2) (1987); *see also* James v. Grand Trunk Western R.R. Co., 152 N.E.2d 858, 867 (Ill. 1958) (granting an anti-antisuit injunction). The *Gannon* case was almost an anti-antisuit injunction case: Payne's initial request to enjoin the Canadian proceedings was made at a time when Gannon was seeking an antisuit injunction from the Canadian court, but Gannon later withdrew his injunction request. *See* Gannon v. Payne, 706 S.W.2d 304, 307 (Tex. 1986).